# 21-88 (L)

21-96 (XAP), 21-114 (XAP)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

CASEY CUNNINGHAM, CHARLES E. LANCE, STANLEY T. MARCUS, LYDIA PETTIS, and
JOY VERONNEAU, individually and as representatives of a class of participants and
beneficiaries on behalf of the Cornell University Retirement Plan for the
Employees of the Endowed Colleges at Ithaca and the Cornell University Tax
Deferred Annuity Plan,
*Plaintiffs-Appellants-Cross-Appellees*,

v.

CORNELL UNIVERSITY, THE RETIREMENT PLAN OVERSIGHT COMMITTEE, MARY G.
OPPERMAN, AND CAPFINANCIAL PARTNERS, LLC d/b/a CAPTRUST FINANCIAL
ADVISORS,
*Defendants-Appellees-Cross-Appellants.*

Appeal from the United States District Court for the Southern District
of New York, Hon. P. Kevin Castel, No. 16-cv-6525

## APPELLANTS' PRINCIPAL BRIEF

Jerome J. Schlichter
Heather Lea
Sean E. Soyars
Joel D. Rohlf
SCHLICHTER BOGARD & DENTON LLP
100 S. Fourth Street, Suite 1200
St. Louis, Missouri 63102
(314) 621-6115
*Counsel for Plaintiffs-Appellants-Cross-Appellees*

# CONTENTS

Authorities ................................................................................................... iii

Jurisdictional Statement ................................................................................ 1

Statement of the Issues ................................................................................. 2

Statement of the Case ................................................................................... 3

    I.   Statutory background ........................................................................... 4

    II.  Factual background ............................................................................. 6

        A.  The Cornell Plans ...................................................................... 6

        B.   The Plans' fiduciaries ............................................................... 7

        C.  The Plans' recordkeepers and investment options ................... 8

    III. Plaintiffs' claims ................................................................................ 9

    IV. The partial dismissal order ............................................................... 10

    V.  The grant of summary judgment and exclusion of expert testimony ......... 11

        A.  Recordkeeping fees claim (Count III) .................................... 11

        B.  Review of investment options claim (Count V) ...................... 15

Summary of the Argument ........................................................................... 19

Standards of Review ................................................................................... 21

Argument ..................................................................................................... 22

    I.   The district court erred in dismissing portions of Count V, which caused the court to disregard relevant evidence at summary judgment. ........................................................................................ 22

        A.  The district court improperly parsed Count V piece by piece. ........... 22

        B.  The erroneous dismissal affected the summary judgment decision. ................................................................................. 25

    II.  Plaintiffs' evidence establishes genuine disputes of fact regarding the Plans' investments (Count V) ................................................... 26

        A.  After Plaintiffs show an imprudent process and a related loss, the burden shifts to Defendants to prove that a prudent fiduciary would have retained the challenged funds. ........................................... 26

        B.  Plaintiffs showed that Defendants had a flawed process. .................... 33

i

1. Pre-July 2013 ................................................................ 33

2. Post-July 2013 ............................................................. 35

3. The district court improperly construed the record in Defendants' favor and its conclusions had no evidentiary or legal support. ................................................................ 38

C. Whether a prudent fiduciary would have removed the challenged funds is genuinely disputed. ................................................ 42

III. Plaintiffs' evidence shows genuine disputes regarding the Plans' losses from investing in retail-class mutual funds (Count V). ................. 48

IV. Whether the Plans suffered losses from excessive recordkeeping fees is genuinely disputed (Count III). .............................................. 50

A. Cornell bears the burden of establishing the reasonableness of Plan fees ...................................................................... 50

B. The record establishes a genuine dispute regarding loss. .................... 52

1. Plaintiffs' experts showed that the Plans suffered a loss. .............. 52

2. Non-expert evidence shows that the Plans suffered a loss. ........... 54

C. Regardless of the Plans' losses, Plaintiffs' request for equitable relief precludes summary judgment. .................................... 57

V. Plaintiffs stated a plausible claim that Cornell caused prohibited transactions involving the Plans' recordkeepers (Count IV). ................... 60

VI. The class period ending date should be vacated for any remanded claims. ....................................................................... 62

Conclusion ........................................................................ 62

Certificate of Compliance ........................................................ 64

Certificate of Service ............................................................ 65

# AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ................................................................58

*Allen v. GreatBanc Trust Co.*,
835 F.3d 670 (7th Cir. 2016) ...........................................61

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................26

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ........................................ 6, 22, 60, 62

*Brotherston v. Putnam Investments, LLC*,
907 F.3d 17 (1st Cir. 2018), *cert. denied,* 140 S.Ct. 911 (2020) ...... 26, 28, 29, 32

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013) .............................................50

*Cunningham v. Cornell Univ.*,
No. 16-6525, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ...............................3

*Cunningham v. Cornell Univ.*,
No. 16-6525, 2018 WL 4279466 (S.D.N.Y. Sept. 6, 2018) .................................3

*Cunningham v. Cornell Univ.*,
No. 16-6525, 2019 WL 275827 (S.D.N.Y. Jan. 22, 2019) ...................................4

*Cunningham v. Cornell Univ.*,
No. 16-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ...............................4

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ....................................... 25, 34

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) ......................................... 5, 36

*Donovan v. Bierwirth*,
754 F.2d 1049 (2d Cir. 1985) ....................................... 52, 56

*Felix v. City of New York*,
344 F. Supp. 3d 644 (S.D.N.Y. 2018) ................................59

iii

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ....................................................................... 5, 44

*George v. Kraft Foods Global, Inc.*,
  641 F.3d 786 (7th Cir. 2011) ................................. 37, 40, 41, 43, 45, 48

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
  530 U.S. 238 (2000) ...............................................................................5

*In re Beck Indus., Inc.*,
  605 F.2d 624 (2d Cir. 1979) ................................................................51

*In re State Police Litig.*,
  88 F.3d 111 (2d Cir. 1996) ..................................................................42

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ................................................................62

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) ..................................................................36

*Jackson v. Fed. Exp.*,
  766 F.3d 189 (2d Cir. 2014) ................................................................59

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005) ................................................................22

*Katsaros v. Cody*,
  744 F.2d 270 (2d Cir. 1984) ................................................................34

*Klein v. Tabatchnick*,
  610 F.2d 1043 (2d Cir. 1979) ..............................................................43

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................ 52, 53

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
  552 U.S. 248 (2008) ...............................................................................6

*LaScala v. Scrufari*,
  479 F.3d 213 (2d Cir. 2007) ..................................................................5

*Lisnitzer v. Zucker*,
  983 F.3d 578 (2d Cir. 2020) ................................................................21

*Liss v. Smith*,
  991 F. Supp. 278 (S.D.N.Y. 1998) ......................................................58

*Lowen v. Tower Asset Mgmt., Inc.*,
  829 F.2d 1209 (2d Cir. 1987) ......................................................... 29, 60

iv

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ..............................................................43

*Martin v. Feilen*,
    965 F.2d 660 (8th Cir. 1992) ............................................................29

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)............................................................................22

*McDonald v. Provident Indem. Life Ins. Co.*,
    60 F.3d 234 (5th Cir. 1995) ..............................................................29

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008)..........................................................................32

*Millbrook v. United States*,
    569 U.S. 50 (2013)............................................................................61

*N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
    18 F.3d 179 (2d Cir. 1994) ............................................ 6, 29, 51, 60

*New York v. Julius Nasso Concrete Corp.*,
    202 F.3d 82 (2d Cir. 2000) ........................................................ 51, 52

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ..............................................................21

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement
Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .................................. 4, 22, 23, 25, 26, 37

*Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus
Fin., N.A.*,
    858 F.3d 1324 (10th Cir. 2017) .................................................. 29, 31

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ..............................................................41

*Rogoz v. City of Hartford*,
    796 F.3d 236 (2d Cir. 2015) ...................................................... 22, 38, 45

*Roth v. Sawyer-Cleator Lumber Co.*,
    16 F.3d 915 (8th Cir. 1994) ..............................................................42

*Silverman v. Mutual Ben. Life Ins. Co.*,
    138 F.3d 98 (2d Cir. 1998) ........................................................ 29, 30, 31

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997) ..............................................................46

v

*Sweda v. Univ. of Pennsylvania*,
   923 F.3d 320 (3d Cir. 2019),
   *cert. denied*, 140 S.Ct. 2565 (2020)........................................... 23, 34, 42, 44, 51

*Tanasi v. New All. Bank*,
   786 F.3d 195 (2d Cir. 2015) ....................................................... 30, 32

*Tatum v. RJR Pension Inv. Comm.*,
   761 F.3d 346 (4th Cir. 2014) ............................... 28, 29, 32, 33, 37, 42

*Teets v. Great-W. Life & Annuity Ins. Co.*,
   921 F.3d 1200 (10th Cir.), *cert. denied,* 140 S.Ct. 554 (2019) ..........................61

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015)..................................................... 5, 6, 7, 24, 27, 28, 32, 44

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013) ..................................................... 36, 39

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016) ..................................................... 5

*Tibble v. Edison Int'l*,
   No. 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) ................................50

*Tompkins v. Metro-N. Commuter R.R. Co.*,
   983 F.3d 74 (2d Cir. 2020) ................................................................21

*Town of Southold v. Town of E. Hampton*,
   477 F.3d 38 (2d Cir. 2007) ................................................................43

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016) ................................................................51

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ................................................................53

*Tussey v. ABB, Inc.*,
   850 F.3d 951 (8th Cir.), *cert. denied,* 138 S.Ct. 281 (2017) ................................52

*Tussey v. ABB, Inc.*,
   No. 06-4305, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) ...........................53

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*,
   373 F.3d 241 (2d Cir. 2004) ................................................................58

**Statutes**

26 U.S.C. §403(b) ...................................................................6

28 U.S.C. §1291 ....................................................................................1

28 U.S.C. §1331 ....................................................................................1

29 U.S.C. §1002(14)(B) .......................................................................5

29 U.S.C. §1002(21)(A)(ii) ..................................................................8

29 U.S.C. §1002(34) .............................................................................6

29 U.S.C. §1101(b)(1) .........................................................................62

29 U.S.C. §1102(a) ...............................................................................7

29 U.S.C. §1104(a) .............................................................................32

29 U.S.C. §1104(a)(1) .............................................................. 29, 31, 35

29 U.S.C. §1104(a)(1)(B) ........................................................ 5, 26, 35

29 U.S.C. §1105(a) .............................................................................31

29 U.S.C. §1105(a)(3) .........................................................................31

29 U.S.C. §1106(a) .............................................................................10

29 U.S.C. §1106(a)(1) .............................................................. 5, 60, 61, 62

29 U.S.C. §1108(b)(2)(A) ........................................................ 6, 60, 61

29 U.S.C. §1109(a) .............................................................. 6, 26, 32, 51, 58

29 U.S.C. §1132(a)(2) .......................................................................1, 6

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................19

Fed. R. Civ. P. 23(e)(2) ........................................................................4

Fed. R. Civ. P. 56(a) ...........................................................................58

Fed. R. Civ. P. 56(f)(2) ............................................................ 20, 48, 59

Fed.R.Evid. 401 .................................................................................56

**Regulations**

29 C.F.R. §2550.408b-2(c)(1) ............................................................61

**Other Authorities**

Bogert, & G. Bogert, Law of Trusts and Trustees (2d rev. ed. 1995 & Supp. 2013) ....................................................................................28

Bogert, & G. Bogert, Law of Trusts and Trustees (3d ed. 2009) ............................27

DOL Advisory Op. No. 88-16A, 1988 WL 222716 (Dec. 19, 1988)......................39

Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure,
77 Fed.Reg. 5632 (Feb. 3, 2012) ........................................................................61

Restatement (Third) of Trusts (2007) ....................................................................27

Restatement (Third) of Trusts (2012) ....................................................................28

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Aug. 2013),
https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ..................7

U.S. Dep't of Labor, *Private Pension Historical Tables and Graphs 1975–2018* (Jan. 2021)..................................................................................................7

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 because this action arises under the Employee Retirement Income Security Act ("ERISA") and is brought under 29 U.S.C. §1132(a)(2). This Court has jurisdiction under 28 U.S.C. §1291 because this is an appeal from the district court's December 22, 2020 judgment. SA1. Plaintiffs noticed their appeal on January 12, 2021. A2069.

## STATEMENT OF THE ISSUES

1. Whether the district court improperly assessed whether isolated allegations stated a plausible claim for breach of fiduciary duty regarding the Plans' investments instead of assessing the complaint as a whole.

2. Whether Plaintiffs' evidence of Defendants' flawed investment review process establishes genuine disputes of material fact.

3. Whether Plaintiffs' evidence of the lower fees charged by institutional-class shares of the Plans' mutual funds establishes a genuine dispute regarding damages.

4. Whether evidence that the Plans paid much higher fees for recordkeeping services than market rates and similar plans presents a genuine dispute regarding the Plans' losses.

5. Whether Plaintiffs "abandoned" their request for equitable relief by failing to address an argument not raised by the movant.

6. Whether Plaintiffs' amended complaint states a plausible prohibited transactions claim regarding the Plans' recordkeeping services and fees.

7. Whether the district court abused its discretion in failing to provide reasons for the class period ending date.

## STATEMENT OF THE CASE

Plaintiffs-Appellants are five of the 28,000 Cornell University employees who participate in two Cornell-sponsored defined contribution retirement plans (the "Plans"). SA9, SA11. Cornell and its co-defendants-appellees are the Plans' fiduciaries. SA9–SA10.

Plaintiffs filed this action on August 17, 2016 (A1, Doc. 1)[1] and amended their complaint on February 24, 2017 (A47). Plaintiffs represent a certified class of the Plans' participants from August 17, 2010 through August 17, 2016. SA11. Plaintiffs allege that Defendants breached their fiduciary duties and caused transactions prohibited by ERISA by causing the Plans to pay excessive fees to service providers and retaining imprudent investments, resulting in significant losses to the Plans. SA9–SA10; A48–A49 (¶¶3–4). Plaintiffs seek recovery of those losses and appropriate equitable relief. A49 (¶5), A185–A186.

On September 29, 2017, the district court, P. Kevin Castel, granted and denied in part motions to dismiss Plaintiffs' amended complaint. SA54–SA79; *Cunningham v. Cornell Univ.*, No. 16-6525, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017). The court later denied Defendants' motion to strike Plaintiffs' jury demand on damages claims (A19, Doc. 198); *Cunningham v. Cornell Univ.*, No. 16-6525, 2018 WL 4279466 (S.D.N.Y. Sept. 6, 2018), and granted class

---

[1] "Doc." refers to the district court ECF document number.

certification (SA80–SA98); *Cunningham v. Cornell Univ.*, No. 16-6525, 2019 WL 275827 (S.D.N.Y. Jan. 22, 2019). This Court denied Defendants' petitions for a writ of mandamus on the jury issue (No. 18-3203) and for permission to appeal class certification (No. 19-324).

On September 27, 2019, the district court granted in substantial part Defendants' motions for summary judgment and excluded certain testimony of Plaintiffs' experts. SA9–SA48; *Cunningham v. Cornell Univ.*, No. 16-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019). After the parties agreed to a class-wide settlement of the sole remaining claim, the district court granted final settlement approval and entered judgment on December 22, 2020. SA1–SA8; *see* Fed. R. Civ. P. 23(e)(2).

Plaintiffs now appeal (A2069) and Defendants conditionally cross-appeal the jury trial issue (A46, Docs. 447, 448).

## I.    Statutory background

"ERISA's central purpose is to protect beneficiaries of employee benefits plans." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 715 (2d Cir. 2013) ("*PBGC*"). It does so by imposing upon plan fiduciaries "strict standards of trustee conduct … derived from the common law of trusts," including "a 'prudent person' standard by which to measure fiduciaries' investment decisions and

disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416, 419 (2014). The statute requires fiduciaries to act "solely in the interest of the participants" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B), SA103. This Court describes these fiduciary duties as the "highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

To define "the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015). Under trust law, and hence ERISA, fiduciaries have "a continuing duty to monitor trust investments and remove imprudent ones," *id*. at 529, and to avoid "[w]asting beneficiaries' money" on unreasonable expenses, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (en banc).

Congress supplemented the general fiduciary duties by categorically prohibiting certain transactions with "parties in interest" such as service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); *see* 29 U.S.C. §1106(a)(1), SA114; §1002(14)(B). Although "reasonable" payments for necessary services qualify for an exemption, a plan is "entitled to recover" any excess above a reasonable fee. *N.Y. State Teamsters Council Health*

5

& *Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir. 1994); 29 U.S.C. §1108(b)(2)(A), SA116–SA117.

Fiduciaries who violate ERISA are liable for any resulting "losses to the plan" and are "subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §1109(a), SA140. Any plan participant may bring a civil action to obtain that relief for the plan, which is the same authority granted to fiduciaries and the Secretary of Labor. 29 U.S.C. §1132(a)(2). The Secretary "depends in part on private litigation to ensure compliance with the statute." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 n.8 (8th Cir. 2009).

## II.    Factual background

### A.    The Cornell Plans

The Plans are "defined contribution" plans, *see* 29 U.S.C. §1002(34), and tax-qualified under 26 U.S.C. §403(b). SA9, SA11. Employees' retirement benefits in a defined contribution plan "are limited to the value of their own individual investment accounts," which is a function of the amount contributed and investment performance, minus expenses. *Tibble*, 575 U.S. at 525; 29 U.S.C. §1002(34). Defined contribution plans "dominate the retirement plan scene today"—105 million Americans have collectively invested over $6.3 trillion in such plans.[2] *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008).

---

[2] U.S. Dep't of Labor, *Private Pension Historical Tables and Graphs 1975–2018*,

The Cornell Plans are among the largest 0.1% of the 675,000 ERISA-governed defined contribution plans in the United States, holding a combined total of over $3.3 billion. SA11. In the competitive market for defined contribution plan services, fiduciaries of large plans have tremendous bargaining leverage to obtain high-quality services at favorable pricing. A820–A821 (¶¶23–24, 29).

Although defined contribution plans allow participants to allocate their investments among various options, participants do not determine which options are available on the investment menu. That is the plan fiduciary's responsibility, as is hiring a provider of administrative services (including recordkeeping of accounts) and negotiating the recordkeeper's compensation. A2263 ¶125; *see* 29 U.S.C. §1102(a). The fiduciary's decisions on those matters can dramatically affect participants' retirement savings. Poorly performing investments and excessive fees for plan services can "significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.[3]

## B.     The Plans' fiduciaries

The Plans' governing documents designate Cornell University as the "named

---

Tables E1, E4, E10 (Jan. 2021),
https://www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletin-historical-tables-and-graphs.pdf.

  [3] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013) (finding that 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

fiduciary" with authority to control the Plans' operation. A2080 ¶13. Cornell

delegated day-to-day oversight responsibility to the Retirement Plan Oversight

Committee, its Vice President for Human Resources (Mary G. Opperman), and

Cornell's Benefits Department. A2080–A2082 ¶¶13–15. Plaintiffs refer to them

collectively as "Cornell" unless otherwise indicated.

Cornell retained an outside consultant, defendant-appellee CapFinancial

Partners, LLC ("CAPTRUST") as the Plans' fiduciary investment advisor. A2085

¶18; *see* 29 U.S.C. §1002(21)(A)(ii).

## C.     The Plans' recordkeepers and investment options

A necessary service for defined contribution plans is the recordkeeping of

participants' accounts. A765 ¶17. Instead of using a single recordkeeper, Cornell

retained two throughout the class period: TIAA and Fidelity.[4] SA12. The Plans

also had the same investment menus of approximately 300 options throughout the

class period, most of which were managed by TIAA and Fidelity. A245–A251;

A615–A622, A627–A628.

Except for TIAA's Traditional Annuity (a fixed annuity), the Plans' investment

options are mutual funds and variable annuities. A2078 ¶10. Each option deducts

fees from the fund's assets, expressed as a percentage of assets under management,

---

[4] "TIAA" refers to Teachers Insurance and Annuity Association of America-College Retirement Equities Fund. SA12. "Fidelity" refers to Fidelity Investments Inc. Management Trust Company and its affiliates. *Id.*

or expense ratio. SA13. The funds' expense ratios cover both investment management and administrative expenses. Fees for recordkeeping were paid through "revenue sharing," by which the Plans' funds pay a percentage of their expense ratios to TIAA and Fidelity. *Id.*

## III. Plaintiffs' claims

As relevant here, Plaintiffs' amended complaint alleges that Cornell breached its duty of prudence and caused prohibited transactions by failing to monitor and control the recordkeeping fees paid to TIAA and Fidelity, resulting in $30 million in losses compared to reasonable market rates for the same services. Counts III–IV, A108–A113 (¶¶122–141), A172–A175.

Plaintiffs further allege that Cornell and CAPTRUST failed to prudently review the fees and performance of the Plans' investment options. A113–A159, A176–A180. For 92 of the Plans' mutual funds, Defendants provided retail-class shares designed for individuals with small amounts to invest, instead of lower-cost—but otherwise identical—institutional-class shares of the same funds designed for large investors like the Plans. A67 ¶45, A113–A124 ¶¶142–152. Cornell also did not monitor most of the Plans' investment options. A133 (¶¶170–171). As a result, the Plans included many funds with severe long-term underperformance—*two-thirds* of the Plans' options underperformed their benchmarks over the five-year period preceding the complaint. A134–A141. Two

options, the CREF Stock Account and TIAA Real Estate Account, had exceptionally poor performance that should have prompted greater monitoring and removal. A141–A158. The Plans sustained substantial losses compared to what they would have earned if Defendants had replaced imprudent options with prudent alternatives. A153–A154 (¶196), A158 (¶202).

## IV. The partial dismissal order

The district court granted in part the Defendants' motions to dismiss under Rule 12(b)(6). SA54–SA79. The court denied Cornell's motion as to Count III,[5] regarding the Plans' recordkeeping fees. SA64–SA65. However, the court dismissed Count IV, holding that the Plans' recordkeeping arrangements did not involve transactions prohibited by 29 U.S.C. §1106(a). SA72–SA74.

The court denied both Defendants' motions to dismiss Count V to the extent it alleges that Cornell and CAPTRUST "breached their duty of prudence by selecting investment options with excessive and unreasonable fees and by failing to remove investment options with a history of poor performance." SA66–SA70. But the court dismissed certain "allegations" in Count V, which it described as alleging that Defendants provided "too many" investment options and failed to monitor all or most of the 300-option menu. SA66–SA67, SA71.

---

[5] The court dismissed Count III against CAPTRUST.

10

## V. The grant of summary judgment and exclusion of expert testimony

### A. Recordkeeping fees claim (Count III)

Plaintiffs' evidence showed that Cornell breached its duty to monitor and control the Plans' recordkeeping fees, resulting in the Plans paying unreasonable fees compared to market rates for the same services. A2271–A2305 (¶¶145–193).

1. *Evidence of breach.* Recordkeeping costs depend primarily on the number of participants in a plan, not asset levels. A2276 ¶151; A766 ¶20. It costs no more to keep records for a $100,000 account than a $1,000 account. A766 ¶20. In large plans, recordkeepers achieve economies of scale because overhead costs are spread among more accounts, with each additional account involving a relatively low incremental cost. A766–A767 ¶21; A820 ¶23, A823 ¶39; A878–A879 (51:23–52:4). Thus, a 20,000-participant plan can obtain a much lower fee per participant than a 10,000-participant plan. A766 ¶20.

Because recordkeeping costs are driven by participant levels it is a standard fiduciary practice to "[n]egotiate a fixed-rate recordkeeping fee based on the number of participants" in a plan, not a percentage of assets. A2276–A2279 ¶¶151–153. As stated by Cornell's expert, "per-participant fees are generally more transparent and more accurately reflect the 'true' cost of providing administration." A2276 ¶151.

In contrast, "a pricing model that is dependent on the market value of plan

11

assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services." A2278 ¶153. As assets grow (through contributions and investment gains) while participants remains constant, the recordkeeper receives much higher compensation for the same level of services. Thus, asset-based payments require close monitoring to ensure that the level of compensation is reasonable for the services rendered. A2289 ¶170; A823 ¶39.

Here, Cornell failed to monitor and diligently negotiate the Plans' asset-based fees paid to TIAA and Fidelity. Cornell did not know how to determine how much the Plans were paying for recordkeeping until 2012, after hiring CAPTRUST. A2284–A2286 ¶¶162–165. As stated by Paul Bursic, Cornell's Senior Director of Benefits who was responsible for administrative matters, "[t]he fee is the fee. We didn't know what it was before." A1067 (100:17–22). He did not know if per-participant fees were available in the market and had "no desire to find out." A1084–A1085 (117:15–118:6).

After CAPTRUST was hired, Cornell did not review CAPTRUST's work, admitting that no member of the Committee "really knows how CAPTRUST is conducting those negotiations," and merely "assume[d]" that CAPTRUST's "assurances that this is a good deal" were reliable. A1051–A1053 (52:16–54:13), A1086 (119:1–13); A2288 ¶168, A2298 ¶184.

Cornell also failed to follow industry standard practices of periodically

12

obtaining competitive bids (A2287–A2288 ¶¶166–169) and consolidating to one recordkeeper, which would have provided the "best cost structure" (A2292–A2295 ¶¶175–179).

2. ***Evidence of loss.*** Plaintiffs' experts, Tyrone Minnich and Albert J. Otto, have vast experience in the defined contribution plan recordkeeping market. Minnich worked for 30 years at top recordkeeping firms such as CitiStreet, MetLife, and Transamerica, where he oversaw recordkeeping pricing and requests for proposals. A816 ¶¶6–7, A820 ¶26. Otto, a consultant and fiduciary for over 20 years, has overseen competitive bidding processes for hundreds of plans, including 403(b) plans and large plans with over 15,000 participants. A761 ¶6; A805–A809.

Based on their knowledge of market prices and "experience of having gone through this process dozens, in fact, hundreds of times," Minnich and Otto determined that if Cornell had followed industry-accepted practices, a reasonable annual fee for the Plans' services during the class period would have been $35–$40 per participant. A2304–A2305 ¶¶192–193; A852 ¶158; A1936–A1937 (115:6– 116:4); A789 ¶81; A1952–A1953 (83:16–84:18). They cited examples of other comparable plans that supported these market prices at the time. A843–A851 ¶¶137–156; A1937 (116:5–20); A790–A791 ¶¶85–89; A1954 (85:8–16).

Plaintiffs also cited Cornell's own data from TIAA and CAPTRUST showing that the Plans' fees were higher than similar plans. A2301–A2303 ¶¶189–191.

13

3. ***The district court's ruling.*** The district court found that Plaintiffs' evidence that Cornell failed to obtain bids, evaluated only "bundled" expense ratios, and failed to understand "what the actual fees were" established a genuine dispute. SA20. But the court concluded that Plaintiffs had not come forward with evidence of loss to the Plans. SA21.

The court rejected Plaintiffs' reliance on TIAA and CAPTRUST data due to a lack of expert testimony explaining "why this data is based upon relevant comparators or would lead a reasonable juror to conclude that Cornell could have achieved lower fees based solely on these numbers." SA22.

The court then found Plaintiffs' experts' damages testimony inadmissible. The court rejected Cornell's challenges to Otto's and Minnich's qualifications given their experience pricing recordkeeping services for hundreds of plans and acknowledged that their opinions "regarding general characteristics of fund structure and 403(b) plans will likely be admissible." SA24–SA26, SA30 n.9. But the court concluded that Otto and Minnich "do not use a reliable methodology to determine what a prudent fiduciary would have secured as a recordkeeping fee for the Plans." SA26–SA27, SA29.

Although Cornell did not address the complaint's request for equitable relief in its motion, the court inferred that Plaintiffs had "abandoned" any claim for equitable relief. SA22–SA23.

14

### B.    Review of investment options claim (Count V)

As with Count III, Plaintiffs presented substantial evidence that Cornell and CAPTRUST had a flawed process and caused Plan losses. A2305–A2380 ¶¶194–352.

Before July 2013, Cornell did little to review the performance of the Plans' 300 options. A2318–A2319 ¶¶221–222. Mr. Bursic admitted that "*[n]o one in the benefits office has the expertise or experience*" to analyze investments. A1054–A1056 (78:9–80:11). Cornell instead relied "very heavily" on assurances from TIAA and Fidelity—interested parties with no fiduciary obligation to act in participants' interests—that their investments satisfied ERISA requirements. A1054–A1055 (78:20–79:2); A1122–A1123.

Soon after it was hired, CAPTRUST observed serious problems with the Plans' investment menu. A2312–A2314 ¶¶209–213. CAPTRUST informed Cornell in January 2012 that "many" Fidelity options and "several" TIAA options were "underperforming funds that we would eliminate on a go forward basis." A1324–A1325. It recommended a "streamlined" lineup, which would provide significant advantages to participants compared to the "status quo" of "too many," "redundan[t]," and underperforming options. A323; A1327, A1331–A1335.

After those initial observations of "many underperforming funds" and other problems, CAPTRUST delayed additional due diligence for 18 months. A2314

15

¶214; A1411–A1417. In October 2012, outside counsel questioned whether CAPTRUST was fulfilling its role and cautioned Cornell about "liability for fiduciary failures." A1420.

In July 2013, CAPTRUST admitted it had "*yet to do a review*" since being hired 19 months earlier and set a 20-day deadline to finally review the "massive" fund lineup to provide "*fiduciary cover*" until Cornell consolidated its lineup. A2319–A2321 ¶¶223–227; A1414–A1417. CAPTRUST sought to "mitigate" "fiduciary exposure" if Cornell did not implement the "recommended line up" until "mid-2014." A1411.

CAPTRUST's hastily prepared July 31, 2013 investment review contained no data on 19 funds (including TIAA Real Estate (A641)), and found that 85 funds failed criteria in Cornell's Investment Policy Statement (IPS) (including CREF Stock (*id*.). A594, A609, A632–A641; A351; A712–A714 ¶¶68–69; A2322–A2335 ¶¶228–250, A2344–A2346 ¶¶268–273. The review did not provide underlying performance data or information needed to interpret CAPTRUST's scoring system, which Cornell did not receive until December 2014. A712 ¶68; A633–A641; A380–A381; A1614.

Not only did Cornell not implement a streamlined lineup by mid-2014, it waited until *spring of 2017* to begin reducing the 300-option menu. A2373–A2376 ¶¶336–343; A373–A374. It had no process to remove investments until 2016.

16

A1156; A381; A488–A489; A1179 (165:4–25); A1027–A1028 (175:16–176:17). As of December 2016, the sub-committee was still developing a "recommendation" on how to implement the revised lineup. A1674–A1684. In the meantime, Cornell merely recategorized the lineup into tiers, effective October 1, 2014, labeling hundreds of funds as "Tier III" options which Cornell did not monitor. A716 ¶73; A380; A414; A1102–A1104 (176:8–177:3, 178:9–25).

Cornell believed that CAPTRUST's evaluation of CREF Stock was "fundamentally unreliable," yet included it in the core lineup without further scrutiny because it had been a long-term option. A1105–A1107 (217:3–219:8). CAPTRUST recommended, and Cornell included, TIAA Real Estate in the core lineup without any evaluation. A631, A641; A1457–A1464 (110:24–113:9, 116:21–117:20). Cornell thereafter relied upon CAPTRUST's assurances that CREF Stock and TIAA Real Estate were acceptable according to CAPTRUST's unexplained scoring system—a single green dot unaccompanied by performance information. A2336 ¶¶251–52, A2346–A2347 ¶¶274–75; A688; A1183 (185:18–25). Had Cornell investigated further, it would have discovered that the funds consistently underperformed their benchmarks. A2337–A2343 ¶¶254–67; A1718–A1724 ¶¶40–45, 49–57.

The court granted summary judgment in substantial part. SA30–SA47. First, the court refused to consider Plaintiffs' argument that "Cornell followed a 'flawed

17

process' by failing to monitor before 2014 and reviewing only core investment options after September 2014," because the claim had previously been dismissed. SA31 n.11.

Even though Cornell admittedly did not review the TIAA Real Estate or CREF Stock funds' "performance compared to peer groups" until July 2013 or later—the first three years of the class period—the court required Plaintiffs to additionally show that a prudent fiduciary aware of the alleged underperformance "would have removed" the funds before July 2013. SA32. Despite having "DENIED" Cornell's motion to exclude Dominguez's testimony (SA47–SA48), the district court refused to consider her opinions. SA32–SA33. The court instead credited Cornell's evidence that many of its hand-picked group of "peers"—other TIAA clients and large universities—had not removed the funds. SA33–SA34. Post-July 2013, the court found that Cornell's "discussions" regarding the fund lineup satisfied its duties as a matter of law. SA36–SA38.

The court rejected Plaintiffs' claim regarding other funds for similar reasons, again refusing to consider Dominguez's testimony. SA40–SA44. Although Cornell had no fund-removal process until 2016 and waited until 2017 to remove over 100 funds identified as problematic years earlier, no reasonable factfinder could find such a lengthy delay imprudent without evidence of "the timeline of a prudent fiduciary." SA42–SA44.

The court also granted summary judgment, with one exception, on Plaintiffs' mutual fund share-class claim. SA44–SA45. Although the court found a genuine dispute on the only ground raised by Cornell, it granted the motion on a ground Cornell never argued: that Plaintiffs had to provide a damages calculation for each fund. SA45–SA46.

## SUMMARY OF THE ARGUMENT

I.  The Rule 12(b)(6) standard requires considering a complaint's allegations "as a whole." The district court evaluated the plausibility of Count V on an allegation-by-allegation basis, dismissing isolated allegations from Count V for reasons that were invalid. The erroneous dismissal of those allegations affected the summary judgment decision by causing the court to disregard relevant evidence.

II. To defeat summary judgment on Count V, Plaintiffs need only establish genuine disputes regarding the prudence of Defendants' investment-review process and related losses. That shifts the burden to Defendants to disprove causation.

A reasonable jury could conclude that Defendants' review process was flawed. Cornell did virtually nothing to review the Plans' investments until hiring CAPTRUST, relying solely on information from the Plans' non-fiduciary recordkeepers who have a financial incentive to promote their own products. Cornell never independently investigated the bases for CAPTRUST's recommendations, agreeing to include underperforming options in the core menu

19

with no evaluation (TIAA Real Estate) or without reviewing performance (CREF Stock), and retaining those options with minimal review. Whether a hypothetical prudent fiduciary would have made the same decisions to retain these funds and others is genuinely disputed.

A jury could further conclude that Cornell unduly delayed nearly five years to make a reasoned decision to implement CAPTRUST's January 2012 recommendation to eliminate over 100 unmonitored and underperforming options. And a jury could find that CAPTRUST's 19-month delay to do the work for which it was hired—which it finally did in a rushed, incomplete manner to provide "fiduciary cover"—reflects an imprudent lack of care, skill, diligence, and a failure to act in participants' interests.

Although the district court deemed Defendants' conduct prudent as a matter of law, its conclusions misread the record and are legally invalid.

III. The district court erroneously granted summary judgment due to the lack of a damages calculation for each of the Plans' retail mutual funds, a ground not raised by Cornell. Had the court provided the notice required by Rule 56(f)(2), Plaintiffs could have addressed any perceived evidentiary gaps. The record shows that the Plans' retail shares charged higher fees than the institutional shares, which establishes a genuine dispute as to loss.

IV. Plaintiffs' proof of Cornell's breach of fiduciary duty and the Plans'

20

expenditures on recordkeeping fees shifted the burden to Cornell to show that the fees were fair and reasonable. The record shows a genuine dispute on that point, based on evidence from both expert and non-expert sources that the district court erroneously excluded or failed to consider. In any event, Plaintiffs' request for equitable relief, which Cornell did not challenge, precludes summary judgment.

V. Plaintiffs plausibly alleged that Cornell caused prohibited transactions—including the furnishing of recordkeeping services in exchange for unreasonable compensation—between the Plans and parties in interest (TIAA and Fidelity). The district court's heightened pleading requirements have no statutory basis.

VI. In the event of a remand, the court should also vacate the district court's unexplained class period ending date.

## STANDARDS OF REVIEW

Summary judgment and Rule 12(b)(6) decisions are reviewed *de novo*. *Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 78 (2d Cir. 2020) (summary judgment); *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (Rule 12(b)(6)). Exclusion of expert testimony and class definitions are reviewed for abuse of discretion. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002) (experts); *Lisnitzer v. Zucker*, 983 F.3d 578, 584 (2d Cir. 2020) (class certification).

Summary judgment must be denied "when the admissible materials in the

record 'make it arguable' that the claim has merit, for the court in considering such a motion *must disregard all evidence favorable to the moving party that the jury is not required to believe.*" *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (emphasis added). The question is not whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). "In sum, summary judgment is proper only when, if all permissible inferences and credibility questions are resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict"; *i.e.*, when "it is quite clear what the truth is." *Rogoz*, 796 F.3d at 246.

## ARGUMENT

### I. The district court erred in dismissing portions of Count V, which caused the court to disregard relevant evidence at summary judgment.

#### A. The district court improperly parsed Count V piece by piece.

Determining whether a complaint states a plausible ERISA breach-of-fiduciary duty claim "requires assessing 'the allegations of the complaint *as a whole.*'" *PBGC*, 712 F.2d at 719 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011)) (emphasis added). Sister circuits agree: an ERISA fiduciary breach complaint should not be "parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594; *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019), *cert. denied*, 140 S.Ct. 2565

22

(2020) (same).

*Sweda* involved allegations which Cornell describes as "materially identical" to Count V here (Doc. 29). As here, Sweda alleged that Penn retained many underperforming funds with excessive fees, and that it "retain[ed] multiple options in the same asset class and investment style," "thereby decreasing the value of actively managed funds, reducing the Plan's leverage, and confusing participants." *Sweda*, 923 F.3d at 331. Employing a "a holistic approach," the Third Circuit considered "*all* of Sweda's well-pleaded factual allegations" and concluded that she "plausibly alleged breach of fiduciary duty." *Id.* at 331–32.

In contrast, the district court parsed the plausibility of Count V on an allegation-by-allegation basis. SA66–SA67. It found that "the fourth and fifth allegations," and the allegation that Cornell failed to monitor investments, "fail to plausibly allege a breach of the duty of prudence." SA67, SA71. Those allegations are not standalone *claims*—they are pieces of circumstantial evidence supporting the overall claim in Count V that Defendants had a flawed investment-review process. Plan participants necessarily must rely on circumstantial evidence because they lack access to "details about a fiduciary's methods." *PBGC*, 712 F.3d at 719. Regardless of whether isolated allegations in Count V plausibly allege a breach standing *alone*, they do *support* an inference of imprudence when "*combined with other alleged facts*," *id.* at 721.

The point of the dismissed "fifth allegation" is not that providing "too many options" is *per se* imprudent. SA67. Rather, retaining 300 overlapping and redundant options despite the prevailing industry practice of consolidating to a streamlined menu of 15 options tends to show the lack of a thorough and reasoned process to determine which options to provide on the menu. A126–A127 ¶¶155–57. That inference is strengthened by the additional facts that Cornell (1) left hundreds of funds unmonitored (A133 ¶¶170–71), (2) failed to obtain identical lower-cost institutional versions of nearly 100 funds (A115–A124 ¶¶148–52), and (3) retained hundreds of options despite long-term underperformance (A134–A141 ¶¶172–74). Accordingly, the partial dismissal of Count V should be reversed.

Even if the district court's piecemeal plausibility inquiry were appropriate, its reasons for dismissing isolated allegations were invalid. Although *Tibble* did not define the scope of the ongoing duty to monitor (SA71), it clearly held that a duty of "some kind" exists. *Tibble*, 575 U.S. at 530. The *precise* scope of the duty is irrelevant because Cornell did *no* monitoring of *any* kind for several years of the class period. A87 (¶170). No matter how minimal the duty, Cornell necessarily violated it.

As to later years, Plaintiffs did, in fact, provide the district court "a principled reason" to conclude that monitoring only some options did not satisfy the duty. SA71. Plaintiffs repeatedly cited authority holding that ERISA fiduciaries must

24

"initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007). Doc. 87 (Opp. 19–20); A48; A60 ¶26, A75 ¶79, A101–A102 ¶111, 113, A168 ¶210, A176 ¶¶234–35. The Court can reasonably infer that "a prudent fiduciary in like circumstances would have acted differently." *PBGC*, 712 F.3d at 719–20.

The district court also mistakenly believed that Plaintiffs "do not allege that any plan participant was actually harmed by defendants' failure to reduce the number of options available." SA67. In fact, Plaintiffs alleged specific facts showing that the multiplicity of options diluted the Plans' bargaining power, resulting in higher fees charged to participants. A126–A133 ¶¶156–69.

## B.  The erroneous dismissal affected the summary judgment decision.

Cornell's summary judgment papers heavily relied on the dismissal order. Cornell objected to Plaintiffs' evidence by citing the order *a total of 68 times*. A2081–A2380 (cites to "ECF No. 107" and 117 (sic)). The district court refused to consider Plaintiffs' evidence of Cornell's monitoring failures because the "claim" had been dismissed. SA31 n.11. It similarly precluded Plaintiffs' arguments regarding inappropriate options that would have been removed from a streamlined investment menu. SA41. Because the partial dismissal of Count V should be reversed, the summary judgment order, which refused to consider evidence

pertinent to the dismissed allegations, necessarily should also be vacated.

## II. Plaintiffs' evidence establishes genuine disputes of fact regarding the Plans' investments (Count V).

### A. After Plaintiffs show an imprudent process and a related loss, the burden shifts to Defendants to prove that a prudent fiduciary would have retained the challenged funds.

Determining whether summary judgment was warranted requires defining the elements of Plaintiffs' claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."). To the extent Plaintiffs seek recovery of the Plans' losses under 29 U.S.C. §1109(a), the elements are "breach, loss, and causation." *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 30 (1st Cir. 2018), *cert. denied,* 140 S.Ct. 911 (2020).

As to breach, the test is whether Defendants used the "care, skill, prudence, and diligence" of a prudent person under like circumstances. 29 U.S.C. §1104(a)(1)(B). This objective standard considers the "fiduciary's *conduct* in *arriving* at an investment decision, *not on its results*," and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *PBGC*, 712 F.3d at 716 (emphasis added). Thus, a flawed *process* constitutes a breach.

The district court required Plaintiffs to prove not only a "procedural" breach but also "the next step"—"that a prudent fiduciary would have removed" the

26

challenged funds under *Tibble*. SA32. Fund removal is an issue of causation, and the trust law sources on which *Tibble* relied place the burden on the fiduciary in breach.

In *Tibble*, the Supreme Court reversed a lower-court decision that claims regarding funds first included in a plan before the limitations period were time-barred. 575 U.S. at 525–26. It unanimously ruled that the Ninth Circuit erred by so holding "without considering the nature of the fiduciary duty" under trust law. *Id.* at 527–28. Because "courts often must look to the law of trusts" in ERISA cases, the Court examined numerous trust law sources and concluded that ERISA's duty of prudence incorporates "a continuing duty to monitor trust investments and remove imprudent ones." *Id*. at 529–30 (discussing, *inter alia*, Restatement (Third) of Trusts § 90 (2007), and Bogert, & G. Bogert, Law of Trusts and Trustees (3d ed. 2009)). In remanding for further consideration, the Court again emphasized that the lower courts must "recogniz[e] the importance of analogous trust law" in analyzing the claim. *Id*. at 531.

While fund removal is an aspect of Plaintiffs' claim, the district court mistakenly assumed it was *Plaintiffs'* burden to show that a prudent fiduciary "would have" removed the funds. SA32. Determining what would have happened if Defendants had acted prudently is an issue of causation: if "a fiduciary who conducted a proper investigation would have reached the same decision," then

27

Defendants' imprudent review did not cause a loss. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363–64, 369 (4th Cir. 2014); *Brotherston*, 907 F.3d at 38 ("what the fiduciary would have done had it not breached its duty" in selecting investments is an issue of causation).

The same trust law sources cited in *Tibble* establish that the burden of disproving causation shifts to the fiduciary in breach. "[I]n matters of causation, when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100, cmt. f (2012) (internal citation omitted), SA154; *see also* Bogert, & G. Bogert, Law of Trusts and Trustees § 871 (2d rev. ed. 1995 & Supp. 2013) ("If the beneficiary makes a prima facie case, the burden of contradicting it ... will shift to the trustee."). Because an ERISA fiduciary's duty to remove imprudent investments derives from these trust law sources, *Tibble*, 575 U.S. at 529, the burden-shifting approach should also apply in ERISA cases. *See Tatum*, 761 F.3d at 363 (adopting the "long-recognized trust law principle.").

Although the district court purported not to resolve the issue (SA21 n.6), it placed the burden on Plaintiffs by requiring them to prove what a prudent fiduciary would have done (SA32). That was error.

This Court has issued seemingly conflicting decisions regarding burden-

shifting on causation,[6] as have sister circuits.[7] But these cases can be reconciled as follows: When the beneficiary seeks relief directly from the principal wrongdoer based on the defendant's *own* breach under §1104(a)(1)—as in *DePerno*, *Brotherston*, *Tatum*, *McDonald*, and *Feilen*—the burden shifts to the defendant. Where the alleged loss depends primarily on the conduct of a third party—as was the case in *Silverman* and *Pioneer*—the causation burden properly remains on the plaintiff. This is consistent with the principal that burden shifting is appropriate when the defendant "possesses more knowledge relevant to the element at issue." *Brotherston*, 907 F.3d at 38; *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987) ("Placing the burden of proof on the fiduciary is … justified" when "the fiduciary has a virtual monopoly of information concerning the transaction in question.").

*DePerno* involved a claim directly against the wrongdoer based on the wrongdoer's *own* breach under §1104(a)(1). *DePerno*, 18 F.3d at 180, 182. The trustee hired additional maintenance workers and paid them "roughly double" the

---

[6] *Compare DePerno*, 18 F.3d at 180, 182 *with Silverman v. Mutual Ben. Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir. 1998) (Jacobs & Meskill, JJ., concurring).

[7] *Compare Brotherston*, 907 F.3d at 35–37; *Tatum*, 761 F.3d at 363; *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) (each holding that once an ERISA plaintiff proves a breach of a fiduciary duty and a prima facie case of loss to the plan, the burden of persuasion shifts to the fiduciary to disprove causation) *with Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1337 (10th Cir. 2017) (rejecting burden shifting).

customary amount. *Id.* at 181. The district court found that the trustee violated its duties, but that the plaintiffs failed "to prove any losses" because they had not shown that the plan "had not received fair value for the payments." *Id.* at 180, 181.

This Court reversed. Once "the plaintiffs sustained their burden of showing the defendants' violation of their fiduciary duty to the Fund and the payment of money as a result of that violation, the burden should have shifted to the defendants" to rebut the claimed loss. *Id.* The plaintiffs were not required to prove "the *fact* of damages" resulting from the breach. *Id.* at 182. Because "principles of trust and fiduciary law" apply to ERISA cases, once the beneficiaries established a *prima facie* case by showing the defendants' breach of fiduciary duty and a related expenditure of plan assets, that "was sufficient to shift to the defendants the burden to show" that the expense was "fair and reasonable under all of the circumstances." *Id.* at 182–83. By relieving ERISA plaintiffs from having to prove "the fact of damages" caused by the violation, this Court places the burden of disproving causation of damages on the fiduciary in breach.

Some lower courts have misinterpreted a later case as requiring ERISA plaintiffs to prove causation in all cases. *Silverman v. Mutual Benefit Life Insurance Co.*, 138 F.3d 98, 105–06 (2d Cir. 1998) (Jacobs & Meskill, JJ., concurring). In the event of a conflict, the earlier *DePerno* case governs. *Tanasi v. New All. Bank*, 786 F.3d 195, 200 n.6 (2d Cir. 2015) ("Where a second panel's

30

decision seems to contradict the first, and there is no basis on which to distinguish the two cases, we have no choice but to follow the rule announced by the first panel."). But there is no conflict, because the cases are distinguishable. Whereas *DePerno*, as here, involved a claim based on the defendant's own breach under §1104(a)(1), *Silverman* involved a claim under ERISA's co-fiduciary liability provision, §1105(a). *Silverman*, 138 F.3d at 101–02.

In *Silverman*, the principal wrongdoers were former trustees who pled guilty to embezzling $130,000 from a pension fund and later proved to be insolvent. *Id.* at 102. The plaintiff asserted that Principal, a co-fiduciary who was not involved in the embezzlement, should nevertheless be held liable for the theft because it failed to cure its co-fiduciary's breach by recovering the funds. *Silverman*, 138 F.3d at 100, 102–04; *see* SA111, 29 U.S.C. §1105(a)(3). In those circumstances, requiring the plaintiff to show that the former trustees still possessed the stolen funds and that Principal's inaction even *could* have been a factor in causing the loss served as a check on the "broadly sweeping liability" of co-fiduciaries under §1105(a). *Silverman*, 138 F.3d at 105–06 (Jacobs & Meskill, JJ., concurring); *see also Pioneer Centres*, 858 F.3d at 1332–33, 1337–38 (rejecting burden shifting where loss theory required speculation that third party would approve transaction). While it is arguably unfair to require a defendant to prove what a third party would have done, that concern does not apply when any loss necessarily resulted from the

31

fiduciary's *own* conduct. In a case like this, based on the fiduciary's *own* breach under §1104(a), *DePerno* controls. *See Tatum*, 761 F.3d at 362 n.10.

Even if *Silverman* could be read as applying to §1104(a), its rejection of the trust law burden-shifting rule contradicts intervening Supreme Court authority emphasizing that "courts often must look to the law of trusts" in ERISA cases. *Tibble*, 575 U.S. at 529; *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (courts should be "guided by principles of trust law"); *see also Tanasi*, 786 F.3d at 200 n.6 (prior panel decisions not binding if abrogated by Supreme Court). As the First Circuit held after *Tibble*, the Supreme Court's repeated reliance on trust law and Congressional intent that ERISA would provide "more protection than [beneficiaries] had at common law" support the burden-shifting rule. *Brotherston*, 907 F.3d at 35–38. And because §1109(a) is silent as to burdens of proof, ERISA's text does not compel a departure from trust law. *Id.* at 35–37; *see* SA140.

Under a burden-shifting framework, Plaintiffs merely had to establish genuine disputes as to Defendants' "procedural" imprudence and a prima facie loss, which the record amply supports.[8] *Tatum*, 761 F.3d at 363–64. The district court should then have shifted the burden to Cornell to prove "that a prudent fiduciary" who reviewed the investments and was fully aware of their deficiencies nevertheless

---

[8] Dominguez calculated the Plans' investment-related damages. A698 ¶¶24–27, A727 ¶100, A730 ¶110, A732–A734 ¶¶116, 121.

"*would have* made the same decision" by *retaining* the funds. *Tatum*, 761 F.3d at 363–64 (emphasis original).

As explained next in Part II.B, Plaintiffs demonstrated a genuine dispute as to whether Cornell and CAPTRUST had a flawed process. Part II.C shows that Defendants did not remotely approach their burden of proving that a prudent fiduciary would have made the same ultimate decisions.

**B.    Plaintiffs showed that Defendants had a flawed process.**

**1.    Pre-July 2013**

The district court effectively acknowledged that Cornell lacked a meaningful process for reviewing investments until July 2013 (SA32), but glossed over that deficiency by focusing on fund removal, addressed *infra*. Plaintiffs' evidence was more than sufficient for a reasonable jury to conclude that Defendants' review process was imprudent.

Cornell did virtually nothing to review the performance of the Plans' 300 investment options before July 2013, admittedly lacking the "expertise or experience" to do so. A2318–A2319 ¶¶221–222, A1054–A1056 (78:9–80:11). Cornell instead relied on the opinions of conflicted non-fiduciary third parties (TIAA and Fidelity) as to whether their proprietary investments complied with ERISA. A1054–A1055 (78:20–79:2); A1122–A1123.

Because ERISA's prudence requirement incorporates "the standards of others

'acting in a like capacity and *familiar* with such matters,'" *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), "[a] fiduciary's process must bear the marks of loyalty, skill, and diligence expected of *an expert* in the field," *Sweda*, 923 F.3d at 329 (emphases added). Under an objective standard, a lack of experience or expertise is "no excuse," and triggers a duty to obtain outside assistance. *Katsaros*, 744 F.2d at 279. In other words, "a pure heart and an empty head are not enough." *Sweda*, 923 F.3d at 329 (quoting *DiFelice*, 497 F.3d at 418). A fiduciary who lacks the necessary expertise is obligated to obtain outside assistance. *Katsaros*, 744 F.2d at 279.

A reasonable factfinder could readily conclude that Cornell breached its duty be failing to review investments for the first three years of the class period, while delegating the review function to unqualified individuals and failing to seek outside assistance. *Katsaros*, 744 F.2d at 279. Moreover, relying on an interested party's representations without conducting an independent investigation—as Cornell did by relying on TIAA and Fidelity—is a recognized breach of fiduciary duty. *Id.* These facts are sufficient to sustain a jury finding that Cornell "acted imprudently in violation of ERISA." *Id.* at 280.

CAPTRUST's conduct was likewise deficient. CAPTRUST admittedly failed to review the Plans' investments for the first 19 months of its tenure. A2314 ¶214; A1411–A1417. It then rushed to review the "massive" fund lineup not because it

believed that to be the prudent course of action, but to provide "*fiduciary cover.*" A1414–A1417.

A reasonable factfinder could easily conclude from this evidence that an investment advisor who waits 19 months to do the job for which it was hired failed to use the care, skill, prudence, and diligence of an expert in the field. 29 U.S.C. §1104(a)(1)(B). The jury could further infer that a fiduciary who "papers the file" to provide "cover" for itself has acted in its own self-interest rather than acting "solely in the interest of the participants." 29 U.S.C. §1104(a)(1).

### 2. Post-July 2013

The fiduciary process remained deficient through the end of the class period. Once CAPTRUST finally got around to the review, its work contained various errors and omissions and was of generally lower quality than its work for other clients. A712–A714 ¶¶68–69; A2322–A2335 ¶¶228–250. After that review, Cornell did not review any performance measures for CREF Stock or TIAA Real Estate, instead relying on CAPTRUST's "green dot" system unaccompanied by performance information. A2336 ¶¶251–52, A2346–A2347 ¶¶274–75; A688; A1183 (185:18–25). A further investigation would have revealed significant underperformance. A2337–A2343 ¶¶254–67; A1718–A1724 ¶¶40–45, 49–57.

Cornell left hundreds of funds unmonitored after the September 2014 performance review, and delayed nearly five years to act on CAPTRUST's

January 2012 recommendation to eliminate the Plans' "many" underperforming and "redundan[t]" options. A323, A1324–A1327, A1331–A1335. At year-end 2014, Cornell was still trying to formulate "a process to make decisions." A381. As of 2016, Cornell finally made a decision to remove a fraction of the 200 unmonitored funds, but had yet to make "meaningful progress" toward that goal. A373–A374.

As with the earlier period, a reasonable jury could conclude from this evidence that Cornell and CAPTRUST failed to act with the care that ERISA demands. Although hiring an advisor like CAPTRUST can be evidence of prudence, it does not "operate as a complete whitewash which, without more, satisfies ERISA's prudence requirement." *Bierwirth*, 680 F.2d at 272. A fiduciary "cannot reflexively and uncritically adopt investment recommendations." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1138 (9th Cir. 2013), *vacated in part on other grounds,* 575 U.S. 523 (2015). The fiduciary must ensure that reliance on the advisor is justified by "analyz[ing] the bases underlying [its] opinion" and independently determining whether the recommendation is supported by credible data. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435–36 (3d Cir. 1996). Thus, a fiduciary must exercise its own judgment based on the information received—passive reliance does not suffice. *Id*. In short, "the most basic of ERISA's investment fiduciary duties," is "the duty to conduct an independent investigation into the merits of a particular investment."

*Id.* at 435. Moreover, a failure to "balance the relevant factors and make a reasoned decision" is a recognized breach of duty. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011); *Tatum*, 761 F.3d at 358, 369.

A jury could reasonably infer that a prudent fiduciary in Cornell's position would not have passively accepted CAPTRUST assurance that CREF Stock and TIAA Real Estate were prudent choices for the core lineup given CAPTRUST's omission of TIAA Real Estate in the initial review and CREF Stock's poor rating. A prudent fiduciary at least would have determined what performance metrics CAPTRUST was using and reviewed the basis for its conclusions. The factfinder could conclude that a prudent fiduciary would have reviewed investment performance more than once in 14 months. The jury could find that a prudent fiduciary acting in the interest of participants and their retirement savings would not leave hundreds of investment options unreviewed, especially those with known performance problems. *PBGC*, 712 F.3d at 717 (a fiduciary "who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent."). A prudent fiduciary would have promptly "a reasoned decision as to the preferred course of action," not spent years trying to decide on a strategy without meaningful progress. *George*, 641 F.3d at 796.

3. **The district court improperly construed the record in Defendants' favor and its conclusions had no evidentiary or legal support.**

In deciding a motion for summary judgment, a court must view the record in the light most favorable to the non-movant and "*must disregard all evidence favorable to the moving party that the jury is not required to believe.*" *Rogoz*, 796 F.3d at 246 (emphasis added). In finding that Plaintiffs failed to demonstrate a breach after 2013, the district court recited evidence favorable to Defendants at length while virtually ignoring Plaintiffs' contrary evidence. SA36–SA38. That flipped the summary judgment standard on its head.

The district court also overstated Defendants' case. In concluding that no reasonable jury could find that Cornell "passively accept[ed]" CAPTRUST's proposals, it cited questions about "disruption" and a "legacy concern" about removing long-term options. SA37–SA38. Prudence demands more than asking questions about *some* topic; Cornell never inquired into CAPTRUST's conclusions regarding the *relevant* issue: the *prudence* of the Plans' investments. Accordingly, even if a factfinder could construe the evidence cited by the district court favorably to Cornell, another plausible interpretation is that Cornell's concern with "disruption" is merely a euphemism for wanting to avoid changes that could elicit negative feedback, even if the changes would unquestionably further the retirement savings goals of the vast majority of participants. The jury could reasonably

38

conclude that unlike Cornell, a prudent financial expert would make investment decisions based on participants' economic interests, not popularity concerns. "A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988). Had the district court construed the record in the light most favorable to Plaintiffs, it would have denied the motion.

Cornell's speculative "disruption" concerns were also wholly unfounded. An advisor with experience managing a "far more dramatic" transition informed Cornell that effectively communicating the advantages would render anticipated employee disruption "a non-event." A2308 ¶200; A2578. CAPTRUST's other university clients also "made huge changes with little push back from participants." A2309 ¶201; A1663. Cornell cannot muster a shred of evidence that any participant values disruption avoidance over having more money in their account.

The district court also misread the cases on which it relied. *Tibble* involved a claim that fiduciaries should have provided a stable value fund, a higher-yielding alternative to the plan's money market fund. 729 F.3d at 1136. Uncontroverted evidence that the fiduciaries had, in fact, discussed the pros-and-cons of a stable

value fund and concluded that the plan's existing bond fund filled the same role was "fatal" to that claim. *Id.*

Here, Plaintiffs do not merely assert that Defendants should have considered an alternative investment. Rather, Plaintiffs' evidence shows that Defendants ignored red flags with the Plans' existing investments and failed to take meaningful action to address the issue. This case is more like *George*. When a fiduciary is aware of problems with plan investments, discussions—even extensive ones—do not alone satisfy the duty of prudence. Prudence requires fiduciaries to "balance the relevant factors and make a reasoned decision as to the preferred course of action." *Id.* at 796.

In *George*, the plaintiffs alleged that fiduciaries were aware that the "unitized" structure of two plan funds caused the funds to suffer significant losses, and that an alternative structure would have eliminated the problem. 641 F.3d at 792–95. The district court granted summary judgment, based on various documents showing extensive discussions among the fiduciaries "regarding the costs and benefits" of both structures. *Id*. at 794–95. The Seventh Circuit reversed. "Despite all this discussion" of the issue by the fiduciaries, the court could "find nothing in the record indicating that defendants ever made a decision on these matters—i.e., that they actually determined whether the costs of making changes to the [funds] outweighed the benefits, or vice versa." *Id.* at 795. The record did not reveal

whether maintaining the unitized structure was "the result of a deliberate decision," as opposed to inertia. *Id*. at 795–96. "Thus, viewing the evidence in the light most favorable to plaintiffs," the court concluded "that no Plan fiduciary ever made a decision" between the two structures, and remanded for trial. *Id*. at 796.

The same reasoning applies here. There is no evidence that Cornell made a reasoned, deliberate decision that participants' financial interests would best be served by retaining CREF Stock and TIAA Real Estate and delaying removal of 100 underperforming funds until 2017. *See George*, 641 F.3d at 795 (defendants failed to cite "a document or affidavit, or any deposition testimony," showing a decision by the fiduciary). As in *George*, the record viewed most favorably to Plaintiffs shows at most that some Cornell personnel had vague "disruption" or "legacy" concerns but made no reasoned decision as to whether the costs of making changes outweighed the benefits, or vice versa.

The district court also misread a Third Circuit case as holding that "[a]ssessing fund lineup for 'a reasonable range of investment options with a variety of risk profiles' satisfies the duty of a prudent fiduciary." SA38 (citing *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011)). The Third Circuit rejected the district court's view in *Sweda*. The court made clear that while the range of options is a relevant factor, the *Renfro* court "*did not hold*, however, that a meaningful mix and range of investment options insulates plan fiduciaries from liability for breach of

41

fiduciary duty." *Sweda*, 923 F.3d at 330, 333–34 (emphasis added). Thus, even though Penn provided a range of options, that did not preclude the plaintiffs' claims that Penn failed to prudently review the plan's investments. *Id.* at 331–34. As in *Sweda*, merely assessing the fund lineup to provide a range of options does not immunize Defendants against Plaintiffs' evidence that Defendants failed to prudently review plan investments.

### C. Whether a prudent fiduciary would have removed the challenged funds is genuinely disputed.

Because it is Cornell's burden to disprove causation, summary judgment cannot be granted unless Cornell's evidence is so conclusive that "no rational jury could fail to" rule in Cornell's favor. *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996). Determining what a hypothetical prudent fiduciary would have done under like circumstances involves "a totality-of-the-circumstances inquiry." *Tatum*, 761 F.3d at 368. It requires "taking into account everything that the trustees *should have known* at the time of their decision." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994). That "fact-intensive inquiry" is typically "not susceptible to summary judgment." *Id.*

The record reveals genuine disputes as to what a prudent, informed fiduciary would have done. Although the court found a lack of "evidence that other fiduciaries removed TIAA, CREF, or any other fund from their plan lineups based on the performance measures identified" (SA33), Plaintiffs' expert in fact

42

identified 14 plans that removed CREF Stock and TIAA Real Estate. A1711–A1712 ¶¶26–29.

The district court nevertheless granted summary judgment because Plaintiffs did not provide evidence "beyond" Dominguez's testimony. SA33, 41. That was error for two reasons. *First*, the district court clearly erred in finding Dominguez's opinions "conclusory"—in addition to citing 14 examples of plans that removed the funds, she issued two lengthy reports with hundreds of annotations which analyzed the funds at length. A724–A730 ¶¶92–110; A1711–A1726 ¶¶26–61.

*Second*, conflicting expert opinions typically preclude summary judgment. *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 52 (2d Cir. 2007). The district court improperly *weighed* Dominguez's testimony against Defendants' evidence and disregarded her opinions as "inappropriate material for consideration." SA32–SA33, SA41–SA42 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 310 (2d Cir. 2008)). *Salvino*, however, was discussing admissibility; an *inadmissible* expert opinion that does not satisfy *Daubert* is "inappropriate material for consideration on a motion for summary judgment." 542 F.3d at 310–11. Here, the court explicitly "DENIED" Cornell's motion to exclude Dominguez's testimony. SA47–SA48. *Salvino* does not endorse weighing and disregarding *admissible* expert opinions at summary judgment. *Cf. George*, 641 F.3d at 798 (reversing

43

summary judgment where district court improperly weighed admissible expert opinions). Dominguez's admissible opinions "create a genuine issue of material fact as to whether defendants acted prudently." *Id.*

The district court further erred in finding that Defendants were entitled to judgment as a matter of law based on evidence that other TIAA clients and universities—others engaging in the same allegedly imprudent practices—also retained CREF Stock and TIAA Real Estate. *Id.* at 25–26. Implicit in the district court's reliance on this evidence is a legal conclusion that because Cornell is a university, the prudence of its actions should be judged by what other universities did. But ERISA's prudence standard does not vary by industry. *Dudenhoeffer*, 573 U.S. at 418–19 ("[T]he same standard of prudence applies to all ERISA fiduciaries."); *Sweda*, 923 F.3d at 334 n.9 ("ERISA fiduciaries are held to one standard under § 1104" and the standard cannot be adjusted "to accommodate subcategories of sponsors and fiduciaries."). Regardless of industry or tax code designation (*e.g.*, 401(k) vs. 403(b)), all defined contribution fiduciaries are bound by the same "exclusive purpose" of accumulating "*financial* benefits (such as retirement income)" for participants while "defraying reasonable expenses." *Dudenhoeffer*, 573 U.S. at 420–21. Poor investment performance will "significantly reduce the value" of a defined contribution account in a university's 403(b) plan in precisely the same way as in a corporate 401(k) plan. *See Tibble*,

575 U.S. at 525.

Accordingly, a reasonable factfinder could easily reject Cornell's hand-picked list of other university plans as irrelevant to the question of what a prudent defined contribution plan fiduciary would have done under the circumstances. *See Rogoz*, 796 F.3d at 246 (court "must disregard all evidence favorable to the moving party that the jury is not required to believe."). Cornell's list of 200 TIAA clients constitutes only 0.03% of the 675,000 ERISA-governed defined contribution plans in the United States. *See supra* at 6–7 & n.2. The jury could easily find more compelling the fact that virtually 100% of non-TIAA clients have not invested in CREF Stock or TIAA Real Estate.

Moreover, Cornell's list shows only that other universities invested in the same funds, but sheds no light on whether the plans' fiduciaries used appropriate methods. *Cf. George*, 641 F.3d at 796 & n.7 (mere fact that another plan took an action does not establish that the decision was made by "a prudent fiduciary. For all we know, Altria's decision to switch … was imprudent."). Cornell's expert admittedly did not investigate the fiduciary process used by the universities on this list. A1692–A1693 (38:6–39:7), A1696–A1698 (48:18–49:1, 50:5–15). If other institutions also failed to monitor performance for years and made decisions based on popularity concerns instead of economic factors, then Cornell's list shows what imprudent fiduciaries did, not what a prudent fiduciary would have done. This

45

Court has long recognized that "a given industry" may "lag[] behind in adopting procedures that reasonable prudence would dictate be instituted," in which case courts "are free to hold a given defendant to a higher standard of care than that adopted by the industry." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

There was also ample evidence supporting the "performance measures identified." TIAA listed the Russell 3000 as a benchmark in the CREF Stock Fund prospectus and disclosures to participants. A2226–A2228 ¶¶97–98; A539. CAPTRUST also used similar broad-based domestic equity benchmarks (S&P 500 and Morningstar Large Blend) for CREF Stock as of July 2013. A1386; A393. And CAPTRUST testified that a 70%/30% mix of domestic and international equities was the best benchmark for CREF Stock. A1174–A1175 (144:21–145:3); A1227–A1229 (116:19–118:8). As the court stated, "[b]enchmarks used by CAPTRUST … are evidence of appropriate comparator benchmarks." SA36 n.14. Although the court questioned the benchmarks because the IPS listed "neither Russell 3000 nor plaintiffs' expert's custom benchmark" for funds in "CREF Stock's asset class (Large Cap U.S. Equity)" (SA34–SA35), Defendants claimed that CREF Stock was not a large cap fund but a "distinct" asset class. A2238–A2239 ¶¶104–05. Indeed, the court later noted that CREF Stock and TIAA Real Estate were "distinct investments in the [IPS]," contradicting its earlier finding. A37.

46

The district court also misunderstood the significance of the IPS. Plaintiffs did not assert that any deviation from the IPS constitutes a *per se* breach as the district court suggested. Rather, because the IPS represents Defendants' *own* standard for what constitutes prudent investments, their repeated and consistent disregard of that standard is evidence tending to show both an imprudent process and that Defendants retained funds that they knew *should* be removed.

The district court's finding that TIAA Real Estate "overperforms the custom index" as of year-end 2009 (SA35) is based on TIAA's "adjusted" performance figures. The propriety of adjusted returns is genuinely disputed. Evidence from Dominguez, CAPTRUST, and Cornell's former CFO shows that adjusting a fund's returns to compare it to a benchmark is inappropriate. A2252–A2256 ¶¶ 114–16, A2336–A2337 ¶¶253–55; A1508, A1531 (CAPTRUST using unadjusted returns); A1721–A1722 ¶¶ 49–51; A1205 (117:5–8).

As to the additional underperforming funds that Cornell delayed in removing (SA40–44), the district court overlooked evidence of "the timeline of a prudent fiduciary." SA43. CAPTRUST completed the same process in six months with the University System of Maine, and CAPTRUST's expert completed a similar process with the University of Georgia in 12–18 months. A2192 ¶80; A1350–A1351, A1365; A1430–A1431 (56:16–57:10), A1468–A1471 (125:12–126:17, 129:23–130:7); A1646. It took Cornell over *five years*, until spring 2017, to *begin*

47

removing the "many underperforming funds" that CAPTRUST recommended "eliminat[ing] on a go forward basis" in January 2012. A1324–A1325. Four years after CAPTRUST's recommendation, Cornell had still yet to make "meaningful progress" or to develop a "strategy." A374; A1159–A1160. A jury could reasonably find that a hypothetical prudent and informed fiduciary would not have retained 100 unmonitored funds for five years. *George*, 641 F.3d at 796–97.

## III. Plaintiffs' evidence shows genuine disputes regarding the Plans' losses from investing in retail-class mutual funds (Count V).

Cornell sought summary judgment on the sole ground that changing share classes would not have reduced the Plans' total administrative fees and TIAA would not have allowed the switch in 2010. A191. The court found that point to be genuinely disputed. SA45. The court nevertheless granted summary judgment on a ground never argued by Cornell: "Plaintiffs present no evidence as to which additional funds had lower-cost options available or whether Cornell had over $2 million invested in these funds." SA46.

That violated Rule 56(f), because Plaintiffs were entitled to notice and an opportunity to respond before a *sua sponte* grant of summary judgment on a ground not raised by Cornell. Fed. R. Civ. P. 56(f)(2). Had the court provided notice, Plaintiffs could have filled any evidentiary gaps.

In any event, Plaintiffs' evidence was sufficient to show "some loss attributable to the failure to swap out a retail fund for an institutional fund." SA45. Plaintiffs

cited prospectuses for the available institutional-class shares, some of which had no minimum investment requirement. A2377 ¶345 & n.1470, A2379 ¶350 & n.1477; A1241–A1315; A1263 ("[T]here is currently no minimum account size for maintaining an Institutional Class account."). Plaintiffs also presented evidence of the Plans' higher-cost share classes and the Plans' combined investment exceeding the $2 million threshold for 11 TIAA-CREF mutual funds. A255–A260 (showing Plans' "Rtmt" shares, expense ratios, and asset level).

These documents, show, for example, that the Plans invested a combined total of $5 million in the TIAA-CREF Growth & Income-Retirement shares with an expense ratio of 0.75% (A255, A259), while Institutional shares of the same fund with no required minimum investment charged 0.50%. SA1259,[9] SA1263. Similar fee differentials apply for the Plans' other Retirement-class shares.

Proving "some loss" (SA45) did not require the same type of precise calculation that Plaintiffs provided for the TIAA-CREF Lifecycle option:

> [A]t the summary judgment stage it was irrelevant that the valuations
> in the report failed to reflect the precise valuations of the securities on
> the particular purchase dates at issue. Such a level of precision was
> not required to defeat summary judgment for the simple reason that
> the amount of overstatement relates to damages, not liability. To

---

[9] Plaintiffs submitted PDFs printed from the SEC website and hyperlinks to the original source. A2377 ¶345 & n.1470. Although the TIAA-CREF fund names are outside the margin of the "Fees and Expenses" table in the filed PDF (A1258–A1260), they appear at prospectus pages 63–64, available at: https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm#A047.

defeat summary judgment, the plaintiffs merely had to establish a genuine dispute as to whether they purchased their shares at inflated prices, regardless of the amount of the inflation.

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 126 (2d Cir. 2013).

Because the retail shares charged higher fees, the Plans necessarily suffered a loss, regardless of the precise damages. "It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks." *Tibble*, 843 F.3d at 1198. Any precise figures inevitably would change before trial to account for "lost investment opportunity." *Id.*

In *Tibble*, upon finding that fiduciaries breached their duties by using retail shares, the district court's trial decision included only a methodology and instructed the parties to compute the precise figure for the judgment. *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *37–38 (C.D. Cal. July 8, 2010). Dominguez's methodology is similar. A734 (¶¶122–123). Summary judgment should be reversed.

## IV. Whether the Plans suffered losses from excessive recordkeeping fees is genuinely disputed (Count III).

### A. Cornell bears the burden of establishing the reasonableness of Plan fees.

A retirement plan sustains a "loss" if the plan's assets are less than they would have been had the fiduciary not breached its duties. *Trs. of Upstate N.Y. Eng'rs*

50

*Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016); 29 U.S.C.

§1109(a). When a breach has been established, a loss usually occurs: "Courts do

not take kindly to arguments by fiduciaries who have breached their obligations

that, if they had not done this, everything would have been the same." *In re Beck

Indus., Inc*., 605 F.2d 624, 636 (2d Cir. 1979).

Plaintiffs established a genuine dispute regarding Cornell's breach of duty.

SA20. To establish a genuine dispute regarding loss, Plaintiffs only had to show an

expenditure for recordkeeping fees. *DePerno*, 18 F.3d at 183. "Proof of that

expenditure alone" "was sufficient to shift to the defendants the burden to show"

that the fees were "fair and reasonable under all of the circumstances." *Id*.

There is no dispute that the Plans paid TIAA and Fidelity recordkeeping fees

(though the exact amount is disputed). SA14; A2144–A2145, A2168. That shifted

the burden to Cornell to establish reasonableness. *DePerno*, 18 F.3d at 182–83

(rejecting default rule that plaintiff must prove "the *fact* of damages"). Cornell did

not establish reasonableness as a matter of law. Determining "reasonableness of

compensation for services" is "inherently factual" and, therefore, rarely amenable

to summary judgment. *See Sweda*, 923 F.3d at 329.

Plaintiffs at most had to "provide the [factfinder] with some relevant data from

which [it] can make a reasonable estimated calculation of the harm suffered." *New

York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000); *Tussey v.*

51

*ABB, Inc.*, 850 F.3d 951, 960 (8th Cir.), *cert. denied,* 138 S.Ct. 281 (2017) (holding in ERISA case that "the measure of such damages need not be exact"). Requiring more "would be a perversion of fundamental principles of justice [and would] deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Julius Nasso*, 202 F.3d at 89. Any "uncertainties in fixing damages" must be "resolved against" the wrongdoer. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).

## B.   The record establishes a genuine dispute regarding loss.

Plaintiffs provided "some relevant data"—experts' testimony, fees paid by similar plans, and Defendants' own data—to allow the jury to assess the harm to the Plans from Cornell's breach. Nothing more was required.

### 1.   Plaintiffs' experts showed that the Plans suffered a loss.

The gatekeeping requirement ensures that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). The methodology that Otto and Minnich used in determining an expected fee for the Plans was the same that they apply in their professional capacities in hundreds of competitive bidding engagements for defined contribution plans. Indeed, Otto's recordkeeping damages opinions in a similar case were affirmed by the Eighth Circuit as sufficient to sustain a trial judgment

for $13.4 million in excessive recordkeeping fees. *Tussey v. ABB, Inc.*, 746 F.3d 327, 337 (8th Cir. 2014); *see Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 1113291, at *13 (W.D. Mo. Mar. 31, 2012) (finding that "the reasonable recordkeeping fee estimates used in Otto's calculations are appropriate").

Otto and Minnich used a reliable methodology that satisfies Rule 702. They begin with the premise that recordkeeping and administrative fees generally involved a fixed set of services, and that participant count is the primary driver of recordkeeping fees. A765–A767 ¶¶17, 20–21; A819–A821 ¶¶22–23, 28. Minnich and Otto thus determined an expected fee for core services based on the number of participants in the Plans. A1952–A1953 (83:13–84:22); A2060–A2061 (104:9–105:22)

Otto and Minnich then consider the cost of additional services beyond core services. A789 ¶81; A842 ¶¶130–132; A1996–A1997 (45:7–46:18), A2013–A2014 (121:7–122:1). Additionally, Otto and Minnich both consider ancillary revenue sources to the recordkeepers such as IRA rollovers. A788 ¶79; A842–A843 ¶¶133–34. Finally, they considered publicly available market data points of similar sized plans as they would in practice. A843–A851 ¶¶137–156; A1937 (116:5–20); A790–A791 ¶¶85–89; A1954 (85:8–16); A1999 (49:2–13). Because these are the same factors they consider in practice in pricing plans, their opinions meet the reliability standard of Rule 702. *See Kumho*, 526 U.S. at 152. The district

53

court erred in finding that Otto and Minnich relied solely on "general references" to their experience. SA27, SA29. The order excluding their testimony should be reversed.

### 2. Non-expert evidence shows that the Plans suffered a loss.

Cornell claimed that its fees were lower than "the median plan" of TIAA's "200 largest clients." A2167 ¶62. But the Plans are much larger than the median. In terms of participant count, the primary driver of recordkeeping costs, the Plans rank in the 15th–20th percentile. A2301–A2302 ¶189. Using the same data, and comparing Cornell's fees to the 25th percentile, the Plans overpaid by up to $30 per participant per year from 2012–2017:[10]



CAPTRUST data from 2014 and 2017 showed that clients of similar size had lower recordkeeping fees than the Plans. A2303 ¶¶190–191. As of 2017, Cornell, at $158/participant, was paying more than double the average fee ($73.83) of other CAPTRUST clients with over 10,000 participants, including

---

[10] A2301–A2302 ¶189 & n.1213; A2498–A2500; A2487–A2492.

($85), ████████████ ($69), ██████████████ ($87), ██████████████

($69), and ██████████████ ($77). A2496.

The district court rejected this evidence due to a lack of "expert testimony"
explaining why it is "based upon relevant comparators or would lead a reasonable
juror to conclude that Cornell could have achieved lower fees based solely on these
numbers." SA22. But Cornell affirmatively offered this evidence in support of its
motion. A2167–A2174 ¶¶62–63. By Cornell's own admission, then, the data
contains relevant comparators.

Moreover, the admissible portions of Otto's and Minnich's testimony,
"regarding general characteristics of fund structure and 403(b) plans" (SA30 n.10),
would allow the jury to reasonably infer that other large plans are relevant
comparators. Based on their testimony that participant count is the primary driver
of recordkeeping costs and that large plans benefit from economies of scale
(A766–A767 ¶¶20–21; A820–A821 ¶¶23, 28–29), the jury could reasonably infer
that other plans with a similar number of participants were relevant comparators.

In that regard, the fees of other plans cited in Otto's and Minnich's reports,
such as Harvard and Caltech, also establish a genuine dispute as to loss. As the
court acknowledged in denying partial reconsideration after Cornell's expert
belatedly produced his own calculations of Caltech's $40 recordkeeping fee, such
plans could be used to prove loss if shown to be "relevant comparators." SA52.

But even under Cornell's own definition of a relevant peer group—TIAA clients and universities with large 403(b) plans (A2097–A2098 ¶26)—Harvard and Caltech are appropriate comparators.

The district court's criticism of Harvard as a data point, that it has "half the participants" that the Cornell Plans have (SA28), is not a basis for exclusion. Because plans with more participants enjoy economies of scale and can obtain lower fees (A766 ¶20), a plan with half as many participants would be expected to have *higher* fees. Evidence of the smaller Harvard plan's *lower* fees tends to show that the larger Cornell Plans' fees were higher than necessary. Fed.R.Evid. 401. Based on Otto's and Minnich's economies-of-scale opinions, a jury could reasonably infer that the larger Cornell Plans should have had *lower* fees than Harvard's plans with half as many participants, and thus suffered a loss.

To be sure, Cornell may conjure up various reasons that the Plans' features are supposedly so unique that neither Harvard, Caltech, nor any other plan provides a meaningful comparison. But if the only relevant damages measure is a benchmark that is identical in every way, it would be impossible to ever prove a plan's losses, undermining Congress' goal of providing meaningful remedies for breaches of fiduciary duty. *See Bierwirth*, 754 F.2d at 1055. Resolving such factual disputes is a quintessential jury function.

The record shows additional evidence of loss. CAPTRUST and others

informed Cornell of the cost savings of a single recordkeeper, which Cornell did not investigate. A2280–A2283 ¶¶155–60, A2292–A2295 ¶¶175–79; A1332 ("Best cost structure"); A272 ("Lower administrative fees."); A2513 ("[F]ee savings are generally optimized under a Single Recordkeeper structure."). Cornell did not even request a quote. A2293 ¶178; A1214–A1215 (200:15–201:22). Evidence that the Plans' per-participant payments of $214 to TIAA and $112 to Fidelity declined to $145 and $58, respectively, after CAPTRUST's hiring also would support a finding that the Plans overpaid in prior years due to Cornell's inability to determine how much the Plans were paying. A343–A345; A1067 (100:17–22) ("The fee is the fee. We didn't know what it was before."). Cornell also apparently failed to act upon TIAA's offer of a 10% fee reduction if Cornell implemented certain "efficiencies." A367 (2012 offer of reduction from 15 bps); A2155 (still 15 bps until 2014). Cornell's expert admitted that many non-university plans were paying $35–$40 per participant annually for recordkeeping, which he omitted from his report. A964–A987 (279:14–302:20), A989–A992 (305:1–308:5).

In short, the record reveals a genuine dispute as to whether the Plans suffered a loss due to unreasonable recordkeeping fees. Summary judgment should be reversed.

## C. Regardless of the Plans' losses, Plaintiffs' request for equitable relief precludes summary judgment.

Additionally, it was improper to grant summary judgment on Count III because

Plaintiffs seek equitable relief, including an order requiring Cornell "to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses." A186. Equitable relief may be awarded "even if no losses have been established." *Liss v. Smith*, 991 F. Supp. 278, 312 (S.D.N.Y. 1998); 29 U.S.C. §1109(a), SA140.

The movant bears the initial burden of showing an entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(a). Cornell did not address equitable relief at all in its motion. Cornell did argue that Plaintiffs could not establish a genuine dispute as to whether Cornell breached its fiduciary duty (A190), which would have foreclosed *both* damages and equitable relief. But Plaintiffs defeated that argument. SA20. Accordingly, Cornell failed to meet its burden for summary judgment on the issue of equitable relief. When the non-movant fails to meet its burden, summary judgment cannot be granted, even if the non-movant fails *entirely* to respond to the motion. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). It would be perverse to deny summary judgment when the plaintiff fails to respond at all, yet grant summary judgment where the plaintiff successfully rebuts the movant's actual arguments. The district court thus wrongly faulted Plaintiffs for not independently raising the issue of equitable relief in responding to Cornell's damages arguments. SA22–SA23. Plaintiffs' obligation to respond to an unraised argument was never triggered. *Adickes*, 398 U.S. at 161.

In the cases cited by the district court, courts inferred abandonment because the plaintiffs failed to respond to arguments *directly* seeking dismissal of certain claims. In *Felix*, the court inferred abandonment because the defendant argued that a "hiring theory" "claim should be dismissed," and the "Plaintiffs do not address this argument in their papers." *Felix v. City of New York*, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018). In *Jackson*, the complaint contained five distinct claims. *Jackson v. Fed. Exp.*, 766 F.3d 189, 192 (2d Cir. 2014). The plaintiff's response to FedEx's motion "for summary judgment on *all* claims" asserted that there remained "issues of fact with respect to one ... claim" and "argued only that summary judgment should be denied as to that one claim." *Id.* at 192, 196. (emphasis added). Those circumstances indicated a clear intent to abandon the other four claims. *Id.* at 196.

No such inference is possible here. Plaintiffs opposed summary judgment as to *all* claims, Plaintiffs directly responded to *all* of Cornell's arguments regarding Count III, Cornell made no direct argument regarding equitable relief, and Plaintiffs rebutted Cornell's sole argument that indirectly implicated equitable relief.

Moreover, before granting summary judgment "on grounds not raised by a party," a court must give notice and an opportunity to respond. Fed.R.Civ.P. 56(f)(2), SA142. Had the court provided notice, Plaintiffs could have demonstrated why equitable relief remained appropriate. Summary judgment must be reversed

for this additional reason.

**V.    Plaintiffs stated a plausible claim that Cornell caused prohibited transactions involving the Plans' recordkeepers (Count IV).**

Even if Plaintiffs failed to prove losses on their claim under §1104(a), triable issues remain regarding the reasonableness of the Plans' recordkeeping fees. The district court erroneously dismissed Plaintiffs' claim under §1106(a). Under that provision, it is the fiduciary's burden to prove that an exemption applies. *Lowen*, 829 F.2d at 1215. Here, the relevant exemption requires a showing that the recordkeeper received "no more than reasonable compensation." 29 U.S.C. §1108(b)(2)(A). If Cornell fails to prove reasonableness, the Plans will be "entitled to recover damages for the difference" between what the Plans paid and a reasonable fee. *DePerno*, 18 F.3d at 183.

The district court erred in concluding that the Plaintiffs failed to state a claim under 29 U.S.C. §1106(a)(1). SA73–SA74. Section 1106(a) generally prohibits the "furnishing of … services" by a "party in interest" to a plan (SA114), but "necessary" services qualify for an exemption so long as the provider's compensation is "reasonable." 29 U.S.C. §1108(b)(2)(A), SA117. Thus, paying a plan recordkeeper unreasonable compensation, as Plaintiffs plausibly alleged (SA65–SA66), negates the exemption, and violates §1106(a). *Braden*, 588 F.3d at 601 (finding §1106(a)(1)(C) claim plausible where provider received "revenue sharing payments in exchange for services rendered"). The DOL agrees: "a service

60

relationship between a plan and a service provider" constitutes a prohibited

transaction, subject to a potential "reasonableness" exemption. Reasonable

Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed.Reg.

5632, 5632 (Feb. 3, 2012). The applicable regulation repeatedly refers to

"*recordkeeping services.*" 29 C.F.R. §2550.408b-2(c)(1)(i), (iii)(B), (iv)(D),

(iv)(F), (viii)(D) (emphasis added).

Because TIAA and Fidelity are service providers and hence "parties in

interest," their "furnishing of" recordkeeping and administrative services to the

Plans is a prohibited transaction unless Cornell proves an exemption. 29 U.S.C.

§1106(a)(1), §1108(b)(2)(A). The district court erred in concluding otherwise.

The district court's requirements "of self-dealing or other disloyal conduct"

(SA73–SA74) have no statutory basis. *Cf.* 29 U.S.C. §1106(a)(1), §1108(b)(2)(A);

*Millbrook v. United States*, 569 U.S. 50, 55–56 (2013) (overruling lower court

decisions creating "additional limitations" on recovery which had no "support in

the text of the statute."). To the contrary, §1106(a) covers "wide swaths of plan

activity." *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1222 (10th

Cir.), *cert. denied,* 140 S.Ct. 554 (2019). It establishes "some bright-line rules, on

which plaintiffs are entitled to rely." *Id.* at 1221 (quoting *Allen v. GreatBanc Trust

Co.*, 835 F.3d 670, 676 (7th Cir. 2016)).

While "revenue sharing payments drawn from mutual fund assets" are not

themselves "plan assets" (SA73), such payments effect an *indirect* transfer of plan assets by reducing the value of the Plans' mutual fund *shares*, which *are* plan assets. 29 U.S.C. §1101(b)(1) (plan assets include any "security" issued by investment company), SA99; The statute expressly applies to such "indirect" transfers. 29 U.S.C. §1106(a)(1), SA114; *Braden*, 588 F.3d at 602–03.

The Court should reverse the dismissal of Count IV.

## VI. The class period ending date should be vacated for any remanded claims.

Although Plaintiffs sought without objection a class period "through the date of judgment" (A188), the district court ended the class period on August 17, 2016. SA98. Plaintiffs conditionally appeal this issue to the extent the Court remands any other claims.

Class certification decisions require "rigorous analysis." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). There is no analysis explaining the 2016 ending date. SA98. The truncated class period caused the court to disregard evidence (SA30 n.9), and could preclude complete relief for claims that proceed to trial. Thus, if the Court remands for further proceedings, the class period ending date should be vacated for further consideration.

## CONCLUSION

The Court should vacate the judgment and remand for further proceedings.

April 27, 2021      Respectfully submitted,

           /s/ Jerome J. Schlichter

           Jerome J. Schlichter

           Sean E. Soyars

           Heather Lea

           Joel D. Rohlf

           SCHLICHTER BOGARD & DENTON LLP

           100 S. Fourth Street, Suite 1200

           St. Louis, Missouri 63102

           (314) 621-6115

           *Counsel for Plaintiffs-Appellants-Cross-Appellees*

## CERTIFICATE OF COMPLIANCE

1. I certify that this brief contains 13,917 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f) and thus complies with the type-volume limitation of Fed.R.App.P. 28.1(e)(2)(A) and Local Rule 28.1.1(a).

2. I certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Times New Roman 14 point font.

s/ Jerome J. Schlichter
Jerome J. Schlichter
Counsel for Plaintiffs-Appellants-Cross-Appellees
April 27, 2021

## CERTIFICATE OF SERVICE

On April 27, 2021, I electronically filed this Brief with the Clerk of the

Court for the United States Court of Appeals for the Second Circuit by using the

appellate CM/ECF system. I further certify that all counsel of record are Filing

Users and are served electronically by the Notice of Docket Activity.

s/ Jerome J. Schlichter
Jerome J. Schlichter
Counsel for Plaintiffs-Appellants-Cross-
Appellees
April 27, 2021
