# No. 21-88 (L)

### 21-96 (XAP), 21-114 (XAP)

## United States Court of Appeals
*for the*
## Second Circuit

───────────────

CASEY CUNNINGHAM, CHARLES E. LANCE, STANLEY T. MARCUS, LYDIA PETTIS, and JOY VERONNEAU, individually and as representatives of a class of participants and beneficiaries of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca & the Cornell University Tax Deferred Annuity Plan,

*Plaintiffs-Appellants-Cross-Appellees,*

– v. –

CORNELL UNIVERSITY, THE RETIREMENT PLAN OVERSIGHT COMMITTEE, MARY G. OPPERMAN, and CAPFINANCIAL PARTNERS, LLC D/B/A CAPTRUST FINANCIAL ADVISORS,

*Defendants-Appellees-Cross-Appellants.*

───────────────

On Appeal from the United States District Court for the Southern District of New York, Hon. P. Kevin Castel, No. 16-cv-6525

### DEFENDANTS-APPELLEES-CROSS-APPELLANTS'
### APPENDIX VOLUME 1

| | | |
|---|---|---|
| Eric S. Mattson | Nancy G. Ross | Michelle N. Webster |
| Joseph R. Dosch | Samuel P. Myler | MAYER BROWN LLP |
| Caroline A. Wong | MAYER BROWN LLP | 1999 K Street, NW |
| Sidley Austin LLP | 71 South Wacker Drive | Washington, DC 20006 |
| One South Dearborn St. | Chicago, IL 60606 | (202) 263-3000 |
| Chicago, IL 60603 | (312) 782-0600 | mwebster@mayerbrown.com |
| (312) 853-7000 | nross@mayerbrown.com | |
| | smyler@mayerbrown.com | |

*Counsel for CAPTRUST Financial Advisors*

*Counsel for Defendants-Appellees-Cross-Appellants Cornell University, The Retirement Plan Oversight Committee, and Mary G. Opperman*

DEFENDANTS-APPELLEES-CROSS-APPELLANTS'

JOINT APPENDIX VOLUME 1

Table of Contents

Docket Sheet, 16-CV-6525 (S.D.N.Y.) ............................................................. DJA1

Dkt.224-2 Captrust MSJ Exhibit 2,
    Ciccotello Report Excerpts.................................................................. DJA47

Dkt.224-11 Captrust MSJ Exhibit 11,
    Strodel Deposition Excerpts ............................................................... DJA96

Dkt.224-11 Captrust MSJ Exhibit 12,
    Advisory Services Agreement ........................................................... DJA108

Dkt.229-1 PUBLIC Transcript of Deposition of Ty Minnich*[1] ................... DJA115

Dkt.229-5 PUBLIC Transcript of Deposition of Al Otto* ............................ DJA125

Dkt.238-10 Cornell MSJ Exhibit 59,
    September 2010 email ...................................................................... DJA129

Dkt.239-1 Cornell MSJ Exhibit 60,
    December 2010 email ....................................................................... DJA135

Dkt.240-1 Cornell MSJ Exhibit 8,
    TIAA Real Estate 2016 Prospectus* .................................................. DJA140

Dkt.246-1 Cornell MSJ Exhibit 20,
    Request for Proposal......................................................................... DJA145

Dkt.246-5 Cornell MSJ Exhibit 24,
    Recordkeeping Agreement* .............................................................. DJA154

Dkt.246-12 Cornell MSJ Exhibit 30,
    Declaration of Douglas Chittenden,
    *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (S.D.N.Y.),
    ECF No. 272-24.............................................................................. DJA158

---

[1] Items marked with an asterisk are excerpts of the as-filed documents; the full document is available on the District Court's docket.

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:16−cv−06525−PKC−JLC

Cunningham v. Cornell University et al
Assigned to: Judge P. Kevin Castel
Referred to: Magistrate Judge James L. Cott
Cause: 29:1001 E.R.I.S.A.: Employee Retirement

Date Filed: 08/17/2016
Date Terminated: 12/22/2020
Jury Demand: Plaintiff
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 08/17/2016 | 1 | COMPLAINT against Cornell University, The Retirement Plan Oversight Committee. (Filing Fee $ 400.00, Receipt Number 0208−12663201)Document filed by Casey Cunningham.(Schlichter, Andrew) (Entered: 08/17/2016) |
| 08/17/2016 | 2 | CIVIL COVER SHEET filed. (Schlichter, Andrew) (Entered: 08/17/2016) |
| 08/18/2016 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge P. Kevin Castel. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (dgo) (Entered: 08/18/2016) |
| 08/18/2016 | | Magistrate Judge James L. Cott is so designated. (dgo) (Entered: 08/18/2016) |
| 08/18/2016 | | Case Designated ECF. (dgo) (Entered: 08/18/2016) |
| 08/19/2016 | 3 | FILING ERROR − DEFICIENT PLEADING − FILER ERROR − REQUEST FOR ISSUANCE OF SUMMONS as to Cornell University and the Retirement Plan Oversight Committee, re: 1 Complaint. Document filed by Casey Cunningham. (Attachments: # 1 Retirement Plan Oversight Committee Summons)(Schlichter, Andrew) Modified on 8/22/2016 (dgo). (Entered: 08/19/2016) |
| 08/19/2016 | 4 | MOTION for Jerome J. Schlichter to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12669730. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Casey Cunningham. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Schlichter, Jerome) (Entered: 08/19/2016) |
| 08/19/2016 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 4 MOTION for Jerome J. Schlichter to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12669730. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 08/19/2016) |
| 08/19/2016 | 5 | MOTION for Michael A. Wolff to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12669942. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Casey Cunningham. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Wolff, Michael) (Entered: 08/19/2016) |
| 08/19/2016 | 6 | MOTION for Troy A. Doles to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12670020. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Casey Cunningham. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Doles, Troy) (Entered: 08/19/2016) |
| 08/19/2016 | 7 | MOTION for Heather Lea to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12670107. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Casey Cunningham. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Lea, Heather) (Entered: 08/19/2016) |

| | | |
|---|---|---|
| 08/19/2016 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 5 MOTION for Michael A. Wolff to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12669942. Motion and supporting papers to be reviewed by Clerk's Office staff., 7 MOTION for Heather Lea to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12670107. Motion and supporting papers to be reviewed by Clerk's Office staff., 6 MOTION for Troy A. Doles to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12670020. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 08/19/2016) |
| 08/22/2016 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney to RE−FILE Document No. 3 Request for Issuance of Summons,. The filing is deficient for the following reason(s): Summons must be filled separately. Each under their own event;. Re−file the document using the event type Request for Issuance of Summons found under the event list Service of Process − select the correct filer/filers − and attach the correct summons form PDF. (dgo)** (Entered: 08/22/2016) |
| 08/22/2016 | 8 | REQUEST FOR ISSUANCE OF SUMMONS as to Cornell University, re: 1 Complaint. Document filed by Casey Cunningham. (Schlichter, Andrew) (Entered: 08/22/2016) |
| 08/22/2016 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Retirement Plan Oversight Committee, re: 1 Complaint. Document filed by Casey Cunningham. (Schlichter, Andrew) (Entered: 08/22/2016) |
| 08/23/2016 | 10 | ORDER granting 5 Motion for Michael A. Wolff to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 08/23/2016) |
| 08/23/2016 | 11 | ORDER granting 6 Motion for Troy A. Doles to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 08/23/2016) |
| 08/23/2016 | 12 | ORDER granting 7 Motion for Heather Lea to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 08/23/2016) |
| 08/23/2016 | 13 | ORDER granting 4 Motion for Jerome J. Schlichter to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 08/23/2016) |
| 08/23/2016 | 14 | ELECTRONIC SUMMONS ISSUED as to Cornell University. (rch) (Entered: 08/23/2016) |
| 08/23/2016 | 15 | ELECTRONIC SUMMONS ISSUED as to The Retirement Plan Oversight Committee. (rch) (Entered: 08/23/2016) |
| 08/24/2016 | 16 | ORDER INITIAL PRETRIAL CONFERENCE: Initial Conference set for 10/31/2016 at 12:15 PM in Courtroom 11D, 500 Pearl Street, New York, NY 10007 before Judge P. Kevin Castel. (As further set forth in this Order.) (Signed by Judge P. Kevin Castel on 8/24/2016) (kko) (Entered: 08/24/2016) |
| 09/14/2016 | 17 | AFFIDAVIT OF SERVICE. Cornell University served on 8/31/2016, answer due 9/21/2016. Service was accepted by Valerie Cross−Dorn, Counsel. Document filed by Casey Cunningham. (Schlichter, Jerome) (Entered: 09/14/2016) |
| 09/14/2016 | 18 | AFFIDAVIT OF SERVICE. The Retirement Plan Oversight Committee served on 8/31/2016, answer due 9/21/2016. Service was accepted by Valerie Cross−Dorn, Counsel. Document filed by Casey Cunningham. (Schlichter, Jerome) (Entered: 09/14/2016) |
| 09/15/2016 | 19 | NOTICE OF APPEARANCE by Jean−Marie L. Atamian on behalf of Cornell University, The Retirement Plan Oversight Committee. (Atamian, Jean−Marie) (Entered: 09/15/2016) |

| 09/15/2016 | 20 | MOTION for Brian D. Netter to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12763622. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, The Retirement Plan Oversight Committee. (Attachments: # 1 DC Certificate of Good Standing, # 2 IL Certificate of Good Standing, # 3 Text of Proposed Order)(Netter, Brian) (Entered: 09/15/2016) |
|---|---|---|
| 09/15/2016 | 21 | MOTION for Nancy Ross to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12763703. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, The Retirement Plan Oversight Committee. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Ross, Nancy) (Entered: 09/15/2016) |
| 09/15/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 21 MOTION for Nancy Ross to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12763703. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 09/15/2016) |
| 09/15/2016 | 22 | MOTION for Michelle Webster to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12763745. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, The Retirement Plan Oversight Committee. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Webster, Michelle) (Entered: 09/15/2016) |
| 09/15/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 22 MOTION for Michelle Webster to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12763745. Motion and supporting papers to be reviewed by Clerk's Office staff., 20 MOTION for Brian D. Netter to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−12763622. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 09/15/2016) |
| 09/16/2016 | 23 | ORDER granting 20 Motion for Brian D. Netter to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 09/16/2016) |
| 09/16/2016 | 24 | ORDER granting 21 Motion for Nancy Ross to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 09/16/2016) |
| 09/16/2016 | 25 | ORDER granting 22 Motion for Michelle Webster to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 09/16/2016) |
| 09/16/2016 | 26 | LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge P. Kevin Castel from Brian D. Netter dated September 16, 2016. Document filed by Cornell University, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 09/16/2016) |
| 09/19/2016 | 27 | NOTICE OF CHANGE OF ADDRESS by Nancy G. Ross on behalf of Cornell University, The Retirement Plan Oversight Committee. New Address: Mayer Brown LLP, 71 South Wacker Drive, Chicago, Illinois, USA 60606, 312−782−0600. (Ross, Nancy) (Entered: 09/19/2016) |
| 09/19/2016 | 28 | ORDER granting 26 Letter Motion for Extension of Time to Answer re 1 Complaint. Application Granted. So Ordered. Cornell University answer due 10/21/2016; The Retirement Plan Oversight Committee answer due 10/21/2016. (Signed by Judge P. Kevin Castel on 9/16/2016) (kko) (Entered: 09/19/2016) |
| 10/07/2016 | 29 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated October 7, 2016 re: Pre−motion letter regarding motion to dismiss. Document filed by Cornell University, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 10/07/2016) |
| 10/14/2016 | 30 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated October 14, 2016 re: Cornell's proposed motion to dismiss. Document filed by Casey Cunningham.(Schlichter, Jerome) (Entered: 10/14/2016) |

| Date | No. | Description |
|---|---|---|
| 10/20/2016 | 31 | LETTER MOTION to Adjourn Conference addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated October 20, 2016. Document filed by Casey Cunningham.(Schlichter, Jerome) (Entered: 10/20/2016) |
| 10/21/2016 | 32 | LETTER RESPONSE in Opposition to Motion addressed to Judge P. Kevin Castel from Brian D. Netter dated 10/21/16 re: 31 LETTER MOTION to Adjourn Conference addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated October 20, 2016. . Document filed by Cornell University, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 10/21/2016) |
| 10/21/2016 | 33 | LETTER REPLY to Response to Motion addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated October 21, 2016 re: 31 LETTER MOTION to Adjourn Conference addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated October 20, 2016. . Document filed by Casey Cunningham. (Schlichter, Jerome) . (Entered: 10/21/2016) |
| 10/24/2016 | 34 | ORDER denying 31 Letter Motion to Adjourn Conference. Application DENIED. October 31 will be a premotion conference based upon the letters submitted by the parties. If plaintiff "intends to file an amended complaint subject to a review of Defendants' motion," it must have formed that intention based upon a review of defendants' premotion letter. In that case, the Court will want to hear, at the premotion conference, why plaintiff believes the fair, speedy and inexpensive resolution of this dispute is promoted by having the defendants file a motion directed to a pleading that the plaintiff has formed an intention to amend. SO ORDERED. (Signed by Judge P. Kevin Castel on 10/24/2016) (kl) (Entered: 10/24/2016) |
| 10/24/2016 | 35 | JOINT LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated October 24, 2016 re: October 31, 2016 Initial Pretrial Conference. Document filed by Cornell University, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 10/24/2016) |
| 10/31/2016 |  | Minute Entry for proceedings held before Judge P. Kevin Castel: Initial Pretrial Conference held on 10/31/2016. See, Order Following Pretrial Conference filed 10/31/2016. (Nacanther, Florence) (Entered: 10/31/2016) |
| 10/31/2016 | 36 | ORDER FOLLOWING PRETRIAL CONFERENCE: As a result of a Pre−Trial Conference held before the Court today, the following is ORDERED: 1. Plaintiff is granted leave to amend the complaint in response to defendants' premotion letter provided plaintiff does so by December 7, 2016. 2. If defendant still wishes to move to dismiss, it shall submit a premotion letter by December 14 with a proposed motion schedule. Amended Pleadings due by 12/7/2016. (Signed by Judge P. Kevin Castel on 10/31/2016) (kgo) (Entered: 10/31/2016) |
| 12/07/2016 | 37 | **FILING ERROR − DEFICIENT PLEADING − FILED AGAINST PARTY ERROR** AMENDED COMPLAINT amending 1 Complaint against Cornell University, The Retirement Plan Oversight Committee with JURY DEMAND.Document filed by Casey Cunningham. Related document: 1 Complaint filed by Casey Cunningham.(Schlichter, Jerome) Modified on 12/8/2016 (pc). (Entered: 12/07/2016) |
| 12/08/2016 | 38 | AMENDED COMPLAINT amending 1 Complaint against Cornell University, The Retirement Plan Oversight Committee, CAPTRUST Financial Advisors, LLC, Mary G. Opperman with JURY DEMAND.Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Joy Veronneau, Lydia Pettis. Related document: 1 Complaint filed by Casey Cunningham.(Schlichter, Jerome) Modified on 12/8/2016 (pc). Modified on 12/8/2016 (dgo). (Entered: 12/08/2016) |
| 12/08/2016 | 39 | REQUEST FOR ISSUANCE OF SUMMONS as to Mary G. Opperman, re: 38 Amended Complaint,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 12/08/2016) |
| 12/08/2016 | 40 | REQUEST FOR ISSUANCE OF SUMMONS as to Captrust Financial Advisors, LLC, re: 38 Amended Complaint,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 12/08/2016) |

| 12/08/2016 | 41 | ELECTRONIC SUMMONS ISSUED as to Mary G. Opperman. (dgo) (Entered: 12/08/2016) |
|---|---|---|
| 12/08/2016 | 42 | ELECTRONIC SUMMONS ISSUED as to CAPTRUST Financial Advisors, LLC. (dgo) (Entered: 12/08/2016) |
| 12/14/2016 | 43 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated December 14, 2016, re: Premotion letter regarding motion to dismiss the Amended Complaint. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 12/14/2016) |
| 12/15/2016 | 44 | **FILING ERROR − DEFICIENT PLEADING − SUMMONS REQUEST PDF ERROR −** REQUEST FOR ISSUANCE OF AMENDED SUMMONS as to CAPTRUST Financial Advisors, re: 38 Amended Complaint,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) Modified on 12/16/2016 (pc). (Entered: 12/15/2016) |
| 12/16/2016 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney to RE−FILE Document No. 44 Request for Issuance of Amended Summons,. The filing is deficient for the following reason(s): the wrong filer/filers were selected for the request for issuance of summons; CAPTRUST Financial Advisors is not a party listed on the amended complaint caption title. Party name must be written as it appears on the amended complaint caption title. Re−file the document using the event type Request for Issuance of Summons found under the event list Service of Process − select the correct filer/filers − and attach the correct summons form PDF.** (pc) (Entered: 12/16/2016) |
| 12/20/2016 | 45 | SCHEDULING ORDER: 1. Defendants may file their motion to dismiss by January 30, 2017. Plaintiff shall respond to the motion by February 20, 2017. Any reply by defendants shall be filed by March 6, 2017. 2. Rule 16(b)(3)(A) provides that a Court's "scheduling order must limit the time to...amend the pleadings...." Pursuant to that authority, the Court hereby limits the time to move to further amend the complaint to 21 days from the filing of the motion to dismiss. Motions due by 1/30/2017. Responses due by 2/20/2017 Replies due by 3/6/2017. (Signed by Judge P. Kevin Castel on 12/19/2016) (mro) (Entered: 12/20/2016) |
| 12/20/2016 | 46 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated December 20, 2016 re: Response to Cornell's Dec. 14, 2016 premotion letter regarding its motion to dismiss. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 12/20/2016) |
| 12/21/2016 | 47 | AMENDED SCHEDULING ORDER: Defendants may file their motion to dismiss by February 17, 2017. Plaintiff shall respond to the motion by March 31, 2017. Any reply by defendants shall be filed by April 14, 2017. Rule 16(b)(3)(A) provides that a Court's "scheduling order must limit the time to...amend the pleadings..." Pursuant to that authority, the Court hereby limits the time to move to further amend the complaint to 21 days from the filing of the motion to dismiss. 3. Letter application (Doc 46) is terminated. Motions due by 2/17/2017. Responses due by 3/31/2017 Replies due by 4/14/2017. (Signed by Judge P. Kevin Castel on 12/21/2016) (mro) (Entered: 12/21/2016) |
| 12/28/2016 | 48 | SUMMONS RETURNED EXECUTED Summons and Amended Complaint, served. CAPTRUST Financial Advisors, LLC served on 12/16/2016, answer due 1/6/2017. Service was accepted by Kimberly M. Carter, Associate Counsel. Document filed by Joy Veronneau; Charles E. Lance; Casey Cunningham; Stanley T. Marcus; Lydia Pettis. (Schlichter, Jerome) (Entered: 12/28/2016) |
| 01/12/2017 | 49 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION for Joel Steven Feldman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13192941. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Feldman, Joel) Modified on 1/13/2017 (bcu). (Entered: 01/12/2017) |

| | | |
|---|---|---|
| 01/12/2017 | 50 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION for Daniel Robert Thies to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13193005. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Thies, Daniel) Modified on 1/13/2017 (bcu). (Entered: 01/12/2017) |
| 01/13/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE−FILE Document No. 49 MOTION for Joel Steven Feldman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13192941. Motion and supporting papers to be reviewed by Clerk's Office staff., 50 MOTION for Daniel Robert Thies to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13193005. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Attorney Affidavit Missing. Please Read Local Rule 1.3;. Re−file the motion as a Corrected Motion to Appear Pro Hac Vice − attach the correct signed PDF − select the correct named filer/filers − attach valid Certificates of Good Standing issued within the past 30 days − attach Proposed Order.. (bcu)** (Entered: 01/13/2017) |
| 01/13/2017 | 51 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION for Eric Stephen Mattson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13195265. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Mattson, Eric) Modified on 1/13/2017 (bcu). (Entered: 01/13/2017) |
| 01/13/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE−FILE Document No. 51 MOTION for Eric Stephen Mattson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13195265. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Attorney Affidavit Missing. Please Read Local Rule 1.3;. Re−file the motion as a Corrected Motion to Appear Pro Hac Vice − attach the correct signed PDF − select the correct named filer/filers − attach valid Certificates of Good Standing issued within the past 30 days − attach Proposed Order.. (bcu)** (Entered: 01/13/2017) |
| 01/17/2017 | 52 | MOTION for Daniel R. Thies to Appear Pro Hac Vice *(Corrected).* **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Affidavit of Daniel R. Thies, # 3 Text of Proposed Order)(Thies, Daniel) (Entered: 01/17/2017) |
| 01/17/2017 | 53 | MOTION for Eric S. Mattson to Appear Pro Hac Vice *(Corrected).* **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Affidavit of Eric Mattson, # 3 Text of Proposed Order)(Mattson, Eric) (Entered: 01/17/2017) |
| 01/17/2017 | 54 | MOTION for Joel S. Feldman to Appear Pro Hac Vice *(Corrected).* **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Affidavit of Joel S. Feldman, # 3 Text of Proposed Order)(Feldman, Joel) (Entered: 01/17/2017) |
| 01/18/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 52 MOTION for Daniel R. Thies to Appear Pro Hac Vice *(Corrected).* Motion and supporting papers to be reviewed by Clerk's Office staff., 54 MOTION for Joel S. Feldman to Appear Pro Hac Vice *(Corrected).* Motion and supporting papers to be reviewed by Clerk's Office staff., 53 MOTION for Eric S. Mattson to Appear Pro Hac Vice *(Corrected).* Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/18/2017) |
| 01/18/2017 | 55 | ORDER granting 52 Motion for Daniel R. Thies to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 01/18/2017) |

| 01/18/2017 | 56 | ORDER granting 53 Motion for Eric S. Mattson to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 01/18/2017) |
|---|---|---|
| 01/18/2017 | 57 | ORDER granting 54 Motion for Joel S. Feldman to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 01/18/2017) |
| 01/19/2017 | 58 | NOTICE OF APPEARANCE by Andrew W. Stern on behalf of CAPTRUST Financial Advisors, LLC. (Stern, Andrew) (Entered: 01/19/2017) |
| 01/19/2017 | 59 | NOTICE OF APPEARANCE by Joel S. Feldman on behalf of CAPTRUST Financial Advisors, LLC. (Feldman, Joel) (Entered: 01/19/2017) |
| 01/19/2017 | 60 | NOTICE OF APPEARANCE by Daniel R Thies on behalf of CAPTRUST Financial Advisors, LLC. (Thies, Daniel) (Entered: 01/19/2017) |
| 01/19/2017 | 61 | NOTICE OF APPEARANCE by Eric S. Mattson on behalf of CAPTRUST Financial Advisors, LLC. (Mattson, Eric) (Entered: 01/19/2017) |
| 01/30/2017 | 62 | LETTER addressed to Judge P. Kevin Castel from Eric S. Mattson dated January 30, 2017 re: Pre−Motion Letter Regarding Motion To Dismiss. Document filed by CAPTRUST Financial Advisors, LLC.(Mattson, Eric) (Entered: 01/30/2017) |
| 02/01/2017 | 63 | MEMO ENDORSEMENT on re: 62 Letter re: Pre−Motion Letter Regarding Motion To Dismiss filed by CAPTRUST Financial Advisors, LLC. ENDORSEMENT: Proceed on the same motion schedule. SO ORDERED. (Signed by Judge P. Kevin Castel on 2/1/2017) (cla) (Entered: 02/01/2017) |
| 02/03/2017 | 64 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated February 3, 2017 re: Response to Pre−Motion Letter regarding Motion to Dismiss [Doc. 62]. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 02/03/2017) |
| 02/17/2017 | 65 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION to Dismiss *Plaintiffs' Amended Complaint*. Document filed by Cornell University, The Retirement Plan Oversight Committee. Responses due by 3/31/2017(Netter, Brian) Modified on 2/17/2017 (ldi). (Entered: 02/17/2017) |
| 02/17/2017 | 66 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MEMORANDUM OF LAW in Support re: 65 MOTION to Dismiss *Plaintiffs' Amended Complaint*. . Document filed by Cornell University, The Retirement Plan Oversight Committee. (Netter, Brian) Modified on 2/17/2017 (ldi). (Entered: 02/17/2017) |
| 02/17/2017 | 67 | NOTICE OF APPEARANCE by Brian D Netter on behalf of Mary G. Opperman. (Netter, Brian) (Entered: 02/17/2017) |
| 02/17/2017 | 68 | NOTICE OF APPEARANCE by Jean−Marie L. Atamian on behalf of Mary G. Opperman. (Atamian, Jean−Marie) (Entered: 02/17/2017) |
| 02/17/2017 | 69 | NOTICE OF APPEARANCE by Michelle N Webster on behalf of Mary G. Opperman. (Webster, Michelle) (Entered: 02/17/2017) |
| 02/17/2017 | 70 | NOTICE OF APPEARANCE by Nancy G. Ross on behalf of Mary G. Opperman. (Ross, Nancy) (Entered: 02/17/2017) |
| 02/17/2017 | 71 | MOTION to Dismiss *Plaintiffs' Amended Complaint*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. Responses due by 3/31/2017(Netter, Brian) (Entered: 02/17/2017) |
| 02/17/2017 | 72 | MEMORANDUM OF LAW in Support re: 71 MOTION to Dismiss *Plaintiffs' Amended Complaint*. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 02/17/2017) |
| 02/17/2017 | 73 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent The CapFinancial Group, LLC for CAPTRUST Financial Advisors, LLC. Document filed by CAPTRUST Financial Advisors, LLC.(Mattson, Eric) (Entered: 02/17/2017) |
| 02/17/2017 | 74 | NOTICE of Request for Judicial Notice in Connection with Motion to Dismiss re: 71 MOTION to Dismiss *Plaintiffs' Amended Complaint*.. Document filed by Cornell |

| | | |
|---|---|---|
| | | University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C−1, # 4 Exhibit C−2, # 5 Exhibit C−3, # 6 Exhibit C−4, # 7 Exhibit C−5, # 8 Exhibit C−6, # 9 Exhibit C−7, # 10 Exhibit C−8, # 11 Exhibit C−9, # 12 Exhibit D−1, # 13 Exhibit D−2, # 14 Exhibit D−3, # 15 Exhibit E−1, # 16 Exhibit E−2, # 17 Exhibit E−3, # 18 Exhibit F, # 19 Exhibit G)(Netter, Brian) (Entered: 02/17/2017) |
| 02/17/2017 | 75 | MOTION to Dismiss . Document filed by CAPTRUST Financial Advisors, LLC. Responses due by 3/31/2017(Mattson, Eric) (Entered: 02/17/2017) |
| 02/17/2017 | 76 | NOTICE of of Motion re: 75 MOTION to Dismiss .. Document filed by CAPTRUST Financial Advisors, LLC. (Mattson, Eric) (Entered: 02/17/2017) |
| 02/17/2017 | 77 | DECLARATION of Daniel R. Thies in Support re: 75 MOTION to Dismiss .. Document filed by CAPTRUST Financial Advisors, LLC. (Attachments: # 1 Exhibit 1)(Thies, Daniel) (Entered: 02/17/2017) |
| 02/24/2017 | 78 | STIPULATION AND ORDER TO CORRECT NAME OF DEFENDANT CAPFINANCIAL PARTNERS, LLC: Plaintiff shall file a Corrected Amended Complaint correcting the name of this defendant, but making no other changes, within 5 days of this Order. The clerk shall correct the name of this defendant on the docket. (As further set forth in this Order.) (Signed by Judge P. Kevin Castel on 2/23/2017) (cf) (Entered: 02/24/2017) |
| 02/24/2017 | 79 | MOTION for Matthew A. Waring to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13354804. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Waring, Matthew) (Entered: 02/24/2017) |
| 02/24/2017 | 80 | MOTION for Travis Crum to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13354888. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Crum, Travis) (Entered: 02/24/2017) |
| 02/24/2017 | 81 | AMENDED COMPLAINT amending 38 Amended Complaint, against CapFinancial Partners, LLC, Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee with JURY DEMAND.Document filed by Joy Veronneau, Charles E. Lance, Casey Cunningham, Stanley T. Marcus, Lydia Pettis. Related document: 38 Amended Complaint, filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance.(Schlichter, Jerome) (Entered: 02/24/2017) |
| 02/27/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 80 MOTION for Travis Crum to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13354888. Motion and supporting papers to be reviewed by Clerk's Office staff., 79 MOTION for Matthew A. Waring to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13354804. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 02/27/2017) |
| 02/27/2017 | 82 | ORDER granting 79 Motion for Matthew A. Waring to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 02/27/2017) |
| 02/27/2017 | 83 | ORDER granting 80 Motion for Travis Crum to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 02/27/2017) |
| 03/20/2017 | 84 | CONSENT LETTER MOTION for Extension of Time *for Plaintiffs' Response to CAPTRUST's Motion to Dismiss* addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated March 20, 2017. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Text of Proposed Order Proposed Amended Scheduling Order)(Schlichter, Jerome) (Entered: 03/20/2017) |

| 03/21/2017 | 85 | AMENDED SCHEDULING ORDER. NOW, therefore, the following is ORDERED: 1. Plaintiffs shall respond to Defendant CAPTRUST's motion to dismiss by April 14, 2017. Any reply by Defendant CAPTRUST shall be filed by May 2, 2017. All other deadlines under the Court's Amended Scheduling Order (Dkt. 45) shall remain unchanged. SO ORDERED. Granting 84 CONSENT LETTER MOTION for Extension of Time for Plaintiffs' Response to CAPTRUST's Motion to Dismiss addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated March 20, 2017. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Signed by Judge P. Kevin Castel on 3/21/2017) (rjm) (Entered: 03/21/2017) |
|---|---|---|
| 03/21/2017 | | Set/Reset Deadlines: Responses due by 4/14/2017. Replies due by 5/2/2017. (rjm) (Entered: 03/21/2017) |
| 03/31/2017 | 86 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply *in Support of Motion to Dismiss* addressed to Judge P. Kevin Castel from Brian D. Netter dated March 31, 2017. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 03/31/2017) |
| 03/31/2017 | 87 | MEMORANDUM OF LAW in Opposition re: 71 MOTION to Dismiss *Plaintiffs' Amended Complaint*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Faculty Meeting Minutes excerpt, # 2 Exhibit CalTech 2015 Form 5500 excerpt, # 3 Exhibit Cornell Univ. Ret. Plan 2013—2015 Form 5500 excerpts, # 4 Exhibit Cornell TDA Plan 2013—2015 Form 5500 excerpts)(Schlichter, Jerome) (Entered: 03/31/2017) |
| 03/31/2017 | 88 | NOTICE of Objections to Defendants' Request for Judicial Notice re: 74 Notice (Other),,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 03/31/2017) |
| 04/03/2017 | 89 | ORDER granting 86 Letter Motion for Extension of Time to File Response/Reply. Application granted. SO ORDERED. Replies due by 5/2/2017. (Signed by Judge P. Kevin Castel on 4/3/2017) (mro) (Entered: 04/04/2017) |
| 04/13/2017 | 90 | MOTION for Samuel P. Myler to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13540379. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Affidavit Affidavit in Support, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order Granting Pro Hac Vice Admission)(Myler, Samuel) (Entered: 04/13/2017) |
| 04/13/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 90 MOTION for Samuel P. Myler to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−13540379. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 04/13/2017) |
| 04/14/2017 | 91 | MEMORANDUM OF LAW in Opposition re: 75 MOTION to Dismiss . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 04/14/2017) |
| 04/18/2017 | 92 | ORDER granting 90 Motion for Samuel P. Myler to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 04/18/2017) |
| 05/02/2017 | 93 | REPLY to Response to Motion re: 71 MOTION to Dismiss *Plaintiffs' Amended Complaint*. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 05/02/2017) |
| 05/02/2017 | 94 | NOTICE of Reply in Support of Request for Judicial Notice in Connection with Motion to Dismiss re: 74 Notice (Other),,. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 05/02/2017) |
| 05/02/2017 | 95 | REPLY to Response to Motion re: 75 MOTION to Dismiss . . Document filed by CapFinancial Partners, LLC. (Thies, Daniel) (Entered: 05/02/2017) |

| 05/16/2017 | 96 | NOTICE of Supplemental Authorities Further Supporting Denial of Motions to Dismiss re: 91 Memorandum of Law in Opposition to Motion, 71 MOTION to Dismiss *Plaintiffs' Amended Complaint.*, 87 Memorandum of Law in Opposition to Motion, 75 MOTION to Dismiss .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Henderson v. Emory Univ., No. 16−2920, Doc. 61 (N.D. Ga. May 10, 2017), # 2 Exhibit Clark v Duke Univ., No. 16−1044, Doc. 48 (M.D.N.C. May 11, 2017), # 3 Exhibit Am. Compl., Clark v. Duke Univ.)(Schlichter, Jerome) (Entered: 05/16/2017) |
|---|---|---|
| 05/22/2017 | 97 | LETTER MOTION for Leave to File Response to Notice of Supplemental Authorities addressed to Judge P. Kevin Castel from Brian Netter dated May 22, 2017. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Cornell's Response to Notice of Supplemental Authorities)(Netter, Brian) (Entered: 05/22/2017) |
| 05/23/2017 | 98 | RESPONSE *to Plaintiffs Notice of Supplemental Authorities*. Document filed by CapFinancial Partners, LLC. (Thies, Daniel) (Entered: 05/23/2017) |
| 06/02/2017 | 99 | ORDER granting 97 Letter Motion for Leave to File Document. Application granted. (Signed by Judge P. Kevin Castel on 6/2/2017) (cf) (Entered: 06/02/2017) |
| 06/08/2017 | 100 | NOTICE of Supplemental Authorities. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − White v. Chevron Corp., 16−cv−793 (Dismiss Am. Compl.))(Netter, Brian) (Entered: 06/08/2017) |
| 06/22/2017 | 101 | RESPONSE re: 100 Notice (Other) . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 06/22/2017) |
| 08/18/2017 | 102 | NOTICE of Supplemental Authority (Second) Further Supporting Denial of Motions to Dismiss re: 91 Memorandum of Law in Opposition to Motion, 75 MOTION to Dismiss ., 71 MOTION to Dismiss *Plaintiffs' Amended Complaint.*, 87 Memorandum of Law in Opposition to Motion,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Tibble v. Edison Int'l, No. 07−5359, Doc. 567 (C.D. Cal. Aug. 16, 2017))(Schlichter, Jerome) (Entered: 08/18/2017) |
| 08/23/2017 | 103 | RESPONSE re: 102 Notice (Other),, . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 08/23/2017) |
| 08/28/2017 | 104 | NOTICE of Supplemental Authority. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Sacerdote v. New York University, 16−cv−6284)(Netter, Brian) (Entered: 08/28/2017) |
| 09/08/2017 | 105 | RESPONSE re: 104 Notice (Other) . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 09/08/2017) |
| 09/26/2017 | 106 | NOTICE of Supplemental Authority. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Sweda v. The University of Pennsylvania, 16−cv−4329, # 2 Exhibit B − Daugherty v. The University of Chicago, 17−cv−3736, # 3 Exhibit C − Nicolas v. The Trustees of Princeton University, 17−cv−3695)(Netter, Brian) (Entered: 09/26/2017) |
| 09/29/2017 | 107 | MEMORANDUM AND ORDER granting in part and denying in part 71 Motion to Dismiss; granting in part and denying in part 75 Motion to Dismiss. Defendants' motions to dismiss (Dkts. 71, 75, 76) are GRANTED in part and DENIED in part. Counts I, II, IV and VI are DISMISSED in their entirety as to all defendants. Count III is DISMISSED as to CAPTRUST. Counts III, V and VII are DISMISSED in part as discussed above. (Signed by Judge P. Kevin Castel on 9/29/2017) (cf) (Entered: 09/29/2017) |
| 10/06/2017 | 108 | LETTER MOTION for Extension of Time to File Answer *to Corrected Amended Complaint* addressed to Judge P. Kevin Castel from Daniel R. Thies dated 10/6/17. Document filed by CapFinancial Partners, LLC.(Thies, Daniel) (Entered: 10/06/2017) |

| | | |
|---|---|---|
| 10/10/2017 | 109 | ORDER granting 108 Letter Motion for Extension of Time to Answer. Application Granted. So Ordered. (CapFinancial Partners, LLC answer due 11/3/2017.) (Signed by Judge P. Kevin Castel on 10/6/2017) (ras) (Entered: 10/10/2017) |
| 10/13/2017 | 110 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Cornell University.(Myler, Samuel) (Entered: 10/13/2017) |
| 10/13/2017 | 111 | ANSWER to 81 Amended Complaint,. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Myler, Samuel) (Entered: 10/13/2017) |
| 11/03/2017 | 112 | ANSWER to 81 Amended Complaint,. Document filed by CapFinancial Partners, LLC.(Mattson, Eric) (Entered: 11/03/2017) |
| 11/17/2017 | 113 | JOINT LETTER MOTION for Conference (*Initial Pretrial Conference*) addressed to Judge P. Kevin Castel from Brian D. Netter, Eric S. Mattson, and Jerome J. Schlichter dated November 17, 2017. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 11/17/2017) |
| 11/20/2017 | 114 | ORDER INITIAL PRETRIAL CONFERENCE: granting 113 Letter Motion for Conference. Initial Conference set for 12/4/2017 at 11:30 AM in Courtroom 11D, 500 Pearl Street, New York, NY 10007 before Judge P. Kevin Castel, and as further set forth in this order. (Signed by Judge P. Kevin Castel on 11/20/2017) (ap) (Entered: 11/20/2017) |
| 11/27/2017 | 115 | JOINT LETTER addressed to Judge P. Kevin Castel from Michael A. Wolff dated 11−27−17 re: Initial Pretrial Conference scheduled for Dec 4, 2017. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Wolff, Michael) (Entered: 11/27/2017) |
| 12/04/2017 | | Minute Entry for proceedings held before Judge P. Kevin Castel: Initial Pretrial Conference held on 12/4/2017. The next case management conference is scheduled for September 7, 2018 at 10:30 a.m. (Nacanther, Florence) (Entered: 12/04/2017) |
| 12/04/2017 | 116 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). Plaintiff believes this case should be tried to a jury. Defendants do not believe that Plaintiff is entitled to a jury in an ERISA action alleging breach of fiduciary duty. TBD. Defendants propose that all fact discovery shall be completed no later than August 3, 2018. Plaintiffs propose that all expert discovery shall be completed no later than October 5, 2018. Counsel for the parties have conferred and their present best estimate of the length of the trial is three weeks. Plaintiffs' pre−motion letter with respect to a motion for class certification under Fed. R. Civ. P 23 shall be filed no later than but may be filed earlier than April 6, 2018. The Court does not anticipate granting any extension of the discovery period. The next Case Management Conference is scheduled for Sept. 7, 2018 at 10:30 a.m. (As further set forth in this Order.) Fact Discovery due by 8/3/2018. Expert Discovery due by 10/5/2018. Case Management Conference set for 9/7/2018 at 10:30 AM before Judge P. Kevin Castel. (Signed by Judge P. Kevin Castel on 12/4/2017) (cf) Modified on 1/26/2018 (cf). (Entered: 12/04/2017) |
| 01/03/2018 | 117 | LETTER MOTION for Leave to File Second Amended Complaint addressed to Judge P. Kevin Castel from Michael A. Wolff dated 01/03/2018. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Wolff, Michael) (Entered: 01/03/2018) |
| 01/08/2018 | 118 | MOTION for Stephen Mark Hoeplinger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−14547972. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit Stephen M. Hoeplinger, # 2 Exhibit Massachusetts Certificate of Good Standing, # 3 Exhibit Missouri Certificate of Good Standing, # 4 Text of Proposed Order Order re Motion for Admission Pro Hac Vice)(Hoeplinger, Stephen) (Entered: 01/08/2018) |
| 01/08/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 118 MOTION for Stephen Mark Hoeplinger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−14547972. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are** |

| | | |
|---|---|---|
| | | **no deficiencies. (jc)** (Entered: 01/08/2018) |
| 01/09/2018 | 119 | ORDER granting 118 Motion for Stephen Mark Hoeplinger to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 01/09/2018) |
| 01/17/2018 | 120 | LETTER RESPONSE to Motion addressed to Judge P. Kevin Castel from Brian D. Netter dated 1/17/18 re: 117 LETTER MOTION for Leave to File Second Amended Complaint addressed to Judge P. Kevin Castel from Michael A. Wolff dated 01/03/2018. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 01/17/2018) |
| 01/18/2018 | 121 | LETTER addressed to Judge P. Kevin Castel from Stephen M. Hoeplinger dated 01−18−18 re: Request for Leave to File Second Amended Complaint. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Exhibit A Proposed Second Amended Complaint)(Hoeplinger, Stephen) (Entered: 01/18/2018) |
| 01/19/2018 | 122 | MEMORANDUM AND ORDER granting 117 Letter Motion for Leave to File Document. Plaintiffs shall address why they need to name 29 additional individuals as defendants other than (a) they think they can; and (b) the assertion of multi−million dollar claims against these individuals who served on a committee at their employer's request has the tremendous power to harass these individuals because they will be required to list the lawsuit on every auto, mortgage or student financial aid application they file. Is there any meaningful relief that could not be obtained without naming these individuals? Before filing the motion to amend, plaintiffs' counsel, Jerome J. Schlichter and Stephen M. Hoeplinger, are directed to show this Order to their clients, who are the real parties in interest with the power to direct and control the actions of their lawyers, and meet and discuss with their clients the wisdom and propriety of this proposed strategy. Letter motion 117 is GRANTED to the extent that plaintiffs may file their motion to amend on the schedule proposed in the January 18 letter (Doc. 121), annexing clean and marked−to−show−changes copies of the proposed amended pleading. (Signed by Judge P. Kevin Castel on 1/19/2018) (mml) (Entered: 01/19/2018) |
| 02/02/2018 | 123 | MOTION to Direct *PLAINTIFFS TO FILE UNDER SEAL DOCUMENTS THAT IDENTIFY PROPOSED INDIVIDUAL DEFENDANTS*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 02/02/2018) |
| 02/02/2018 | 124 | MEMORANDUM OF LAW in Support re: 123 MOTION to Direct *PLAINTIFFS TO FILE UNDER SEAL DOCUMENTS THAT IDENTIFY PROPOSED INDIVIDUAL DEFENDANTS*. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 02/02/2018) |
| 02/02/2018 | 125 | DECLARATION of Mary George Opperman re: 123 MOTION to Direct *PLAINTIFFS TO FILE UNDER SEAL DOCUMENTS THAT IDENTIFY PROPOSED INDIVIDUAL DEFENDANTS*. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 02/02/2018) |
| 02/05/2018 | 126 | LETTER addressed to Judge P. Kevin Castel from Stephen M. Hoeplinger dated 02−05−2018 re: Defendants' Motion to Direct Plaintiffs to File Under Seal Documents that Identify Proposed Individual Defendants (Doc. 123). Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Hoeplinger, Stephen) (Entered: 02/05/2018) |
| 02/05/2018 | 127 | NOTICE of Withdrawal of Travis Crum as Counsel. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Crum, Travis) (Entered: 02/05/2018) |
| 02/06/2018 | 128 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated February 6, 2018 re: Pre−motion letter regarding motion to strike plaintiffs' request for jury demand. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 02/06/2018) |

| | | |
|---|---|---|
| 02/06/2018 | 129 | MEMO ENDORSEMENT granting 123 Motion to Direct, 126 LETTER addressed to Judge P. Kevin Castel from Stephen M. Hoeplinger dated 02−05−2018. ENDORSEMENT: Defendants motion (Doc 123) is granted. (Signed by Judge P. Kevin Castel on 2/5/2018) (cf) (Entered: 02/06/2018) |
| 02/07/2018 | 130 | MEMO ENDORSEMENT: on re: 128 Letter, filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman. ENDORSEMENT: Proceed on proposed schedule. SO ORDERED. (Motions due by 2/14/2018. Responses due by 2/28/2018. Replies due by 3/7/2018.) (Signed by Judge P. Kevin Castel on 2/6/2018) (ap) (Entered: 02/07/2018) |
| 02/07/2018 | 131 | CONFIDENTIALITY STIPULATION AND ORDER:...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge P. Kevin Castel on 2/6/2018) (ap) (Entered: 02/07/2018) |
| 02/09/2018 | 132 | MOTION for Leave to File Second Amended Complaint . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Hoeplinger, Stephen) (Entered: 02/09/2018) |
| 02/09/2018 | 133 | MEMORANDUM OF LAW in Support re: 132 MOTION for Leave to File Second Amended Complaint . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Hoeplinger, Stephen) (Entered: 02/09/2018) |
| 02/09/2018 | 134 | DECLARATION of Stephen M. Hoeplinger in Support re: 132 MOTION for Leave to File Second Amended Complaint .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Hoeplinger, Stephen) (Entered: 02/09/2018) |
| 02/09/2018 | 135 | CERTIFICATE OF SERVICE of Unredacted Exhibits 1 and 2 served on All Defendants on 02−09−18. Service was made by Mail. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Hoeplinger, Stephen) (Entered: 02/09/2018) |
| 02/13/2018 | 136 | SEALED DOCUMENT placed in vault.rz) (Entered: 02/13/2018) |
| 02/14/2018 | 137 | MOTION to Strike *Plaintiffs' Jury Demand*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 02/14/2018) |
| 02/14/2018 | 138 | MEMORANDUM OF LAW in Support re: 137 MOTION to Strike *Plaintiffs' Jury Demand*. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 02/14/2018) |
| 02/23/2018 | 139 | RESPONSE in Opposition to Motion re: 132 MOTION for Leave to File Second Amended Complaint . . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 02/23/2018) |
| 02/28/2018 | 140 | MEMORANDUM OF LAW in Opposition re: 137 MOTION to Strike *Plaintiffs' Jury Demand*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Hoeplinger, Stephen) (Entered: 02/28/2018) |
| 03/01/2018 | 141 | REPLY MEMORANDUM OF LAW in Support re: 132 MOTION for Leave to File Second Amended Complaint . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1)(Hoeplinger, Stephen) (Entered: 03/01/2018) |
| 03/01/2018 | 142 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated March 1, 2018 re: Request to Direct the Clerk to Terminate Travis Crum as an Attorney−of−Record for Defendants. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 03/01/2018) |
| 03/02/2018 | 143 | MEMO ENDORSEMENT on re: 142 Letter, filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman. ENDORSEMENT: Application granted. Attorney Travis Crum terminated. (Signed by Judge P. Kevin Castel on 3/1/2018) (cf) (Entered: 03/02/2018) |

| | | |
|---|---|---|
| 03/07/2018 | 144 | REPLY to Response to Motion re: 137 MOTION to Strike *Plaintiffs' Jury Demand*. . Document filed by CapFinancial Partners, LLC, Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 03/07/2018) |
| 04/06/2018 | 145 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated April 6, 2018 re: Pre−Motion Letter regarding Motion for Class Certification. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 04/06/2018) |
| 04/12/2018 | 146 | LETTER addressed to Judge P. Kevin Castel from Joel S. Feldman dated 4/12/18 re: response to Plaintiffs' pre−motion letter. Document filed by CapFinancial Partners, LLC.(Feldman, Joel) (Entered: 04/12/2018) |
| 04/12/2018 | 147 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated 4/12/18 re: response to Plaintiffs' pre−motion letter. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 04/12/2018) |
| 04/20/2018 | 148 | MOTION for Scott A. Bumb to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−14968554. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit of Scott Bumb In Support of Motion for Admission Pro Hac Vice, # 2 Exhibit Certificate of Good Standing Scott A. Bumb, # 3 Text of Proposed Order)(Bumb, Scott) (Entered: 04/20/2018) |
| 04/20/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 148 MOTION for Scott A. Bumb to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−14968554. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc)** (Entered: 04/20/2018) |
| 04/23/2018 | 149 | ORDER granting 148 Motion for Scott A. Bumb to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 04/23/2018) |
| 04/27/2018 | 150 | NOTICE of of Supplemental Authority re: 137 MOTION to Strike *Plaintiffs' Jury Demand*.. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit A (Divane v. Northwestern Order Striking Jury Demand))(Myler, Samuel) (Entered: 04/27/2018) |
| 05/02/2018 | 151 | MOTION to Certify Class . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 05/02/2018) |
| 05/02/2018 | 152 | MEMORANDUM OF LAW in Support re: 151 MOTION to Certify Class . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit Casey Cunningham, # 2 Affidavit Charles Lance, # 3 Affidavit Joy Veronneau, # 4 Affidavit Lydia Pettis, # 5 Affidavit Stanley Marcus)(Schlichter, Jerome) (Entered: 05/02/2018) |
| 05/02/2018 | 153 | DECLARATION of Andrew D. Schlichter in Support re: 151 MOTION to Certify Class .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18)(Schlichter, Jerome) (Entered: 05/02/2018) |
| 05/02/2018 | 154 | DECLARATION of Jerome J. Schlichter in Support re: 151 MOTION to Certify Class .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A)(Schlichter, Jerome) (Entered: 05/02/2018) |
| 05/04/2018 | 155 | LETTER addressed to Judge P. Kevin Castel from Stephen M. Hoeplinger dated 05/04/2018 re: terminating my appearance as attorney−of−record. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy |

| | | |
|---|---|---|
| | | Veronneau.(Hoeplinger, Stephen) (Entered: 05/04/2018) |
| 05/04/2018 | 156 | NOTICE of of Withdrawal of Appearance re: 155 Letter,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Hoeplinger, Stephen) (Entered: 05/04/2018) |
| 05/09/2018 | 157 | MEMO ENDORSEMENT on re: 156 Notice (Other) filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance. ENDORSEMENT: Application granted. Attorney Stephen Mark Hoeplinger terminated. (Signed by Judge P. Kevin Castel on 5/9/2018) (cf) (Entered: 05/09/2018) |
| 05/11/2018 | 158 | LETTER addressed to Judge P. Kevin Castel from Joel S. Feldman dated May 11, 2018 re: Briefing Schedule for Plaintiffs' Motion for Class Certification. Document filed by CapFinancial Partners, LLC.(Feldman, Joel) (Entered: 05/11/2018) |
| 05/11/2018 | 159 | MOTION for James Redd, IV to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15060554. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit James Redd, IV, # 2 Missouri Certificate of Good Standing, # 3 Illinois Certificate of Good Standing, # 4 Text of Proposed Order)(Redd, James) (Entered: 05/11/2018) |
| 05/11/2018 | 160 | MEMO ENDORSEMENT on re: 158 Letter filed by CapFinancial Partners, LLC. ENDORSEMENT: The schedule is adopted as an Order of the Court. (Motions due by 5/2/2018., Responses due by 6/13/2018, Replies due by 7/13/2018.) (Signed by Judge P. Kevin Castel on 5/11/2018) (cf) (Entered: 05/11/2018) |
| 05/14/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 159 MOTION for James Redd, IV to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15060554. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 05/14/2018) |
| 05/14/2018 | 161 | ORDER granting 159 Motion for James Redd, IV to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 05/14/2018) |
| 06/12/2018 | 162 | MOTION to Seal *10 Exhibits*. Document filed by CapFinancial Partners, LLC.(Thies, Daniel) (Entered: 06/12/2018) |
| 06/12/2018 | 163 | MEMORANDUM OF LAW in Support re: 162 MOTION to Seal *10 Exhibits*. . Document filed by CapFinancial Partners, LLC. (Thies, Daniel) (Entered: 06/12/2018) |
| 06/12/2018 | 164 | DECLARATION of Scott Matheson in Support re: 162 MOTION to Seal *10 Exhibits*.. Document filed by CapFinancial Partners, LLC. (Thies, Daniel) (Entered: 06/12/2018) |
| 06/13/2018 | 165 | MEMORANDUM OF LAW in Opposition re: 151 MOTION to Certify Class . . Document filed by CapFinancial Partners, LLC. (Feldman, Joel) (Entered: 06/13/2018) |
| 06/13/2018 | 166 | DECLARATION of Scott Matheson in Support re: 165 Memorandum of Law in Opposition to Motion. Document filed by CapFinancial Partners, LLC. (Feldman, Joel) (Entered: 06/13/2018) |
| 06/13/2018 | 167 | DECLARATION of Daniel R. Thies in Support re: 165 Memorandum of Law in Opposition to Motion. Document filed by CapFinancial Partners, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6 − Slip Sheet, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Thies, Daniel) (Entered: 06/13/2018) |
| 06/13/2018 | 168 | RESPONSE to Motion re: 151 MOTION to Certify Class . . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 06/13/2018) |
| 06/18/2018 | 169 | NOTICE of Additional Supplemental Authority re: 137 MOTION to Strike *Plaintiffs' Jury Demand*.. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit A − Clark v. Duke (Order Striking Jury Demand))(Myler, Samuel) (Entered: 06/18/2018) |

| | | |
|---|---|---|
| 06/21/2018 | 170 | MOTION for Ethan Dail Hatch to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15231426. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit of Ethan Hatch in Support of Motion for Pro Hac Vice, # 2 Exhibit MO Certificate of Good Standing, # 3 Exhibit IL Certificate of Good Standing, # 4 Text of Proposed Order)(Hatch, Ethan) (Entered: 06/21/2018) |
| 06/21/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 170 MOTION for Ethan Dail Hatch to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15231426. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc)** (Entered: 06/21/2018) |
| 06/22/2018 | 171 | LETTER MOTION for Conference addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated June 22, 2018., LETTER MOTION to Compel Cornell University, et al. to Produce Documents addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated June 22, 2018. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Schlichter, Jerome) (Entered: 06/22/2018) |
| 06/25/2018 | 172 | ORDER granting 170 Motion for Ethan Dail Hatch to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 06/25/2018) |
| 06/25/2018 | 173 | MOTION for Joel David Rohlf to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit of Joel Rohlf in Support of Motion for Pro Hac Vice, # 2 Exhibit MO Certificate of Good Standing, # 3 Exhibit IL Certificate of Good Standing, # 4 Exhibit DC Certificate of Good Standing, # 5 Text of Proposed Order)(Rohlf, Joel) (Entered: 06/25/2018) |
| 06/26/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 173 MOTION for Joel David Rohlf to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 06/26/2018) |
| 06/26/2018 | 174 | ORDER granting 173 Motion for Joel David Rohlf to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 06/26/2018) |
| 06/28/2018 | 175 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated June 28, 2018 re: Letter Response to Plaintiffs' Letter Motion (Dkt. 171). Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − November 2, 2016 letter, # 2 Exhibit B − December 7, 2016 letter, # 3 Exhibit C − Plaintiff Requests for Production, # 4 Exhibit D − March 23, 2018 letter, # 5 Exhibit E − April 9, 2018 letter, # 6 Exhibit F − May 2, 2018 letter, # 7 Exhibit G − June 13, 2018 letter, # 8 Exhibit H − June 15, 2016 letter)(Netter, Brian) (Entered: 06/28/2018) |
| 06/29/2018 | 176 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non−dispositive pretrial motions, and settlement). Referred to Magistrate Judge James L. Cott. SO ORDERED. Motions referred to James L. Cott. (Signed by Judge P. Kevin Castel on 6/29/2018) (ama) (Entered: 06/29/2018) |
| 07/02/2018 | 177 | LETTER addressed to Magistrate Judge James L. Cott from Joel D. Rohlf dated July 2, 2018 re: Reply Letter to Cornell Defendants' Response to Letter Motion for Discovery Conference (Dkt. 175). Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Rohlf, Joel) (Entered: 07/02/2018) |
| 07/02/2018 | 178 | ORDER granting 171 Letter Motion for Conference; taking under advisement 171 Letter Motion to Compel. As Judge Castel has referred this case to me for general pretrial supervision, including the pending discovery disputes (Dkt. No. 171), the |

| | | |
|---|---|---|
| | | Court will hold a conference on July 16 at 3 p.m. in Courtroom 21−D, 500 Pearl Street, New York, New York. In the interim, the parties are directed to further meet and confer to attempt to resolve or at least narrow the various disputes that they have presented to the Court. The parties are directed to provide a status report and advise the Court, by letter, no later than July 12 whether they have resolved any (or all) of their outstanding disputes. Defendants are directed to provide a courtesy copy of their letter to my chambers as soon as possible (plaintiff's courtesy copy to Judge Castel has already been forwarded by Judge Castel's chambers to me). (HEREBY ORDERED by Magistrate Judge James L. Cott)(Text Only Order) (Cott, James) (Entered: 07/02/2018) |
| 07/03/2018 | <u>179</u> | MOTION for Daniel R. Thies to Withdraw as Attorney . Document filed by CapFinancial Partners, LLC.(Thies, Daniel) (Entered: 07/03/2018) |
| 07/09/2018 | <u>180</u> | LETTER addressed to Judge P. Kevin Castel from James Redd IV dated July 9, 2018 re: terminating my appearance as attorney−of−record. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Redd, James) (Entered: 07/09/2018) |
| 07/09/2018 | <u>181</u> | NOTICE of of Withdrawal of Appearance. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Redd, James) (Entered: 07/09/2018) |
| 07/09/2018 | 182 | ORDER granting <u>179</u> Motion to Withdraw as Attorney. Attorney Daniel R Thies terminated. Application granted. (HEREBY ORDERED by Magistrate Judge James L. Cott)(Text Only Order) (Cott, James) (Entered: 07/09/2018) |
| 07/09/2018 | <u>183</u> | MEMO ENDORSEMENT on re: <u>180</u> Letter filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance. ENDORSEMENT: Application granted. Attorney James Redd IV terminated. Attorney James Redd, IV terminated. (Signed by Magistrate Judge James L. Cott on 7/9/2018) (kgo) (Entered: 07/09/2018) |
| 07/09/2018 | <u>184</u> | MOTION for Scott Apking to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15300186. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # <u>1</u> Affidavit of Scott Apking in Support of Motion for Pro Hac Vice, # <u>2</u> Exhibit IL Certificate of Good Standing, # <u>3</u> Exhibit MO Certificate of Good Standing, # <u>4</u> Text of Proposed Order)(Apking, Scott) (Entered: 07/09/2018) |
| 07/10/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>184</u> MOTION for Scott Apking to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15300186. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 07/10/2018) |
| 07/10/2018 | 185 | ORDER granting <u>184</u> Motion for Scott Apking to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 07/10/2018) |
| 07/12/2018 | <u>186</u> | STATUS REPORT. *Joint Pursuant to Court's Order dated July 2, 2018 (Doc. 178)* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Rohlf, Joel) (Entered: 07/12/2018) |
| 07/13/2018 | <u>187</u> | MOTION for Joseph R. Dosch to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15321365. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by CapFinancial Partners, LLC. (Attachments: # <u>1</u> Affidavit of Joseph R. Dosch, # <u>2</u> Illinois Certificate of Good Standing, # <u>3</u> Text of Proposed Order)(Dosch, Joseph) (Entered: 07/13/2018) |
| 07/13/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>187</u> MOTION for Joseph R. Dosch to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15321365. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc)** (Entered: 07/13/2018) |

| 07/13/2018 | 188 | ORDER OF WITHDRAWAL OF APPEARANCE: SO ORDERED. (Signed by Judge P. Kevin Castel on 7/13/2018) (anc) (Entered: 07/13/2018) |
|---|---|---|
| 07/13/2018 | 189 | REPLY MEMORANDUM OF LAW in Support re: 151 MOTION to Certify Class . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 07/13/2018) |
| 07/16/2018 | 190 | ORDER granting 187 Motion for Joseph R. Dosch to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 07/16/2018) |
| 07/16/2018 | | Minute Entry for proceedings held before Magistrate Judge James L. Cott: Initial Pretrial Conference held on 7/16/2018. (Court Reporter Kristen Carrnnante) (Tam, David) (Entered: 07/16/2018) |
| 07/16/2018 | 191 | ORDER denying without prejudice 171 Letter Motion to Compel. For the reasons set forth on the record at today's conference, the motion to compel is denied without prejudice. The parties are directed to meet and confer by July 20 to discuss any related issues and potential further production. If the parties have any additional applications regarding document discovery, they must be made by July 25, 2018. Finally, as requested at the conference, the Court hereby extends the fact discovery deadline until August 10 for the purpose of accommodating certain non−party depositions identified on the record. (HEREBY ORDERED by Magistrate Judge James L. Cott)(Text Only Order) (Cott, James) (Entered: 07/16/2018) |
| 07/23/2018 | 192 | JOINT STIPULATION AND ORDER: Plaintiffs withdraw their motion for leave to file a Second Amended Complaint and shall not thereafter seek to join any of the 29 Individuals as a party to this action. (As further set forth herein.) (Signed by Judge P. Kevin Castel on 7/20/2018) (kgo) (Entered: 07/23/2018) |
| 07/30/2018 | 193 | JOINT STIPULATION AND AMENDED SCHEDULING ORDER: It is hereby stipulated, by and between Plaintiffs, the Cornell Defendants, and Defendant CapFinancial Advisors LLC through their undersigned attorneys, as follows: 1. Plaintiffs' expert disclosures and reports are to be served on or before August 24, 2018. 2. Defendants' expert and rebuttal expert disclosures and reports are to be served on or before September 14, 2018. 3. Plaintiffs' rebuttal expert disclosures and reports are to be served on or before September 26, 2018. 4. Expert depositions are to begin on September 27, 2018. 5. All expert depositions are to be completed by October 18, 2018. 6. The deadline for a request for a pre−motion conference relating to summary judgment shall be November 1, 2018. 7. All other deadlines under the Court's Scheduling Order (Dkt. 116) shall remain unchanged. ( Deposition due by 10/18/2018.) (Signed by Magistrate Judge James L. Cott on 7/30/2018) (mro) (Entered: 07/30/2018) |
| 08/09/2018 | 194 | TRANSCRIPT of Proceedings re: conference held on 7/16/2018 before Magistrate Judge James L. Cott. Court Reporter/Transcriber: Kristen Carannante, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/30/2018. Redacted Transcript Deadline set for 9/10/2018. Release of Transcript Restriction set for 11/7/2018.(McGuirk, Kelly) (Entered: 08/09/2018) |
| 08/09/2018 | 195 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 7/16/18 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 08/09/2018) |
| 08/14/2018 | 196 | MOTION for Alexander L. Braitberg to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15446515. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit of Alexander Braitberg in Support of Motion for Pro Hac Vice, # 2 Exhibit IL Certificate of Good Standing, # 3 Exhibit MO Certificate of Good Standing, # 4 Text of Proposed Order)(Braitberg, Alexander) (Entered: 08/14/2018) |

| | | |
|---|---|---|
| 08/14/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 196 MOTION for Alexander L. Braitberg to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15446515. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 08/14/2018) |
| 08/15/2018 | 197 | ORDER granting 196 Motion for Alexander L. Braitberg to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 08/15/2018) |
| 09/06/2018 | 198 | OPINION AND ORDER re: 137 MOTION to Strike *Plaintiffs' Jury Demand* filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman. The motion to strike the jury demand (Dkt. 137) as to all claims by beneficiaries against fiduciaries to personally make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty is DENIED. It is otherwise GRANTED. (Signed by Judge P. Kevin Castel on 9/6/2018) (mro) (Entered: 09/07/2018) |
| 09/07/2018 | | Minute Entry for proceedings held before Judge P. Kevin Castel: Case Management Conference held on 9/7/2018. (Nacanther, Florence) (Entered: 09/07/2018) |
| 09/18/2018 | 199 | LETTER addressed to Judge P. Kevin Castel from Nancy G. Ross dated September 18, 2018 re: Parties do not Agree to Mediate. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Ross, Nancy) (Entered: 09/18/2018) |
| 09/21/2018 | 200 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated 9/21/2018 re: Letter Motion for Court to Certify for Interlocutory Appeal Dkt. 198. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 09/21/2018) |
| 09/27/2018 | 201 | MOTION for Ankur Mandhania to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15624066. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cornell University, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Certificate of Good Standing, # 2 Text of Proposed Order)(Mandhania, Ankur) (Entered: 09/27/2018) |
| 09/27/2018 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 201 MOTION for Ankur Mandhania to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208−15624066. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 09/27/2018) |
| 09/27/2018 | 202 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated September 27, 2018 re: in Response to Cornell Defendants' Pre−Motion Letter for Interlocutory Appeal. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 09/27/2018) |
| 09/28/2018 | 203 | ORDER granting 201 Motion for Ankur Mandhania to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Castel, P.) (Entered: 09/28/2018) |
| 10/11/2018 | 204 | OPINION AND ORDER: Letter motion for certification under section 1292(b) of title 28 (Doc 200) is DENIED. (Signed by Judge P. Kevin Castel on 10/11/2018) (jwh) (Entered: 10/11/2018) |
| 10/23/2018 | 205 | NOTICE of Supplemental Authority in Further Support of Class Certification re: 151 MOTION to Certify Class .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Henderson v. Emory Univ., No. 16−2920, Doc. 167 (N.D.Ga. Sept. 13, 2018), # 2 Exhibit Cassell v. Vanderbilt Univ., No. 16−2086, Doc. 126 (M.D. Tenn. Oct. 23, 2018), # 3 Exhibit Tracey v. MIT, No. 16−11620, Doc. 157 (D. Mass. Oct. 19, 2018))(Schlichter, Jerome) (Entered: 10/23/2018) |
| 11/01/2018 | 206 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated 11/1/2018 re: Pre−Motion Letter Prior to Filing a Motion for Summary Judgment. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 11/01/2018) |

| 11/01/2018 | 207 | LETTER addressed to Judge P. Kevin Castel from Joel S. Feldman dated November 1, 2018 re: Summary Judgment. Document filed by CapFinancial Partners, LLC.(Feldman, Joel) (Entered: 11/01/2018) |
|---|---|---|
| 11/07/2018 | 208 | LETTER addressed to Judge P. Kevin Castel from Joel D. Rohlf dated November 7, 2018 re: Response to Defendants' Pre−Motion Letters to File Motions for Summary Judgment. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Rohlf, Joel) (Entered: 11/07/2018) |
| 11/13/2018 | 209 | ORDER re: 208 Letter, filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance, 207 Letter filed by CapFinancial Partners, LLC, 206 Letter, filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman. The Plaintiff and the Defendants and the two groups of defendants were unable to agree on a common motion schedule. All defendant's motions may proceed on the following schedule: summary judgment motions due January 25, 2019, oppositions due February 25, 2019 and any replies due March 25, 2019. Movants' are cautioned that Local Civil Rule 56.1 requires a statement of material facts not in dispute. the listing of a fact in the statement is a concession that the fact is material that cannot be avoided if the fact is later successfully disputed by the non−movant. SO ORDERED. (Signed by Judge P. Kevin Castel on 11/13/2018) (kv) (Entered: 11/14/2018) |
| 11/14/2018 | 210 | LETTER addressed to Judge P. Kevin Castel from Ethan D. Hatch dated November 14, 2018 re: terminating my appearance as attorney−of−record. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Hatch, Ethan) (Entered: 11/14/2018) |
| 11/14/2018 | 211 | NOTICE of Withdrawal of Appearance re: 210 Letter,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Hatch, Ethan) (Entered: 11/14/2018) |
| 11/15/2018 | 212 | MEMO ENDORSEMENT on re: 210 Letter, filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance. ENDORSEMENT: Application granted as to Ethan Hatch. SO ORDERED. Attorney Dail Hatch terminated. (Signed by Judge P. Kevin Castel on 11/14/2018) (jca) Modified on 11/15/2018 (jca). (Entered: 11/15/2018) |
| 11/20/2018 | 213 | NOTICE of Supplemental Authority in Further Support of Class Certification re: 151 MOTION to Certify Class .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 11/20/2018) |
| 11/21/2018 | 214 | RESPONSE re: 213 Notice (Other) *NOTICE of Supplemental Authority in Further Support of Class Certification*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 11/21/2018) |
| 01/07/2019 | 215 | ORDER: Defendant Capfinancial Partners, d/b/a Captrust Financial Advisors ("CAPTRUST") filed a Motion to File Under Seal "10 exhibits in connection with its opposition to class certification," to include presentations given at and minutes of the meetings of Cornell's Retirement Plan Oversight Committee through which Captrust communicated its confidential and proprietary advice." (Doc 162 at 1.) In its Memorandum of Law in support of the motion, CAPTRUST again characterized the exhibits it would like sealed to include "presentations" to Cornell's Retirement Plan Oversight Committee "as well as minutes of those meetings." (Doc 163 at 2.) Scott Matheson, Managing Director of the Consulting Solutions Group for CAPTRUST, then filed a declaration in support of the motion in which he described the requested materials to be sealed as 9 exhibits and a forthcoming declaration from himself "describing in more detail the types of factors Captrust considers when providing investment advice and the process by which it evaluates investment options to be offered in retirement plans." (Doc 164 at 2.) Following these submissions, CAPTRUST filed with the Court Mr. Matheson's declaration (Doc 166), and nine exhibits (Doc 167 Exs. 1−9.) Mr. Matheson's declaration was not submitted under seal. Of the nine exhibits, only oneExhibit 6was submitted under seal. Exhibit 6 contains a single presentation from a Cornell Retirement Plan Oversight Committee meeting dated September 17, 2014. (See Doc 167 at 23.) The remaining eight exhibits are not |

| | | |
|---|---|---|
| | | related to presentations given to the Retirement Plan Oversight Committee or minutes of those presentations. (See id.) It appears that CAPTRUST's submissions related to its Motion to File Under Seal are inconsistent. The Court has not received multiple presentations to Cornell's Retirement Plan Oversight Committee or any minutes related to meetings of the Committee for consideration as part of CAPTRUST's opposition to the class certification motion. By Monday, January 14, 2019, CAPTRUST shall clarify to the Court in a letter the submissions it seeks to file under seal. (Signed by Judge P. Kevin Castel on 1/7/2019) (mro) (Entered: 01/08/2019) |
| 01/10/2019 | 216 | LETTER addressed to Judge P. Kevin Castel from Joel S. Feldman dated January 10, 2019 re: to clarify its motion to file certain documents under seal in support of its opposition to class certification. Document filed by CapFinancial Partners, LLC.(Feldman, Joel) (Entered: 01/10/2019) |
| 01/10/2019 | 217 | NOTICE of Supplemental Authority. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Wilcox v. Georgetown Univ., No. 18−cv−00422)(Netter, Brian) (Entered: 01/10/2019) |
| 01/17/2019 | 218 | RESPONSE re: 217 Notice (Other) *Response to Cornell Defendants' Notice of Supplemental Authority*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 01/17/2019) |
| 01/22/2019 | 219 | OPINION AND ORDER: Plaintiffs motion for class certification is GRANTED (Doc 151.) The Court certifies the following class: All participants and beneficiaries of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan from August 17, 2010, through August 17, 2016, excluding the Defendants and any participant who is a fiduciary to the Plans. The Clerk is directed to terminate the motion (Doc 151.) The law firm of Schlichter Bogard & Denton LLP is appointed to act as class counsel. Within 21 days, class counsel shall submit a proposed form of notice to class members and a proposed plan for distributing the notice. SO ORDERED. (Signed by Judge P. Kevin Castel on 1/22/2019) (jca) (Entered: 01/22/2019) |
| 01/22/2019 | 220 | ORDER granting 162 Motion to Seal. CAPTRUST asks the court to seal one exhibit − Exhibit 6−filed in connection with its Memorandum in Opposition to the Motion for Class Certification (Doc. 167 Ex. 6; see Letter of January 10, 2019; Doc 216.). CAPTRUST's motion to file under seal is GRANTED. The Clerk is directed to terminate the motion. (Doc 162.) SO ORDERED. (Signed by Judge P. Kevin Castel on 1/22/2019) (jca) Transmission to Sealed Records Clerk for processing. (Entered: 01/22/2019) |
| 01/25/2019 | 221 | MOTION for Summary Judgment . Document filed by CapFinancial Partners, LLC.(Mattson, Eric) (Entered: 01/25/2019) |
| 01/25/2019 | 222 | MEMORANDUM OF LAW in Support re: 221 MOTION for Summary Judgment . . Document filed by CapFinancial Partners, LLC. (Mattson, Eric) (Entered: 01/25/2019) |
| 01/25/2019 | 223 | RULE 56.1 STATEMENT. Document filed by CapFinancial Partners, LLC. (Mattson, Eric) (Entered: 01/25/2019) |
| 01/25/2019 | 224 | DECLARATION of Joseph R. Dosch in Support re: 221 MOTION for Summary Judgment .. Document filed by CapFinancial Partners, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Dosch, Joseph) (Entered: 01/25/2019) |
| 01/25/2019 | 225 | MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*. Document filed by Cornell University.(Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | 226 | DECLARATION of Brian D. Netter in Support re: 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*.. Document filed by Cornell University. (Attachments: # 1 Exhibit Ex A Excerpts of Dominguez Dep PUBLIC, # 2 Exhibit Ex B Dominguez Report PUBLIC, # 3 Exhibit Ex C Pl Supplement to Rule 26 Disclosures, # 4 Exhibit Ex D Dominguez Dep Exhibit 313 part 1, # 5 Exhibit Ex D Dominguez Dep Exhibit 313 |

| | | |
|---|---|---|
| | | part 2, # <u>6</u> Exhibit Ex E Dominguez Dep Exhibit 297 part 1, # <u>7</u> Exhibit Ex E Dominguez Dep Exhibit 297 part 2, # <u>8</u> Exhibit Ex E Dominguez Dep Exhibit 297 part 3, # <u>9</u> Exhibit Ex F Dominguez Dep Exhibit 298, # <u>10</u> Exhibit Ex G Dominguez Dep Exhibit 300, # <u>11</u> Exhibit Ex H Product Analysis 3Q18, # <u>12</u> Exhibit Ex I Portfolio Review 3Q18, # <u>13</u> Exhibit Ex J Dominguez Dep Exhibit 292 part 1, # <u>14</u> Exhibit Ex J Dominguez Dep Exhibit 292 part 2, # <u>15</u> Exhibit Ex K Committee Minutes 2012−01−12, # <u>16</u> Exhibit Ex L Committee Minutes 2012−04−13, # <u>17</u> Exhibit Ex M Amendment to agreement 2012−06−26, # <u>18</u> Exhibit Ex N Amendment to Agreement 2012−01−01, # <u>19</u> Exhibit Ex O Amendment to agreement 2012−06−26, # <u>20</u> Exhibit Ex P Poehler Expert Report PUBLIC, # <u>21</u> Exhibit Ex Q Fee Disclosure, # <u>22</u> Exhibit Ex R Buetow Expert Report PUBLIC, # <u>23</u> Exhibit Ex S Excerpts of Buetow Dep, # <u>24</u> Exhibit Ex T Eml Jeremy Hueth to Brian Netter enclosing Quarterly Portfolio Reviews)(Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>227</u> | MEMORANDUM OF LAW in Support re: <u>225</u> MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*. . Document filed by Cornell University. (Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>228</u> | MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto . Document filed by Cornell University.(Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>229</u> | DECLARATION of Brian D. Netter in Support re: <u>228</u> MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto .. Document filed by Cornell University. (Attachments: # <u>1</u> Exhibit Ex A Excerpts of Minnich Dep PUBLIC, # <u>2</u> Exhibit Ex B Excerpts of Polacek Dep PUBLIC, # <u>3</u> Exhibit Ex C Excerpts of Bursic Dep, # <u>4</u> Exhibit Ex D Expert Report of Otto PUBLIC, # <u>5</u> Exhibit Ex E Excerpts of Otto Dep PUBLIC, # <u>6</u> Exhibit Ex F Expert Report of Minnich PUBLIC, # <u>7</u> Exhibit Ex G Otto Deposition Exhibit 218, # <u>8</u> Exhibit Ex H Expert Report of Poehler PUBLIC, # <u>9</u> Exhibit Ex I Minnich Dep Exhibit 214, # <u>10</u> Exhibit Ex J Minnich Dep Exhibit 220, # <u>11</u> Exhibit Ex K Minnich Dep Exhibit 226)(Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>230</u> | MEMORANDUM OF LAW in Support re: <u>228</u> MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto . . Document filed by Cornell University. (Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>231</u> | MOTION for Summary Judgment . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>232</u> | RULE 56.1 STATEMENT. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>233</u> | MEMORANDUM OF LAW in Support re: <u>231</u> MOTION for Summary Judgment . . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 01/25/2019) |
| 01/25/2019 | <u>234</u> | **FILING ERROR − DEFICIENT DOCKET ENTRY (SEE <u>250</u> Declaration) −** DECLARATION of Samuel P. Myler in Support re: <u>231</u> MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # <u>1</u> Exhibit Exhibit 1 Corrected Amended Complaint, # <u>2</u> Exhibit Exhibit 2 Order on Defendants Motion to Dismiss, # <u>3</u> Exhibit Exhibit 3 2008 CURP Adoption Agreement, # <u>4</u> Exhibit Exhibit 4 2008 CURP Basic Plan, # <u>5</u> Exhibit Exhibit 5 2008 TDA Plan Adoption Agreement, # <u>6</u> Exhibit Exhibit 6 2008 TDA Plan Document, # <u>7</u> Exhibit Exhibit 7 Report Challenges and Best Practices.., # <u>8</u> Exhibit Exhibit 8 DOL Bulletin 2009−02, # <u>9</u> Exhibit Exhibit 9 A Close Look at ERISA 403(b) Plans, # <u>10</u> Exhibit Exhibit 10 2016 Form 5500 CURP, # <u>11</u> Exhibit Exhibit 11 2016 Form 5500 TDA, # <u>12</u> Exhibit Exhibit 12 2012 Form 5500 CURP, # <u>13</u> Exhibit Exhibit 13 2012 Form 5500 TDA, # <u>14</u> Exhibit Exhibit 14 2017 TDA Plan Notice, # <u>15</u> Exhibit Exhibit 15 2017 CURP Plan, # <u>16</u> Exhibit Exhibit 16 Declaration of Paul Bursic, # <u>17</u> Exhibit Exhibit 17Committee Charter, # <u>18</u> Exhibit Exhibit 18 Excerpts of Opperman Dep, # <u>19</u> Exhibit Exhibit 19 RPOC Meeting Minutes., # <u>20</u> Exhibit Exhibit 20 2011 Plan Consultant Request for Proposal)(Netter, Brian) Modified on 1/29/2019 (db). (Entered: 01/25/2019) |

| | | |
|---|---|---|
| 01/26/2019 | 235 | **FILING ERROR − DEFICIENT DOCKET ENTRY (SEE 246 Declaration) −** DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 20 2011 Plan Consultant Request for Proposal, # 2 Exhibit Exhibit 21 Retirement Plan Advisory Services Agreement, # 3 Exhibit Exhibit 22 Excerpt 2016 Plansponsor 403(b) Recordkeeping Survey, # 4 Exhibit Exhibit 23 Expert Report of Glenn Poehler, # 5 Exhibit Exhibit 24 TIAA/Cornell Recordkeeping Agreement, # 6 Exhibit Exhibit 24 TIAA/Cornell Recordkeeping Agreement, # 7 Exhibit Exhibit 25 Fidelity/Cornell Recordkeeping Agreement, # 8 Exhibit Exhibit 26 2012 TIAA Service & Fee Disclosure, # 9 Exhibit Exhibit 27 2014 TIAA/Cornell Year in Review, # 10 Exhibit Exhibit 28 2016 TIAA Making the Most of Your Retirement Plan., # 11 Exhibit Exhibit 29 Excerpts of Polacek Deposition, # 12 Exhibit Exhibit 30 Declaration of Douglas)(Netter, Brian) Modified on 1/29/2019 (db). (Entered: 01/26/2019) |
| 01/26/2019 | 236 | **FILING ERROR − DEFICIENT DOCKET ENTRY (SEE 247 Declaration) −** DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 31 2016 Fidelity Master Recordkeeper, # 2 Exhibit Exhibit 32 Email from Jim Strodel, # 3 Exhibit Exhibit 33 2011 Fidelity Fee Disclosure and Higher Ed Trends, # 4 Exhibit Exhibit 34 2017 PSCA Fee Structure and Evaluation in 403(b) Plans, # 5 Exhibit Exhibit 35 Excerpts of Warner Deposition, # 6 Exhibit Exhibit 36 Excerpts of Strodel Deposition, # 7 Exhibit Exhibit 37 2009 TDA Plan Investment Fee & Expense, # 8 Exhibit Exhibit 38 2009 CURP Investment Fee & Expense)(Netter, Brian) Modified on 1/29/2019 (db). (Entered: 01/26/2019) |
| 01/26/2019 | 237 | **FILING ERROR − DEFICIENT DOCKET ENTRY (SEE 248 Declaration) −** DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 41 Excerpts of Bursic Deposition, # 2 Exhibit Exhibit 42 2010 Johns Hopkins 403(b) Plan Design, # 3 Exhibit Exhibit 43 RPOC Meeting Materials Jan 2012, # 4 Exhibit Exhibit 44 RPOC Meeting Minutes Jan 2012, # 5 Exhibit Exhibit 45 RPOC Meeting Minutes July 2012, # 6 Exhibit Exhibit 46 Excerpts of Otto Deposition, # 7 Exhibit Exhibit 47 Pepperdine Committee minutes., # 8 Exhibit Exhibit 48 Declaration of Scott Matheson, # 9 Exhibit Exhibit 49 RPOC Meeting Materials April 2012, # 10 Exhibit Exhibit 50 RPOC Meeting Minutes April 2012)(Netter, Brian) Modified on 1/29/2019 (db). (Entered: 01/26/2019) |
| 01/26/2019 | 238 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 50 RPOC Meeting Minutes April 2012, # 2 Exhibit Exhibit 51 Declaration of Jim Strodel, # 3 Exhibit Exhibit 52 Excerpts of Deposition of Barry Schmitt, # 4 Exhibit Exhibit 53 Deloitte 2015 Annual Defined Contribution Benchmarking, # 5 Exhibit Exhibit 54 2017 Vendor Fee Benchmarking Presentation., # 6 Exhibit Exhibit 55 2016 TIAA Revenue Requirement, # 7 Exhibit Exhibit 56 2012 TIAA Revenue Requirement Summary, # 8 Exhibit Exhibit 57 TIAA Side−by−Side Comparison of Cornell/Weill Services, # 9 Exhibit Exhibit 58 RPOC Meeting Minutes March 2016, # 10 Exhibit Exhibit 59 Email from Patrick)(Netter, Brian) (Entered: 01/26/2019) |
| 01/26/2019 | 239 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 60 Vanguard Signal Share Class Conversion Letter, # 2 Exhibit Exhibit 61 Letter−of−Direction for Spartan Share Class Replacement, # 3 Exhibit Exhibit 62 Fidelity Letter of Direction for Spartan Share Class, # 4 Exhibit Exhibit 63 RPOC Meeting Minutes December, # 5 Exhibit Exhibit 64 Expert report of Marcia Wagner, # 6 Exhibit Exhibit 65 2012 Columbia Fee, # 7 Exhibit Exhibit 66 CAPTRUST Required Revenue Spreadsheet, # 8 Exhibit Exhibit 67 CAPTRUST TIAA Clients and Fees, # 9 Exhibit Exhibit 68 TIAA Top−200 Client Fee Data Spreadsheet, # 10 Exhibit Exhibit 69 opinion and order in Sacerdote v. New York University, # 11 Exhibit Exhibit 70 email from Barry)(Netter, Brian) (Entered: 01/26/2019) |

| 01/26/2019 | 240 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 81 2016 TIAA CREF Prospectus, # 2 Exhibit Exhibit 82 TIAA and CREF Contract Comparison., # 3 Exhibit Exhibit 83 2011 CREF Prospective, # 4 Exhibit Exhibit 83 2011 CREF Prospective, # 5 Exhibit Exhibit 84 Russell U.S. Equity Index Methodology, # 6 Exhibit Exhibit 85 MSCI ACWI Ex−USA IMI Index Fact Sheet., # 7 Exhibit Exhibit 86 Expert Report of John Chalmers, # 8 Exhibit Exhibit 86 Expert Report of John Chalmers, # 9 Exhibit Exhibit 86 Expert Report of John Chalmers, # 10 Exhibit Exhibit 86 Expert Report of John Chalmers, # 11 Exhibit Exhibit 86 Expert Report of John Chalmers, # 12 Exhibit Exhibit 86 Expert Report of John Chalmers, # 13 Exhibit Exhibit 87 2012 TIAA Form 5500 TDA Plan Schedule of Assets, # 14 Exhibit Exhibit 88 2012 TIAA Form 5500 CURP Schedule of Assets., # 15 Exhibit Exhibit 89 2018 CREF Stock Fund Fact Sheet)(Netter, Brian) (Entered: 01/26/2019) |
| 01/26/2019 | 241 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 90 RPOC Meeting Presentation July 2013, # 2 Exhibit Exhibit 91 Review of Proposed Core Fund Lineup, # 3 Exhibit Exhibit 92 RPOC Meeting Presentation September 2014, # 4 Exhibit Exhibit 93 RPOC Meeting Presentation December 2014, # 5 Exhibit Exhibit 94 RPOC Meeting Presentation June 2015, # 6 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 7 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 8 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 9 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 10 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 11 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 12 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015, # 13 Exhibit Exhibit 95 RPOC Meeting Presentation December 2015)(Netter, Brian) (Entered: 01/26/2019) |
| 01/26/2019 | 242 | **FILING ERROR − DEFICIENT DOCKET ENTRY (SEE 249 Declaration) −** DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit Exhibit 96 RPOC Meeting Presentation June 2016, # 2 Exhibit Exhibit 97 RPOC Meeting Presentation March 2016, # 3 Exhibit Exhibit 98 RPOC Meeting Presentation September 2016, # 4 Exhibit Exhibit 98 RPOC Meeting Presentation September 2016, # 5 Exhibit Exhibit 99 December 2014 Core Fund Full Review, # 6 Exhibit Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 7 Exhibit Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 8 Exhibit Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 9 Exhibit Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 10 Exhibit Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 11 Exhibit Exhibit 106 Expert Report of Wendy Dominguez., # 12 Exhibit Exhibit 107 Expert Report of Al Otto., # 13 Exhibit Exhibit 108 Expert Report of Ty Minnich., # 14 Exhibit Exhibit 109 Declaration of Erich Podzinski, # 15 Exhibit Exhibit 110 From the Desk of Al Otto, # 16 Exhibit Exhibit 111 3Q2018 Portfolio Review, # 17 Exhibit Exhibit 112 Declaration of Douglas)(Netter, Brian) Modified on 1/29/2019 (db). (Entered: 01/26/2019) |
| 01/26/2019 | 243 | LETTER addressed to Judge P. Kevin Castel from Samuel P. Myler dated January 25, 2019 re: Notice of Redacted Filing. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 01/26/2019) |
| 01/28/2019 | 244 | MEMO ENDORSEMENT on re: 243 Letter filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman. ENDORSEMENT: The Court will permit the filing in unredacted documents identified in Ex. A to Doc 243, unless a party shows cause in writing within 14 days why the Lugosch standard is satisfied. (Signed by Judge P. Kevin Castel on 1/28/2019) (jwh) Modified on 7/22/2019 (jwh). (Entered: 01/28/2019) |
| 01/28/2019 | 245 | LETTER addressed to Judge P. Kevin Castel from Joel D. Rohlf dated January 28, 2019 re: Motion to Strike. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Rohlf, Joel) (Entered: 01/28/2019) |

| 01/28/2019 | 246 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 20 2011 Plan Consultant Request for Proposal, # 2 Exhibit 21 Retirement Plan Advisory Services Agreement, # 3 Exhibit 22 Excerpt 2016 Plansponsor 403(b) Recordkeeping Survey, # 4 Exhibit 23 Expert Report of Glenn Poehler, # 5 Exhibit 24 TIAA/Cornell Recordkeeping Agreement, # 6 Exhibit 24 TIAA/Cornell Recordkeeping Agreement, # 7 Exhibit 25 Fidelity/Cornell Recordkeeping Agreement, # 8 Exhibit 26 2012 TIAA Service & Fee Disclosure, # 9 Exhibit 27 2014 TIAA/Cornell Year in Review, # 10 Exhibit 28 2016 TIAA Making the Most of Your Retirement Plan., # 11 Exhibit 29 Excerpts of Polacek Deposition, # 12 Exhibit 30 Declaration of Douglas)(Netter, Brian) (Entered: 01/28/2019) |
|---|---|---|
| 01/28/2019 | 247 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 31 2016 Fidelity Master Recordkeeper, # 2 Exhibit 32 Email from Jim Strodel, # 3 Exhibit 33 2011 Fidelity Fee Disclosure and Higher Ed Trends, # 4 Exhibit 34 2017 PSCA Fee Structure and Evaluation in 403(b) Plans, # 5 Exhibit 35 Excerpts of Warner Deposition, # 6 Exhibit 36 Excerpts of Strodel Deposition, # 7 Exhibit 37 2009 TDA Plan Investment Fee & Expense, # 8 Exhibit 38 2009 CURP Investment Fee & Expense, # 9 Exhibit 39 2014 CREF Multi−Class Structure, # 10 Exhibit 40 2015 TIAA Business Planning, # 11 Exhibit 40 2015 TIAA Business Planning, # 12 Exhibit 40 2015 TIAA Business Planning, # 13 Exhibit 40 2015 TIAA Business Planning, # 14 Exhibit 40 2015 TIAA Business Planning, # 15 Exhibit 40 2015 TIAA Business Planning, # 16 Exhibit 40 2015 TIAA Business Planning, # 17 Exhibit 40 2015 TIAA Business Planning, # 18 Exhibit 40 2015 TIAA Business Planning, # 19 Exhibit 40 2015 TIAA Business Planning, # 20 Exhibit 40 2015 TIAA Business Planning, # 21 Exhibit 40 2015 TIAA Business Planning)(Netter, Brian) (Entered: 01/28/2019) |
| 01/28/2019 | 248 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 41 Excerpts of Bursic Deposition, # 2 Exhibit 42 2010 Johns Hopkins 403(b) Plan Design, # 3 Exhibit 43 RPOC Meeting Materials Jan 2012, # 4 Exhibit 43 RPOC Meeting Materials Jan 2012, # 5 Exhibit 43 RPOC Meeting Materials Jan 2012, # 6 Exhibit 43 RPOC Meeting Materials Jan 2012, # 7 Exhibit 43 RPOC Meeting Materials Jan 2012, # 8 Exhibit 44 RPOC Meeting Minutes Jan 2012, # 9 Exhibit 45 RPOC Meeting Minutes July 2012, # 10 Exhibit 46 Excerpts of Otto Deposition, # 11 Exhibit 47 Pepperdine Committee minutes., # 12 Exhibit 48 Declaration of Scott Matheson, # 13 Exhibit 49 RPOC Meeting Materials April 2012, # 14 Exhibit 50 RPOC Meeting Minutes April 2012)(Netter, Brian) (Entered: 01/28/2019) |
| 01/28/2019 | 249 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 96 RPOC Meeting Presentation June 2016, # 2 Exhibit 97 RPOC Meeting Presentation March 2016, # 3 Exhibit 98 RPOC Meeting Presentation September 2016, # 4 Exhibit 98 RPOC Meeting Presentation September 2016, # 5 Exhibit 99 December 2014 Core Fund Full Review, # 6 Exhibit 99 December 2014 Core Fund Full Review, # 7 Exhibit 99 December 2014 Core Fund Full Review, # 8 Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 9 Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 10 Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 11 Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 12 Exhibit 100 2016 TIAA Real Estate Account Prospectus, # 13 Exhibit 101 TIAA Real Estate Account Fact Sheet, # 14 Exhibit 102 TIAA Real Estate Account Frequently Asked Questions, # 15 Exhibit 103 2015 TDA Plan TIAA Fund Usage and Diversification Report, # 16 Exhibit 104 2015 CURP Fund Usage and Diversification Report, # 17 Exhibit 105 Excerpt Dominguez Deposition, # 18 Exhibit 106 Expert Report of Wendy Dominguez, # 19 Exhibit 107 Expert Report of Al Otto., # 20 Exhibit 108 Expert Report of Ty Minnich, # 21 Exhibit 109 Declaration of Erich Podzinski, # 22 Exhibit 110 From the Desk of Al Otto, # 23 Exhibit 111 3Q2018 Portfolio Review, # 24 Exhibit 112 Declaration of Douglas)(Netter, Brian) (Entered: 01/28/2019) |
| 01/28/2019 | 250 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The |

| | | |
|---|---|---|
| | | Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 1 Corrected Amended Complaint, # 2 Exhibit 2 Order on Defendants Motion to Dismiss, # 3 Exhibit 3 2008 CURP Adoption Agreement, # 4 Exhibit 4 2008 CURP Basic Plan, # 5 Exhibit 5 2008 TDA Plan Adoption Agreement, # 6 Exhibit 6 2008 TDA Plan Document, # 7 Exhibit 7 Report Challenges and Best Practices, # 8 Exhibit 8 DOL Bulletin 2009−02, # 9 Exhibit 9 A Close Look at ERISA 403(b) Plans, # 10 Exhibit 10 2016 Form 5500 CURP, # 11 Exhibit 11 2016 Form 5500 TDA, # 12 Exhibit 12 2012 Form 5500 CURP, # 13 Exhibit 13 2012 Form 5500 TDA, # 14 Exhibit 14 2017 TDA Plan Notice, # 15 Exhibit 15 2017 CURP Plan, # 16 Exhibit 16 Declaration of Paul Bursic, # 17 Exhibit 17Committee Charter, # 18 Exhibit 18 Excerpts of Opperman Dep, # 19 Exhibit 19 RPOC Meeting Minutes.)(Netter, Brian) (Entered: 01/28/2019) |
| 01/29/2019 | 251 | ORDER re: 245 Letter filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance: Motion (Doc 245) is DENIED. (Signed by Judge P. Kevin Castel on 1/29/2019) (jwh) (Entered: 01/29/2019) |
| 01/29/2019 | 252 | DECLARATION of Sam P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 71 2017 Value Deck Prepared for Cornell University by Fidelity, # 2 Exhibit 72 Excerpts of Minnich Deposition, # 3 Exhibit 73 2012 Fidelity Investment Review, # 4 Exhibit 74 email from AJ Edwards., # 5 Exhibit 75 RPOC Meeting Minutes November 2012, # 6 Exhibit 76 RPOC Investment Policy Statement, # 7 Exhibit 77 Email Regarding Formation of Faculty Advisory Committee, # 8 Exhibit 78 RPOC Meeting Minutes September 2013, # 9 Exhibit 79 RPOC Meeting Materials September 2015, # 10 Exhibit 80 RPOC Meeting Minutes December 2016)(Netter, Brian) (Entered: 01/29/2019) |
| 01/29/2019 | 253 | RESPONSE in Support of Motion re: 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*. . Document filed by CapFinancial Partners, LLC. (Mattson, Eric) (Entered: 01/29/2019) |
| 01/31/2019 | 254 | JOINT LETTER MOTION for Extension of Time to File Response/Reply as to 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*., 228 MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto . addressed to Judge P. Kevin Castel from Joel D. Rohlf dated January 31, 2019. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Rohlf, Joel) (Entered: 01/31/2019) |
| 02/01/2019 | 255 | ORDER granting 254 Letter Motion for Extension of Time to File Response/Reply. Application Granted. SO ORDERED. Responses due by 3/11/2019 Replies due by 4/8/2019. (Signed by Judge P. Kevin Castel on 2/1/2019) (kv) (Entered: 02/01/2019) |
| 02/11/2019 | 256 | ENDORSED LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated 2/5/2019 re: requesting certain documents be provisionally sealed. ENDORSEMENT: The request is provisionally granted for 14 days. (Signed by Judge P. Kevin Castel on 2/8/2019) (jwh) Transmission to Sealed Records Clerk for processing. (Entered: 02/11/2019) |
| 02/11/2019 | 257 | MOTION For An Order Maintaining Under Seal *Certain Documents*. Document filed by CapFinancial Partners, LLC.(Mattson, Eric) (Entered: 02/11/2019) |
| 02/11/2019 | 258 | MEMORANDUM OF LAW in Support re: 257 MOTION For An Order Maintaining Under Seal *Certain Documents*. . Document filed by CapFinancial Partners, LLC. (Mattson, Eric) (Entered: 02/11/2019) |
| 02/11/2019 | 259 | DECLARATION of Scott Matheson in Support re: 257 MOTION For An Order Maintaining Under Seal *Certain Documents*.. Document filed by CapFinancial Partners, LLC. (Mattson, Eric) (Entered: 02/11/2019) |
| 02/11/2019 | 260 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Teachers Insurance and Annuity Association of America Board of Overseers for Teachers Insurance and Annuity Association of America. Document filed by Teachers Insurance and Annuity Association of America.(Martin, Lori) (Entered: 02/11/2019) |

| | | |
|---|---|---|
| 02/11/2019 | 261 | LETTER MOTION to Seal Document *(Request to Maintain Sealing of Exhibits 68 and 109 to the Declaration of Samuel P. Myler in Support of the Cornell Defendants' Motion for Summary Judgment)* addressed to Judge P. Kevin Castel from Lori A. Martin dated February 11, 2019. Document filed by Teachers Insurance and Annuity Association of America.(Martin, Lori) (Entered: 02/11/2019) |
| 02/11/2019 | 262 | DECLARATION of Douglas Chittenden in Support re: 261 LETTER MOTION to Seal Document *(Request to Maintain Sealing of Exhibits 68 and 109 to the Declaration of Samuel P. Myler in Support of the Cornell Defendants' Motion for Summary Judgment)* addressed to Judge P. Kevin Castel from Lori A.. Document filed by Teachers Insurance and Annuity Association of America. (Martin, Lori) (Entered: 02/11/2019) |
| 02/11/2019 | 263 | MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243.* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Rohlf, Joel) (Entered: 02/11/2019) |
| 02/11/2019 | 264 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION to Seal *and Memorandum of Law In Response to the Court's January 28, 2019 Order (Doc. 244) To Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243 Redacted.* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit Redacted Declaration of Wendy Dominguez, # 2 Exhibit 2 Deposition Excerpts Wendy Dominguez, # 3 Exhibit 3 Deposition Excerpts John Chalmers)(Rohlf, Joel) Modified on 2/19/2019 (ldi). (Entered: 02/11/2019) |
| 02/12/2019 | 265 | LETTER addressed to Judge P. Kevin Castel from Joel D. Rohlf dated 02−12−2019 re: Class Notice. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Text of Proposed Order)(Rohlf, Joel) (Entered: 02/12/2019) |
| 02/13/2019 | 266 | SEALED DOCUMENT placed in vault.(rz) (Entered: 02/13/2019) |
| 02/15/2019 | 267 | NOTICE OF APPEARANCE by Jennifer Sokoler on behalf of Fidelity Management Trust Company. (Sokoler, Jennifer) (Entered: 02/15/2019) |
| 02/15/2019 | 268 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent FMR LLC for Fidelity Management Trust Company. Document filed by Fidelity Management Trust Company.(Sokoler, Jennifer) (Entered: 02/15/2019) |
| 02/15/2019 | 269 | MOTION to Seal *Certain Documents.* Document filed by Fidelity Management Trust Company.(Sokoler, Jennifer) (Entered: 02/15/2019) |
| 02/15/2019 | 270 | MEMORANDUM OF LAW in Support re: 269 MOTION to Seal *Certain Documents.* . Document filed by Fidelity Management Trust Company. (Sokoler, Jennifer) (Entered: 02/15/2019) |
| 02/15/2019 | 271 | DECLARATION of Scott Senseney in Support re: 269 MOTION to Seal *Certain Documents..* Document filed by Fidelity Management Trust Company. (Sokoler, Jennifer) (Entered: 02/15/2019) |
| 02/15/2019 | 272 | DECLARATION of Jennifer B. Sokoler in Support re: 269 MOTION to Seal *Certain Documents..* Document filed by Fidelity Management Trust Company. (Attachments: # 1 Exhibit A − Slip sheet, # 2 Exhibit B − Slip sheet, # 3 Exhibit C − Slip sheet, # 4 Exhibit D − Slip sheet, # 5 Exhibit E − Slip sheet, # 6 Exhibit F − Slip sheet, # 7 Exhibit G − Slip sheet, # 8 Exhibit H − Slip sheet, # 9 Exhibit I − Slip sheet)(Sokoler, Jennifer) (Entered: 02/15/2019) |
| 02/19/2019 | | **\*\*\*NOTICE TO ATTORNEY TO RE−FILE DOCUMENT − DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Joel D. Rohlf to RE−FILE Document 264 MOTION to Seal *and Memorandum of Law In Response to the Court's January 28, 2019 Order (Doc. 244) To Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243 Redacted.* ERROR(S): Supporting documents must be filed separately, each receiving their own document number. Declaration in Support of Motion and Memorandum of Law in Support of Motion are both found under the event list Replies, Opposition and Supporting Documents. Note: Re−file both supporting documents separately,** |

| | | |
|---|---|---|
| | | **and link to document # 263 Motion. (ldi)** (Entered: 02/19/2019) |
| 02/19/2019 | 273 | MEMORANDUM OF LAW in Support re: 263 MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 02/19/2019) |
| 02/19/2019 | 274 | DECLARATION of Wendy Dominguez in Support re: 263 MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 02/19/2019) |
| 02/19/2019 | 275 | DECLARATION of Scott T. Apking in Support re: 263 MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 2 − Deposition Excerpt of Wendy Dominguez, # 2 Exhibit 3 − Deposition Excerpt of John Chalmers)(Rohlf, Joel) (Entered: 02/19/2019) |
| 02/19/2019 | 276 | MEMORANDUM OF LAW in Opposition re: 263 MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243. [REDACTED]*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 02/19/2019) |
| 02/19/2019 | 277 | DECLARATION of Brian D. Netter in Support re: 276 Memorandum of Law in Opposition to Motion,. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Innovest Advice Document [FILED UNDER SEAL], # 2 Exhibit B − Dominguez Deposition Excerpt [FILED UNDER SEAL], # 3 Exhibit C − TIAA Document Regarding Innovest Client [FILED UNDER SEAL])(Netter, Brian) (Entered: 02/19/2019) |
| 02/20/2019 | 278 | LETTER MOTION for Discovery addressed to Magistrate Judge James L. Cott from Joel D. Rohlf dated February 20, 2019. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Rohlf, Joel) (Entered: 02/20/2019) |
| 02/21/2019 | 279 | SEALED DOCUMENT placed in vault.(mhe) (Entered: 02/21/2019) |
| 02/21/2019 | 280 | ORDER REGARDING FORM OF CLASS NOTICE re: 265 Letter, filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance. It is hereby ORDERED that: (1) If the parties, at any time, file a motion for preliminary approval of a class−wide settlement, then the motion shall be accompanied by a proposed notice and terms for a notice program compliant with Rule 23, the Class Action Fairness Act, and any other applicable law; and (2) If the Court enters judgment for or against the plaintiff class, then the Class Counsel will, within 45 days thereafter, file a proposed notice and terms for a notice program compliant with Rule 23, the Class Action Fairness Act, and any other applicable law. (Signed by Judge P. Kevin Castel on 2/21/2019) (jwh) (Entered: 02/21/2019) |
| 02/22/2019 | 281 | LETTER MOTION for Extension of Time to File Response/Reply as to 263 MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243*. addressed to Judge P. Kevin Castel from Scott T. Apking dated 02/22/2019. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Apking, Scott) (Entered: 02/22/2019) |
| 02/22/2019 | 282 | LETTER addressed to Magistrate Judge James L. Cott from Eric S. Mattson dated February 22, 2019 re: Opposition To Letter Motion To Exclude Matheson. Document filed by CapFinancial Partners, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Mattson, Eric) (Entered: 02/22/2019) |

| 02/22/2019 | 283 | LETTER addressed to Magistrate Judge James L. Cott from Samuel P. Myler dated February 22, 2019 re: Letter in Response to Plaintiffs Letter Motion [ECF No. 278]. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Plaintiffs' Rule 26(a) Disclosures, # 2 Exhibit B − A.J. Edwards Deposition Exhibit 135, # 3 Exhibit C − Deposition of James Strodel (Excerpt))(Myler, Samuel) (Entered: 02/22/2019) |
| 02/25/2019 | 284 | ORDER granting 281 Letter Motion for Extension of Time to File Response/Reply. Application Granted. So Ordered. (Replies due by 3/1/2019.) (Signed by Judge P. Kevin Castel on 2/25/2019) (anc) (Entered: 02/25/2019) |
| 02/25/2019 | 285 | ORDER deferring ruling on 257 Motion ; deferring ruling on 261 Motion to Seal Document ; deferring ruling on 263 Motion to Seal; deferring ruling on 269 Motion to Seal. The documents currently under provisional seal by Order of February 11, 2019 shall remain fully under seal until they are replaced with their redacted versions. There are also pending motions to seal with respect to several other documents filed by the Cornell Defendants and listed in Exhibit A of Doc 243. (See Docs 257, 261, 263). These documents currently appear on the docket in redacted form, and require no further action on the part of the Cornell Defendants. (See Doc 243). The Court will defer decision on the motions to seal pending disposition of their accompanying underlying motions to exclude and for summary judgment. SO ORDERED. (Signed by Judge P. Kevin Castel on 2/25/2019) (anc) (Entered: 02/25/2019) |
| 02/25/2019 | 286 | MEMORANDUM OF LAW in Opposition re: 231 MOTION for Summary Judgment . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 02/25/2019) |
| 02/25/2019 | 287 | COUNTER STATEMENT TO 232 Rule 56.1 Statement. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 02/25/2019) |
| 02/25/2019 | 288 | MEMORANDUM OF LAW in Opposition re: 221 MOTION for Summary Judgment . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 02/25/2019) |
| 02/25/2019 | 289 | COUNTER STATEMENT TO 223 Rule 56.1 Statement. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 02/25/2019) |
| 02/26/2019 | 290 | DECLARATION of Joel D. Rohlf in Opposition re: 221 MOTION for Summary Judgment ., 231 MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50)(Rohlf, Joel) (Entered: 02/26/2019) |
| 02/26/2019 | 291 | DECLARATION of Joel D. Rohlf in Opposition re: 221 MOTION for Summary Judgment ., 231 MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 51, # 2 Exhibit 52, # 3 Exhibit 53, # 4 Exhibit 54, # 5 Exhibit 55, # 6 Exhibit 56, # 7 Exhibit 57, # 8 Exhibit 58, # 9 Exhibit 59, # 10 Exhibit 60, # 11 Exhibit 61, # 12 Exhibit 62, # 13 Exhibit 63, # 14 Exhibit 64, # 15 Exhibit 65, # 16 Exhibit 66, # 17 Exhibit 67, # 18 Exhibit 68, # 19 Exhibit 69, # 20 Exhibit 70, # 21 Exhibit 71, # 22 Exhibit 72, # 23 Exhibit 73, # 24 Exhibit 74 part 1, # 25 Exhibit 74 part 2, # 26 Exhibit 74 part 3, # 27 Exhibit 74 part 4, # 28 Exhibit 74 part 5, # 29 Exhibit 74 part 6, # 30 Exhibit 75 part 1, # 31 Exhibit 75 part 2, # 32 Exhibit 75 part 3, # 33 Exhibit 76, # 34 Exhibit 77, # 35 Exhibit 78, # 36 Exhibit 79, # 37 Exhibit 80, # 38 Exhibit 81, # 39 Exhibit 82, # 40 Exhibit 83, # 41 Exhibit 84, # 42 Exhibit 85, # 43 Exhibit 86, # 44 Exhibit 87, # 45 Exhibit 88, # 46 Exhibit 89, # 47 Exhibit 90, # 48 Exhibit 91, # 48 |

| | | |
|---|---|---|
| | | Exhibit 92, # <u>49</u> Exhibit 93, # <u>50</u> Exhibit 94, # <u>51</u> Exhibit 95, # <u>52</u> Exhibit 96, # <u>53</u> Exhibit 97, # <u>54</u> Exhibit 98, # <u>55</u> Exhibit 99, # <u>56</u> Exhibit 100)(Rohlf, Joel) (Entered: 02/26/2019) |
| 02/26/2019 | <u>292</u> | DECLARATION of Joel D. Rohlf in Opposition re: <u>221</u> MOTION for Summary Judgment ., <u>231</u> MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # <u>1</u> Exhibit 101 part 1, # <u>2</u> Exhibit 101 part 2, # <u>3</u> Exhibit 102, # <u>4</u> Exhibit 103, # <u>5</u> Exhibit 104, # <u>6</u> Exhibit 105, # <u>7</u> Exhibit 106, # <u>8</u> Exhibit 107, # <u>9</u> Exhibit 108, # <u>10</u> Exhibit 109, # <u>11</u> Exhibit 110, # <u>12</u> Exhibit 111, # <u>13</u> Exhibit 112, # <u>14</u> Exhibit 113, # <u>15</u> Exhibit 114, # <u>16</u> Exhibit 115, # <u>17</u> Exhibit 116, # <u>18</u> Exhibit 117, # <u>19</u> Exhibit 118, # <u>20</u> Exhibit 119, # <u>21</u> Exhibit 120, # <u>22</u> Exhibit 121 part 1, # <u>23</u> Exhibit 121 part 2, # <u>24</u> Exhibit 121 part 3, # <u>25</u> Exhibit 122, # <u>26</u> Exhibit 123 part 1, # <u>27</u> Exhibit 123 part 2, # <u>28</u> Exhibit 123 part 3, # <u>29</u> Exhibit 124, # <u>30</u> Exhibit 125, # <u>31</u> Exhibit 126, # <u>32</u> Exhibit 127, # <u>33</u> Exhibit 128, # <u>34</u> Exhibit 129, # <u>35</u> Exhibit 130, # <u>36</u> Exhibit 131, # <u>37</u> Exhibit 132, # <u>38</u> Exhibit 133, # <u>39</u> Exhibit 134, # <u>40</u> Exhibit 135, # <u>41</u> Exhibit 136, # <u>42</u> Exhibit 137, # <u>43</u> Exhibit 138, # <u>44</u> Exhibit 139, # <u>45</u> Exhibit 140, # <u>46</u> Exhibit 141, # <u>47</u> Exhibit 142, # <u>48</u> Exhibit 143, # <u>49</u> Exhibit 144, # <u>50</u> Exhibit 145, # <u>51</u> Exhibit 146, # <u>52</u> Exhibit 147, # <u>53</u> Exhibit 148, # <u>54</u> Exhibit 149, # <u>55</u> Exhibit 150)(Rohlf, Joel) (Entered: 02/26/2019) |
| 02/26/2019 | <u>293</u> | DECLARATION of Joel D. Rohlf in Opposition re: <u>221</u> MOTION for Summary Judgment ., <u>231</u> MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # <u>1</u> Exhibit 151 part 1, # <u>2</u> Exhibit 151 part 2, # <u>3</u> Exhibit 152, # <u>4</u> Exhibit 153, # <u>5</u> Exhibit 154, # <u>6</u> Exhibit 155, # <u>7</u> Exhibit 156 part 1, # <u>8</u> Exhibit 157, # <u>9</u> Exhibit 158, # <u>10</u> Exhibit 159, # <u>11</u> Exhibit 160, # <u>12</u> Exhibit 161, # <u>13</u> Exhibit 162, # <u>14</u> Exhibit 163, # <u>15</u> Exhibit 164, # <u>16</u> Exhibit 165, # <u>17</u> Exhibit 166, # <u>18</u> Exhibit 167, # <u>19</u> Exhibit 168 part 1, # <u>20</u> Exhibit 168 part 2, # <u>21</u> Exhibit 170, # <u>22</u> Exhibit 172, # <u>23</u> Exhibit 173, # <u>24</u> Exhibit 174, # <u>25</u> Exhibit 175, # <u>26</u> Exhibit 177)(Rohlf, Joel) (Entered: 02/26/2019) |
| 02/26/2019 | <u>294</u> | LETTER MOTION to Seal Document <u>292</u> Declaration in Opposition to Motion,,,,, <u>291</u> Declaration in Opposition to Motion,,,,, <u>290</u> Declaration in Opposition to Motion,,,, <u>293</u> Declaration in Opposition to Motion,,, <u>286</u> Memorandum of Law in Opposition to Motion, <u>287</u> Counter Statement to Rule 56.1, <u>289</u> Counter Statement to Rule 56.1 addressed to Judge P. Kevin Castel from Joel D. Rohlf dated February 25, 2019. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # <u>1</u> Exhibit A List of Documents)(Rohlf, Joel) (Entered: 02/26/2019) |
| 02/27/2019 | <u>295</u> | DECLARATION of Joel D. Rohlf in Opposition re: <u>221</u> MOTION for Summary Judgment ., <u>231</u> MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # <u>1</u> Exhibit 169, # <u>2</u> Exhibit 171, # <u>3</u> Exhibit 176)(Rohlf, Joel) (Entered: 02/27/2019) |
| 03/01/2019 | <u>296</u> | NOTICE of Filing Redacted Documents re: <u>285</u> Order on Motion for Miscellaneous Relief, Order on Motion to Seal Document,,,,,,,,,,,,, <u>256</u> Endorsed Letter,. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # <u>1</u> ECF #232 Rule 56.1 Statement (REDACTED), # <u>2</u> ECF #233 Cornell Mem. of Law in Support of Summary Judgment (REDACTED), # <u>3</u> ECF #235−4 Exhibit 23 Expert Report of Glenn Poehler (REDACTED), # <u>4</u> ECF #237−8 Exhibit 48 Declaration of Scott Matheson (REDACTED), # <u>5</u> ECF #238−5 Exhibit 54 2017 Vendor Fee Benchmarking Presentation (REDACTED), # <u>6</u> ECF #239−11 Exhibit 70 Email from Barry (REDACTED), # <u>7</u> ECF #246−4 Exhibit 23 Expert Report of Glenn Poehler (REDACTED), # <u>8</u> ECF #248−12 Exhibit 48 Declaration of Scott Matheson (REDACTED))(Myler, Samuel) (Entered: 03/01/2019) |
| 03/01/2019 | <u>297</u> | REPLY MEMORANDUM OF LAW in Support re: <u>263</u> MOTION to Seal *In Response to the Court's January 28, 2019 Order (Doc. 244) to Show Cause In Writing to Maintain Under Seal Exhibits Identified in Exhibit A of Document 243*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 03/01/2019) |

| 03/11/2019 | 298 | RESPONSE in Opposition to Motion re: 228 MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 03/11/2019) |
|---|---|---|
| 03/11/2019 | 299 | DECLARATION of Joel D. Rohlf in Opposition re: 228 MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24)(Rohlf, Joel) (Entered: 03/11/2019) |
| 03/11/2019 | 300 | MEMORANDUM OF LAW in Opposition re: 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 03/11/2019) |
| 03/11/2019 | 301 | DECLARATION of Scott T. Apking in Opposition re: 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 (Slip Sheet), # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19)(Apking, Scott) (Entered: 03/11/2019) |
| 03/11/2019 | 302 | LETTER MOTION to Seal Document 301 Declaration in Opposition to Motion,, 300 Memorandum of Law in Opposition to Motion, addressed to Judge P. Kevin Castel from Scott T. Apking dated March 11, 2019. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Apking, Scott) (Entered: 03/11/2019) |
| 03/13/2019 | 303 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** MOTION for Charles M. Dyke to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cammack Retirement Group, Inc.. (Attachments: # 1 Affidavit of Charles M. Dyke, # 2 Exhibit Certificates of Good Standing)(Dyke, Charles) Modified on 3/13/2019 (jc). (Entered: 03/13/2019) |
| 03/13/2019 | | Pro Hac Vice Fee Payment: for 303 MOTION for Charles M. Dyke to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff..** Filing fee $ 200.00, receipt number ANYSDC−16490237.(Dyke, Charles) (Entered: 03/13/2019) |
| 03/13/2019 | 304 | LETTER MOTION to Seal Document 291 Declaration in Opposition to Motion,,,,, *Request of Non−Party Cammack to Seal Document 291−10* addressed to Judge P. Kevin Castel from Charles M. Dyke dated March 13, 2019. Document filed by Cammack Retirement Group, Inc.. (Attachments: # 1 Affidavit Declaration of Earle W. Allen)(Dyke, Charles) (Entered: 03/13/2019) |
| 03/13/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE−FILE Document No. 303 MOTION for Charles M. Dyke to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): 1) expired Certificates of Good Standing from California, District of Columbia, and Illinois; and 2) missing Proposed Order. Re−file the motion as a Motion to Appear Pro Hac Vice − attach the correct signed PDF − select the correct named filer/filers − attach valid Certificates of Good Standing issued within the past 30 days − attach Attorney Affidavit − attach Proposed Order. (jc)** (Entered: 03/13/2019) |
| 03/13/2019 | 305 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Cammack Retirement Group, Inc..(Dyke, Charles) (Entered: 03/13/2019) |
| 03/13/2019 | 306 | ENDORSED LETTER addressed to Judge P. Kevin Castel from Scott T. Apking dated 3/13/2019 re: request to temporarily seal documents on the record. ENDORSEMENT: Application granted. (Signed by Judge P. Kevin Castel on 3/13/2019) (jwh) Transmission to Sealed Records Clerk for processing. (Entered: 03/14/2019) |

| 03/18/2019 | 307 | JOINT LETTER MOTION for Conference *(Pre−Motion Discovery Conference)* addressed to Judge P. Kevin Castel from Brian D. Netter, Joel S. Feldman dated March 18, 2019. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 03/18/2019) |
|---|---|---|
| 03/18/2019 | 308 | DECLARATION of Brian D. Netter in Support re: 307 JOINT LETTER MOTION for Conference *(Pre−Motion Discovery Conference)* addressed to Judge P. Kevin Castel from Brian D. Netter, Joel S. Feldman dated March 18, 2019.. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Plfs Rule 26(a) Disclosures, # 2 Exhibit B − Plaintiffs' RFP to Captrust, # 3 Exhibit C − Cunningham Response to Cornell Defendants' Interrogatories, # 4 Exhibit D − Plaintiffs' Supplement to Rule 26(a)(1) Disclosures, # 5 Exhibit E − Marcus Excerpts, # 6 Exhibit F − Cunningham Excerpts, # 7 Exhibit G − Cunningham's Supplemental Responses to the Cornell Defendants' First Set of Interrogatories)(Netter, Brian) (Entered: 03/18/2019) |
| 03/22/2019 | 309 | LETTER RESPONSE in Opposition to Motion addressed to Judge P. Kevin Castel from Scott T. Apking dated 03/22/2019 re: 307 JOINT LETTER MOTION for Conference *(Pre−Motion Discovery Conference)* addressed to Judge P. Kevin Castel from Brian D. Netter, Joel S. Feldman dated March 18, 2019. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 03/22/2019) |
| 03/22/2019 | 310 | DECLARATION of Scott T. Apking in Opposition re: 307 JOINT LETTER MOTION for Conference *(Pre−Motion Discovery Conference)* addressed to Judge P. Kevin Castel from Brian D. Netter, Joel S. Feldman dated March 18, 2019.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Apking, Scott) (Entered: 03/22/2019) |
| 03/25/2019 | 311 | REPLY to Response to Motion re: 221 MOTION for Summary Judgment . . Document filed by CapFinancial Partners, LLC. (Mattson, Eric) (Entered: 03/25/2019) |
| 03/25/2019 | 312 | REPLY MEMORANDUM OF LAW in Support re: 231 MOTION for Summary Judgment . . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 03/25/2019) |
| 03/26/2019 | 313 | RULE 56.1 STATEMENT. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 03/26/2019) |
| 03/26/2019 | 314 | LETTER MOTION to Seal Document 312 Reply Memorandum of Law in Support of Motion, 313 Rule 56.1 Statement addressed to Judge P. Kevin Castel from Samuel P. Myler dated March 25, 2019. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Myler, Samuel) (Entered: 03/26/2019) |
| 03/26/2019 | 315 | DECLARATION of Samuel P. Myler in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 113 − November 19, 2012 RPOC Meeting Presentation, # 2 Exhibit 114 − Emails re Subcommittee Meetings, # 3 Exhibit 115 − 2016 Business Planning Presentation, # 4 Exhibit 116 − 2010 Fidelity Retirement Plan Investment Review, # 5 Exhibit 117 − 2017 Letter from TIAA, # 6 Exhibit 118 − TIAA Plan Efficiency Scorecard, # 7 Exhibit 119 − Excerpts from Cross−Examination, # 8 Exhibit 120 − Excerpts from Paul Bursic Deposition, # 9 Exhibit 121 − Excerpts from Mary Opperman Deposition, # 10 Exhibit 122 − Excerpts from Ty Minnich Deposition, # 11 Exhibit 123 − Excerpts from Paul Weber Deposition, # 12 Exhibit 124 − Excerpts of Conrad Ciccotello Deposition, # 13 Exhibit 125 − Excerpts from Glenn Poehler Deposition)(Myler, Samuel) (Entered: 03/26/2019) |
| 03/26/2019 | 316 | MOTION for Charles M. Dyke to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Cammack Retirement Group, Inc.. (Attachments: # 1 Affidavit of Charles M. Dyke, # 2 Certificates of Good Standing, # 3 [Proposed] Order Granting Motion for Admission Pro Hac Vice)(Dyke, Charles) (Entered: 03/26/2019) |

| | | |
|---|---|---|
| 03/26/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 316 MOTION for Charles M. Dyke to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 03/26/2019) |
| 03/26/2019 | 317 | LETTER MOTION to Seal Document 292 Declaration in Opposition to Motion,,,,, *Request of Non−Party Cammack to Seal Document at Dkt. No. 292−46* addressed to Judge P. Kevin Castel from Charles M. Dyke dated March 26, 2019. Document filed by Cammack Retirement Group, Inc.. (Attachments: # 1 Declaration of Earle W. Allen)(Dyke, Charles) (Entered: 03/26/2019) |
| 03/27/2019 | 318 | ORDER granting 316 Motion for Charles M. Dyke to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Nacanther, Florence) (Entered: 03/27/2019) |
| 03/27/2019 | 319 | NOTICE OF APPEARANCE by Alison Irene Stein on behalf of Aon Hewitt Investment Consulting, Inc.. (Stein, Alison) (Entered: 03/27/2019) |
| 03/27/2019 | 320 | LETTER MOTION to Seal Document 292 Declaration in Opposition to Motion,,,,, */ Non−Party Aon Hewitt Investment Consulting Inc.'s Request to Seal Document at Dkt. No. 292−46* addressed to Judge P. Kevin Castel from Alison I. Stein dated March 27, 2019. Document filed by Aon Hewitt Investment Consulting, Inc..(Stein, Alison) (Entered: 03/27/2019) |
| 03/27/2019 | 321 | DECLARATION of Daniel B. Pawlisch in Support re: 320 LETTER MOTION to Seal Document 292 Declaration in Opposition to Motion,,,,, */ Non−Party Aon Hewitt Investment Consulting Inc.'s Request to Seal Document at Dkt. No. 292−46* addressed to Judge P. Kevin Castel from Alison I. Stein da. Document filed by Aon Hewitt Investment Consulting, Inc.. (Stein, Alison) (Entered: 03/27/2019) |
| 03/27/2019 | 322 | NOTICE OF APPEARANCE by Charles Dyke on behalf of Cammack Retirement Group, Inc.. (Dyke, Charles) (Entered: 03/27/2019) |
| 03/28/2019 | 323 | ORDER granting 307 Letter Motion for Conference: I will hear the parties on the discovery dispute outlined in defendants' letter of March 18 on April 1, 2019 at 2:15 p.m. (Status Conference set for 4/1/2019 at 02:15 PM before Judge P. Kevin Castel.) (Signed by Judge P. Kevin Castel on 3/28/2019) (jwh) (Entered: 03/28/2019) |
| 03/28/2019 | 324 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Aon, plc for Aon Hewitt Investment Consulting, Inc.. Document filed by Aon Hewitt Investment Consulting, Inc..(Stein, Alison) (Entered: 03/28/2019) |
| 03/28/2019 | 325 | MOTION for Amanda S. Amert to Appear Pro Hac Vice *for Aon Hewitt Investment Consulting, Inc.*. Filing fee $ 200.00, receipt number ANYSDC−16582698. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Aon Hewitt Investment Consulting, Inc.. (Attachments: # 1 Affidavit of Amanda S. Amert in Support of Motion for Admission Pro Hac Vice, # 2 Certificate of Good Standing (IL), # 3 Certificate of Good Standing (DC), # 4 Text of Proposed Order)(Amert, Amanda) (Entered: 03/28/2019) |
| 03/28/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 325 MOTION for Amanda S. Amert to Appear Pro Hac Vice *for Aon Hewitt Investment Consulting, Inc.*. Filing fee $ 200.00, receipt number ANYSDC−16582698. Motion and supporting papers to be reviewed by Clerk's Office st. The document has been reviewed and there are no deficiencies. (jc)** (Entered: 04/02/2019) |
| 04/01/2019 | | Minute Entry for proceedings held before Judge P. Kevin Castel: Show Cause Hearing held on 4/1/2019. The Court took up the parties' joint letter motion for a conference (Doc 307) to discuss defendants' proposed motion to preclude certain evidence under Rule 37(c)(1), Fed R Civ P. The Court ruled that plaintiffs were not precluded from submitting evidence in plaintiffs' supplemental Rule 26 disclosures or expert reports incorporated therein. (Court Reporter Eve Giniger) (Nacanther, Florence) (Entered: 04/02/2019) |
| 04/02/2019 | 326 | ORDER granting 325 Motion for Amanda S. Amert to Appear Pro Hac Vice (HEREBY ORDERED by Judge P. Kevin Castel)(Text Only Order) (Nacanther, Florence) (Entered: 04/02/2019) |

| 04/08/2019 | 327 | REPLY to Response to Motion re: 228 MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto . . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit L − Otto Report PUBLIC, # 2 Exhibit M − Ty Minnich Excerpts PUBLIC, # 3 Exhibit N − Al Otto Excerpts PUBLIC, # 4 Exhibit O − Trinity 2017 5500 PUBLIC, # 5 Exhibit P − Trinity 2018 disclosure PUBLIC, # 6 Exhibit Q − Trinity 2012 Disclosure PUBLIC, # 7 Exhibit R − Trinity 2012 5500 PUBLIC, # 8 Exhibit S − GlennPoehler Excerpts PUBLIC)(Netter, Brian) (Entered: 04/08/2019) |
|---|---|---|
| 04/08/2019 | 328 | REPLY to Response to Motion re: 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow.* . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Netter, Brian) (Entered: 04/08/2019) |
| 04/10/2019 | 329 | MANDATE of USCA (Certified Copy) USCA Case Number 18−3203. Petitioners request a writ of mandamus. Upon due consideration, it is hereby ORDERED that the petition is DENIED because Petitioners have not demonstrated that they lack an adequate, alternative means of obtaining relief, that their right to the writ is clear and indisputable, or that granting the writ is appropriate under the circumstances. See Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 38081 (2004).. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 04/10/2019. (nd) (Entered: 04/10/2019) |
| 04/15/2019 | 330 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: 231 MOTION for Summary Judgment . . Document filed by Cornell University. (Netter, Brian) (Entered: 04/15/2019) |
| 04/15/2019 | 331 | DECLARATION of SAMUEL P. MYLER in Support re: 231 MOTION for Summary Judgment .. Document filed by Cornell University. (Attachments: # 1 Exhibit A − Expert Report of Wendy Dominguez, # 2 Exhibit B − Deposition of Wendy Dominguez (Excerpt), # 3 Exhibit C − Fund Comparison, # 4 Exhibit D − Buetow Fidelity Damages Calculations (2018 CURP and TDA), # 5 Exhibit E − April 1 2019 Hearing Transcript)(Myler, Samuel) (Entered: 04/15/2019) |
| 04/18/2019 | 332 | TRANSCRIPT of Proceedings re: conference held on 4/1/2019 before Judge P. Kevin Castel. Court Reporter/Transcriber: Eve Giniger, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019.(McGuirk, Kelly) (Entered: 04/18/2019) |
| 04/18/2019 | 333 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 4/1/19 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 04/18/2019) |
| 04/25/2019 | 334 | LETTER MOTION to Seal Document 290 Declaration in Opposition to Motion,,,, / *Non−Party Aon Hewitt Investment Consulting, Inc.s Request to Seal Document at Dkt. 290−3* addressed to Judge P. Kevin Castel from Amanda S. Amert dated April 25, 2019. Document filed by Aon Hewitt Investment Consulting, Inc..(Amert, Amanda) (Entered: 04/25/2019) |
| 04/25/2019 | 335 | DECLARATION of Daniel Pawlisch in Support re: 334 LETTER MOTION to Seal Document 290 Declaration in Opposition to Motion,,,, / *Non−Party Aon Hewitt Investment Consulting, Inc.s Request to Seal Document at Dkt. 290−3* addressed to Judge P. Kevin Castel from Amanda S. Amert dated April 2. Document filed by Aon Hewitt Investment Consulting, Inc.. (Amert, Amanda) (Entered: 04/25/2019) |
| 04/29/2019 | 336 | SUPPLEMENTAL MEMORANDUM OF LAW in Opposition re: 231 MOTION for Summary Judgment . *to Defendants' Supplemental Memorandum (Doc. 330).* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 04/29/2019) |

| 04/29/2019 | 337 | COUNTER STATEMENT TO 232 Rule 56.1 Statement. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 04/29/2019) |
|---|---|---|
| 04/29/2019 | 338 | DECLARATION of Scott T. Apking in Opposition re: 231 MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit P178, # 2 Exhibit P179, # 3 Exhibit P180, # 4 Exhibit P181, # 5 Exhibit P182, # 6 Exhibit P183, # 7 Exhibit P184, # 8 Exhibit P185, # 9 Exhibit P186)(Rohlf, Joel) (Entered: 04/29/2019) |
| 05/03/2019 | 339 | LETTER MOTION to Seal Document 290 Declaration in Opposition to Motion,,,, /Non−Party Willis Towers Watson Request The Court Continue To Permit The Sealing Of Rohlf Dec. Ex. P28 (ECF Doc. 290−28) (Exhibit 28) and Rohlf Dec. Ex. P141 (ECF Doc. 292−46) (Exhibit 141) addressed to Judge P. Kevin Castel from Angelo A. Stio III dated 05/03/2019. Document filed by Willis Towers Watson.(Stio, Angelo) (Entered: 05/03/2019) |
| 05/03/2019 | 340 | DECLARATION of CHRIS GREEN in Support re: 339 LETTER MOTION to Seal Document 290 Declaration in Opposition to Motion,,,, /Non−Party Willis Towers Watson Request The Court Continue To Permit The Sealing Of Rohlf Dec. Ex. P28 (ECF Doc. 290−28) (Exhibit 28) and Rohlf Dec. Ex. P141 (ECF D. Document filed by Willis Towers Watson. (Stio, Angelo) (Entered: 05/03/2019) |
| 05/06/2019 | 341 | NOTICE of Supplemental Authority. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Sweda Opinion)(Rohlf, Joel) (Entered: 05/06/2019) |
| 05/07/2019 | 342 | RESPONSE re: 341 Notice (Other) *NOTICE of Supplemental Authority*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 05/07/2019) |
| 05/16/2019 | 343 | LETTER MOTION for Leave to File Response to Plaintiffs' Second Counterstatement of Undisputed Material Facts addressed to Judge P. Kevin Castel from Brian D. Netter dated May 16, 2019. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Response to Plaintiffs' Second Counterstatement of Undisputed Material Facts)(Netter, Brian) (Entered: 05/16/2019) |
| 05/17/2019 | 344 | LETTER RESPONSE in Opposition to Motion addressed to Judge P. Kevin Castel from Joel D. Rohlf dated 05/17/2019 re: 343 LETTER MOTION for Leave to File Response to Plaintiffs' Second Counterstatement of Undisputed Material Facts addressed to Judge P. Kevin Castel from Brian D. Netter dated May 16, 2019. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Rohlf, Joel) (Entered: 05/17/2019) |
| 05/17/2019 | 345 | ORDER granting 343 Letter Motion for Leave to File Document. Application granted. File within 14 days. SO ORDERED. (Signed by Judge P. Kevin Castel on 5/17/2019) (kv) (Entered: 05/17/2019) |
| 05/22/2019 | 346 | RESPONSE re: 337 Counter Statement to Rule 56.1 . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 05/22/2019) |
| 06/19/2019 | 347 | MANDATE of USCA (Certified Copy) USCA Case Number 19−324. Petitioners request, pursuant to Federal Rule of Civil Procedure 23(f), leave to appeal the district court's order granting Respondents' motion for class certification. Upon due consideration, it is hereby ORDERED that the petition is DENIED because an immediate appeal is not warranted. See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 13940 (2d Cir. 2001).. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 06/19/2019. (nd) (Entered: 06/19/2019) |
| 09/06/2019 | 348 | NOTICE of Withdrawal of Matthew A. Waring as Counsel. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Waring, Matthew) (Entered: 09/06/2019) |
| 09/12/2019 | 349 | NOTICE of Supplemental Authority re: 231 MOTION for Summary Judgment .. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia |

| | | |
|---|---|---|
| | | Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1)(Rohlf, Joel) (Entered: 09/12/2019) |
| 09/19/2019 | 350 | BRIEF re: 349 Notice (Other) *Response to Plaintiffs' Notice of Supplemental Authority*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 09/19/2019) |
| 09/27/2019 | 351 | ORDER granting 314 Motion to Seal Document ; granting 317 Motion to Seal Document ; granting 320 Motion to Seal Document ; granting 334 Motion to Seal Document ; granting 339 Motion to Seal Document ; granting 257 Motion ; granting 261 Motion to Seal Document ; denying 263 Motion to Seal; granting 269 Motion to Seal; granting 294 Motion to Seal Document ; granting 302 Motion to Seal Document ; granting 304 Motion to Seal Document. All motions to seal are GRANTED except Doc 263, plaintiffs' motion to seal testimony and portions of Dominguez's expert report, which is DENIED. Aon Hewitt, Cammack, and Willis Towers Watson shall file a redacted version of Doc 292−46 within seven (7) days of this Order. Any information currently redacted in the Reply Memorandum or Reply 56.1 Counterstatement that is not maintained under seal pursuant to this Order shall be unredacted within seven (7) days of this Order. The moving papers and any attached exhibits of plaintiffs and defendants on the motion to exclude testimony of Dominguez and Buetow, which were filed in redacted form, shall be filed in unredacted form within seven (7) days of this Order, along with unredacted versions of the Dominguez testimony and report. The Clerk is directed to terminate the motions (Docs 257, 261, 263, 269, 294, 302, 304, 314, 317, 320, 334, 339.) (Signed by Judge P. Kevin Castel on 9/27/2019) (rro) Transmission to Sealed Records Clerk for processing. (Entered: 09/27/2019) |
| 09/27/2019 | 352 | OPINION AND ORDER re: 225 MOTION in Limine *Cornell Defendants' Notice of Motion to Exclude Plaintiffs' Expert Wendy Dominguez and Gerald Buetow*. filed by Cornell University, 278 LETTER MOTION for Discovery addressed to Magistrate Judge James L. Cott from Joel D. Rohlf dated February 20, 2019. filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance, 221 MOTION for Summary Judgment . filed by CapFinancial Partners, LLC, 231 MOTION for Summary Judgment . filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman, 228 MOTION to Exclude Plaintiffs' Expert Ty Minnich and Al Otto . filed by Cornell University. For the reasons explained, Cornell Defendants' motion to exclude the expert testimony of Otto and Minnich is GRANTED in part, the motions to exclude the expert testimony of Buetow, Dominguez, and Matheson are DENIED, and the motion for summary judgment is GRANTED for all counts except for Count V insofar as it alleges imprudent retention of TIAA−CREF Lifecycle target date funds. CAPTRUST's motion for summary judgment is GRANTED. The Clerk is respectfully directed to te1minate the motions (Docs 221, 225, 228, 278, 233.) An order addressing the parties' requests to seal parts of the summary judgment record will follow. (Signed by Judge P. Kevin Castel on 9/27/2019) (rro) (Entered: 09/27/2019) |
| 10/04/2019 | 353 | NOTICE of of Filing Documents re: 351 Order on Motion to Seal Document,,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Previously Doc. 264, # 2 Previously Doc. 264−1, # 3 Previously Doc. 290−4, # 4 Previously Doc. 290−8, # 5 Previously Doc. 290−25, # 6 Previously Doc. 290−26, # 7 Previously Doc. 290−29, # 8 Previously Doc. 290−30, # 9 Previously Doc. 290−34, # 10 Previously Doc. 290−38, # 11 Previously Doc. 291−6, # 12 Previously Doc. 291−11 part 1, # 13 Previously Doc. 291−11 Part 2, # 14 Previously Doc. 291−11 Part 3, # 15 Previously Doc. 300, # 16 Previously Doc. 301−1, # 17 Previously Doc. 301−2, # 18 Previously Doc. 301−5, # 19 Previously Doc. 301−7, # 20 Previously Doc. 301−9)(Rohlf, Joel) (Entered: 10/04/2019) |
| 10/04/2019 | 354 | LETTER addressed to Judge P. Kevin Castel from Amanda S. Amert dated October 4, 2019 re: the Court's September 27, 2019 order (Dkt. 351). Document filed by Aon Hewitt Investment Consulting, Inc.. (Attachments: # 1 Redacted Version of P141, Dkt. 292−46)(Amert, Amanda) (Entered: 10/04/2019) |
| 10/04/2019 | 355 | NOTICE of Filing re: 351 Order on Motion to Seal Document,,,,, Order on Motion for Miscellaneous Relief,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. |

| | | (Attachments: # 1 Previously Doc. 226−01, # 2 Previously Doc. 226−02, # 3 Previously Doc. 226−22, # 4 Previously Doc. 227, # 5 Previously Doc. 229−01, # 6 Previously Doc. 229−04, # 7 Previously Doc. 229−05, # 8 Previously Doc. 229−06, # 9 Previously Doc. 230, # 10 Previously Doc. 327, # 11 Previously Doc. 327−02, # 12 Previously Doc. 328)(Netter, Brian) (Entered: 10/04/2019) |
|---|---|---|
| 10/07/2019 | 356 | LETTER MOTION for Extension of Time *of the Final Pretrial Submission Date* addressed to Judge P. Kevin Castel from Brian D. Netter dated October 7, 2019. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 10/07/2019) |
| 10/08/2019 | 357 | ORDER granting 356 Letter Motion for Extension of Time: All Final Pre−Trial Submissions consisting of proposed voir dire, proposed jury instructions, proposed verdict sheet, fully submitted in limine motions, proposed Joint Pre−Trial Order (with proposed stipulations of fact) are due November 27, 2019. The Final Pre−Trial Conference will be held on December 19, 2019 at 2 p.m. Letter motion (Doc 356) is granted to the extent indicated. (Joint Proposed Discovery due by 11/27/2019. Motions due by 11/27/2019.) (Signed by Judge P. Kevin Castel on 10/8/2019) (jwh) (Entered: 10/08/2019) |
| 10/08/2019 | | Set/Reset Hearings: Final Pretrial Conference set for 12/19/2019 at 02:00 PM before Judge P. Kevin Castel. (jwh) (Entered: 10/08/2019) |
| 10/08/2019 | 358 | MEMO ENDORSEMENT on re: 356 LETTER MOTION for Extension of Time. ENDORSEMENT: Final Pretrial Submission date extended to November 27, 2019. (Signed by Judge P. Kevin Castel on 10/8/2019) (jwh) (Entered: 10/08/2019) |
| 11/06/2019 | 359 | MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 11/06/2019) |
| 11/06/2019 | 360 | MEMORANDUM OF LAW in Support re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions.* . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 11/06/2019) |
| 11/06/2019 | 361 | DECLARATION of Ankur Mandhania in Support re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions.*. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit 1 − Excerpts from Deposition of Wendy Dominguez, # 2 Exhibit 2 − 10/23/19 − 10/25/19 Emails Between Plaintiffs' Counsel and Cornell Defendants' Counsel)(Netter, Brian) (Entered: 11/06/2019) |
| 11/06/2019 | 362 | MOTION in Limine *Notice of Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation at Trial.*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Apking, Scott) (Entered: 11/06/2019) |
| 11/06/2019 | 363 | MEMORANDUM OF LAW in Support re: 362 MOTION in Limine *Notice of Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation at Trial.*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 11/06/2019) |
| 11/06/2019 | 364 | DECLARATION of Scott T. Apking in Support re: 362 MOTION in Limine *Notice of Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation at Trial..*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Apking, Scott) (Entered: 11/06/2019) |
| 11/12/2019 | 365 | MEMO ENDORSEMENT denying 362 Motion in Limine. ENDORSEMENT: The Exhibit (Doc 361, Ex 2) will stand. Plaintiff is free to make any appropriate argument in their response to the motion in limine. Letter motion (Doc 362) is DENIED. SO ORDERED. (Signed by Judge P. Kevin Castel on 11/8/2019) (va) (Entered: 11/12/2019) |

| | | |
|---|---|---|
| 11/20/2019 | 366 | MEMORANDUM OF LAW in Opposition re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions.* . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 11/20/2019) |
| 11/20/2019 | 367 | DECLARATION of Scott T. Apking in Opposition re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions..* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Apking, Scott) (Entered: 11/20/2019) |
| 11/27/2019 | 368 | REPLY MEMORANDUM OF LAW in Support re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions.* . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 11/27/2019) |
| 11/27/2019 | 369 | DECLARATION of Ankur Mandhania in Support re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions..* Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Exhibit A − Share Classes Damages, # 2 Exhibit B − Deposition EX282 subpoena, # 3 Exhibit C − Dominguez deposition excerpt re subpoena)(Netter, Brian) (Entered: 11/27/2019) |
| 11/27/2019 | 370 | PRETRIAL MEMORANDUM. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1 Stipulation, # 2 Exhibit 2 Stipulation PLan, # 3 Exhibit 3 Plf Ex. List, # 4 Exhibit 4 Def Ex. List)(Schlichter, Jerome) (Entered: 11/27/2019) |
| 11/27/2019 | 371 | PROPOSED JURY INSTRUCTIONS. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 11/27/2019) |
| 11/27/2019 | 372 | PROPOSED VOIR DIRE QUESTIONS. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 11/27/2019) |
| 11/27/2019 | 373 | NOTICE of Filing of Proposed Verdict Form. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1 Plf Proposed Verdict Form, # 2 Exhibit 2 Def Proposed Verdict Form)(Schlichter, Jerome) (Entered: 11/27/2019) |
| 11/27/2019 | 374 | LETTER addressed to Judge P. Kevin Castel from Scott Apking dated 11/27/19 re: Clarification on ruling. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Apking, Scott) (Entered: 11/27/2019) |
| 11/28/2019 | 375 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated 11/28/2019 re: Response to Plaintiffs' Letter (Dkt. 374) to Judge P, Kevin Castel Regarding Clarification on Ruling. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee.(Netter, Brian) (Entered: 11/28/2019) |
| 12/02/2019 | 376 | ORDER re: 365 Order on Motion in Limine: There is an error in the Court's handwritten Order of November 8, 2019. "Letter motion (Doc 362) is DENIED" should read "Letter motion (Doc 365) is DENIED." The existence of an error should have been apparent to Messrs. Schlichter and Netter for the simple reason that Doc 362 is not a Letter Motion. The import of the Court's November 8 Order is very simple: the Court is not striking the referenced exhibit (Doc 361, Ex.2) from the docket and the parties are free to make their arguments in their briefing. Defendant's should file their response to Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation al Trial by December 10, 2019. (Signed by Judge P. Kevin Castel on 12/2/2019) (jwh) (Entered: 12/02/2019) |
| 12/04/2019 | 377 | LETTER MOTION for Leave to File Sur−Reply in Opposition to Cornell Defendants' Motion to Exclude Plaintiffs' Expert Wendy Dominguez addressed to Judge P. Kevin Castel from Scott Apking dated 12/4/2019. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Plaintiffs' Sur−Reply to Opposition to Cornell Defendants' Motion to Exclude Plaintiffs' Expert Wendy Dominguez, # 2 Exhibit Declaration of Scott Apking, # 3 |

| | | |
|---|---|---|
| | | Exhibit A, # 4 Exhibit B)(Apking, Scott) (Entered: 12/04/2019) |
| 12/05/2019 | 378 | ORDER granting 377 Letter Motion for Leave to File Document: Plaintiff may file its sur−reply and defendants may file a sur−sur reply by December 11, 2019. (Signed by Judge P. Kevin Castel on 12/5/2019) (jwh) (Entered: 12/05/2019) |
| 12/05/2019 | | Set/Reset Deadlines: Surreplies due by 12/11/2019. (jwh) (Entered: 12/05/2019) |
| 12/05/2019 | 379 | RESPONSE in Opposition to Motion re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions.* . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 12/05/2019) |
| 12/05/2019 | 380 | DECLARATION of Scott T. Apking in Opposition re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions.*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Apking, Scott) (Entered: 12/05/2019) |
| 12/06/2019 | 381 | **FILING ERROR − DEFICIENT DOCKET ENTRY (SEE 382 Letter)** − LETTER addressed to Judge P. Kevin Castel from Scott Apking dated 12−06−19 re: Replace Doc 307−02 Jt. Stipulation. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Jt. Stipulation Regarding Data Plan)(Apking, Scott) Modified on 12/9/2019 (db). (Entered: 12/06/2019) |
| 12/09/2019 | 382 | LETTER addressed to Judge P. Kevin Castel from Scott Apking dated 12/09/19 re: Jt Stipulation Regarding Plan Data correction Ex. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Jt. Stipulation Regarding Plan Data)(Apking, Scott) (Entered: 12/09/2019) |
| 12/10/2019 | 383 | MEMORANDUM OF LAW in Opposition re: 362 MOTION in Limine *Notice of Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation at Trial.*. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 12/10/2019) |
| 12/11/2019 | 384 | JOINT STIPULATION REGARDING PLAN DATA, FUND EXPENSE RATIOS AND FUND PERFORMANCE: In order to expedite the presentation of evidence at trial and to shorten the time necessary for trial, the Plaintiffs and Defendants (collectively, the "Parties") hereby agree and stipulate that: 1. Exhibit A is a true and accurate table reflecting each TIAA Lifecycle investment fund at issue in this case, its ticker, and its end−of−year assets in the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca. 2. Exhibit B is a true and accurate table reflecting each TIAA Lifecycle investment fund at issue in this case, its ticker, and its end−of−year assets in the Cornell University Tax Deferred Annuity Plan. 3. Exhibit C is a true and accurate table reflecting each TIAA Lifecycle investment fund at issue in this case, its ticker, and its annual expense ratio for the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan. 4. Exhibit D is a true and accurate table reflecting each TIAA Lifecycle investment fund at issue in this case, its ticker, and its annual performance for the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan. 5. Exhibit E is a true and accurate table reflecting each TIAA Lifecycle investment fund at issue in this case, its ticker, and its plan services expense. (Signed by Judge P. Kevin Castel on 12/11/2019) (mro) (Entered: 12/11/2019) |
| 12/11/2019 | 385 | REPLY MEMORANDUM OF LAW in Support re: 359 MOTION in Limine *to Exclude Plaintiffs' Expert Wendy Dominguez's Share Class Opinions. SUR−SUR−REPLY MEMORANDUM.* Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 12/11/2019) |
| 12/17/2019 | 386 | MOTION for Reconsideration re; 352 Memorandum & Opinion,,,,, . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau.(Schlichter, Jerome) (Entered: 12/17/2019) |

| 12/17/2019 | 387 | MEMORANDUM OF LAW in Support re: 386 MOTION for Reconsideration re; 352 Memorandum & Opinion,,,,, . . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 12/17/2019) |
|---|---|---|
| 12/17/2019 | 388 | LETTER MOTION for Leave to File Affidavit addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated 12/17/19. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Affidavit, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Schlichter, Jerome) (Entered: 12/17/2019) |
| 12/17/2019 | 389 | REPLY MEMORANDUM OF LAW in Support re: 362 MOTION in Limine *Notice of Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation at Trial.. .* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Apking, Scott) (Entered: 12/17/2019) |
| 12/17/2019 | 390 | REPLY AFFIDAVIT of Scott T. Apking in Support re: 362 MOTION in Limine *Notice of Plaintiffs' Motion to Exclude Defendants' Expert Glenn Poehler and Motion In Limine to Preclude Defendants From Offering an Offset Calculation at Trial...* Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A)(Apking, Scott) (Entered: 12/17/2019) |
| 12/19/2019 | 391 | JOINT PRETRIAL ORDER: SO ORDERED. (Signed by Judge P. Kevin Castel on 12/19/2019) (jwh) (Entered: 12/19/2019) |
| 12/19/2019 | | Minute Entry for proceedings held before Judge P. Kevin Castel: Final Pretrial Conference held on 12/19/2019. Present for plaintiffs, Jerome Schlickter and Joel Rohlf. Also appearing for defendants, Nancy Ross and Brian Netter. (Court Reporter Elizabeth Chan.) Parties to exchange updated charts by January 31, 2020. Next conference is scheduled for April 24, 2020 at 2:00 p.m. Jury trial is set for May 4, 2020 at 10:00 a.m. Motion DE 359 is terminated (see transcript). (Nacanther, Florence) (Entered: 12/19/2019) |
| 12/19/2019 | 392 | MEMO ENDORSEMENT with respect to 386 Motion for Reconsideration. ENDORSEMENT: Defendants' time to respond is extended to January 14 and plaintiff's reply to January 24. (Signed by Judge P. Kevin Castel on 12/19/2019) (jwh) (Entered: 12/20/2019) |
| 12/19/2019 | | Set/Reset Deadlines as to 386 MOTION for Reconsideration re; 352 Memorandum & Opinion: Responses due by 1/14/2020. Replies due by 1/24/2020. (jwh) (Entered: 12/20/2019) |
| 12/23/2019 | 393 | LETTER RESPONSE to Motion addressed to Judge P. Kevin Castel from Brian D. Netter dated December 23, 2019 re: 388 LETTER MOTION for Leave to File Affidavit addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated 12/17/19. . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 12/23/2019) |
| 01/14/2020 | 394 | MEMORANDUM OF LAW in Opposition re: 386 MOTION for Reconsideration re; 352 Memorandum & Opinion,,,,, . . Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Netter, Brian) (Entered: 01/14/2020) |
| 01/14/2020 | 395 | LETTER MOTION for Leave to File Declaration addressed to Judge P. Kevin Castel from Brian D. Netter dated January 14, 2020. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Declaration of Brian D. Netter, # 2 Exhibit A to Netter Declaration)(Netter, Brian) (Entered: 01/14/2020) |
| 01/15/2020 | 396 | ORDER granting 395 LETTER MOTION for Leave to File Declaration addressed to Judge P. Kevin Castel from Brian D. Netter dated January 14, 2020. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. Application granted. So ordered. (Signed by Judge P. Kevin Castel on 1/14/2020) (rjm) (Entered: 01/15/2020) |

| 01/15/2020 | 397 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/19/2019 before Judge P. Kevin Castel. Court Reporter/Transcriber: Elizabeth Chan, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/5/2020. Redacted Transcript Deadline set for 2/18/2020. Release of Transcript Restriction set for 4/14/2020.(McGuirk, Kelly) (Entered: 01/15/2020) |
|---|---|---|
| 01/15/2020 | 398 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/19/2019 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 01/15/2020) |
| 01/24/2020 | 399 | REPLY MEMORANDUM OF LAW in Support re: 386 MOTION for Reconsideration re; 352 Memorandum & Opinion,,,,, . . Document filed by Casey Cunningham, Charles E. Lance, Lydia Pettis, Joy Veronneau. (Schlichter, Jerome) (Entered: 01/24/2020) |
| 01/31/2020 | 400 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated 1/31/2020 re: Revised Proposed Verdict Form. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit Revised Proposed Verdict Form).(Schlichter, Jerome) (Entered: 01/31/2020) |
| 01/31/2020 | 401 | LETTER addressed to Judge P. Kevin Castel from Samuel P. Myler dated 1/31/2020 re: Revised Proposed Verdict Form. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. (Attachments: # 1 Revised Proposed Verdict Form).(Myler, Samuel) (Entered: 01/31/2020) |
| 02/27/2020 | 402 | NOTICE of Supplemental Authority re: 371 Proposed Jury Instructions. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A).(Rohlf, Joel) (Entered: 02/27/2020) |
| 02/28/2020 | 403 | NOTICE of Withdrawal of Attorney. Document filed by Fidelity Management Trust Company..(Sokoler, Jennifer) (Entered: 02/28/2020) |
| 03/11/2020 | 404 | OPINION AND ORDER re: 386 MOTION for Reconsideration re; 352 Memorandum & Opinion: For these reasons, plaintiffs' motion for reconsideration is DENIED. The Clerk is directed to terminate the motion (Doc 386). (Signed by Judge P. Kevin Castel on 3/11/2020) (jwh) (Entered: 03/11/2020) |
| 03/16/2020 | 405 | ORDER: The following situation has arisen regarding the trial schedule in this matter. The Court had scheduled United States v. Vance Collins and Ramon Ramirez, 1: 1 9−cr−395, for trial beginning on April 6, 2020. In order to protect public health, and in recognition of the national emergency declared by the President of the United States on March 13, 2020, the Court has moved the Collins and Ramirez trial to May 4, 2020. Trial in the above−captioned matter is now the first back−up trial to Collins and Ramirez on May 4, 2020 at 10:00am. The Court will apprise the parties of further developments. SO ORDERED. (Signed by Judge P. Kevin Castel on 3/16/2020) (kv) (Entered: 03/17/2020) |
| 04/20/2020 | 406 | LETTER addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated 4/20/2020 re: Pretrial Conference. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Schlichter, Jerome) (Entered: 04/20/2020) |
| 04/20/2020 | 407 | MEMO ENDORSEMENT on re: 406 Letter filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance. ENDORSEMENT: The conference previously scheduled for April 24, 2020 is adjourned to September 10, 2020 at 12:00 pm. (Case Management Conference set for 9/10/2020 at 12:00 PM before Judge P. Kevin Castel.) (Signed by Judge P. Kevin Castel on 4/20/2020) (js) (Entered: 04/21/2020) |
| 04/22/2020 | 408 | NOTICE OF CHANGE OF ADDRESS by Amanda Susan Amert on behalf of Aon Hewitt Investment Consulting, Inc.. New Address: Willkie Farr & Gallagher LLP, 300 N. La Salle Drive, Chicago, IL, 60654, 312−728−9000..(Amert, Amanda) (Entered: |

| | | |
|---|---|---|
| | | 04/22/2020) |
| 04/27/2020 | 409 | **FILING ERROR − DEFICIENT DOCKET ENTRY −** LETTER MOTION to Continue *Pretrial Conference* addressed to Judge P. Kevin Castel from Nancy G. Ross dated April 27, 2020. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee..(Ross, Nancy) Modified on 6/8/2020 (db). (Entered: 04/27/2020) |
| 04/28/2020 | 410 | ORDER granting 409 Letter Motion to Continue: The conference scheduled for September 10, 2020 is adjourned to October 2, 2020 at 12:00 p.m. (Case Management Conference set for 10/2/2020 at 12:00 PM before Judge P. Kevin Castel.) (Signed by Judge P. Kevin Castel on 4/27/2020) (jwh) (Entered: 04/28/2020) |
| 05/20/2020 | 411 | ORDER: In ways that should be self−evident, the Covid−19 pandemic will affect civil jury trials in this District for a considerable and presently unknowable time to come. When trials do resume, priority will be given to criminal cases with detained defendants. Within 21 days, the parties are directed to confer telephonically on the following subjects and report back to the Court via fax to Chambers: (a) waiver of trial by jury; (b) consent to trial before Magistrate Judge James L. Cott; and ( c) settlement. SO ORDERED. (Signed by Judge P. Kevin Castel on 5/20/2020) (ama) (Entered: 05/20/2020) |
| 08/14/2020 | 412 | ORDER: As the parties are aware, jury trials in this District have been suspended. It is anticipated that they may resume as early as late September or early October. While, generally, criminal trials will have priority, the Court may resume trials with at least one short civil trial. I have proposed this case for an early trial. Whether a trial will be set in late September or early October is not within this judge's sole control, but it is appropriate that the parties be aware that this may occur so they can plan accordingly. The Court will notify the parties if a trial date is set as soon as the information becomes available. (Signed by Judge Kevin P. Castel on 8/14/2020) (cf) Modified on 8/21/2020 (cf). (Entered: 08/14/2020) |
| 08/24/2020 | 413 | ORDER: The trial of this action will commence on September 29, 2020 at 10:00 a.m. The Court will conduct a conference with counsel to go over jury selection and trial procedures on September 22, 2020 at 3:30 p.m. (Jury Trial set for 9/29/2020 at 10:00 AM before Judge P. Kevin Castel. Status Conference set for 9/22/2020 at 03:30 PM before Judge P. Kevin Castel.) (Signed by Judge P. Kevin Castel on 8/24/2020) (jwh) (Entered: 08/24/2020) |
| 08/26/2020 | 414 | JOINT LETTER MOTION for Conference re: 413 Order, Set Hearings,, addressed to Judge P. Kevin Castel from Jerome J. Schlichter dated 8/26/2020. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Schlichter, Jerome) (Entered: 08/26/2020) |
| 08/27/2020 | 415 | ORDER granting 414 Letter Motion for Conference: The Court will hold a teleconference in this matter on Tuesday, September 1, 2020 at 11:00am. The dial−in information for this conference is as follows: Dial−in: (888) 363−4749 Access Code: 3667981 (Telephone Conference set for 9/1/2020 at 11:00 AM before Judge P. Kevin Castel.) (Signed by Judge P. Kevin Castel on 8/27/2020) (jwh) (Entered: 08/27/2020) |
| 08/28/2020 | 416 | MOTION for ALISON I. STEIN to Withdraw as Attorney *(MOTION FOR LEAVE TO WITHDRAW THE APPEARANCE OF ALISON I. STEIN)*. Document filed by Aon Hewitt Investment Consulting, Inc...(Amert, Amanda) (Entered: 08/28/2020) |
| 08/31/2020 | 417 | ORDER: The conference previously scheduled for 11:00am on September 1, 2020 will be held at 2:00pm on September 1, 2020, utilizing the same call−in information. SO ORDERED. (Signed by Judge P. Kevin Castel on 8/31/2020) ( Telephone Conference set for 9/1/2020 at 02:00 PM before Judge P. Kevin Castel.) (ks) (Entered: 08/31/2020) |
| 09/01/2020 | | Minute Entry for proceedings held before Judge P. Kevin Castel: Case Management Conference held on 9/1/2020. Appearing for plaintiffs, Jerome Schlichter and Joel Rohlf. Appearing for defendants, Nancy Ross and Brian Netter. Law Clerk, Elana Stern. Parties requested that the trial scheduled to begin September 29, 2020 be vacated, as the parties have reached a settlement in principle on the remaining claim. Preliminary approval of settlement documents to be submitted to the Court by the close of business on September 21, 2020. When and if they are submitted, the trial will be vacated. (Court Reporter Vincent Bologna) (Nacanther, Florence) (Entered: |

| | | |
|---|---|---|
| | | 09/01/2020) |
| 09/21/2020 | 418 | MOTION for Settlement *(Unopposed)* for Preliminary Approval of Settlement. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | 419 | PROPOSED ORDER. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. Related Document Number: 418 ..(Rohlf, Joel) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 09/21/2020) |
| 09/21/2020 | 420 | MEMORANDUM OF LAW in Support re: 418 MOTION for Settlement *(Unopposed) for Preliminary Approval of Settlement*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | 421 | DECLARATION of Jerome J. Schlichter in Support re: 418 MOTION for Settlement *(Unopposed) for Preliminary Approval of Settlement*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A Settlement Agreement with Attachments).(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | 422 | MOTION to Certify Class *(Unopposed)* for Certification of a Settlement Only *Sub−Class*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | 423 | MEMORANDUM OF LAW in Support re: 422 MOTION to Certify Class *(Unopposed) for Certification of a Settlement Only Sub−Class*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | 424 | DECLARATION of Casey Cunningham in Support re: 422 MOTION to Certify Class *(Unopposed) for Certification of a Settlement Only Sub−Class*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | 425 | DECLARATION of Joel D. Rohlf in Support re: 422 MOTION to Certify Class *(Unopposed) for Certification of a Settlement Only Sub−Class*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit 1).(Rohlf, Joel) (Entered: 09/21/2020) |
| 09/21/2020 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 419 Proposed Order was reviewed and approved as to form. (km)** (Entered: 09/21/2020) |
| 10/07/2020 | 426 | ORDER FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT OF RELEASED CLAIM granting 418 Motion for Settlement: Having reviewed the Settlement Agreement and the accompanying and supporting papers, it is ORDERED as follows: A hearing is scheduled at the United States District Court for the Southern District of New York, the Honorable District Court Judge P. Kevin Castel presiding, at 2 p.m. on Dec. 22, 2020 in Courtroom 11D, 500 Pearl St, NY, NY 10007 determine, among other issues: A. Whether the Settlement Agreement should be approved as fair, reasonable, and adequate, and as further set forth in this order. A common fund is agreed to by the Settling Parties in the Settlement Agreement and is hereby established and shall be known as the Cunningham v. Cornell University Litigation Settlement Fund (the "Settlement Fund" or "Gross Settlement Amount"). The Settlement Fund shall be a "qualified settlement fund" within the meaning of Treasury Regulations § 1.468−1(a) promulgated under Section 468B of the Internal Revenue Code. The Settlement Fund shall consist of $225,000 and any interest earned thereon, and as further set forth in this order. All valid Former Participant Claim Forms must be received by the Settlement Administrator with a postmark date no later than November 23, 2020. (Signed by Judge P. Kevin Castel on 9/22/2020) (jwh) (Entered: 10/07/2020) |
| 10/14/2020 | 427 | NOTICE of Withdrawal as Attorney of Record. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Apking, Scott) (Entered: 10/14/2020) |

DJA43

| 10/14/2020 | 428 | LETTER addressed to Judge P. Kevin Castel from Scott Apking dated 10/14/2020 re: Withdrawal as Attorney of Record. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Apking, Scott) (Entered: 10/14/2020) |
|---|---|---|
| 10/14/2020 | 429 | MEMO ENDORSEMENT on re: 428 Letter filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance ENDORSEMENT: Application Granted. So Ordered. Attorney Scott Apking terminated. (Signed by Judge P. Kevin Castel on 10/14/2020) (js) (Entered: 10/15/2020) |
| 10/23/2020 | 430 | MOTION for Attorney Fees *and Expenses and Case Contribution Award for Class Representative*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Schlichter, Jerome) (Entered: 10/23/2020) |
| 10/23/2020 | 431 | MEMORANDUM OF LAW in Support re: 430 MOTION for Attorney Fees *and Expenses and Case Contribution Award for Class Representative*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Schlichter, Jerome) (Entered: 10/23/2020) |
| 10/23/2020 | 432 | DECLARATION of Jerome J. Schlichter in Support re: 430 MOTION for Attorney Fees *and Expenses and Case Contribution Award for Class Representative*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Exhibit A − Firm Bio).(Schlichter, Jerome) (Entered: 10/23/2020) |
| 10/23/2020 | 433 | DECLARATION of Joel D. Rohlf in Support re: 430 MOTION for Attorney Fees *and Expenses and Case Contribution Award for Class Representative*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Schlichter, Jerome) (Entered: 10/23/2020) |
| 10/27/2020 | 434 | MEMO ENDORSEMENT granting 416 Motion to Withdraw as Attorney. ENDORSEMENT: Application granted. (Attorney Alison Irene Stein terminated.) (Signed by Judge P. Kevin Castel on 10/27/2020) (jwh) (Entered: 10/27/2020) |
| 12/02/2020 | 435 | ORDER: The Standing Order of Chief Judge McMahon dated November 30, 2020 is suspending all in−person proceedings until after January 15, 2021. The Fairness Hearing scheduled for December 22, 2020 will proceed telephonically. The conference will commence at 2 p.m. The dial−in information is as follows: Phone Number: 888−363−4749 Access Code: 3667981 Members of the press and public may access this proceeding with the same information but will not be permitted to speak. (Telephone Conference set for 12/22/2020 at 02:00 PM before Judge P. Kevin Castel.) (Signed by Judge P. Kevin Castel on 12/2/2020) (jwh) (Entered: 12/02/2020) |
| 12/08/2020 | 436 | MOTION for Settlement *(Unopposed) for Final Approval*. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. (Attachments: # 1 Text of Proposed Order).(Rohlf, Joel) (Entered: 12/08/2020) |
| 12/08/2020 | 437 | MEMORANDUM OF LAW in Support re: 436 MOTION for Settlement *(Unopposed) for Final Approval*. . Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 12/08/2020) |
| 12/08/2020 | 438 | DECLARATION of Joel D. Rohlf in Support re: 436 MOTION for Settlement *(Unopposed) for Final Approval*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 12/08/2020) |
| 12/08/2020 | 439 | DECLARATION of Analytics Consulting LLC in Support re: 436 MOTION for Settlement *(Unopposed) for Final Approval*.. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau..(Rohlf, Joel) (Entered: 12/08/2020) |
| 12/16/2020 | 440 | MOTION for Joel S. Feldman to Withdraw as Attorney . Document filed by CapFinancial Partners, LLC..(Feldman, Joel) (Entered: 12/16/2020) |
| 12/22/2020 | | Minute Entry for proceedings held before Judge P. Kevin Castel: Fairness Hearing held on 12/22/2020. Telephonic hearing. Present is plaintiff, Casey Cunningham with attorneys Heather Lea and Joel Rohlf. Present for defendants Brian Netter. Law Clerk: Brandon Davis. The settlement class is certified. The proposed settlement is fair, |

| | | |
|---|---|---|
| | | reasonable and adequate and is approved. Attorneys fees, reimbursement of reasonable expenses, and a $1,000 incentive award to lead plaintiff are granted. (Court Reporter Steven Greenblum) (Nacanther, Florence) (Entered: 12/22/2020) |
| 12/22/2020 | 441 | FINAL APPROVAL ORDER AND JUDGMENT: Having reviewed the Settlement Agreement and the accompanying and supporting papers, it is ORDERED as follows: The Court confirms that the Class certified for settlement purposes only under Fed. R. Civ. P. 23(b)(1) is appropriate. The Court confirms the appointment of Plaintiff Casey Cunningham as the Representative for the settlement sub−class. Pursuant to Fed. R. Civ. P. 23(e), the Court hereby approves and confirms the Settlement Agreement and the terms therein as being a fair, reasonable, and adequate settlement and compromise of the claims asserted in the Class Action, based on the following findings of fact, conclusions of law, and determination of mixed fact/law questions: a. The Settlement Agreement resulted from arm's−length negotiations by experienced and competent counsel; b. The Settlement Agreement was negotiated only after the Settling Parties engaged in extensive litigation and discovery, and on the eve of trial, and Class Counsel has received extensive and pertinent information and documents from the Cornell Defendants; c. The Settling Parties were well positioned to evaluate the value of the Class Action; d. If the Settlement Agreement had not been achieved, both Plaintiffs and the Cornell Defendants faced the expense, risk, and uncertainty of extended litigation; e. The amount of the Settlement − $225,000 − is fair, reasonable and adequate, and as further set forth in this judgment. The Motion for Final Approval of the Settlement Agreement is hereby GRANTED, the settlement of the Action is APPROVED as fair, reasonable and adequate to the Plans and the Class, and the Settling Parties are hereby directed to take the necessary steps to effectuate the terms of the Settlement Agreement. The Court awards Class Counsel Attorneys' Fees and Costs in the amount of $88,017.25, to be paid from the Gross Settlement Amount. The Court awards the Class Representative $1,000 as Class Representative Compensation, to be paid from the Gross Settlement Amount. The Court finds that it has subject matter jurisdiction over the claims herein and personal jurisdiction over the Cornell Defendants, the Plans and the Class Members pursuant to the provisions of ERISA, and expressly retains that jurisdiction for purposes of enforcing this Final Approval Order and/or the Settlement Agreement. Any motion to enforce this Final Approval Order or the Settlement Agreement, including by way of injunction, shall be filed in this Court, and the provisions of the Settlement Agreement and/or this Final Approval Order may be asserted by way of an affirmative defense or counterclaim in response to any action that is asserted to violate the Settlement Agreement. (Signed by Judge P. Kevin Castel on 12/22/2020) (jwh) (Entered: 12/22/2020) |
| 12/22/2020 | | Terminate Transcript Deadlines (jwh) (Entered: 12/22/2020) |
| 12/22/2020 | 442 | LETTER addressed to Gordon Barger, Director of Benefits Services & Administration, Cornell University from Darin R. Hoffner of GALLAGHER FIDUCIARY ADVISORS, LLC dated 12/10/2020 re: This will confirm that, on behalf of the Plans, and in its capacity as independent fiduciary, Gallagher approves and authorizes the settlement of Released Claims, as defined in the Settlement Agreement. (jwh) (Entered: 12/22/2020) |
| 01/12/2021 | 443 | NOTICE OF APPEAL from 219 Memorandum & Opinion,,, 352 Memorandum & Opinion,,,,, 107 Order on Motion to Dismiss,,, 404 Memorandum & Opinion, 441 Judgment,,,,,,,,,,. Document filed by Casey Cunningham, Charles E. Lance, Stanley T. Marcus, Lydia Pettis, Joy Veronneau. Filing fee $ 505.00, receipt number ANYSDC−23476401. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Schlichter, Jerome) (Entered: 01/12/2021) |
| 01/13/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 443 Notice of Appeal. (tp) (Entered: 01/13/2021) |
| 01/13/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 443 Notice of Appeal, filed by Stanley T. Marcus, Casey Cunningham, Joy Veronneau, Lydia Pettis, Charles E. Lance were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/13/2021) |
| 01/14/2021 | 444 | MEMO ENDORSEMENT re: 440 NOTICE OF WITHDRAWAL AS COUNSEL for Joel S. Feldman to Withdraw as Attorney filed by CapFinancial Partners, LLC. ENDORSEMENT: Application GRANTED. SO ORDERED., Attorney Joel S. |

| | | |
|---|---|---|
| | | Feldman terminated. (Signed by Judge P. Kevin Castel on 1/14/2021) (nb) (Entered: 01/15/2021) |
| 01/15/2021 | 445 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/22/2020 before Judge P. Kevin Castel. Court Reporter/Transcriber: Steven Greenblum, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/5/2021. Redacted Transcript Deadline set for 2/16/2021. Release of Transcript Restriction set for 4/15/2021..(McGuirk, Kelly) (Entered: 01/15/2021) |
| 01/15/2021 | 446 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/22/20 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 01/15/2021) |
| 01/19/2021 | 447 | NOTICE OF CROSS APPEAL from 441 Judgment,,,,,,,,,,.. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee. Filing fee $ 505.00, receipt number ANYSDC−23573012. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Netter, Brian) (Entered: 01/19/2021) |
| 01/19/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 447 Notice of Cross Appeal. (tp) (Entered: 01/19/2021) |
| 01/19/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 447 Notice of Cross Appeal, filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/19/2021) |
| 01/19/2021 | 448 | NOTICE OF CROSS APPEAL from 198 Memorandum & Opinion,. Document filed by CapFinancial Partners, LLC. Filing fee $ 505.00, receipt number ANYSDC−23585311. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Mattson, Eric) (Entered: 01/19/2021) |
| 01/20/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 448 Notice of Cross Appeal. (tp) (Entered: 01/20/2021) |
| 01/20/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 448 Notice of Cross Appeal, filed by CapFinancial Partners, LLC were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/20/2021) |
| 04/20/2021 | 449 | LETTER addressed to Judge P. Kevin Castel from Brian D. Netter dated April 20, 2021 re: Termination of Appearance. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee..(Netter, Brian) (Entered: 04/20/2021) |
| 04/20/2021 | 450 | NOTICE of of Withdrawal of Brian D. Netter as Counsel. Document filed by Cornell University, Mary G. Opperman, The Retirement Plan Oversight Committee..(Netter, Brian) (Entered: 04/20/2021) |
| 04/21/2021 | 451 | MEMO ENDORSEMENT on NOTICE OF WITHDRAWAL OF BRIAN D. NETTER AS COUNSEL: re: 450 Notice (Other) filed by Cornell University, The Retirement Plan Oversight Committee, Mary G. Opperman. ENDORSEMENT: Application Granted. SO ORDERED., Attorney Brian D Netter terminated. (Signed by Judge P. Kevin Castel on 4/20/2021) (ama) Modified on 4/21/2021 (ama). (Entered: 04/21/2021) |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---

CASEY CUNNINGHAM, *et al*.,

                *Plaintiffs,*

           vs.                                    Case No.: 1:16-cv-06525

CORNELL UNIVERSITY, *et al.,*

                *Defendants.*

---

September 14, 2018

**Expert Report of Conrad Ciccotello, Ph.D.**

---

**Exhibit 249**

**Confidential**

DJA47

# TABLE OF CONTENTS

I.   CICCOTELLO QUALIFICATIONS ................................................................. 1

II.  ASSIGNMENT ................................................................................................ 4

III. SUMMARY OF OPINIONS ........................................................................... 5

IV. RELEVANT BACKGROUND INFORMATION ............................................ 5

    A. Evolution of 403(b) Plans. ....................................................................... 5

    B. The Cornell Plans at Issue in this Matter. ............................................... 7

    C. The Retention of CAPTRUST and the Environment at Cornell..................... 9

V.  CAPTRUST APPRECIATED THE CHALLENGES THAT WERE SPECIFIC TO
    CORNELL AND HAS PROVIDED THE RPOC WITH CONSISTENT AND SENSIBLE
    ADVICE SINCE ITS ENGAGEMENT IN 2011 ................................................. 14

    A. CAPTRUST has helped maintain appropriate oversight for the Cornell Plans. ............... 15

    B. CAPTRUST introduced, recommended, and helped implement a tiered investment
       architecture for the Cornell Plans that was both reasonable and appropriate for a
       University Plan................................................................................... 18

    C. Once the tiered structure was in place, CAPTRUST promptly advised the RPOC about
       additional Cornell Plan refinements................................................... 23

    D. CAPTRUST provided formal training and informal updates to the RPOC..................... 26

VI. CAPTRUST PROVIDED THE RPOC WITH APPROPRIATE MONITORING
    INFORMATION.......................................................................................... 27

    A. CAPTRUST provided the RPOC with appropriate performance information before the
       formalization of the tiered structure in 2014............................................. 27

    B. Once the tiered structure was implemented, CAPTRUST provided the RPOC with
       quarterly quantitative and qualitative performance reviews that led to changes in the
       Cornell Plans' investment menus.................................................... 30

VII. CAPTRUST APPROPRIATELY ASSESSED THE PERFORMANCE OF UNIQUE TIAA
    OFFERINGS AND UNDERSTANDS THE VALUE OF INCLUDING ANNUITY
    PRODUCTS IN RETIREMENT PLANS ................................................. 33

    A. CAPTRUST's monitoring and analysis of CREF Stock and TIAA Real Estate in the
       Cornell Plans was appropriate.  Plaintiffs' experts inappropriately dismiss CREF Stock
       and TIAA Real Estate as appropriate Cornell Plan investment options. ................. 33

    B. CAPTRUST wisely considered both the accumulation and decumulation phases of
       retirement planning while Plaintiffs' experts fail to understand the value of annuities in
       the Cornell Plan................................................................................ 37

Confidential

## I.    CICCOTELLO QUALIFICATIONS

1.    I am the Director of the Reiman School of Finance in the Daniels College of Business at the University of Denver.  In that capacity, I supervise 16 full-time faculty and oversee over 400 undergraduate and 80 graduate student majors in finance.  From 2015 to 2017, I was the Chair of the Department of Risk Management and Insurance in the Robinson College of Business at Georgia State University, where I supervised over 20 full-time faculty in one of the nation's top Risk Management and Insurance programs.  I was also the Director of Asset and Wealth Management (previously, Personal Financial Planning) Programs in the Robinson College of Business from 1999 to 2017.  Over 200 of my programs' graduates are currently practicing financial advisors.  I served as a member of the Georgia State University Faculty Senate for 14 years, focusing on faculty and staff employment issues such as salary structure, performance evaluation, and benefits.  During that time, I supported the Benefits Office at Georgia State by conducting retirement planning workshops for faculty and staff.

2.    I have worked as a faculty member in higher education for 27 years.  For the last 19 years, I have held faculty leadership positions (Director or Department Chair).  Prior to the University of Denver and Georgia State, I was a member of the faculty at the Pennsylvania State University from 1997 to 1999, and a member of the US Air Force Academy faculty (1988-1990 and 1993-1997).  I also taught as an adjunct professor for the Colorado State University System in the mid-1990s.  I am a graduate of Lehigh University (B.S., Engineering), St. Mary's University (MBA), and Suffolk University (JD).  In 1993, I completed my Ph.D. in Finance at the Pennsylvania State University.

3.    From 2008 to 2017, I supported the University System of Georgia ("USG") defined-contribution retirement plans as an inside investment consultant.  These plans cover the 26 higher-education institutions in the USG, including four research universities (University of Georgia, Georgia Tech University, Georgia State University, and Augusta University), four comprehensive universities, nine state universities, and nine state colleges.[1]  The USG has approximately 45,000 benefits-eligible employees.

4.    There are three USG defined contribution plans.  The first is an Internal Revenue Code section 401(a) plan for exempt employees, which has a mandatory six percent employee

---

[1] University System of Georgia – USG Facts, at https://www.usg.edu/news/usgfacts.

contribution and a 9.24% employer match.  This 401(a) plan has been called the "optional retirement plan" ("Georgia Plan") since its creation in 1990 as an alternative to the Employee Retirement System of Georgia defined benefit (pension) plan.  The second and third plans (section 403(b) and 457(b) plans, respectively) are called the "voluntary plans" ("Georgia Voluntary Plans").  They generally are open to all employees (except for student employees).  No employee contributions are required and no matching contributions are made by the employer.  As of 2016, the three plans together had over $4 billion in participant assets, with about three quarters of those assets in the Georgia Plan.

5.     The USG Board of Regents is responsible for administering the Georgia Plan.  The day-to-day administration is conducted by the USG Human Resources Office.  In 2008, the USG Human Resources Office asked me to serve as an inside investment consultant to (and member of) the Georgia Plan Investment Committee.  My focus areas were monitoring investment performance/cost as well as vendor education and advisory services, given my research on mutual funds and experience as director of personal financial planning programs at Georgia State University.  Since I was also a full-time faculty member at a USG institution, my "inside" role as a consultant provided the Georgia Plan Investment Committee with a faculty perspective as well.  The Georgia Plan Investment Committee also included an outside independent consultant, who was the primary intermediary to the vendors, and USG Human Resources Office staff.

6.     As of 2009, the Georgia Plan investment menu had three tiers of investment options offered by three vendors: Fidelity, TIAA, and VALIC.  Tier 1 of the Georgia Plan was for the "please do it for me" participants.  This was the "default" for those participants not wishing or unable to make an informed choice of investments (target-date retirement funds).  Tier 2 was a short-list of about 20-25 funds aimed at the "please help me" type of participant who wanted to build a diversified portfolio from a small number of sponsor-monitored funds.  Tier 3 was for the "please don't take away my choices" group of participants.  Tier 3 was designed to minimize disruption for participants who had invested in funds outside of what was now in Tier 2, and for participants who wanted a wider variety of investment options than those in Tiers 1 and 2.  The Georgia Plan Investment Committee was responsible for monitoring the performance and fees of the investments offered in Tier 1 and Tier 2.  I served on the Georgia Plan Investment Committee until my departure from Georgia State University in June 2017.

7.     In 2015, USG Human Resources asked me to serve on the Voluntary Retirement Plans Strategy Committee ("Georgia Voluntary Plans Strategy Committee").  USG formed this committee to evaluate and implement strategies to consolidate vendors and fund lineups across the Georgia Voluntary Plans and consider how to better synchronize fund lineups between the Georgia Plan and the Georgia Voluntary Plans.  Working with CAPTRUST as the independent consultant and representatives from several USG institutions, I served on the Georgia Voluntary Plans Strategy Committee until my departure from Georgia State University in June 2017.

8.     I have also served as an Investment Consultant and Executive Director for two private foundations whose mission is to support the advancement of risk management and insurance scholarship and learning.  I became the Executive Director of the Huebner Foundation in 2012, upon its move from the Wharton School to Georgia State University.  I was the Investment Consultant for the Risk Management Foundation endowment from 2003 to 2017 and served as the Foundation's Executive Director from 2015 to 2017.  In both foundations, I was a member of a committee that managed the endowment investments, using Vanguard as the vendor.

9.     From 2007 to the present, I have served as a Research Fellow in the TIAA Institute. As one of over 50 fellows who are dedicated to helping leaders of non-profit, higher-education, and public-sector organizations make better decisions, my focus in the Institute has been on examining and improving financial security for faculty and staff in universities.  For example, I have studied the engagement of millennials and "baby boomer" employees in defined contribution retirement plans, as well as the financial and social issues impacting faculty retirement decisions.

10.     My primary research interests are in law and finance, with an emphasis in financial intermediation and services.  I have over 60 publications, including articles in top journals such as the *Journal of Financial Economics*, *Journal of Law and Economics*, *Management Science*, the *Journal of Financial and Quantitative Analysis*, and *Financial Analysts Journal*.  During my academic career, I have successfully competed for research grants from the TIAA Institute, Financial Planning Foundation, Kauffman Foundation, and the William Davidson Institute.  I am the author of the first two chapters in Mutual Funds: The Blackwell Series in Finance.  My research on the financial advisory profession is cited in the Federal Register and my paper on

market timing of mutual funds is entered into the Congressional Record as Senate Banking Committee testimony.[2]  In 2008, I provided expert testimony on investment policy for defined benefit plans during a Retirement Committee meeting of the Georgia Senate legislative session. I have been quoted on matters related to investments, retirement, and financial planning topics in numerous outlets including the *Wall Street Journal*, *Washington Post*, *New York Times*, *USA Today*, *Kiplinger's Personal Finance*, *Consumer Reports*, and *Investment Advisor*.

11.    I was the Editor of a top specialty academic journal in personal financial planning, the *Financial Services Review*, from 2001 to 2007.  During those six years as editor, I reviewed nearly 1,000 manuscripts and accepted 120 for publication.

12.    Attached as Exhibit 1 to this report is a current copy of my curriculum vitae, which includes the publications I have authored over the previous ten years.  My previous appearances as an expert witness over the previous four years are attached as Exhibit 2 to this report.  The materials I have considered in connection with this assignment are listed in Exhibit 3 to this report.  If presented with new or additional information after the date of this report, I reserve the right to modify or expand upon my opinion.  I am being compensated for my time spent on this engagement at an hourly rate of $700.  My compensation is not contingent on the outcome of this matter.  Charles River Associates, an international financial and economics consulting company, has provided support for my analysis.

## II.    ASSIGNMENT

13.    I have been asked by counsel for Defendant CapFinancial Partners, LLC, d/b/a CAPTRUST Financial Advisors ("CAPTRUST") to review the advice it provided to Cornell University ("Cornell") and the Cornell Retirement Plans Oversight Committee ("RPOC") related to the Cornell University Retirement Plan for the Employees of the Endowed Colleges

---

[2] Ciccotello, C. S., C. T. Grant and M. Dickie (2003). Will Consult for Food! Rethinking Barriers to Professional Entry in the Information Age. *American Business Law Journal* 40, 905-939.  *Cited in Federal Register:  Certain Broker-Dealers Deemed Not to be Investment Advisors – April 19, 2005*. Ciccotello, C. S., R. Edelen, J. Greene, and C. Hodges (2002). Trading at Stale Prices with Modern Technology: Policy Options for Mutual Funds in the Internet Age. *Virginia Journal of Law and Technology* 7 (3), 6-37.  *Added to Congressional Record as Senate Banking Committee Testimony – November 2003.*

at Ithaca (the "CURP Plan") and the Cornell University Tax Deferred Annuity Plan (the "TDA Plan") (collectively, the "Cornell Plans").  Specifically, I have been asked to offer opinions related to CAPTRUST's recommendation for an investment architecture for the Cornell Plans, its recommendations for investments and the monitoring of investments in the Plans, and the inclusion and monitoring of CREF Stock and TIAA Real Estate in the Plans.

### III.    SUMMARY OF OPINIONS

1.  CAPTRUST appreciated the challenges that were specific to Cornell and has provided the RPOC with consistent and sensible advice since its engagement in 2011.

2.  CAPTRUST provided the RPOC with appropriate monitoring information.

3.  CAPTRUST appropriately assessed the performance of unique TIAA offerings and understands the value of including annuity products in retirement plans.

### IV.    RELEVANT BACKGROUND INFORMATION

#### A.  Evolution of 403(b) Plans.

14.    The two plans at issue in this litigation are retirement plans governed by Internal Revenue Code Section 403(b).  Section 403(b) plans are tax-advantaged retirement savings plans offered by certain non-profit organizations, including universities, arts and cultural organizations, foundations, hospitals, K-12 school systems, libraries, museums, religious institutions, research institutions, and community service organizations.  403(b) plans can vary greatly in terms of the number of participants, employee eligibility, contribution requirements, sponsor contribution matching, available investments, investment education and advice provided to participants, customer service, and administrative practice.

15.    Although 401(k) and 403(b) plans share some similarities with regard to tax treatment and compliance, their origins were quite different.  The original purpose of the 401(k) plan was to allow employees to share in their employer's profits in a tax-advantaged manner.

16.    Conversely, from their inception 403(b) plans were intended to serve as vehicles for providing lifetime income to employees of non-profit organizations.  The intent dates back to

the introduction of Section 403(b) to the Internal Revenue Code in 1958.  Section 403(b) established rules for the taxation of annuity accounts in 403(b) plans, and it required that all assets be invested only in annuity contracts.  The model for the 403(b) plan was the higher-education environment.  For nearly forty years prior to the adoption of Section 403(b), university professors (such as Albert Einstein in 1933) had been relying on annuities to provide income in retirement.

17.     Many 403(b) plan annuities are contractual agreements between the individual participant and an independent company providing the annuity.  These individual annuity contracts are portable and may be moved from institution to institution when the annuity holder changes employment.  This was (and remains) a very attractive feature in higher education, where faculty often change universities several times during a career.[3]

18.     In 1974, Congress changed the governing statute so that 403(b) plans could offer mutual funds in addition to annuities.  Annuities are different from mutual funds because, among other things, the individual annuity contract owner—the plan participant—can elect to receive monthly payments for the rest of his or her life or for joint lives (e.g., spouse), with a period for certain payment regardless of the timing of death.  Further, fixed annuities (e.g., TIAA Traditional) can offer guaranteed annual growth rates that can exceed the inflation rate. This is valuable to participants concerned about investment as well as longevity risk.

19.     Since an individual annuity contract is an agreement between a participant and the annuity provider, a 403(b) plan sponsor cannot alter the terms or existence of this contract unless both the participant and the annuity provider agree to the changes.

20.     Despite the fact that it has been over 43 years since mutual funds could be used as 403(b) investments, annuities have remained very popular in 403(b) plans.  As of 2012, approximately 53% of 403(b) plan assets were invested in annuities.[4]  In contrast, the most recent data available on 401(k) plans (2015) indicates that only approximately five percent of 401(k) plans offer participants a lifetime income option.[5]

---

[3] For example, I have been a participant in defined contribution plans at four different universities.  I value having my money from these plans consolidated with one vendor as it simplifies my retirement planning.

[4] BrightScope, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans (2015), at 21-24; available at https://www.ici.org/pdf/ppr_15_dcplan_profile_403b.pdf.

[5] 401(k) Plans Cautious About Adding Guaranteed Income Products, Plan Sponsor, January 2017; available at: http://plansponsor.com/401k-Plans-Cautious-About-Adding-Guaranteed-Income-Products/.

21.     Policymakers have begun to realize that 401(k) participants need increased access to annuities in their plans to assist them with income provision in retirement.  Commenting on new Treasury Regulations easing the purchase of annuities in 401(k) plans, Treasury Secretary Timothy Geithner stated in 2012: "Having the ability to choose from expanded options will help retirees and their families achieve both greater value and security."[6]

22.     In university plans like Cornell's, vendors typically make their annuity products and mutual funds available to participants through the vendors' own "platforms."  It is also common for vendors in a university plan to provide participants with on-campus education and advisory services that complement their investment products.  403(b) university plans tend to have multiple vendors, each providing its own specific list of investment products and administrative services.[7]  In some cases, vendors (such as TIAA) have had a campus presence for many decades.  The stability of these relationships is highly valued by university participants, as is the convenience of having education and advice on campus.

23.     In 2015, Plan Sponsor Council of America survey data showed that over 50% of higher education institutions sampled used more than one vendor in their plan.[8]

24.     In 2007, the IRS introduced comprehensive regulations related to 403(b) retirement plans.  These regulations took effect on January 1, 2009.  The regulations imposed new legal requirements, including a written plan document, timely transfer of contributions to providers, and rollover ability.  Prior to the regulatory changes, 403(b) plan participants made vendor selections and investment decisions with modest plan sponsor oversight.

### B.  The Cornell Plans at Issue in this Matter.

25.     The two plans at issue in this matter are the Cornell University Retirement Plan and the Tax Deferred Annuity Plan.  The Cornell University Retirement Plan is funded through

---

[6] New Treasury Rules Ease 401(k) Annuity Purchase, Mary Williams Walsh, *New York Times*, February 2, 2012.

[7] BrightScope, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans (2015), at 17; available at https://www.ici.org/pdf/ppr_15_dcplan_profile_403b.pdf. Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors*, 5-6 (Nov. 2011).

[8] 2015 403(b) Plan Survey, Plan Sponsor Council of America's 7th Benchmarking Survey of 403(b) Plans, Table 117, at p. 66.

**Confidential**

contributions by the University of 10% of participants' base pay up to $275,000.[9]  All eligible employees are fully and immediately vested in their account balance once enrolled. Participants who do not make an active decision are automatically enrolled in a TIAA lifecycle fund or a Fidelity Freedom lifecycle fund.[10]

26.     Any Cornell employee with FICA deductions is also eligible to participate in the Tax Deferred Annuity Plan.  Employees can select the pre-tax amount they want to contribute from their paycheck, up to an annual limit of $18,500 (depending on the age of the employee). Participants can choose from TIAA and Fidelity investment options to invest their money.[11] While the name of the Tax Deferred Annuity Plan reflects its origin in annuity products, it offers participants both annuity and mutual fund investment options.

27.     Table 1 shows the numbers of participants, total investments, and average investments per account in the two plans at issue in this matter.  As of December 31, 2010, the Cornell University Retirement Plan had 20,995 participants with account balances, and the Tax Deferred Annuity Plan had 12,427 participants with account balances.[12]  As of December 31, 2016, the Cornell University Retirement Plan had 19,191 participants with account balances, and the Tax Deferred Annuity Plan had 11,778 participants with account balances.[13]

---

[9] https://hr.cornell.edu/benefits-pay/retirement-finances/retirement-and-savings/cornell-university-retirement-plan-curp.

[10] https://hr.cornell.edu/benefits-pay/retirement-finances/retirement-and-savings/cornell-university-retirement-plan-curp.

[11] https://hr.cornell.edu/benefits-pay/retirement-finances/retirement-and-savings/tax-deferred-annuity-tda.

[12] 2010 Form 5500, Cornell University Retirement Plan; 2010 Form 5500, Tax Deferred Annuity Plan.

[13] 2016 Form 5500, Cornell University Retirement Plan; 2016 Form 5500, Tax Deferred Annuity Plan.

**Table 1**
**Participants and Total Investments by Year**[14]

| | Cornell University Retirement Plan | | | Tax Deferred Annuity Plan | | |
|---|---|---|---|---|---|---|
| | Participants with Account Balances | Total Investments | Average Account Balance | Participants with Account Balances | Total Investments | Average Account Balance |
| 12/30/2009 | 24,535 | $1,348,590,602 | $54,966 | 11,757 | $793,743,113 | $67,512 |
| 12/31/2010 | 20,995 | $1,459,325,800 | $69,508 | 12,427 | $879,831,606 | $70,800 |
| 12/31/2011 | 25,360 | $1,445,997,829 | $57,019 | 12,357 | $882,182,099 | $71,391 |
| 12/31/2012 | 17,950 | $1,576,642,402 | $87,835 | 10,286 | $975,473,176 | $94,835 |
| 12/31/2013 | 18,172 | $1,795,110,035 | $98,784 | 10,541 | $1,136,516,319 | $107,819 |
| 12/31/2014 | 18,470 | $1,874,897,145 | $101,510 | 10,982 | $1,218,219,260 | $110,929 |
| 12/31/2015 | 18,750 | $1,867,710,536 | $99,611 | 11,365 | $1,240,014,607 | $109,108 |
| 12/31/2016 | 19,191 | $1,965,221,781 | $102,403 | 11,778 | $1,332,121,033 | $113,102 |

28.     Cornell Plan participants are free to choose the investment options and associated fees they prefer, depending on their individual risk/reward profiles, investment horizons, preference for active or passive management,[15] and other participant-specific factors.  This freedom is consistent with what the Complaint in this matter refers to as a "participant-directed retirement plan."[16]

## C.  The Retention of CAPTRUST and the Environment at Cornell.

29.     CAPTRUST responded to the request for proposal that Cornell sent to numerous investment consultants to advise the RPOC in its oversight of the Cornell Plans.  In its response to the request for proposal, CAPTRUST described its experience with organizations similar to the RPOC: "In recent years, we have developed an expertise in working with colleges and universities and healthcare organizations, as well as the providers of 403(b) administrative services."[17]

---

[14] Forms 5500 for Cornell University Retirement Plan and Tax Deferred Annuity Plan 2009-2016.  Average account balance calculated by dividing assets by participants with account balances.

[15] There are two main types of investment management.  "Passive" or "index" funds are comprised of a portfolio of assets that are meant to closely mimic the performance of a market index (such as the S&P 500).  The portfolio manager of a passive fund tries to minimize the difference between the fund performance and the index it tracks.  In contrast, "active" funds involve the portfolio manager's effort to outperform particular investment benchmarks or indices, or to take on different risks (more or less) than benchmarks or indices.  Actively managed funds typically have higher investment management fees than passive funds.

[16] Complaint, at ¶ 158.

[17] [EX105] CORNELL011415, at p. 2.

30.   CAPTRUST noted that "[a]dditionally, our team has invested considerable resources into understanding each of these providers [Fidelity, TIAA-CREF, and Vanguard], especially the nuanced contracts and products at TIAA-CREF."[18]

> This level of knowledge and expertise with these providers and others offers our firm the opportunity to serve as a strong advocate for the highest level of services available at a competitive cost on behalf of our client.  We believe we have developed a unique understanding of the 403(b) regulations and the advisory services that are necessary to enhance Cornell University's current plans.[19]

31.   CAPTRUST was officially retained by Cornell and the RPOC on December 8, 2011.[20]  From that point forward, CAPTRUST representatives attended all RPOC meetings and led discussions on matters relating to its investment expertise.  As the RPOC minutes and documents produced in this case indicate, CAPTRUST worked closely with Cornell representatives outside of the RPOC meetings and recommended improvements to the investment offerings and oversight of the Cornell Plan.

32.   At a meeting on January 11, 2012,[21] soon after it was retained, CAPTRUST endeavored to "provide the Committee several topic[s] for discussion in order to create a baseline for future discussions as well as a 'framework' to be used going forward."[22]

33.   CAPTRUST is a well-known and respected advisor to universities offering defined contribution retirement plans.  I have experience working with CAPTRUST as it was retained by the USG in 2016 as an independent consultant.  CAPTRUST advised the Voluntary Plans Strategy Committee regarding consolidation of vendors and investment lineups across the Georgia Plans.

34.   Based on my experience, CAPTRUST has several core strengths.  As I will discuss in the following sections, CAPTRUST has a very strong commitment to process discipline.  As explained by Barry Schmitt of CAPTRUST, the process begins with formalization of the

---

[18] [EX105], CORNELL011415, at p. 2.

[19] [EX105], CORNELL011415, at p. 2.

[20] CAPTRUST_001.

[21] 2012-01-11 RPOC Meeting Mins_EX054 CAPTR_0047903.

[22] 2012-01-11 RPOC Meeting Mins_EX054 CAPTR_0047903.

Investment Policy Statement and then moves on to an assessment of the fund menu.[23] CAPTRUST also has an independent group of numerous professionals who are focused on investment analysis and the benchmarking of retirement plans, participant education, and vendor relations.[24]

35. Another CAPTRUST strength is its recognition of each client's particular circumstances in the context of a disciplined process. As Schmitt stated in his deposition in this matter, "[t]he one thing I would say is each client is different. And so we have a – a robust discussion with clients in terms of fund offerings, what they're trying to achieve with particular funds."[25]

36. In the case of the Georgia Voluntary Plans, CAPTRUST encountered a university system with over two dozen units, ten vendors, and several different unit-specific plan documents. The Voluntary Plans Strategy Committee decisions about vendor consolidation and how to synchronize investment lineups across the plans were not simple ones to make. Our Committee selected CAPTRUST as it had both the necessary investment lineup building and monitoring expertise as well as the process discipline to help the Committee make sustainable progress.

37. CAPTRUST exhibited the same methodical approach with the Cornell Plans. In the paragraphs that follow, I outline the Cornell environment that CAPTRUST encountered and how it worked with the RPOC.

38. A key theme of CAPTRUST's work with the RPOC was the RPOC's understandable sensitivity to *disruption* of the Cornell Plans. This sensitivity arises from two basic sources. One source, the Bain restructuring, is particular to Cornell and to the timeframe being evaluated; the other, the culture of shared governance, is common to all universities, and to research universities in particular.

39. After the 2008-09 financial crisis, Cornell hired Bain Consulting to help the University with cost-cutting, which resulted in layoffs and early retirements.[26] While it might be tempting to believe that universities with large endowments would be untouched by the

---

[23] Schmitt Deposition, at pp. 98-99.

[24] [EX105] CORNELL011415, at p. 18.

[25] Schmitt Deposition, at p. 71.

[26] Edwards Deposition, at pp. 79-80.

financial crisis, this was not the case. As endowments lost billions, many universities, including Cornell, issued debt to cover expenses.[27]

40.    A.J. Edwards was an RPOC member from 2010 to 2016 and the Chief Investment Officer of Cornell University from 2011 to 2016. He explained that Cornell Plan participants had experienced "a lot of changes on campus, for the prior several years," and so "if there's going to be potentially more changes in their retirement plan," the RPOC wanted to be "cognizant of the environment that we were dealing in."[28] This concern was reflected in the communications from the RPOC to participants. Mr. Edwards explained that there was a desire to use softer language so that participants would understand that any possible disruption to their retirement plan would be as limited as possible.[29] RPOC member Joanne DeStefano, an employee in the Cornell University accounting department, explained that this sensitivity was "a result of the fallout from all of the Bain activity."[30] RPOC Chair and Cornell Chief Human Resources Officer Mary Opperman explained that "disruption to participants . . . was a big concern of ours," and that the RPOC was "concerned about the people who had made the choice of these funds and the impact it would have on them" if the RPOC limited participants' ability to invest in funds they had chosen.[31]

41.    CAPTRUST's Barry Schmitt described the Cornell environment:[32]

> One of the things that we have talked consistently and have had robust discussion with Cornell is this area of disruption. And Cornell was very concerned about making significant changes to the plan with regards to fund selection – you know, funds available in the plan. They – you know, the premise is individuals made an active election to choose those individual funds. There were other things going on, I believe, in the university where I think there was a term "change w[e]ary" came out. So they were – they were – they were really focused on how do we make – how do we make progress on this without overwhelming our faculty and staff with the amount of change.

---

[27] "Lessons Learned: Colleges Lose Billions in Endowments," Institutional Investor, November 9, 2009, at https://www.institutionalinvestor.com/article/b150q8vw8ggzys/lessons-learned-colleges-lose-billions-in-endowments.

[28] Edwards Deposition, at p. 80.

[29] Edwards Deposition, at pp. 81-82.

[30] DeStefano Deposition, at p. 209.

[31] Opperman Deposition at pp. 86-87.

[32] Schmitt Deposition, at p. 133.

**Confidential**

**DJA60**

42.     The information conveyed by Mr. Schmitt indicates that he recognized the importance of having a good, thoughtful process at Cornell and the importance of implementing change at a measured, sustainable pace.

43.     Beyond the specific issues associated with the Great Recession and the Bain restructuring, there is also the consideration of how universities are governed.  "Shared governance" is a term used to describe the culture in universities like Cornell.  It means that the organization is not run in a traditional top-down corporate style.  Gary Olsen, Provost of Idaho State University, writes that shared governance is "complex; it is a delicate balance between faculty and staff participation in planning and decision making processes, on the one hand, and administrative accountability on the other."[33]  The American Association of University Professors explains that oversight in a university system is shared by all of its constituents: faculty, staff, trustees, and other stakeholders.[34]

44.     In the context of retirement plans, shared governance is manifest through the concern the RPOC had about suddenly disrupting participants' choices.  Mary Opperman, Vice President and Chief Human Resource Officer, noted that it was important for the RPOC not to replace participants' judgment with its own without careful consideration.[35]

45.     The Cornell Plans have a diverse population of faculty and staff participants.  In this environment, making major decisions about the 403(b) plan requires input and approval from a variety of stakeholders such as leadership, administration, faculty, and the health system, which encompasses Cornell University and the Weill Cornell Medical College.

46.     The RPOC reflects the diverse population of Cornell Plan participants.  Exhibit 4 provides a summary and background of the RPOC members and other individuals who were involved in the oversight of the Cornell Plans.

47.     The record in this matter shows that many decisions made by the RPOC were accompanied by a discussion of disruption and impact on the participants.[36]  The RPOC's concern for the disruptive impact of its decisions on plan participants is consistent with my

---

[33] Gary Olsen, "Exactly What is 'Shared Governance'?" *The Chronicle of Higher Education*, July 23, 2009.

[34] "Shared Governance," at https://www.aaup.org/our-programs/shared-governance.

[35] Opperman Deposition, at p. 88.

[36] Opperman Deposition, at pp. 88, 115-116; [EX170] CORNELL013108; CAPTR_0051798; CAPTR_0004284, at 285; Streeter Deposition, at p. 55; Edwards Deposition, at pp. 81-82.

experience as a committee member and inside investment consultant for the Georgia Plans.  In my experience, university 403(b) investment committees and prudent independent advisors carefully consider the impact of their decisions on participants and respect the diversity of their participant population.

48.    CAPTRUST recognized the challenges of shared governance and working with the RPOC members, who reflected the diversity of the Cornell participants.  As Mr. Schmitt explained, the discussions with the RPOC were thoughtful and involved competing viewpoints.[37]  These types of robust conversations are very common in academic settings of all kinds.

49.    The contrast between CAPTRUST's appreciation for the Cornell-specific challenges the RPOC faced in the shared governance environment and the opinions offered by Plaintiffs' experts could not be more striking.  Plaintiffs' Expert Dominguez states that a "prudent fiduciary" would have immediately created a "best of class investment menu and map[ped] all assets to a single provider menu as of September 1, 2010."[38]  This was the date of the first RPOC meeting and over a year before CAPTRUST was retained as an investment consultant. The conclusion gives no consideration for the specific circumstances facing Cornell nor any appreciation for the appropriate process in the shared-governance environment.  Moreover, the opinion completely ignores whether such mapping would even be possible and fails to consider the participant disruption that would ensue.

## V.    CAPTRUST APPRECIATED THE CHALLENGES THAT WERE SPECIFIC TO CORNELL AND HAS PROVIDED THE RPOC WITH CONSISTENT AND SENSIBLE ADVICE SINCE ITS ENGAGEMENT IN 2011

50.    In my opinion, CAPTRUST gave the RPOC prudent and reasonable investment advice.  Moreover, CAPTRUST was consistent in terms of its advice throughout the engagement.  Over time, the RPOC made significant progress towards the goals that CAPTRUST outlined.  This advice was ongoing and not limited to the periodic RPOC meetings.

---

[37] Schmitt Deposition, at p. 101.

[38] Dominguez Report, at p. 31.

51.    Exhibit 5 provides a summary of some of the communications and activity between CAPTRUST and the RPOC.

52.    At the RPOC meeting on January 11, 2012,[39] CAPTRUST provided the committee with a reminder about its roles and responsibilities and then got into more detail on its initial review of the investment options in the Plans.  As CAPTRUST led a discussion of the three vendors that provided record-keeping and other administrative services to various Cornell retirement plans, the RPOC discussed its goals, which included "fiduciary training, implementation of Investment Policy Statement ('IPS'), investment menu redesign for TIAA-CREF, Fidelity and Vanguard; understanding plan expenses and methodology for monitoring plan investments in the future, and fee benchmarking."[40]  (Vanguard provided services to retirement plans that are not at issue in this case; TIAA-CREF and Fidelity provide services to the two plans at issue in this case.)

53.    It is my opinion that CAPTRUST was successful in helping the RPOC move towards improved oversight and plan redesign.

## A.  CAPTRUST has helped maintain appropriate oversight for the Cornell Plans.

54.    At the first ever RPOC meeting in November 2010, the RPOC discussed the need for an Investment Policy Statement to "be used as a roadmap to guide the committee to select and monitor the plans' investments."[41]  Outside counsel Stephen Daley recommended hiring an independent consultant to help develop the Investment Policy Statement.[42]

55.    From the outset of its retention by Cornell and the RPOC, CAPTRUST was charged with taking the necessary steps to help the RPOC finalize the Investment Policy Statement. Due to the shared governance model discussed above, this process turned out to be an iterative one that spanned numerous meetings.  At the July 24, 2012 RPOC meeting, CAPTRUST was left with an action item of finalizing the Investment Policy Statement.[43]

---

[39] 2012-01-11 RPOC Meeting Mins_EX054 CAPTR_0047903.

[40] 2012-01-11 RPOC Meeting Mins_EX054 CAPTR_0047903, at 904.

[41] [EX049] CORNELL021932, at pp. 2-3.

[42] [EX049] CORNELL021932, at pp. 2-3.

[43] 2012-07-24 RPOC Quarter Review Meeting Mins_EX055 CAPTR_0047911, at 914.

**DJA63**

56.    Email correspondence suggests that RPOC members and advisors from CAPTRUST frequently exchanged comments, edits, and questions about potential additions and revisions to the Investment Policy Statement.[44]

57.    In October 2012, RPOC member Joanne DeStefano expressed concern over terminology choices in the Investment Policy Statement in an email to CAPTRUST's Barry Schmitt.  Mr. Schmitt provided a comprehensive and prompt response which allowed for more flexibility in the Investment Policy Statement's expense ratio guidelines.[45]  Ms. DeStefano expressed that she felt "much better," and the update was included in the final version of the Investment Policy Statement.[46]

58.    On November 19, 2012, after many iterations, drafts and comments, the Investment Policy Statement was formally approved.[47]  The finalized Investment Policy Statement sets forth the following objectives of the RPOC: "to assist it in fulfilling the fiduciary responsibilities imposed by the Employee Retirement Income Securities Act of 1974 ('ERISA') in choosing and monitoring the menu of investment vehicles for participants in the Plans."[48]

59.    The Investment Policy Statement also sets forth the investment structure and criteria governing investments.  It mandates a "broad range of investment alternatives" so that participants can diversify their portfolios with different asset classes "with different risk and return characteristics."  The Investment Policy Statement sets forth six investment screening criteria: fees, style consistency, volatility and diversification, performance, management and organization, and additional factors.  Under the Investment Policy Statement, the investment consultant is critical to the evaluation process.  The consultant is to report on each investment's performance "generally on a quarterly basis," communicate on an ad hoc basis "any material changes affecting any of the selected investment alternatives," and meet at least annually with RPOC.[49]

---

[44] [EX135] CORNELL022000.

[45] [EX058] CORNELL014291.

[46] [EX002] CORNELL013763, at p. 6.

[47] 2012-11-19 RPOC Quarterly Review Meeting Mins_[EX056] CAPTR_0047924.

[48] CORNELL013763, at p. 3.

[49] CORNELL013763, at pp. 5-7.

60.     On September 17, 2014, CAPTRUST made recommendations to the RPOC related to its members.  Barry Schmitt of CAPTRUST suggested a more formalized structure to the membership as well as the addition of representation from Faculty and Facilities.[50]  The RPOC followed through on these recommendations and added three new members, including the Chair of General Faculty Counsel, Allen Bishop, an AVP in Human Resources, and Patrick Flynn.[51]

61.     In my opinion, it is critical for a university-level committee to have the proper representation when tasked with making decisions of the magnitude of those facing the RPOC.  CAPTRUST's recommendations regarding the RPOC's structure and representation are further indications of CAPTRUST's awareness of both the research university environment in general and the client-specific issues at Cornell.

62.     In March 2016, CAPTRUST noted that there were several new RPOC members and explained that it would conduct fiduciary training for these members in the coming months.[52]  At the next RPOC meeting it was confirmed that CAPTRUST had completed fiduciary training for Harper Watters and Fiona McLennan.[53]  CAPTRUST again noted in September 2016 that it would conduct fiduciary training for new members in the coming months.[54]

63.     In December 2016, CAPTRUST provided a fiduciary update related to the Department of Labor's proposed re-definition of a fiduciary.  CAPTRUST noted that the new rule, if adopted, would impact the three record-keeping vendors "in the manner in which they provide advice to Faculty and Staff."[55]

64.     At the beginning of 2017, CAPTRUST provided a fiduciary update on industry trends in 2017.  The topics covered included the Department of Labor's new fiduciary rule, the impact of tightening labor markets, the ongoing litigation against plan sponsors, and potential tax policies and implications.[56]  Later in 2017, CAPTRUST again provided the RPOC an

---

[50] 2014-09-17 RPOC Meeting Mins_CAPTR_0020541, at 542.

[51] 2014-09-17 RPOC Meeting Mins_CAPTR_0020541, at 542.

[52] 2016-03-31 RPOC 4th Quarter Review Meeting Mins [EX030] CAPTR_0013568, at 572.

[53] 2016-06-29 RPOC 4th Quarter Meeting Mins_CAPTR_0006752, at 754.

[54] 2016-09028 RPOC 2d Quarter Review Meeting Mins [EX031] CAPTR_0013580, at 582.

[55] 2016-12-12 RPOC 3d Quarter Review Meeting Mins_CAPTR_0020550, at 551.

[56] 2017-04-14 RPOC 4th Quarter Review Meeting Mins [EX033] CAPTR_0013583, at 585.

update on industry trends. The discussion topics included defined contribution leakage related to loans, cybersecurity issues, financial stress in the workplace, the fiduciary rule, the U.S. Chamber of Commerce's proposal to raise the required minimum distribution age to 75, additional IRS guidance on hardship, and continued ERISA litigation.[57]

65.    On September 27, 2017, CAPTRUST again provided the RPOC with information on industry trends. Specifically, CAPTRUST discussed the new fiduciary rule, updated fee disclosure standards, pending litigation, benefit plan cautions, and insurance claims. As a result of these topics, the RPOC asked CAPTRUST to come back with additional information about the potential impact of the new fiduciary rule on faculty and staff.[58]   CAPTRUST followed this with an update on the economy and CAPTRUST's outlook.

### B. CAPTRUST introduced, recommended, and helped implement a tiered investment architecture for the Cornell Plans that was both reasonable and appropriate for a University Plan.

66.    In my opinion, CAPTRUST provided reasonable and prudent advice with regard to the tiered investment structure implemented by the RPOC.

67.    At the first meeting it attended in January 2012, CAPTRUST introduced various structures and vendor arrangements for the RPOC to consider. CAPTRUST's representatives went into depth on a four-tiered option which would include target date funds, core asset classes, non-core asset classes, and a brokerage account.[59]   At this meeting, CAPTRUST also discussed building an investment menu within the confines of the Investment Policy Statement. At the next meeting in April 2012, CAPTRUST presented three- and four-tiered options for the RPOC to consider and explained that "Cornell will need to decide upon the structure best suited to their faculty and staff."[60]   CAPTRUST explained various models and was tasked with researching these models with the plans' vendors.

68.    After further discussions, consideration, and guidance from the RPOC, CAPTRUST tailored its recommendation toward a three-tiered investment structure. On July 24, 2012

---

[57] 2017-06-23 1Q Quarterly Review Meeting Mins_CAPTR_0020557, at 558.

[58] 2017-09-27 RPOC Meeting Minutes [Ex 119] CAPTR_0013939, at 940.

[59] 2012-01-11 RPOC Meeting Mins [EX054] CAPTR_0047903, at 904.

[60] 2012-04-13 RPOC Quarterly Review Meeting Mins_CAPTR_0020501, at 503.

CAPTRUST gave the RPOC information about this three-tiered investment structure. This included an overview of other institutions that used tiered investment structures.[61] One of the primary action items after this meeting involved CAPTRUST providing the RPOC with a "more detailed proposal on the recommended investment menu as well as disruption analysis of any fund changes."[62]

69.   On November 19, 2012, CAPTRUST presented an overview of the various tiered-structure proposals. CAPTRUST explained to the RPOC that the tiered proposals considered "ERISA, Modern Portfolio Theory, behavioral finance and industry best practices."[63] The proposal by CAPTRUST was consistent with the RPOC's goals and objectives and was meant to be a "mirrored investment approach across three providers" with approximately 23-25 funds per menu.[64] The discussion moved on to the implementation of a new fund menu.

70.   On July 31, 2013, CAPTRUST explained that its construction of the proposed menu included a quantitative screening process and qualitative screening, both of which utilized various CAPTRUST databases.[65] When CAPTRUST presented the initial list of proposed funds, the RPOC discussion was focused on the following key points, all of which I believe to be reasonable and appropriate:[66]

- The menu must be easily understood and actionable.
- There were concerns raised in the amount of disruption that will occur.
- Adequate consideration should be given to funds already being utilized.
- Having low cost funds is very important.
- The list should be comprehensive but manageable.
- The RPOC, in general, liked the combination of active and passive funds.

71.   The meeting included a discussion of "change management," and CAPTRUST introduced the key considerations that needed to be vetted at upcoming meetings related to implementation, transition, mapping, freezing, annuities, communication, and education.[67]

---

[61] 2012-07-24 RPOC Meeting Materials_CAPTR_0017329, at 341.

[62] 2012-07-24 RPOC Quarter Review Meeting Mins_[EX055] CAPTR_0047911, at 914.

[63] 2012-11-19 RPOC Quarterly Review Meeting Mins_[EX056] CAPTR_0047924, at 925.

[64] 2012-11-19 RPOC Quarterly Review Meeting Mins_[EX056] CAPTR_0047924, at 926.

[65] 2013-07-31 RPOC Meeting Mins_CAPTR_0021851, at 852.

[66] 2013-07-31 RPOC Meeting Mins_CAPTR_0021851, at 852.

[67] 2013-07-31 RPOC Meeting Mins_CAPTR_0021851, at 853.

The RPOC decided to form a sub-committee based on the amount of feedback and the number of topics that needed to be addressed.

72.    On September 30, 2013, the RPOC and CAPTRUST continued their discussions about creating a new investment fund menu.  The RPOC noted that "[w]hile the RPOC was generally okay with the fund line ups as presented, they would like CAPTRUST to provide more clarity on the amount of disruption that will occur both from a participant and asset perspective.  The preference would be to minimize the amount of 'noise' as much as possible."[68]  As a result of this feedback, CAPTRUST began to work with the sub-committee on a "disruption analysis."[69]

73.    Also on September 30, 2013, CAPTRUST presented extensive information for the RPOC to consider as the new menu was developed.  This presentation included overviews of topics such as investor profiling, analysis of fixed income funds, analysis of large company growth funds, analysis of target date funds, and active vs. passive management.  The presentation for this RPOC meeting went into great detail and comparison of fund options related to many of these topics.[70]

74.    The discussion of the new investment menu continued at the next meeting of the RPOC on December 4, 2013.  CAPTRUST again went through the previously discussed objectives of the new approach and explained that the sub-committee had met several times since the September 2013 meeting with a focus on several reasonable principles:[71]

- Minimal participant disruption, while maintaining a sound fiduciary process;
- Symmetry across the existing vendors/recordkeepers;
- Tiered packaging of menu for ease of participant utilization and understanding.

75.    Based on the work of the sub-committee, "CAPTRUST recommended a four phased approach to menu re-design to occur over the next few years."[72]  These phases were very much

---

[68] 2013-09-30 RPOC Meeting Mins_CAPTR_0020538, at 539.

[69] 2013-09-30 RPOC Meeting Mins_CAPTR_0020538, at 540.

[70] 2013-09-30 RPOC Presentation [EX035] CORNELL012533.

[71] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

[72] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

focused on minimizing disruption and maximizing participant buy-in.  The multiple year approach was meant to foster several reasonable goals:[73]

- Maintain current accumulations with no requirement to move assets (0% disruption)
- Impact future contributions initially with a 'carrot' v. 'stick' approach
- Allow new menu to gain momentum with participants before making any changes to existing funds
- Introduce future phases intentionally over a reasonable period of time.

76.    It was determined that the first phase would be an introduction of the new investment options as supplementing to the existing options.  The second phase would include the start of redirection of certain contributions into the new menu.  This would be coupled with encouragement to use the new funds as opposed to the "old."  The old funds would include those not in accordance with the Investment Policy Statement; those that had reasonable alternatives on the new menu; and those that were redundant to strategies on the new menu.[74]

77.    CAPTRUST and the sub-committee determined that 25% of Fidelity participants, 8% of TIAA-CREF participants, and 22% of Vanguard participants would suffer some sort of disruption of contributions as a result of the second phase.[75]  The meeting minutes noted that the second phase would take 12-18 months to implement after phase one and targeted January 1, 2016.[76]  At this meeting the RPOC approved the first and second phases and discussed the additional two phases.  The third phase would involve freezing the "old" funds and would start approximately twelve months after the completion of the second phase.  The fourth and final phase was contemplated as being a few years in the future and involved completing the closing and mapping of certain investment options.[77]

78.    The RPOC met again on March 21, 2014 and CAPTRUST led the discussion of the "phase in approach" to a new structured investment lineup.  CAPTRUST presented a timeline

---

[73] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

[74] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

[75] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

[76] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

[77] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 917.

                              Confidential

for implementation.  The RPOC "suggested several items that CAPTRUST will adjust."[78]
Two noted items were:[79]

- Importance of setting the right tone – faculty and staff are 'change weary' so the messaging must set the right tone.  The introductory letter must include reasons why we are 'forced' into this process, our intent to limit the disruption as best we can, a focus on improving/enhancing the plans, recognition that changes will occur in the future, and ways the employee can gain access to more information.

- Vendor involvement – The RPOC would like each vendor to have more detailed information on the new structure available by early May
  - Tiering of the menu – each vendor should have the structure in place so we may respond to participant inquiries.

79.    By September 2014, participants had been notified of the upcoming changes to the Cornell Plan that would result in the creation of a tiered investment menu.  These communications were distributed to participants by CAPTRUST and the vendors.[80]  The communication offered participants access to new fund workshops that would be provided by all three of the vendors.  As of October 1, 2014, Cornell Plan participants would have access to the following tiers:[81]

- Tier 1 – Target Date funds
- Tier 2 – Menu of active and passive funds approved and monitored by the RPOC
- Tier 3 – Non-core funds representing funds that remain available to participants
- Tier 4 – Self-directed brokerage window

80.    At this point in time, CAPTRUST recommended that TIAA-CREF and Fidelity target-date funds would be used as the Qualified Default Investment Alternative for the Cornell Plans.[82]  These are default investment alternatives for participants who enrolled in the Cornell Plan but failed to select investments.  In both the Cornell Plans and the Georgia Plan, participants who failed to make an investment selection were defaulted into the appropriate target-date fund in Tier 1.

---

[78] 2014-03-21 RPOC Meeting Mins_[EX061] CAPTR_0004284, at 285.

[79] 2014-03-21 RPOC Meeting Mins_[EX061] CAPTR_0004284, at 285.

[80] 2014-09-17 RPOC Meeting Mins_CAPTR_0020541, at 542.

[81] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at p. 4.

[82] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at p. 31.

## C. Once the tiered structure was in place, CAPTRUST promptly advised the RPOC about additional Cornell Plan refinements.

81.     In my opinion, and as explained below, CAPTRUST effectively managed the process of continuing to meet the goals it and the RPOC shared.

82.     An excellent example occurred after CAPTRUST and the RPOC confirmed the introduction of the tiered structure for the Cornell Plans.  CAPTRUST then shifted its focus towards the second phase of investment menu redesign, which would focus on the redirection of contributions into the new menu and encouraging participants to use the new funds.  This would be coupled with encouraging participants to move away from funds that did not conform to the Investment Policy Statement, had reasonable alternatives on the new menu, or were redundant to strategies existing on the new menu.[83]  In September 2014, CAPTRUST encouraged the RPOC to get started with this second phase.  It was noted at the outset that the second phase would stretch over a 12-15 month period.[84]

83.     On December 3, 2014, CAPTRUST and the RPOC discussed two options for moving forward with the Tier 3 investment offerings.  The first option involved phasing out the options in Tier 3 and replacing the entire tier with a brokerage window.  The second option was based on "less disruption" and involved the provision of "caution [to] participants to strongly consider [to] begin phasing out, as soon as may be practicable for them, all of their investment funds Cornell will not monitor."[85]

84.     At this time, the RPOC established a sub-committee to address Tier 3.  This sub-committee would create a set of "guiding principles" to oversee the review of Tier 3 and would consider the amount of disruption, the guidance of the Investment Policy Statement, and the risk of participant confusion.[86]

85.     On June 2, 2015, CAPTRUST provided the RPOC with a summary of the sub-committee activity since the previous RPOC meeting.[87]  The sub-committee decided to screen for funds that had failed the performance measures outlined in the Investment Policy Statement

---

[83] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 916.

[84] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at p. 7.

[85] 2014-12-03 RPOC Meeting Minutes 3rd Quarter Review Meeting_CAPTR_0013586, at 588.

[86] 2014-12-03 RPOC Meeting Minutes 3rd Quarter Review Meeting_CAPTR_0013586, at 588.

[87] 2015-06-02 RPOC 4th Quarter Review Meeting Mins [EX025] CAPTR_0013598, at 599.

and funds with fewer than 50 active participants.[88]  At the conclusion of this discussion, the RPOC directed CAPTRUST and the sub-committee to consider a different approach. CAPTRUST "suggested evaluating each of the funds in Tier III to see if the same fund share classes are offered and available within the brokerage window (investment management fee). It was agreed, in concept, that any fund in Tier III that is available through the brokerage account for the same investment management fee could be eliminated from Tier III."[89]

86.    At the next RPOC meeting on September 9, 2015, CAPTRUST provided an update on the sub-committee's Tier III analysis, which found that 17 Fidelity funds did not satisfy the quantitative guidelines found in the Investment Policy Statement.[90]  The RPOC decided to remove these funds from the menu.[91]

87.    The sub-committee also "evaluated each of the funds in Tier III to determine if the same fund share class is offered and available within the brokerage window."[92]  This analysis resulted in the migration of 139 Fidelity funds, 22 TIAA-CREF funds, and 33 Vanguard funds to the brokerage account.[93]  It was tentatively (see below) decided that these accounts would be frozen for new participants only as of January 1, 2016, and CAPTRUST would recommend a closing and mapping strategy for the 17 underperforming funds at the next RPOC meeting.

88.    Before the December 16, 2015 RPOC meeting, Weill Cornell Medical College outside counsel advised that "freezing funds at the participant level does not pass non-discrimination rules." [94]  The service providers' systems also could not accommodate "segmentation based on hire date."[95]  As a result, the RPOC had to scrap its tentative plan to freeze the account to new participants as of January 1, 2016 and instead decided to:[96]

> Freeze all future contributions to Tier III funds for current and future employees, modified as follows: a. Funds currently available in the brokerage window at the same cost b. Remaining Tier III funds would be reviewed based on performance

---

[88] 2015-06-02 RPOC 4th Quarter Review Meeting Mins [EX025] CAPTR_0013598, at 599.

[89] 2015-06-02 RPOC 4th Quarter Review Meeting Mins [EX025] CAPTR_0013598, at 599.

[90] 2015-09-09 RPOC 2nd Quarter Review Meeting Mins [EX027] CAPTR_0013573, at 574.

[91] 2015-09-09 RPOC 2nd Quarter Review Meeting Mins [EX027] CAPTR_0013573, at 574.

[92] 2015-09-09 RPOC 2nd Quarter Review Meeting Mins [EX027] CAPTR_0013573, at 574.

[93] 2015-09-09 RPOC 2nd Quarter Review Meeting Mins [EX027] CAPTR_0013573, at 574.

[94] 2015-12-16 RPOC 3rd Quarter Review Meeting Mins [EX029] CAPTR_0013594, at 596.

[95] 2015-12-16 RPOC 3rd Quarter Review Meeting Mins [EX029] CAPTR_0013594, at 596.

[96] 2015-12-16 RPOC 3rd Quarter Review Meeting Mins [EX029] CAPTR_0013594, at 596; CAPTR_0005302.

and/or utilization to determine which should be considered for inclusion in Tier II and which would be frozen to new contributions.

89. The RPOC concluded that CAPTRUST and the sub-committee should work with the vendors to transition underperforming funds as well as those available in the brokerage window at the same time to minimize disruption. The RPOC also asked for more information on the process the vendors would follow in a migration to determine the "least disruptive process."[97]

90. In advance of the March 31, 2016 RPOC meeting, CAPTRUST "met with each of the three vendors to discuss the most efficient and effective way to transition most of Tier III into the brokerage window."[98] Based on these conversations, CAPTRUST presented three options for a path forward to the RPOC. The RPOC discussed each of these options and the advantages/disadvantages of each. As part of this discussion, CAPTRUST presented the information recreated in Table 2.

**Table 2**
**December 31, 2015 Tier 3 Structure[99]**

|                              | Fidelity | TIAA Cornell | TIAA Weill | Vanguard |
|------------------------------|----------|--------------|------------|----------|
| Fund Options                 | 199      | 28           | 7          | 38       |
| Failed IPS                   | (17)     | -            | -          | -        |
| Brokerage Window Availability| (139)    | (22)         | (2)        | (33)     |
| **Remaining**                | **43**   | **6**        | **5**      | **5**    |

91. As presented in Table 2, Fidelity had the vast majority of the Tier 3 investment options. With this in mind, the RPOC decided to focus on Fidelity and "[i]n order to make meaningful progress towards the ultimate goal of eliminating Tier III, a recommendation was made to freeze future contributions to any Fidelity Fund within Tier III that is available within the brokerage window."[100] The RPOC discussed this recommendation at length and then voted

---

[97] 2015-12-16 RPOC 3rd Quarter Review Meeting Mins [EX029] CAPTR_0013594, at 596.

[98] 2016-03-31 RPOC 4th Quarter Review Meeting Mins [EX030] CAPTR_0013568, at 569.

[99] 2016-03-31 RPOC 4th Quarter Review Meeting Mins [EX030] CAPTR_0013568, at 570.

[100] 2016-03-31 RPOC 4th Quarter Review Meeting Mins [EX030] CAPTR_0013568, at 570.

to implement it during the first quarter of 2017 in order to allow the RPOC to focus on the remaining 43 Fidelity funds presented in Table 2 as well as the fund options available in Tier 3 through TIAA and Vanguard.

92.    On September 28, 2016, the RPOC established a sub-committee to work with CAPTRUST to "eventually eliminate Tier III" and to provide recommendations at the next meeting.[101]  The sub-committee was to perform additional screens to determine funds to be eliminated or migrated to Tier I or Tier II.[102]  In December 2016, the RPOC approved the implementation plan and tasked CAPTRUST and Cornell Human Resources to work on implementation.[103]  Ms. Opperman specifically requested that impacted participants be identified for customized communication.[104]

### D.  CAPTRUST provided formal training and informal updates to the RPOC.

93.    In my opinion, CAPTRUST provided valuable training and information to the RPOC throughout its engagement.

94.    An excellent example was the first meeting in which CAPTRUST participated. Messrs. Strodel, Schmitt, and Freedman led a discussion about the RPOC's objectives, including document compliance, plan-level investment decisions, documentation of the process, monitoring service providers, communicating effectively with plan participants, and documentation of due diligence.  CAPTRUST also shared an initial analysis of the Plan's characteristics.  They discussed investment structure, vendor arrangements, fee disclosure, vendor management, investment due diligence, investment review, expense review, and education.  CAPTRUST created a timeline of action items to be completed in its initial phase with Cornell that centered on finalizing the Investment Policy Statement and negotiating for lower fees with vendors.[105]

95.    Another example occurred at the December 4, 2013 meeting.  On that date, CAPTRUST provided the RPOC with an overview of both target date funds and medical trusts.

---

[101] 2016-09-28 RPOC 2nd Quarter Review Meeting Mins [EX031] CAPTR_0013580, at 581.

[102] 2016-09-28 RPOC 2nd Quarter Review Meeting Mins [EX031] CAPTR_0013580, at 581.

[103] 2016-12-12 RPOC 3d Quarter Review Meeting Mins_CAPTR_0020550, at 552.

[104] 2016-12-12 RPOC 3d Quarter Review Meeting Mins_CAPTR_0020550, at 552.

[105] CORNELL015582, at pp. 4-7; CAPTR_0047903.

Related to the target date funds, CAPTRUST explained that the RPOC had a responsibility to evaluate "target-date funds in light of previously released 'Tips for ERISA Plan Fiduciaries' from the Department of Labor."[106]  CAPTRUST presented further on the evaluation of target date funds on March 21, 2014.  The discussion at this RPOC meeting also included a tutorial on accumulation and decumulation as it relates to retirement.[107]

96.    At the December 3, 2014 RPOC meeting, CAPTRUST gave a new committee orientation to two new members and it was noted that CAPTRUST would work to provide this orientation to several new committee members.[108]

97.    In June 2016, CAPTRUST presented to the RPOC on the evolution of target date funds.  In September 2016, CAPTRUST presented many current topics in the industry, including the new fiduciary rule, recent plan-related litigation, and a change in how Morningstar classifies its asset classes and benchmarks.[109]


## VI.    CAPTRUST PROVIDED THE RPOC WITH APPROPRIATE MONITORING INFORMATION

98.    In my opinion, CAPTRUST provided the RPOC with appropriate monitoring information both before and after the tiered structure was formalized in 2014.  This information included both quantitative analysis and qualitative information and was responsive to specific requests.  Before the formalization of the tiers, CAPTRUST was comprehensive in its presentations to the RPOC.  Following the formalization of the tiers, CAPTRUST followed an appropriate structure and made consistent and appropriate recommendations.

### A.  CAPTRUST provided the RPOC with appropriate performance information before the formalization of the tiered structure in 2014.

99.    In my opinion, CAPTRUST provided the RPOC with the appropriate performance-related information for monitoring investments prior to the introduction of the tiered structure in 2014.

---

[106] 2013-12-04 RPOC Meeting Mins [EX021] CAPTR_0047915, at 917.

[107] 2014-03-21 RPOC Meeting Mins_[EX061] CAPTR_0004284, at 285.

[108] 2014-12-03 RPOC Meeting Minutes 3rd Quarter Review Meeting_CAPTR_0013586, at 587.

[109] 2016-09028 RPOC 2d Quarter Review Meeting Mins [EX031] CAPTR_0013580, at 581.

100.   At the first meeting CAPTRUST attended on January 11, 2012, it introduced the RPOC to the CAPTRUST investment review and scoring system.[110]  CAPTRUST explained that its scoring system would evaluate performance of investment options consistent with the objectives established in the Cornell Investment Policy Statement.[111]  At this meeting, CAPTRUST also presented the RPOC with an overview of target date funds and expense detail for each investment option.  CAPTRUST's focus at the remaining 2012 meetings was on target date funds, expense reduction, and the tiered structure.  At the July 31, 2013 RPOC meeting, CAPTRUST presented its analysis that scored 198 investment options as "meet criteria," 38 that "partially meet criteria," and 16 that were "failing criteria."[112]  From its review of available investment options, CAPTRUST "supports the recommendation of reduced menu to 'most appropriate' by asset class."[113]

101.   Before the introduction of the new fund menu in late 2014, "CAPTRUST provided the RPOC with a high level review of the current 250+ funds on the various platforms with specific fund concerns noted.  These concerns are being addressed within the construct of the new fund menu offering that is being developed."[114]  CAPTRUST provided the RPOC with the results of its analysis that scored each investment option in seven to ten quantitative areas. This review indicated that all 40 TIAA-CREF and all 40 Vanguard investment options were passing the performance tests and complied with the Investment Policy Statement.[115]  Of the 179 Fidelity investment options, 23 were failing the performance metrics and 9 were not scored because of the unavailability of appropriate comparable information.[116]

102.   Included in these presentations were risk-adjusted performance ratings, evaluations relative to peer group investments, performance to comparable style investments, and confidence ratings at 3 and 5 year performance intervals.[117]  CAPTRUST also graded the

---

[110] 2012-01-11 RPOC Presentation [EX006] CORNELL015582, at p. 17.

[111] 2012-01-11 RPOC Presentation [EX006] CORNELL015582, at p. 17.

[112] 2013-07-31 RPOC Presentation_CAPTR_0033664, at 679.

[113] 2013-07-31 RPOC Presentation_CAPTR_0033664, at 679.

[114] 2013-07-31 RPOC Meeting Mins_CAPTR_0021851, at 853.

[115] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at p. 8.

[116] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at p. 8.

[117] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at pp. 39-47.

investment options based on expenses, fund management, and fund family.[118]  The
presentations noted which investment options were not in compliance with the Investment
Policy Statement as a result of either poor performance metrics or because the asset class was
not bound by the Investment Policy Statement.

103.   Plaintiffs' expert Ms. Dominguez implies that CAPTRUST did not perform an
adequate analysis on the Plan's investment options because CAPTRUST "did not provide any
underlying data."[119]  This opinion disregards the quantitative analysis CAPTRUST performed
and provided to the RPOC across seven categories in July 2013 and later expanded to ten
categories in a September 2014 presentation.  Furthermore, Ms. Dominguez asserts that
CAPTRUST's analysis for Cornell must be flawed because it did not provide the same
presentation it gave to the University of Maine around the same time.  This claim is not
supported.  First, and most broadly, Ms. Dominguez's claim implicitly relies on the notion that
the Cornell Plans and the University of Maine Plan must be similar so both organizations
should receive the same presentations.  This disregards organizational differences between
Cornell and the University of Maine as it relates to plan architecture, plan stage, and plan
needs.  Second, Ms. Dominguez highlights the "underlying performance data" in the "FUND
FACTS SHEETS & COMPARISONS" that "gave a short narrative analysis of each fund and
several key performance measures."[120]  Not only are most of the data points referenced in the
"FUND FACTS SHEETS & COMPARISONS" captured in CAPTRUST's presentations to
Cornell, but also the analysis for Maine involves a fraction of the number of funds that were
reviewed for Cornell.[121]

---

[118] 2014-09-17 RPOC Presentation [EX022] CORNELL013567, at pp. 39-47.

[119] Dominguez Report, at ¶ 68.

[120] Dominguez Report, at ¶ 68; EX176.

[121] EX176.

**B. Once the tiered structure was implemented, CAPTRUST provided the RPOC with quarterly quantitative and qualitative performance reviews that led to changes in the Cornell Plans' investment menus.**

104.   In my opinion, the quantitative and qualitative performance reviews provided by CAPTRUST after the implementation of the tiered structure were appropriately timed, thorough, and effective in bringing about updates to the investment lineup.

105.   For example, on December 3, 2014, CAPTRUST provided the RPOC with its third quarter performance review of the Cornell Plan investment options.  This was the first presentation of performance analysis by CAPTRUST since the implementation of the tiered approach.  Exhibit 6 shows an aggregation of the quarterly quantitative review analyses that CAPTRUST performed across the Plan's Tier 1 and 2 funds.  For these funds, CAPTRUST performed a detailed analysis that scored each fund on a 100-point scale and rated each fund, pass, review, or fail.  CAPTRUST calculated the ratings based on:[122]

> The scoring system measures quantitative areas as well as qualitative (or subjective) fields for actively managed investment options.  Quantitative scoring areas include Risk Adjusted Performance (3 & 5yr.); Performance vs. Relevant Peer Group; Style Attribution; and Confidence.  Qualitative Scoring Areas measure the quality of the Management Team while also considering the stewardship of the investment option's parent company under Investment Family Items. Qualitative areas of analysis are subjective in nature.

106.   CAPTRUST presented a summary of performance at each RPOC meeting after the tiered structure was in place.  CAPTRUST regularly recommended replacing certain underperforming funds.  The RPOC always took these recommendations into consideration and discussed them.  Sometimes the RPOC followed the recommendations, sometimes the RPOC decided to stick with the current offering.  Whatever the decision on any particular investment offering, the point is the process was robust.

107.   For example, on September 9, 2015, CAPTRUST presented a summary of the performance of the Cornell Plan investment options as of the second quarter of 2015.  CAPTRUST noted two specific investment options for review: Blackrock Investment Grade Bond fund and PIMCO Total Return.[123]  The RPOC discussed these options and decided to

---

[122] [EX121] CAPTR_0013943, at p. 24.

[123] 2015-09-09 RPOC 2d Quarter Review Meeting Mins [EX027] CAPTR_0013573, at 574.

take no action as of the time of the meeting.[124]  At the December 16, 2015 RPOC meeting, CAPTRUST again presented the performance assessment for the Cornell Plan investment options for the previous quarter.  CAPTRUST marked the same two investments for review.[125]  Again, the RPOC discussed these options but decided not to change the investment lineup at that time.

108.   At the March 31, 2016 RPOC meeting, CAPTRUST presented on industry trends in the marketplace for 2016 before moving on to a presentation of the quarterly performance of the investment options in the Cornell Plans.  CAPTRUST again noted the two investment options that had been marked for review at the previous two RPOC meetings.[126]  At this meeting, CAPTRUST also informed the RPOC that one of the more important areas of focus for 2016 should be money market fund reform.  CAPTRUST presented an overview of the new SEC rules that would take effect in October 2016 and then led a discussion about the impact on the Cornell Plan.  As a result of this conversation, CAPTRUST recommended that the Vanguard Federal Money Market (VMFXX) be added to Tier 2 on the platform of each of the three vendors and that other money market fund options be closed and mapped to the VMFXX.  The RPOC approved this recommendation.[127]

109.   In June 2016, CAPTRUST presented its periodic performance assessment of the Cornell Plans and also focused the RPOC on a discussion of the money market reform and the progress of adding VMFXX to Tier 2 on each of the vendor platforms.  These additions had been scheduled to take place in the spring of 2017 as part of the larger Tier 3 changes (closing funds that were failing the Investment Policy Statement and making certain Fidelity funds available at the brokerage window).[128]

110.   On September 28, 2016, CAPTRUST presented its periodic plan level performance review, noting that "all funds within Tier I and Tier II are meeting policy guidelines with the exception of PIMCO Total Return (only on the Fidelity platform).  RPOC discussed and would like CAPTRUST to provide the Committee, through an email vote, their fund replacement

---

[124] 2015-09-09 RPOC 2d Quarter Review Meeting Mins [EX027] CAPTR_0013573, at 574.

[125] 2015-12-16 RPOC 3rd Quarter Review Meeting Mins [EX029] CAPTR_0013594, at 597.

[126] 2016-03-31 RPOC 4th Quarter Review Meeting Mins [EX030] CAPTR_0013568, at 570-571.

[127] 2016-03-31 RPOC 4th Quarter Review Meeting Mins [EX030] CAPTR_0013568, at 571-572.

[128] 2016-06-29 RPOC 4th Quarter Meeting Mins_CAPTR_0006752, at 753.

recommendation."[129]  In December 2016, after presenting plan-level performance for the previous quarter, CAPTRUST reported back on the vote and informed the RPOC that the replacement would be the Prudential Total Bond fund and that all balances and future contributions would be mapped to that fund.  CAPTRUST was to work with Cornell Human Resources to implement this change.[130]

111.  On April 14, 2017, CAPTRUST provided a summary of its periodic performance assessment of the Cornell Plan assets as of December 31, 2016.  CAPTRUST noted two specific funds for further discussion.  CAPTRUST noted recent changes that had been made to the TIAA-CREF Lifecycle Fund Series.  CAPTRUST also explained that the Blackrock Managed Income Fund was failing Investment Policy Statement guidelines and recommended that the RPOC consider a replacement fund.[131]  The RPOC agreed with this recommendation and moved forward with the Vanguard Long-Term Investment Grade Fund as a replacement.[132]  CAPTRUST was instructed to help implement this change.

112.  In June 2017, CAPTRUST provided the periodic review of performance of investment options in the Cornell Plan through the first quarter of 2017.  It repeated this process in September 2017, and indicated that Morningstar had made changes to its peer groups in terms of share classes, inclusion of exchange traded funds, and how asset weighting was calculated.  CAPTRUST noted that it planned on constructing its own peer groups to be consistent with the Investment Policy Statement and would provide the RPOC with this updated methodology.[133]  CAPTRUST noted that all funds were meeting policy guidelines.[134]

113.  In my opinion, CAPTRUST provided the RPOC with valuable information on a regular basis.  The quantitative and qualitative investment monitoring information was thorough and provided the RPOC with a detailed understanding of the investment options and a sound basis for making decisions.  Further, CAPTRUST provided the RPOC with appropriate advice about specific investments that allowed the RPOC to periodically update the offerings

---

[129] 2016-09028 RPOC 2d Quarter Review Meeting Mins [EX031] CAPTR_0013580, at 581.

[130] 2016-12-12 RPOC 3d Quarter Review Meeting Mins_CAPTR_0020550, at 551.

[131] 2017-04-14 RPOC 4th Quarter Review Meeting Mins [EX033] CAPTR_0013583, at 584.

[132] 2017-04-14 RPOC 4th Quarter Review Meeting Mins [EX033] CAPTR_0013583, at 584.

[133] 2017-09-27 RPOC Meeting Minutes [EX118], CAPTR_0013939, at 941.

[134] 2017-09-27 RPOC Meeting Minutes [EX118], CAPTR_0013939, at 941.

to participants.  In my opinion, CAPTRUST contributed to a robust process and offered prudent advice.

### VII.   CAPTRUST APPROPRIATELY ASSESSED THE PERFORMANCE OF UNIQUE TIAA OFFERINGS AND UNDERSTANDS THE VALUE OF INCLUDING ANNUITY PRODUCTS IN RETIREMENT PLANS

114.   In my opinion, CAPTRUST's recommendation to retain CREF Stock and TIAA Real Estate in the Cornell Plans was appropriate.

115.   In my opinion, CAPTRUST appropriately monitored the performance of CREF Stock and TIAA Real Estate and provided relevant information to the RPOC to support the RPOC's decisions to retain these two investments in the Cornell Plans.

116.    The Plaintiffs and their experts focus their critique and their quantification of damages on the inclusion of CREF Stock and TIAA Real Estate in the Cornell Plans.[135]  I disagree with their allegations and their choice of benchmarks for CREF Stock and TIAA Real Estate.

#### A.  CAPTRUST's monitoring and analysis of CREF Stock and TIAA Real Estate in the Cornell Plans was appropriate.  Plaintiffs' experts inappropriately dismiss CREF Stock and TIAA Real Estate as appropriate Cornell Plan investment options.

117.   In my opinion, CAPTRUST built appropriate (and customized) benchmarks with which to compare the performance of CREF Stock and TIAA Real Estate.  For CREF Stock, this benchmark contains both domestic and international components to reflect CREF Stock's geographical mix.[136]  For TIAA Real Estate, CAPTRUST used a custom index to reflect TIAA's direct holdings of real estate and low leverage.[137]

---

[135] Buetow Report, at ¶ 22; Minnich Report, at ¶¶ 91-98.

[136] Strodel Deposition, at pp. 144-45; Schmitt Deposition, at pp. 116-18.

[137] Strodel Deposition, at p. 145.

**Confidential**

118.    Consistent with my opinion, RPOC members not only displayed an understanding that these two investment options were difficult to benchmark,[138] but were also comfortable with the benchmarks developed by CAPTRUST.[139]

119.    CAPTRUST understands that CREF Stock and TIAA Real Estate must be evaluated carefully.  Mr. Schmitt explained, "[t]hey are distinct – those are distinct investments because there is not a true published benchmark by which to evaluate them.  And one of the things that we built within the Investment Policy Statement is – is the ability to deviate from that scoring for certain types of investments."[140]

120.    Mr. Schmitt explained that CAPTRUST uses a proprietary methodology to evaluate certain funds, including CREF Stock and TIAA Real Estate.[141]  The CAPTRUST organization includes "a separate group that evaluates these funds, that talks to the managers."[142]  Mr. Schmitt specifically noted that CAPTRUST meets "with the managers periodically, assess not only a historical return, but trying to determine, based on their process, is their – is their – is their process sustainable going forward."[143]

121.    Jim Strodel of CAPTRUST goes into greater detail and explains the evolution of CREF Stock benchmarking at CAPTRUST.  Mr. Strodel explains that specific to CREF Stock, CAPTRUST decided that the Morningstar peer group was too small to make an appropriate evaluation.[144]  Specifically, the interpretation of CREF Stock's performance was too dependent on the allocation of domestic versus international exposure in the small peer group which made it less relevant.[145]  Therefore, CAPTRUST decided to develop a custom index that specifically

---

[138] Edwards Deposition, at pp. 125-26; Gallagher Deposition, at pp. 190-91; Prasad Deposition, at pp. 109-14; DeStefano Deposition, at p. 67; Schwartz Deposition, at pp. 165-69;

[139] Prasad Deposition, at pp. 124-25; Schwartz Deposition, at p. 158.

[140] Schmitt Deposition, at pp. 113-14.

[141] Schmitt Deposition, at pp. 115-18.

[142] Schmitt Deposition, at p. 115.

[143] Schmitt Deposition, at p. 117.

[144] Strodel Deposition, at pp. 140-41.

[145] Strodel Deposition, at p. 141.

mapped to the allocation of the CREF Stock portfolio.[146]  To reiterate, Mr. Strodel also noted that CAPTRUST interacts with the managers of CREF Stock to support their analysis.[147]

122.  Specific to TIAA Real Estate, CAPTRUST also understood that it had a small peer group without appropriate benchmarks.[148]  CAPTRUST approached TIAA Real Estate benchmarking in an appropriate and thoughtful manner.  It developed a custom benchmark for TIAA Real Estate that was comprised of actual private real estate holdings.[149]

123.  I have read the Expert Report of Professor John Chalmers in this matter, and I agree with his analysis and conclusions regarding CREF Stock and TIAA Real Estate.  Professor Chalmers compares the performance of CREF Stock and TIAA Real Estate to appropriate benchmarks.  Professor Chalmers' analyses show that the performance of both CREF Stock and TIAA Real Estate is in line with the appropriate benchmarks.[150]

124.  The differences in the quality of the approaches that CAPTRUST and Professor Chalmers take to benchmarking CREF Stock and TIAA Real Estate and those taken by the Plaintiffs' experts could not be more striking.  Mr. Buetow's comparison of CREF Stock to index funds illustrates how coarse and unreliable the Plaintiffs' damages estimates are.  He begins by comparing CREF Stock to the Vanguard Institutional Index fund (VIIIX), a fund designed to track the performance of the S&P 500 Index.  The alleged damage is $202M.[151]  Mr. Buetow then realizes that CREF Stock has a significant non-US investment component (approximately 23 percent international and seven percent emerging market),[152] so he next benchmarks versus a 70/30 domestic/international index.  The "damage" drops by over 93% (from $202M to $14M) for the period 9/1/2010 through 6/30/2018.[153]  Corresponding damages

---

[146] 70% domestic equity, 30% international equity with 8 - 10% of the 30% in emerging markets. Strodel Deposition, at p. 144-45; Schmitt Deposition, at pp. 116-18.

[147] Strodel Deposition, at p. 142.

[148] Strodel Deposition, at p. 144.

[149] Strodel Deposition, at p. 145.

[150] Chalmers Report, at Section IV.

[151] Buetow Expert Report, at ¶ 26.

[152] Schmitt Deposition, at pp. 116-118.

[153] Buetow Expert Report, at ¶ 28.

for the period 10/1/2013 through 6/30/2018 reflect a similar pattern, declining from $101M to $6.5M, respectively.[154]

125.   Mr. Buetow ignores the investment strategy of CREF Stock entirely in his comparisons to index-fund benchmarks.  As Professor Chalmers discusses, CREF Stock is managed using a combination of index, quantitative, and active management strategies.[155]

126.   With regard to TIAA Real Estate, Mr. Buetow and Ms. Dominguez also use an inappropriate benchmark (the Vanguard REIT Index Fund) to assess damages.  They both fail to recognize the significant differences between these two investments.  Mr. Buetow says nothing about these differences.  He merely estimates that investing in the Vanguard REIT Index Fund would have resulted in participants accumulating higher balances than they would have accumulated if they had invested in TIAA Real Estate, and then labels the difference between the balances as "losses."[156]  Ms. Dominguez states that she advises 403(b) plans to avoid the real-estate sector, but that including REITs in a plan would be appropriate because it offers "similar exposure."[157]  Yet, she provides no discussion about the differences between TIAA Real Estate and the Vanguard REIT Index Fund.

127.   The Vanguard REIT Index Fund is not a proper benchmark for TIAA Real Estate as the latter owns low-risk real properties directly, has a significant liquidity provision, and has low leverage.[158]

128.   All of these alleged damage amounts computed in Mr. Buetow's Expert Report are carried over to Ms. Dominguez's Expert Report.[159]

---

[154] Buetow Expert Report, at ¶ 29. I note that the damage amount reported for the 10/1/2013 – 6/30/2018 by Mr. Buetow when using the 70/30 benchmark is incorrectly reported as $10,825,111.00 instead of the correct amount of $6,543,318.00.  The correct figure is reported in tab "Sub Plan Later Date" of Mr. Buetow's workbook "DamageSummary.xlsx" as well as by Ms. Dominguez at ¶ 121 of her Expert Report.

[155] Chalmers Report, at Section III.

[156] Buetow Report, at ¶¶ 32-33.

[157] Dominguez Report, at ¶ 108.

[158] Vanguard REIT Index Fund owns REITs, which in turn own properties.  TIAA Real Estate owns properties directly.  TIAA Real Estate maintains a liquidity buffer of approximately 20% of its assets while the Vanguard REIT Index carries virtually no liquidity buffer due to its mandate to minimize tracking error.  TIAA Real Estate has a loan-to-value ratio of approximately 15% where the average publicly-traded REIT has a leverage ratio of over 33%. https://www.reit.com/data-research/reit-market-data/reit-industry-financial-snapshot.  TIAA Real Estate focuses on low-risk real estate investments in residential, office, retail, and industrial.  Vanguard's REIT Index must hold REITs in much higher risk and return REIT sectors (such as Health Care REITs) to mimic the REIT Index.

[159] Dominguez Expert Report, ¶ 100 (for the $14M amount), ¶ 110 (for the $202M amount), ¶ 121 (for the $101M amount), and ¶ 121 (for the $6.5M amount).

129.   In failing to properly analyze these investments, the Plaintiffs also place their judgment up against that of a very large number of Cornell Plan participants.  Exhibit 7 summarizes these two TIAA investments in terms of total assets as a percentage of total Cornell plan assets.  Exhibit 7 indicates that TIAA Real Estate and CREF Stock have made up between approximately 20% and 24% of the total Cornell Plan asset balance in recent years. CREF Stock is widely-held and has consistently been the second largest holding in the Cornell Plans.  TIAA Real Estate is a unique product that is valuable to participants interested in portfolio diversification benefits from its low correlation to other asset classes.[160]

### B. CAPTRUST wisely considered both the accumulation and decumulation phases of retirement planning while Plaintiffs' experts fail to understand the value of annuities in the Cornell Plan.

#### i. CAPTRUST recognized the annuities provided participants with distribution benefits not present in mutual funds.

130.   Defined contribution plans have both an accumulation and a decumulation cycle. Participants reaching age 70.5 must begin to take minimum required distributions from their plan.[161]  The bottom-line reason the vast majority of participants have for investing in a defined-contribution plan is to provide *income* for themselves (and a beneficiary, often a spouse or partner) during retirement.

131.   CAPTRUST recognized the value of annuities in the Cornell Plans.  Mr. Strodel explained that "a variable annuity has the option to annuitize at some point in the future where a mutual fund doesn't.  So it's – they're both accumulation tools.  The annuity has a tool for decumulation, where a mutual fund does not."[162]  Mr. Strodel went on to emphasize that the "ability to decumulate over time"[163] was a primary difference between mutual funds and annuities.

---

[160] Chalmers Report, at Section IV.

[161] The minimum required distribution is the account balance divided by the applicable life expectancy.  For a 71-year-old, this would be roughly four percent of the account balance.  As a participant ages, the applicable life expectancy declines and puts upward pressure on the minimum required distribution.

[162] Strodel Deposition, at pp. 80-81.

[163] Strodel Deposition, at p. 82.

**Confidential**

132.   The Plaintiffs call attention to the added costs of annuities by labeling specific TIAA products as "variable annuities with four layers of expenses"[164] and allege that "[t]wo of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plans' participants, and the other two layers of fees pay for services that provide *no* benefit to the Plans' participants."[165]

133.   As stated by Mr. Strodel, annuities embed options for the distribution phase of the life cycle that mutual funds do not.  In my opinion, it is appropriate for an investment consultant to consider both the costs and *benefits* of having variable annuities in a retirement plan.

134.   In their seminal 1963 paper, Albert Ando and Franco Modigliani propose a life cycle hypothesis of saving that encompasses both the accumulation of financial wealth and the eventual decumulation of that wealth.[166]  The goal is to provide a smooth stream of *income* to satisfy consumption needs over the life cycle.  As CAPTRUST recognized, an annuity is a product that envisions both phases of the life cycle, and embodies a range of income options in the decumulation phase that can allow a participant to transfer longevity and investment risks to the insurance company.

135.   The Society of Actuaries calls longevity the "underlying driver in retirement risk."[167]  The National Association of Insurance Commissioners states that: "For individuals, longevity risk is the risk of outliving ones' assets, resulting in a lower standard of living, reduced care, or a return to employment."[168]

136.   Variable annuities (like CREF Stock and TIAA Real Estate) have options embedded in them that allow a participant to annuitize a portion (or all) of her/his variable annuity accumulation value and create a stream of lifetime income.  The participant can choose a single

---

[164] Complaint, at ¶ 115.

[165] Complaint, at ¶ 117.

[166] The Life Cycle Hypothesis of Saving: Aggregate Implications and Tests, American Economic Review, Volume 53(1), 55-84.

[167] Key Findings and Issues -- Longevity: The Underlying Driver in Retirement Risk, 2005 Risks and Process of Retirement Survey Report (July 2006). *Available at*: https://www.soa.org/files/research/projects/Longevity-Short-Report.pdf.

[168] Longevity Risk: National Association of Insurance Commissioners Center for Insurance Policy and Research. *Available at*: https://www.naic.org/cipr_topics/topic_longevity_risk.htm.

or joint-life annuity and certain guaranteed periods of payment to offset the risk of an early death or deaths.  The income options in variable annuities remove longevity risk (outliving the income stream), and in the case of TIAA Traditional (a fixed annuity), both longevity and investment risk.

137.   The dynamics of labor markets in higher education are important to understand when advising a university 403(b) plan.  A new tenure-track assistant professor at a research university like Cornell faces a significant risk that he or she will not make tenure.  During a faculty career, changing universities several times is often necessary in order for a faculty member to obtain tenure, achieve promotions, and materially increase compensation.  Moving to take an endowed or a leadership position are other common reasons faculty change universities.

138.   As a result, faculty often choose a defined contribution plan option so as to not lose employer contributions in a defined benefit plan option for failing to vest.[169]  As such, faculty often do not have defined benefit type retirement plans (other than Social Security).

139.   In this situation, *partial* annuitization of the accumulated assets in a 403(b) plan is a strategy that *diversifies* the participant's income streams in retirement and builds off the Social Security base income.  Partial annuitization also serves as a hedge against cognitive decline and the need to make good decisions about what and how much of their accumulated balance to sell to fund current income needs.

140.   From its inception in 1952, CREF Stock has been a variable annuity with the goal of providing an inflation hedge for lifetime income.[170]  The income stream from an annuitized variable annuity (like CREF Stock) is determined by the performance of the underlying investments.  Building an inflation-adjusted income stream from an underlying asset portfolio that is 50% CREF Stock and 50% TIAA Real Estate would take advantage of the low correlation of the latter to the former and reduce the variation in the payouts over time.[171]

---

[169] A defined benefit option may not even be available.  If there is a defined benefit plan, the vesting period is typically ten years or longer.  The tenure "clock" typically is six or seven years, maximum.

[170] https://www.tiaa.org/public/pdf/ffs/194408126.pdf.

[171] The correlation coefficient between CREF Stock and TIAA Real Estate based on annual returns from 2009 – 2017 was .24.  Source data available at: https://nb.fidelity.com/public/workplacefunds/view-all/OBPW and https://www.tiaa.org/public/pdf/ffs/87244W797.pdf.

Payments will continue so long as the annuitant (or surviving beneficiary) is alive, or for the minimum guaranteed period, if applicable.

141. While annuitizing a variable annuity involves investment risk, it offers a long-run inflation-adjusted income stream that is often a valuable complement to the fixed-income stream provided by TIAA Traditional (as I discuss in the following section).

142. TIAA annuities offer benefits to beneficiaries of the participant as well. A beneficiary, such as a spouse, has one year from the participant's death to make such an election. This offers a valuable option to a beneficiary who may not have the same appetite or aptitude for investment risk as the participant.

143. The challenge of maintaining sufficient income during retirement is becoming greater as life expectancies increase. According to the Society of Actuaries, for a couple, both age 65, there is a greater than 50% percent chance that one spouse will live past age 90 and approximately a 20% percent chance that one will live to age 100.[172]

144. Annuities are very valuable for participants who expect a long life, or for a couple where one of the spouses has such an expectation. Eleven out of thirteen widowed individuals are women, so these options tend to be valuable in the common case where a woman is the surviving spouse.[173]

145. TIAA annuities also have very favorable charges for the longevity protected income options they embed. For example, CREF Stock has a mortality charge of 0.5 *basis points* per year. For a participant with a $100,000 balance in CREF Stock, this is $5 per annum.

146. While the Plaintiffs bemoan the "layers of fees" in annuities, the expense ratio of CREF Stock R3 places it in the bottom decile of expenses of mutual funds with similar objectives.[174]

147. Taking advantage of the lifetime income options in annuities can greatly improve participants' peace of mind. For example, spending in retirement tends to be non-linear. The highest spending occurs just after retirement (often to satisfy the demand for pent-up leisure, especially travel). This is the "go-go" phase of retirement. This is followed by a "slow-go"

---

[172] Actuaries Longevity Illustrator, American Society of Actuaries and Society of Actuaries, at http://www.longevityillustrator.org.

[173] https://www.theguardian.com/lifeandstyle/2015/oct/05/widows-women-bereavement-spouses.

[174] Chalmers Report, Section IV.

period of reduced spending.  Finally, there is the risk of a significant "no-go" period, dominated by high medical expenses.[175]  Having an inflation-adjusted lifetime income stream on top of Social Security can greatly ease income planning in retirement and allow participants to enjoy some "go-go" utility without worrying as much about liquidating investments in a volatile market.  Having an inflation-adjusted income stream can also be a very important hedge against the high costs of extreme old age.

148.   As mentioned in the section on the history of the 403(b), the U.S. Treasury has recognized the longevity risk challenges facing participants in defined contribution plans.  In 2012, the Treasury Department issued rules easing the purchase of annuities in 401(k) plans.[176]

149.   The participants in the Cornell Plans recognize the value of annuity options.  In 2016, for example, annuities comprised over $1.3 billion in the Cornell Plans, or about 40% of the total assets.[177]  So the Plaintiffs' experts' bias against annuities, manifested by their focus on annuity costs and exclusion of benefits, is a glaring weakness in their analyses.

150.   CAPTRUST recognized the value of annuities in the Cornell Plans.

151.   Wise independent consultants like CAPTRUST do not disregard the impact of their decisions on plan participants.  For participants nearing the decumulation phase of the life cycle, the implications of mapping from one investment option to another can be particularly disruptive.

152.   For example, consider the implications of Plaintiffs' 2010 Cornell Plans mapping edict on the investment and income provisioning complexities facing a 60-year-old participant. Based on the overall investment holdings in the Cornell Plan, the 60-year-old is likely to have a combination of fixed annuities, variable annuities, and mutual funds in her 403(b) plan.  For a long-term university employee, these 403(b) accumulations may well represent the vast majority of her life savings.  She faces having investment options she may have relied upon for decades mapped to options she did not select.

153.   Moreover, one 60-year-old participant is not necessarily like another.  While on the Georgia Plan Investment Committee, I observed data that indicated nearly two-thirds of our

---

[175] Wade Pfau. https://www.forbes.com/sites/wadepfau/2016/08/09/retirement-spending-increases-and-decreases-over-time/#7980a3ff36d0.

[176] New Treasury Rules Ease 401(k) Annuity Purchase, Mary Williams Walsh, *New York Times*, February 2, 2012.

[177] 2016 Form 5500s.

60-year-old participants had asset allocations in their defined contribution retirement plan that were *outside* of ten percent (plus or minus) of the target-date fund glide slope.[178]  This suggests a wide array of participant financial situations at this stage in the life cycle.

154.   Participant differences arise for many reasons outside of the participant's job situation.  These include health, longevity expectations, debt levels, savings or pensions outside of the 403(b) plan, and family issues, including not only a spouse or partner, but also children and aging parents.

155.   In my opinion, CAPTRUST acted prudently when it worked with the RPOC to carefully consider the implications of mapping or freezing investment options in the Cornell Plans.

156.   Based on my experiences as a consultant to the Georgia Plan, I believe that it is wise to consider the implications of investment committee decisions on both the accumulation and decumulation phases of the plan, as CAPTRUST did.  In contrast, for the Plaintiffs, the approach is to ignore participant diversity and the associated disruption their mapping demands would cause.

157.   More broadly, when evaluating any financial product or service, it is appropriate to evaluate both the benefits and costs, as opposed to just the costs (as Plaintiffs do in the case of annuities).

### ii.   Plaintiffs Also Fail to Understand the value of TIAA Fixed Annuities

158.   Doubling down on their bias against annuities, Plaintiffs also train their sights onto TIAA Traditional, a fixed annuity.  Plaintiffs' expert Ty Minnich promoted his role in "educational campaigns designed to move participants' assets out of 'legacy' investment options."[179]  Mr. Minnich explains that during his career he has spent time "promoting change and assisting 403(b) plan sponsors to move away from TIAA.  I have had success in engaging plan sponsors based on, among other things, the lack of liquidity and underperformance of TIAA 'legacy' assets."[180]

---

[178] Conrad Ciccotello and Paul Yakoboski, A Tale of Two Nudges: Improving Financial Outcomes for Boomers and Millennials, Benefits Quarterly, 2014 (3), 32-37.

[179] Minnich Expert Report, ¶ 96.

[180] Minnich Expert Report, ¶ 96.

**Confidential**

**DJA90**

159.  Mr. Minnich suggests the TIAA Retirement Choice annuity is preferable to the TIAA Traditional Annuity because in the former option assets can be mapped, with or without the assent of participants.  However, Mr. Minnich fails to acknowledge that TIAA Traditional under the Retirement Choice contract has several provisions that are not as favorable to participants as those for TIAA Traditional under the "old" group retirement annuity (GRA) or the retirement annuity (RA) contracts.  TIAA Traditional in the Retirement Choice product has lower guaranteed crediting rates, lower guaranteed payout rates, and a mortality table that is updated each year (as opposed to a fixed mortality table in the GRA or RA contracts).[181]

160.  The Society of Actuaries estimates that mortality improvements will average roughly one percent per year through age 85, and then 0.85% from age 85 to 95.[182]  Annuities become more expensive as mortality improves due to the increased cost of transferring longevity risk.  As such, the annually updated mortality table in the Retirement Choice contract will lead to significantly reduced payouts for Retirement Choice contract annuitants over time relative to group retirement contract annuitants.

161.  In Table 3, I examine the wisdom of leaving TIAA "legacy assets" by comparing TIAA Traditional payouts to those in the annuity marketplace.  I use the option for a single-life payout with a 10-year period certain where monthly payments are made for the life of the annuitant or over ten years, whichever is larger.  For this option, and a 65-year annuitant, I compare average and highest immediate annuity annual payout rates with those provided by various vintages of the TIAA Traditional Annuity.

---

[181] https://www.tiaa.org/public/pdf/understanding_your_new_retirement_choice.pdf.

[182] "Mortality Improvement Scale MP-2017," Society of Actuaries, October 2017, p. 10.

**Confidential**

**DJA91**

**Table 3**
**TIAA Traditional Annuity vs. Immediate Annuity Payouts[183]**

|  |  | Single Life & 10-Year Guarantee | Joint Life & 20-Year Guarantee |
|---|---|---|---|
| TIAA Vintage | Pre-2002 | 8.30% | 7.40% |
|  | 2002 - 2011 | 7.00% | 6.10% |
|  | 2012 - 2015 | 6.00% | 5.10% |
|  | 2016 - 2017 | 5.80% | 5.00% |
|  | 2018 | 6.20% | 5.30% |
| Blended TIAA Rate | September 2018 | 7.32% | 6.43% |
| Schwab Annuities | September 2018 | 6.41% | 5.51% |
| Market Average | September 2018 | 6.20% |  |
| Market Highest | September 2018 | 6.42% |  |

162.   Table 3 indicates that a 65-year owner of the TIAA Traditional Annuity who had been contributing regularly over a long horizon would obtain a blended payout rate[184] that would be superior to the average (and even to the highest reported) rate of a non-TIAA immediate annuity in the marketplace.  Specifically, over a 30-year horizon, a TIAA annuitant making regular monthly contributions would obtain an annual payout rate greater than 7.32%, besting the market highest payout by nearly one percent (7.32% versus 6.42%).

163.   The second column of Table 3 shows the corresponding payouts for a joint annuity with a 20-year guarantee.  The TIAA Traditional again offers superior performance relative to

---

[183] "TIAA Vintage" rates from https://www.tiaa.org/public/investment-performance/tiaatraditional/profile?ticker=47933630.  "Blended TIAA Rate" assumes that the balance after 30 years of savings for retirement is equally distributed for each vintage year.  "Schwab Annuities" is for a single life with 10 years certain is the average of male and female rates, as calculated in https://www.schwab.com/public/schwab/investing/accounts_products/investment/annuities/income_annuity/fixed_income_annuity_calculator.  "Market Average" from http://www.immediateannuities.com/comparativeannuityreports/ accessed 9/11/18.  The 6.20% annual payout rate is calculated from the average of the reported male and female monthly payouts, $529 and $504 per $100,000 premium, respectively, as 6.20% = [12*($529 + $504)/2] ÷ $100,000.  "Market Highest" http://www.immediateannuities.com/comparativeannuityreports/ accessed 9/11/18.  The 6.42% annual payout rate is calculated from the average of the reported male and female monthly payouts, $545 and $525 per $100,000 premium, respectively, as 6.42% = [12*($545 + $525)/2] ÷ $100,000.

[184] The blended payout rate is the weighted average of the individual vintage rates, weighted by the balance in each vintage.

other annuities.  This column also highlights the benefits of having flexible distribution options, as the survivor is also protected against investment and longevity risk.

164.    TIAA Traditional was first introduced more than one hundred years ago on April 23, 1918.[185]  As Table 3 shows, TIAA Traditional has historically paid significantly higher rates than the average and even the highest immediate annuity market rates, especially for longer accumulation phases, because unneeded contingency reserves are gradually returned for the benefit of contract-holders.

165.    The superior TIAA payouts are not the entire story.  Not all insurance companies have the same credit quality, and a promise to pay income streams decades into the future varies in value depending on who is making that promise.  Table 4 shows that, over the class period and through to the present, TIAA has consistently received the highest rating offered by the four major insurance company rating agencies.  These are as follows: A.M. Best (A++, "Superior," highest of 15 categories); Fitch (AAA, Exceptionally Strong," the highest of 22 categories); and the highest or second highest rating among 22 categories from both Standard & Poor's and Moody's.  As Table 4 below indicates, a recent ranking of the financial strength of insurance companies places TIAA among the top three based on the combined ratings of the four independent rating agencies mentioned.

166.    In my opinion, the efforts by Mr. Minnich to discredit TIAA Traditional is another reflection of the bias against annuities shown by Plaintiffs' experts.

---

[185] James Poterba and Mark Warshawsky, "The Costs of Annuitizing Retirement Payouts from Individual Accounts," in *Administrative Aspects of Investment-Based Social Security Reform*, edited by John B. Shoven, National Bureau of Economic Research, January 2000, pages 173-206, page 192.

**Table 4**
**TIAA Financial Strength[186]**

| TIAA Financial Strength | Rating Agency | | | |
|---|---|---|---|---|
| | A.M. Best | Standard & Poor's | Moody's | Fitch |
| April 2010 – February 2011 | A++ | AAA | Aaa | AAA |
| December 2011 – June 2012 | A++ | AA+ | Aaa | AAA |
| April 201 | A++ | AA+ | Aaa | AAA |
| August 2017 – June 2018 | A++ | AA+ | Aa1 | AAA |
| Top-Three Insurance Companies, as of March 2018 | | | | |
| Northwestern Mutual | A++ | AA+ | Aaa | AAA |
| New York Life | A++ | AA+ | Aaa | AAA |
| TIAA | A++ | AA+ | Aa1 | AAA |

167.   I conclude that Plaintiffs' experts' opinions about annuities in 403(b) plans are fundamentally flawed.  They do not properly benchmark the returns during the accumulation phase (e.g., CREF Stock and TIAA Real Estate) and they ignore or misrepresent the valuable lifetime income options in the distribution phase of the lifecycle.

168.   In my opinion, wise investment consultants such as CAPTRUST consider not only careful monitoring of annuity investments during the accumulation phase of a 403(b) plan, but also recognize the valuable options for income that annuities can offer during the decumulation phase.

---

[186] "April 2010 – February 2011" ratings source: TIAA Traditional Annuity Defined Contribution Plans, footnote 1, page 4. A.M. Best (A++ as of 02/11); Standard & Poor's (AAA as of 8/10); Moody's Investors Service (Aaa as of 7/10); and Fitch (AAA as of 4/10). "December 2011 – June 2012" ratings source: The TIAA General Account, as of June 30, 2012, page 1. Best (A++ as of 4/12); Standard & Poor's (AA+ as of 5/12); Moody's Investors Service (Aaa as of 12/11); and Fitch (AAA as of 6/12). "April 2014" ratings source: The TIAA General Account, as of March 31, 2014, page 1. "August 2017 – June 2018" ratings source:  The TIAA General Account, as of March 31, 2018, page 1. Best (A++ as of 6/18); Standard & Poor's (AA+ as of 8/17); Moody's Investors Service (Aa1 as of 2/18); and Fitch (AAA as of 6/18).  "Top-Three Insurance Companies" ratings source: https://www.insuranceandestates.com/top-25-highest-rated-insurance-companies/.

Executed this 14th of September, 2018

_____

Conrad S. Ciccotello, J.D., Ph.D.

**Confidential**

**DJA95**

# Exhibit 11

Page 1

1

            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------------

4   CASEY CUNNINGHAM,

5                     Plaintiff,

6        -vs-                    16-CV-6525-PKC

7   CORNELL UNIVERSITY, et al.,

8                     Defendants.

9  -------------------------------------------------

10

11

12      VIDEOTAPED DEPOSITION OF JAMES W. STRODEL

13                 (Taken by Plaintiff)

14                Raleigh, North Carolina

15                Thursday, August 9, 2018

16

17

18

19

20

21   Reported by Cindy A. Hayden, RMR-CRR

22

23

24

25

Page 2

```
 1              A P P E A R A N C E S
 2
 3    For the Plaintiff:
 4      SCHLICHTER BOGARD & DENTON, LLP
        Attorneys at Law
 5      100 S. 4th Street
        Suite 1200
 6      St. Louis, MO 63102
        BY:  SCOTT T. APKING, ESQ.
 7      314.621.6115
        sapking@uselaws.com
 8
              -and-
 9
        BY:  SCOTT A. BUMB, ESQ.
10      314.621.6115
        sbumb@uselaws.com
11
12    For Defendant Cornell University:
13      MAYER BROWN LLP
        Attorneys at Law
14      71 South Wacker Drive
        Chicago, IL  60606-4637
15      BY:  NANCY G. ROSS, ESQ.
        312.701.8788
16      nross@mayerbrown.com
17
      For Defendant CAPTRUST:
18
        SIDLEY AUSTIN, LLP
19      Attorneys at Law
        One South Dearborn
20      Chicago, IL  60603
        BY:  ERIC S. MATTSON, ESQ.
21      312.853.4716
        emattson@sidley.com
22
23    Also Present:  Michael Kirby, Videographer
24
25
```

Page 90

```
 1   that plan sponsor conducting an RFP, to your
 2   knowledge?
 3              MR. MATTSON:  Are you limiting this to
 4         CAPTRUST?
 5              MR. APKING:  CAPTRUST, yes.
 6              THE WITNESS:  I don't recall.  I -- I
 7         think maybe -- it's the minority.  But I think
 8         there may be one or two that have engaged us
 9         without an RFP.
10   BY MR. APKING:
11         Q.    When you respond to an RFP, do you
12   provide information on the services that you intend
13   on providing to that university for their 403(b)
14   plan?
15         A.    Yes, we do.
16         Q.    Do you separate pricing out with respect
17   to each service that you plan on providing?
18         A.    No.  We have a bundled service.
19         Q.    Is that pricing negotiable?
20         A.    The price that we propose to a client?
21         Q.    Yes.
22         A.    Yes.
23              (EXHIBIT 1, Retirement Plan Advisory
24         Services Agreement, was previously marked for
25         identification.)
```

Page 91

1    BY MR. APKING:

2        Q.    I'm going to share with you what's been

3    previously marked as CAPTRUST Exhibit 001.

4        A.    Which one of these apps should I be --

5        Q.    PDF Expert, please.

6        A.    Just a one-page document?

7        Q.    No.  It's an eight-page document.

8        A.    Oh, I'm sorry.  It swipes this way.

9    Sorry.  I have it.

10       Q.    Do you recognize this document?

11       A.    I do.

12       Q.    Have you ever read this document before?

13       A.    I have.

14       Q.    And if we go down to Number 1,

15    Investment Advisory Services,  do you see some

16    check marks?

17       A.    Yes.

18       Q.    And under  Vendor Analysis,  we see

19    Vendor analysis, benchmarking and scoring ; is that

20    correct?

21       A.    Yes.

22       Q.    Did that mean to you -- did that

23    include, in your mind, negotiating recordkeeping

24    fees?

25       A.    Yes.

1    preservation category.  So that was part of the

2    previous exhibit, how we evaluate funds.

3         Q.    That would be detailed in Appendix B?

4         A.    Yes.  And the -- yes, that's where we

5    score CREF stock, which has evolved over time as

6    well.

7         Q.    Has that -- have you scored CREF stock

8    in that way the entire time you've been on the RPOC

9    committee?

10        A.    No.

11              MS. ROSS:  Object -- objection.

12              MR. MATTSON:  He wasn't on the R -- he

13       wasn't on the committee.

14   BY MR. APKING:

15        Q.    Strike that.

16              While you've been an investment adviser

17   to the committee -- is that the correct terminology,

18    investment adviser ?

19        A.    It is.

20        Q.    While you served as an investment

21   adviser to the RPOC committee, has the way that

22   you've scored CREF stock account changed?

23        A.    It has.

24        Q.    How has it changed?

25        A.    It's changed in that, as described on

Page 141

1    Page -- on Appendix B, Page 12 of 22, the -- the

2    peer group -- the quantitative component of the peer

3    group to CREF stock is a global all cap equity fund,

4    which means it buys large, mid and small cap

5    domestic companies, and it buys developed and

6    emerging international companies to create this

7    global all cap allocation fund.  And it has a very

8    small peer group.  So our team determined that the

9    peer group was not significantly significant --

10   significantly significant enough to -- to make a

11   peer-relative evaluation of it based on the

12   Morningstar peer group.  So we dropped the

13   peer-relative performance as a measure that we show

14   in the methodology.

15       Q.    When did that occur?

16       A.    We still monitor it relative to peer.

17   But when it -- when you put it through this, you

18   find that as CREF stock -- as international markets

19   go relative to domestic markets, CREF stock will do

20   better or worse depending on the underlying

21   allocation, domestic versus international.

22            And so you can sometime -- the -- the

23   peer group was domestic or large cap blend, which

24   didn't have any international equity, and so it was

25   becoming -- it was not as relevant as we'd like it

Page 142

1    to be.  So while we still look at it, we lean on

2    other measures.  And that occurred, I think, in '13

3    or '14.  Probably '14 is when that occurred.

4         Q.    Other than changing the benchmark from

5    large cap plan -- strike that.

6              Other than the change related to the

7    benchmark from large cap blend to global all cap

8    equities, are there any other ways that CAPTRUST has

9    changed how it conducts investment evaluation of the

10   CREF stock account?

11             MR. MATTSON:  Object to the form.

12             THE WITNESS:  So that what we changed

13        was the Morningstar -- the peer group, not the

14        index.  Well, what I was referencing is, we --

15        we changed the peer group.  We've used a

16        custom index, which has evolved as well.  It's

17        related to specifically the underlying

18        allocation of the portfolio.  That -- so those

19        are the changes.

20             As a firm, we've also interacted -- the

21        research team has.  I haven't -- with some of

22        the managers at CREF stock, the analysts and

23        such.

24   BY MR. APKING:

25        Q.    Other than what you've just described as

Page 143

1   the changes and how CREF stock is evaluated, are

2   there any other changes that have occurred while

3   you've been an investment adviser to the RPOC

4   committee?

5           MR. MATTSON:  With respect to the way

6        CREF stock is evaluated?

7           MR. APKING:  Yes.

8           THE WITNESS:  So I'll say again, I -- I

9        didn't do the actual evaluation.  So there's a

10        team that does that.  And so I -- I can't

11        speak to, have they changed other things.

12        Those are the ones I know about.

13   BY MR. APKING:

14       Q.    So if we look on Page 12, the investment

15   evaluation/scoring system, this is the way CREF

16   stock -- the CREF stock account has been analyzed to

17   the RPOC, subject to the changes you just described?

18       A.    It was initially analyzed this way, and

19   then it went to the evolved way, where it's -- it

20   doesn't have the points -- the raw score tallied

21   that's described on Page 13.

22       Q.    When did that change?

23       A.    I think that was in '14.

24       Q.    How did CAPTRUST perform investment

25   evaluations with respect to the TIAA real estate

Page 144

1  account?

2       A.    So, again, I -- I have not the closest

3  look into how we do the actual analysis, because

4  it's done by an analyst team, but it's the same mix

5  of quantitative and qualitative.

6       Q.    Better reflected on Appendix B?

7       A.    So one of the issues with the TIAA real

8  estate account is that it -- it also has a very,

9  very small peer group, and it also is a difficult --

10  it -- it doesn't have a widely known -- widely

11  available benchmark.  And so we use a custom

12  benchmark to evaluate TIAA real estate, and we look

13  at -- we don't think there's a significant peer

14  group as well.

15       Q.    Are there any other investments within

16  the plans that you create custom benchmarks for

17  outside of CREF stock account and TIAA real estate?

18       A.    That we create custom benchmarks for

19  besides those two?  I don't think so.

20       Q.    Do you know how the custom -- strike

21  that.

22            Do you know what the custom benchmark is

23  made up for with respect to the CREF stock account?

24       A.    Yes.  It's the -- 70 percent domestic

25  equity, 30 percent ACWI ex-U.S., ACWI ex-U.S.  So

Page 145

1    70 percent domestic all cap, 30 percent

2    international, with 10 percent of that 30 being

3    emerging markets.

4         Q.    Do you know when the first time that

5    custom benchmark was used to evaluate the CREF stock

6    account?

7         A.    Probably in '14.

8         Q.    Do you know what the custom benchmark is

9    for TIAA real estate?

10        A.    It's an acronym, NCREIF.  It's a -- I

11   don't know what the acronym means, but it's a

12   benchmark made of private real estate holdings.

13        Q.    Is it 100 percent of the NCREIF?

14        A.    I don't know if I understand that

15   question.  Could you repeat it?  Is what

16   100 percent?

17        Q.    Sure.  The benchmark -- the NCREIF, is

18   it discounted at all as a benchmark?

19        A.    I don't know what that means either.

20   When you say  discounted  -- meaning, like, the

21   other one is a blended benchmark for CREF stock?

22        Q.    Sure.  So do you say it's 95 percent of

23   the NCREIF?

24        A.    Oh.  We use that 100 percent.  Sorry.

25        Q.    Is the performance data for the TIAA

Page 257

1    STATE OF NORTH CAROLINA

2    CABARRUS COUNTY

3                    REPORTER'S CERTIFICATE

4              I, Cindy A. Hayden, a Notary Public in

5    and for the State of North Carolina, do hereby

6    certify that there came before me on Thursday, the

7    9th day of August, 2018, the person hereinbefore

8    named, who was by me duly sworn to testify to the

9    truth and nothing but the truth of his knowledge

10   concerning the matters in controversy in this

11   cause; that the witness was thereupon examined

12   under oath, the examination reduced to typewriting

13   under my direction, and the deposition is a true

14   record of the testimony given by the witness.

15             I further certify that I am neither

16   attorney or counsel for, nor related to or employed

17   by, any attorney or counsel employed by the parties

18   hereto or financially interested in the action.

19             IN WITNESS WHEREOF, I have hereto set

20   my hand this the 13th day of August, 2018.

21

22             *Cindy A Hayden*

23             Cindy A. Hayden, Notary Public

24             Notary Public #20020910053

25

# Exhibit 12



 CAPTRUST

## RETIREMENT PLAN ADVISORY SERVICES AGREEMENT
### (Non-Discretionary)

This Retirement Plan Advisory Services Agreement (the "Agreement") entered into by **Cornell University** ("Client") and **CAPFINANCIAL PARTNERS, LLC**, d/b/a, CAPTRUST Financial Advisors, ("CAPTRUST" or "CAPTRUST Financial Advisors"), a North Carolina limited liability company. Client retains CAPTRUST to provide the Services (as described below) in its capacity as an Investment Adviser firm registered with the Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940, as amended, (the "Advisers Act") for Client's **Cornell University Retirement Plan for the Employees of the Endowed College, Retirement Plan for Faculty and Exempt Employees of Weill Cornell Medical College, Cornell University Tax Deferred Annuity Plan, and Weill Cornell Medical College Tax Deferred Annuity Plan** (the "Plans"). In addition, CAPTRUST is a member of FINRA and Securities Investors Protection Corporation ("SIPC").

**Investment Advisory Services**

**CAPTRUST will provide the following service(s) (the "Services") to Client for the Plans:** *(please check appropriate services)*

☒ **Investment Advisory Consulting**
- Plan Level Advice
- Investment Menu Development
- Ongoing Investment Due Diligence

☒ **Vendor Analysis**
- Vendor Analysis, Benchmarking, & Scoring
- Plan Administration & Investment Cost Comparison
- Overall Recommendation & Ongoing Due Diligence

☐ **Executive Financial Planning**
- Annual Financial Review
- Allocation & Investment Recommendations
- Continuous Goal Monitoring & Evaluation

☐ **Participant Education & Advice**
- One-On-One Group Enrollment Meetings
- Investment Education Seminars
- Dedicated Participant Advice Line & Website

☒ **Documentation/Process Management**
- Real-Time Access to Industry Research
- Electronic Repository of Key Plan Documents

☐ **Non-Qualified Deferred Compensation Consulting**
- Plan Design
- Plan Financing
- Plan Administration/Trust Services
- Investment Menu Selection/Due Diligence
- Highly compensated Employee Education & Investment Advice

CAPTRUST will provide specific investment advice to Client in respect to the Plans; however, Client acknowledges that it has retained, and will exercise, final decision-making authority and responsibility for the implementation of any recommendations made to the Client by CAPTRUST. CAPTRUST will serve as a fiduciary as defined by ERISA §3(21)(A)(ii) with regard to the selection of investment manager(s) or mutual fund(s) available to the Plans within the platform provided by the Plan's Administrator. Notwithstanding the preceding to the contrary, CAPTRUST shall have no duties of any kind regarding the following assets held by the Plans: (i) any stock of, any equity interests of any kind in, or any debt of, the Client or a company related to the Client (collectively, "Client Stock"); and/or (ii) any assets allocated to self-directed brokerage accounts ("Self-Directed Brokerage Assets"), that may be held by the Plans or that may be considered as an investment for the Plans. In particular and not in limitation of the foregoing, CAPTRUST shall have no duties regarding the analysis, purchase, sale, retention, or valuation of any Client Stock or any Self-Directed Brokerage Assets; nor shall it take into account any Client Stock or any Self-Directed Brokerage Assets in providing the Services. Any Client Stock and any Self-Directed

Brokerage Assets shall be disregarded in determining the Fees payable to CAPTRUST based upon Plan assets. For this purpose, Self-Directed Brokerage Assets include any assets of the Plan that are invested at the direction of the participant or his or her adviser through a separate brokerage account, sometimes called a "brokerage window," or any similar arrangement whereby the assets of the Plan attributable to a participant are segregated from the normal investment funds of the Plan and invested at the direction of the participant or his or her adviser.

## Fees

CAPTRUST shall not be compensated on the basis of a share of capital gains upon or capital appreciation of the funds or any portion of the funds of the Client; rather, the fees to be paid to CAPTRUST for the Services (the "Fees") shall be determined as follows:

Year 1: $165,000 flat annual fee

Year 2 and ongoing: $125,000 plus an annual adjustment of 5%

*Any fees received by CAPTRUST from the investment companies selected by Client for the Plan's accounts will reduce the amount of the Fees otherwise due CAPTRUST.*

Fees are annual and will be payable quarterly, in advance, at the beginning of each calendar quarter. Upon termination of this Agreement, Fees shall be prorated for the applicable calendar quarter through the effective date of termination.

Client authorizes CAPTRUST to collect payment in the following manner:

☒ Invoice Client

☐ Invoice record keeper/administrator for payment from Plan assets

☐ Other: N/A

Client's execution of this Agreement may authorize the custodian of Plan's account(s) to debit such account(s) for the amount of CAPTRUST's Fees and to remit those amounts directly to CAPTRUST.

## Client Information

Client will provide or will cause to be provided to CAPTRUST all pertinent information regarding the Plan's investment objectives, risk tolerances, asset allocation, historical performance, income and liquidity requirements, and any other relevant matters that may from time to time be requested by CAPTRUST. CAPTRUST may rely on the information provided without further verification. If the Plan's needs or objectives change so that the information previously provided is no longer accurate or complete, Client agrees to promptly notify CAPTRUST, in writing, about such changes and to provide the updated information. It is understood and agreed that CAPTRUST shall not be responsible for any delay or failure in providing Services if such delay or nonperformance is caused or contributed to by Client's failure to timely provide the necessary information to CAPTRUST. Information relating to the Services provided under this Agreement may be transmitted electronically and each party shall be required to take normal and customary security precautions to protect the privacy of any information communicated by such means.

## Indemnification/Insurance

Except where attributable to a breach of its obligations under this Agreement or the negligence or willful misconduct of the party otherwise to be indemnified, each party shall indemnify and hold the other harmless from and against any and all third party loss, damage, and expense (including reasonable attorney's fees, court costs, and other defense costs) that results from the indemnifying party's: (i) breach of this Agreement; or (ii) negligence or willful misconduct. All obligations to defend, indemnify, and hold a party harmless shall extend to that party's members, officers, directors, employees, agents, shareholders, parent, affiliates, and the officers, directors and agents of any corporate shareholder of the party. These indemnification obligations shall survive a termination of the Agreement.

If a party to be indemnified pursuant to these indemnification obligations (the "Indemnitee") receives any summons or any other written official or unofficial notice or threat of litigation alleging that Indemnitee and/or Indemnitor may be liable for any matter covered by this Section, it shall promptly notify the indemnifying party (the "Indemnitor"). If litigation is instituted against an Indemnitee with respect to an

**DJA110**

indemnified matter, the Indemnitor shall have the right, within ten (10) business days after having received that notice, to select counsel which will represent that Indemnitee in connection with the litigation, provided that such counsel is reasonably acceptable to that Indemnitee. If counsel is not timely selected by the Indemnitor, the Indemnitee shall have the right to select its own counsel, whose reasonable fees and expenses shall be paid/reimbursed by the Indemnitor, as its obligations may be pursuant to this Section. The Indemnitor may pursue any litigation to a final determination by a court of competent jurisdiction, and expressly reserves the right, at its sole discretion, to appeal from any adverse judgment or order. Neither Indemnitor nor Indemnitee shall have the right to settle, compromise, or consent to any claim involving an indemnified matter without the other party's express written approval. If the Indemnitee rejects a proposed settlement or compromise which the Indemnitor is prepared to accept (so long as such proposed settlement or compromise (a) consists only of monetary damages, which will be paid in full by the Indemnitor, as the sole proposed relief, and (b) includes, as an unconditional term thereof, the giving by the claimant or the plaintiff to the Indemnitee of a release, in form and substance reasonably satisfactory to the Indemnitee, from all liability in respect of such claim), then that Indemnitor shall only be liable for the amount of the settlement or compromise rejected by the Indemnitee and all costs and expenses incurred up to the date of that rejection, and, thereafter, the Indemnitee shall be solely responsible for the litigation or settlement relating to the indemnified matter.

Continuously throughout the term of this Agreement: (i) CAPTRUST shall maintain professional liability (errors and omissions) insurance with coverage of $5,000,000/$5,000,000; and (b) Each party shall maintain commercial general liability insurance with coverage of not less than $1,000,000, combined single limits, with client able to meet this requirement through a program of self insurance. The amount and coverage of such insurance shall not be construed to limit CAPTRUST's liability nor relieve it of any other obligation under this Agreement.

## 5. Limitations

This Agreement only governs the Services and Fees described in this Agreement, and it shall not affect or be applicable to any other services provided to Client or any related person or entity by CAPTRUST (or any other affiliated company of CAPTRUST) pursuant to separate agreement or understanding.

Client acknowledges that CAPTRUST performs investment advisory services for various other clients and may give advice and take action in the performance of its duties with respect to any of its other clients that may differ from the advice given or action taken with respect to Client and the Plans.

## 6. Warranty/Limitation of Liability

CAPTRUST warrants that it is qualified to provide the Services and that all of the Services shall be performed in accordance with all applicable standards in the industry and all applicable governmental regulations (including, but not limited to, ERISA). Any information provided by CAPTRUST which has been obtained, computed, formatted, or displayed by outside sources is believed to be accurate but may not have been independently verified by CAPTRUST and cannot be guaranteed. Investments are subject to various market, political, currency, economic, and business risks, and may not always be profitable. CAPTRUST cannot guarantee financial results and any information provided by it regarding past performance cannot guarantee future results. THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) RELATING TO THE SERVICES. EXCEPT WITH RESPECT TO AMOUNTS PAYABLE BY A PARTY PURSUANT TO ITS INDEMNITY OBLIGATIONS UNDER SECTION 4 OF THIS AGREEMENT, NEITHER PARTY, UNDER ANY CIRCUMSTANCES, SHALL BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR SIMILAR DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT. Client acknowledges that: (i) the Fees charged by CAPTRUST reflect the agreed upon allocation of risks between the parties as contemplated by this Agreement, including, but not limited to, the limitation of liability described above; and (ii) a modification of this allocation of risks would affect those Fees.

3

## 2. Representations

CAPTRUST represents that it is a registered investment adviser under the Advisers Act. In addition, CAPTRUST, in its capacity as a broker dealer, is a member of FINRA and Securities Investors Corporation.

Each party warrants that: (i) it is authorized and empowered to enter into this Agreement; (ii) the person(s) signing in a representative capacity on its behalf is duly authorized to sign this Agreement; and (iii) this Agreement constitutes its valid and binding obligations and is enforceable as against it in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting generally the enforcement of creditor's rights and the discretion of a court to grant specific performance of contracts.

Client represents that the retention of CAPTRUST as an investment advisor in respect of the Plans is permitted by the documents comprising the Plans and any related trust and agrees to provide such supporting documentation (including amendments thereto which may be implemented from time to time) as may be reasonably required by CAPTRUST.

## 8. Termination

Client or CAPTRUST may terminate this Agreement with or without cause upon 30 days' prior written notice given to the other. Such termination will become effective upon the expiration of such 30-day period. Client shall deliver any such written notice of termination to CAPTRUST at CAPTRUST's principal address. Termination will not affect Client's responsibilities under this Agreement for Fees owed as a result of Services rendered or costs incurred by CAPTRUST through the effective date of termination. Upon termination, CAPTRUST will have no further obligation under this Agreement to act or advise Client with respect to Client's assets or the Plans.

## 9. Miscellaneous

This document (together with any attached exhibits and documents incorporated into this document) constitutes the entire agreement between the parties on this subject matter and supersedes any and all prior agreements, arrangements and understandings, whether written, oral, electronic, or otherwise, between the parties. No modification of this Agreement shall be binding unless in writing and signed by the party against which it is sought to be enforced. No waiver of any right or remedy shall be enforceable unless it is in writing and signed by all of the parties in interest that may be adversely affected by such waiver and, in any event, shall not operate as a waiver of any other right or remedy or of the same right or remedy, on a future occasion. Neither Client nor CAPTRUST may assign this Agreement without consent of the other party. Notwithstanding the foregoing, each party has the right without the consent of the other party to assign this Agreement, or delegate obligations, to any Affiliate (as that term is interpreted under Rule 12b-2 of the Securities and Exchange Act of 1934, as amended) as part of an internal reorganization. Client acknowledges and agrees that transactions that do not result in a change of actual control or management of CAPTRUST shall not be considered an assignment pursuant to Rule 202(a)(1)-1 under the Advisers Act. This Agreement shall be binding upon and shall inure to the benefit of the parties and their successors and permitted assigns. This Agreement shall be construed in accordance with the laws of North Carolina without giving effect to its conflict of laws principles. This Agreement shall be construed as having been drafted by both parties, jointly, and not in favor of or against one party or the other. All words and phrases in this Agreement shall be construed to include the singular or plural number, and the masculine, feminine, or neuter gender, both as the context requires. This Agreement may be executed in two (2) or more counterparts as the parties may desire and each counterpart shall constitute an original. Each party will execute and deliver all additional documents and do all other acts as may be reasonably necessary to carry out the provisions and intent of this Agreement. Nothing in this Agreement shall be deemed or construed to constitute or create a partnership, association, joint venture, or agency between the parties. In any action or proceeding brought to enforce any provision of this Agreement, or where any provision of this Agreement is validly asserted as a defense, the successful party shall be entitled to recover reasonable attorneys' fees from the unsuccessful party, in addition to any other available remedy. For any legal actions relating to this Agreement the parties consent to the exclusive, personal jurisdiction by the courts of New York and to venue in Tompkins County, New York and waive any objection thereto. All written notices required under this Agreement shall be addressed to the appropriate addresses noted in this document or as otherwise noted in writing in accordance with this provision, and shall either be: (a) personally served; (b) delivered by a nationally recognized overnight

4

express delivery service (deemed received the next business day); or (c) posted by certified United States mail, postage prepaid, return receipt requested (deemed received three (3) business days after posting). If any part of this Agreement is found to be invalid or unenforceable, it will not affect the validity or enforceability of the remainder of the Agreement. This Agreement shall not be binding on CAPTRUST until accepted by it, in writing, as indicated by its signature below.

## 10. Mediation

This Agreement contains a non-binding mediation clause.

Except where injunctive relief is sought (in which case a civil lawsuit may be filed), all controversies or disputes which may arise between Client and CAPTRUST and/or their respective affiliated entities arising out of or related to this Agreement or any other prior or subsequent agreement between the parties (each, a "Dispute") must be submitted to mediation as contemplated below. The parties shall, in good faith, attempt to settle any such Dispute by mediation before resorting to litigation or some other dispute resolution procedure and a party's good faith participation in mediation will be an express condition precedent to that party's pursuing any litigation or other dispute resolution procedure.

The mediation will be administered by the American Arbitration Association (the "Association") under its Commercial Mediation Procedures and either party may commence the mediation process by providing the Association and the other party with a written request, setting forth the subject of the Dispute and the relief requested (the "Initiating Notice"). The initial mediation session shall be held within thirty (30) days after the Association's receipt of the Initiating Notice in Ithaca, New York and then administered by the Association's office in that city. The mediation shall be conducted by a single mediator mutually acceptable to the parties, or, in the event the parties are unable to agree upon a single mediator, by a single mediator appointed by the Association.

All offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts, and/or attorneys and by the mediator or any Association employees are confidential, privileged, and inadmissible for any purpose, including impeachment, in any litigation or other dispute resolution procedure involving the parties; provided, however, that any evidence which is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

The provisions of this section may be enforced by any Court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including reasonable attorneys' fees, to be paid by the party against whom enforcement is ordered. Otherwise, the cost of the mediation (other than a party's attorneys' fees, which shall be its sole responsibility) shall be ratably borne by the parties to the proceeding. If a court action seeking injunctive relief is filed, such action shall be confined and limited to an action for injunctive relief only until such time as the mediation is concluded.

## 11. Disclosure Brochure/Privacy Policy

As required by Rule 204-3(b) under the Advisers Act, by signing below, Client acknowledges receipt of the CAPTRUST Form ADV, Part II (the Disclosure Brochure which contains CAPTRUST'S Privacy Policy) not less than 48 hours prior to its signing this Agreement. *(Please refer to the Disclosure Brochure for the entire Privacy Policy. Clients may call (800) 967-9948 with any questions.)* If Client has not received that Disclosure Brochure at least 48 hours prior to entering into this Agreement, Client may terminate this Agreement, without penalty, by giving written notice of that termination to CAPTRUST within five business days after signing this Agreement. The Privacy Policy requires that CAPTRUST obtain your permission to include your company name/logo on any CAPTRUST Marketing Materials such as a Representative Client List. Client agrees to permit CAPTRUST to include its company name/logo in an electronic "Representative Client List" (which is a electronic, closed circuit display screen located in CAPTRUST's home office) and other CAPTRUST print marketing materials. Client understands that the listing of this information is not intended to be the Client's "testimonial" and will not be represented by CAPTRUST as a reference or endorsement of the investment advisory, consulting, or client services provided by CAPTRUST.

5

## 12. Acknowledgement & Acceptance

**Cornell University**

By: _[signature]_

Name/Title: Mary Opperman, Vice President, Human Resources & Safety Services

Address: **130 Day Hall**
**Ithaca, NY 14853-2801**

Date: *November 29*, 2011

*Client's execution of this Agreement shall be deemed a contract offer, which shall not be deemed accepted by CAPTRUST until this Agreement is executed by CAPTRUST and a counterpart original of the executed Agreement returned to Client.*

**ACCEPTED BY:**

CAPFINANCIAL PARTNERS, LLC

By: _[signature]_
Name/Title: Denise M. Buchanan, CCO
Address: Attn.: Compliance
4208 Six Forks Road, Ste. 1700
Raleigh, North Carolina, 27609
Date: Dec 8, 2011

F:\n\...\rcd\CapTrust\AdvisoryServices\Contracts Cornell\RPA\4^4-5) doc

6

# EXHIBIT A

Page 1

1                    CASEY CUNNINGHAM

2

3                     PLAINTIFF

4                       VS.

5        CORNELL UNIVERSITY, ET AL

6

7                    DEFENDANTS

8

9

10        VIDEO DEPOSITION OF

11

12               TY MINNICH

13

14

15          OCTOBER 3, 2018

16

17

18            CONFIDENTIAL

19

20

21

22

23

24

DJA116

Minnich deposition transcript page 98 filed under seal

1  cannot map assets in the RA contract.  It is their

2  contention that their individual contracts that have

3  to be mapped at the direction and discretion of the

4  participant because the contract in TIAA's view is

5  between the participant and the individual.

6       Q    Are you aware of any circumstance in which

7  a plan fiduciary has mapped the assets held by TIAA,

8  despite TIAA's position?

9       A    I am not aware of any.

10      Q    Have you ever advised a retirement plan

11  that, not withstanding TIAA's position, it is

12  possible to map assets subject to an RA contract?

13      A    I have not.

14      Q    You say in your report that a highly

15  effective boots on the ground educational campaign

16  can result in 60 to 80 percent of the active plan

17  participants moving their retirement assets out of

18  TIAA Legacy products and into superior investment

19  options.

20           Now, first, in using the phrase

21  superior investment options, again, you are not

22  providing an opinion as to the relative merits of

23  investment options today, are you?

24      A    That is correct.

1    Mercer, to $172,051 being paid to Cal Tech, plus

2    another 87,859 being paid to Mercer Investment

3    Consulting, to 25,989 being paid to Grant Thorton,

4    and then another $15,302 being paid to Traci Sexton

5    Communications.  That's equal to $508,000, right?

6              MR. ROHLF:  Objection to form.

7         A    Yes.

8         Q    (By Mr. Netter) Okay.  Do you have any

9    interpretation of the 5500 that would explain why

10   the amount of the direct compensation paid in Column

11   D would be equal to the amount that was paid by TIAA

12   out of revenue credits for plan administrative

13   expenses?

14        A    Let me just review an auditor's note that

15   I referenced.

16             Okay.  And the question?

17        Q    Do you have any interpretation of the 5500

18   that would explain why the amount of the direct

19   compensation paid in Column D would be equal to the

20   amount that was paid by TIAA out of revenue credits

21   out of the plan?

22        A    Do I have any reason to believe?  How did

23   you open the question?

24        Q    My question is, is there any way to

1    interpret the 500 that would explain how the

2    $507,000 referenced as the amount TIAA paid in plan

3    administration expenses is anything other than the

4    amounts that we just went through in Column D?

5         A    No, I have no reason to believe that.

6              MR. ROHLF:   Objection to form.

7         Q    (By Mr. Netter) You have no reason to

8    believe what?

9         A    That it is any different than what you

10   just --

11        Q    Okay.  You reference also you had done

12   calculation in your rebuttal report to look at the

13   amount that had been rebated to the plan; is that

14   right?

15        A    Correct.

16        Q    Okay.  I'm going to give you an exhibit

17   that I've marked as Exhibit 209.

18                        (Deposition Exhibit Number 209

19                        marked for identification.)

20        Q    (By Mr. Netter) You shouldn't recognize

21   this because I made it myself.

22                   This is, I hope, going to help us go

23   through some of the numbers here.  If you look at

24   the auditor's note on plan servicing credit of 2013,

1                       marked for identification.)

2        Q     (By Mr. Netter)  That's going to be Exhibit

3    214.  I'm not 100 percent certain this is the

4    document that you referenced.

5                       Are you familiar with the document

6    that I just marked as Exhibit 214?

7        A     Yes.

8        Q     Okay.  Let me draw your attention to the

9    bullet points in the middle of the page.  This

10   identifies five retirement plans that are affected

11   by this document; is that right?

12       A     Yes.

13       Q     Now, the calculations that you performed

14   was you said it was the Harvard Plans 2016 Form

15   5500.  Do you know which of these five plans you

16   evaluated?

17       A     I need to look at the 5500 forms.

18       Q     Do you know any reason why you looked at

19   only one of the five plans?

20       A     I don't know that I did.

21       Q     If you look in the footnote, it says,

22   multiply the recordkeeping fee by $805 million and

23   divide that by 17,058 participants?

24       A     Correct.

Page 160

1    that right?

2         A    That's correct.

3         Q    If you turn to page two of this document.

4    Line 6G says that the number of participants with

5    account balance at the end of the year was 17,058;

6    is that right?

7         A    Yes.

8         Q    If you turn to the notes for the financial

9    statements in the back and go to page four of those

10   notes.  You see that the assets available for

11   benefits at the end of the year was $805,752,113,

12   right?

13        A    Yes.

14        Q    So it looks like your methodology to

15   multiply the total amount of assets in this

16   particular plan by 3.8 basis point and divide it by

17   the total number of participants in this plan; is

18   that right?

19        A    That's correct.

20        Q    Did you replicate that analysis with any

21   of Harvard's other plans to see if it comported with

22   your understanding of Harvard's participant fee?

23        A    I did not.

24        Q    Okay.  Let's take a look at one of the

Page 161

1    other Harvard plans then.

2                      (Deposition Exhibit Number 216

3                      marked for identification.)

4        Q      (By Mr. Netter) I'm going to hand you what

5    has been marked as Exhibit 216, which is the 5500

6    for the retirement income plan for teaching faculty

7    of Harvard University.

8                 If you look at the second page of

9    this document, line 6G, the number of participants

10   in this plan is how many?

11       A      8,362.

12       Q      Okay.  If we go back to the notes of the

13   financial statements and look at page three, can you

14   tell me what were the net assets available for

15   benefits at year end 2016?

16       A      1.4.

17       Q      That's $1.4 billion, right?

18       A      Correct.

19       Q      If we multiply $1.4 billion times 3.8

20   basis points, do you know what that number is?

21       A      I can if I multiply it, I will let you do

22   the math.

23       Q      You have a calculator in front of you.  So

24   feel free to use that calculator.

Page 162

1            I get $536,087, does that sound about

2    right to you?

3        A    Yeah.

4        Q    Okay.  If we divide that then by the 8,362

5    participants in the plan, that would be following

6    the same methodology that you used for the other

7    Harvard plan, right?

8        A    Yes.

9        Q    So applying that methodology for the

10   retirement income plan for teaching faculty, you

11   would get $64 per participant per year; is that

12   right?

13       A    The math is correct.

14       Q    Let me ask you to go back to the document

15   we marked as Exhibit 214.

16            If you turn to the second page.

17   There's a section that says the new TIAA fee

18   structure and then it says, heading one, Plan

19   Servicing Fee.

20            Do you see that?

21       A    Yes.

22       Q    Before the bolded text it says, there are

23   costs related to administration of your retirement

24   program, including recordkeeping, legal, accounting

# EXHIBIT E

Page 1

1           CASEY CUNNINGHAM

2

3

4              PLAINTIFF

5

6                VS.

7

8      CORNELL UNIVERSITY, ET AL

9

10

11             DEFENDANTS

12

13

14       VIDEO DEPOSITION OF

15

16              AL OTTO

17

18

19         OCTOBER 10, 2018

20           CONFIDENTIAL

21

       VERITEXT LEGAL SOLUTIONS
22       MID-ATLANTIC REGION

23    1250 Eye Street NW - Suite 350

24      Washington, D.C.  20005

CONFIDENTIAL

Page 124

1    need to address it separately so that the people who

2    are using it are the ones that pay for it.

3         Q    (By Mr. Netter) Now, you say that

4    Harvard's plan is smaller than Cornell's; is that

5    right?

6         A    That's what I said, a third of the assets.

7         Q    Were you surprised to hear that Harvard

8    had such a small plan?

9         A    Not particularly, why.

10         Q    You don't have any expectation about

11    Harvard being a large universities?

12         A    Well, it is, I don't expect it to be the

13    size of a, like a major state university, no.  It is

14    hard to get in.  It is a smaller set of people.

15         Q    Let me show you what I have marked as

16    Exhibit 259.

17                        (Deposition Exhibit Number 259

18                         marked for identification.)

19         Q    (By Mr. Netter) Do you recognize Exhibit

20    259?

21         A    I have seen this.  They have four, yes, I

22    have seen this.

23         Q    So you were just saying they have four

24    plans?

Page 125

1          A       That's what it says here.

2          Q       Did you look at any plans other than the

3    Harvard University retirement plan?

4          A       No, I looked at the Harvard University

5    retirement plan.

6          Q       How did you select the Harvard University

7    retirement plan, which is the third plan listed on

8    this list?

9          A       Because they clearly have a recordkeeping

10   fee stated both for Fidelity and for Vanguard.

11         Q       I'm asking a different question.  I'm

12   asking among the four plans that are subject to this

13   disclosure that you identified, why did you look at

14   the Harvard University retirement plan to assess the

15   size of Harvard's plans?

16         A       I did not use that to assess the size of

17   Harvard's plans.  I used this as an example that

18   showed that one can operate the plan as I have

19   given.

20         Q       Well, you say here that Harvard has about

21   half of the participants and one third of the assets

22   of the Cornell plans?

23         A       Uh-huh.

24         Q       Your footnote there cites the fee

# Cornell Motion for Summary Judgment Exhibit 59

Message

| | |
|---|---|
| **From**: | Warner, Patrick [Patrick.Warner@fmr.com] |
| **Sent**: | 9/7/2010 9:38:59 AM |
| **To**: | J Paul Bursic [/O=CORNELL UNIVERSITY/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jpb22]; Mary D'Ambrosio Zielinski [/O=CORNELL UNIVERSITY/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Mfd7] |
| **CC**: | Borio, Rich D [Rich.Borio@fmr.com]; Vartabedian, Raffi [Raffi.Vartabedian@fmr.com]; Mutter, Lauren [Lauren.Mutter@fmr.com]; Giesen, William [william.giesen@fmr.com]; Cornett, Erin [erin.cornett@fmr.com] |
| **Subject**: | RE: Fidelity Institutional K Share Class Implementation for Cornell University Employees |
| **Attachments**: | FidelityKsharesList.ppt |
| | |
| **Importance**: | High |

Paul

Please find attached, a listing of the 29 Fidelity Mutual Funds and
Freedom Funds that Fidelity offers a lower K Share Class to investors.
The presentation shows the current expense ratio of the fund, as well as
the lower K Share expense ratio they will pay after the conversion.  We
will be making all K Share Funds available to Cornell University
employees on 12/8/10.

Erin will be drafting the Letter of Direction to make these changes and
send to you and Mary shortly for sign-off.

Please let me know if you have any questions.

Regards,
Patrick

-----Original Message-----
From: J Paul Bursic [mailto:jpb22@cornell.edu]
Sent: Friday, September 03, 2010 4:15 PM
To: Warner, Patrick; Mary D'Ambrosio Zielinski
Cc: Borio, Rich D; Vartabedian, Raffi; Mutter, Lauren; Giesen, William;
Cornett, Erin
Subject: RE: Fidelity Institutional K Share Class Implementation for
Cornell University Employees

Thank you, Patrick.  This is very good news.  Yes we all are becoming
much more sensitive to fees in our retirement plans.  So, we thank
Fidelity for advancing plans to move us into a lower cost class of
investors.  Can we see a listing of the funds affected reflecting the
fee structure we are paying and the current level of the category you
propose?

Paul

-----Original Message-----
From: Warner, Patrick [mailto:Patrick.Warner@fmr.com]
Sent: Friday, September 03, 2010 11:14 AM
To: Mary D'Ambrosio Zielinski; J Paul Bursic
Cc: Borio, Rich D; Vartabedian, Raffi; Mutter, Lauren; Giesen, William;
Cornett, Erin
Subject: Fidelity Institutional K Share Class Implementation for Cornell
University Employees
Importance: High

Mary & Paul

I hope all is well in Ithaca.  I am sure campus is booming with the
return of the students for another exciting year.

Based on our conversations over the past several months, I have been
working diligently with our Finance and Implementation Teams, and am
pleased to announce that Fidelity will be making our lower cost,
Institutional K Share Class available to Cornell University employees
for the 29 Fidelity Mutual Funds that offer these lower cost

DJA130

alternatives, as well as the Fidelity Freedom Funds.  These changes provide employees with enhanced savings opportunities, as they will have access to the same funds and portfolio managers, but at a lower fund expense ratio.

Recent market events continue to reflect an unprecedented challenge to do more with less.  Today, I know you are looking to work with providers that can act as extension of your organization and fully serve all of your needs in the most efficient and effective way possible including to ensure full optimization of the services available with a strong focus on engaging employees and providing the guidance to drive financial success.

There has been, and continues to be, a significant focus and scrutiny in the industry regarding the expenses/fees plan sponsors and participants pay in their defined contribution plans.  Add on top the mounting pressures you are facing to find ways to reduce cost in your benefits program.  At Fidelity we are focused on bringing you the resources, innovation, perspective and strategies to help you make the most of your benefit plan and drive success for you and your employees.

We will be transitioning your employees to the new share class at the next available implementation date of 12/8/10.  An Implementation Project Manager, Erin Cornett, has been assigned to complete this initiative, and Raffi Vartabedian from our Communications Team will be drafting the notice to employees in Lauren's absence.

Below are details of the Institutional K Shares for your information:

What is Fidelity's Class K Offering:
*       New retirement share class of 29 select Fidelity mutual funds
*       Lower fund expenses compared to current non-K, non-advisor share class of funds
*       Same portfolio management and investment objectives as related non-k, non-advisor share class
*       Carry over track record performance from the non-K, non-advisor share class

What is Fidelity's Freedom K Offering:
*       New Target Date Fund Series from Freedom K Income to Freedom K 2050
*       Lower fund expenses compared to current Freedom Fund Series
*       In many cases same underlying funds, asset allocation and rolldown as the Freedom Fund Series
*       No carry over of performance history due to Freedom K being a new fund series and not a class of the existing Freedom Funds

Please let me know if you have any questions.  Erin will be reaching out to Mary shortly to review the project timeline and we will be providing sample employee communications as well.

Have a great Labor Day Weekend.

Regards,

Patrick

Patrick T. Warner
Vice President, Managing Director
Retirement Services
Tax-Exempt Market/Plan Sponsor Services

Fidelity Investments
245 Summer Street, V6B
Boston, MA 02210
Tel: 508-787-7642
Fax: 508-490-6966
Patrick.Warner@fmr.com

Notice:  All e-mail sent to or from Fidelity Investments is subject to retention, monitoring and/or review by Fidelity personnel. Please note that Fidelity is unable to accept orders left over voicemail or email regarding any account.

Confidential                                **DJA131**                                CORNELL021638_0002

The information in this e-mail and in any attachments is intended solely
for the attention and use of the named addressee(s) and may contain
information that is considered privileged, proprietary, confidential,
and/or exempt from disclosure under applicable law.  If you are not the
intended recipient of this email or if you have otherwise received this
email in error, please immediately notify me by replying to this message
or by telephone (you may call me collect).   Any use, dissemination,
distribution or copying of this e-mail is strictly prohibited without
authorization from Fidelity Investments.
Clearing, custody or other brokerage services may be provided by
Fidelity Brokerage Services LLC or National Financial Services LLC,
members NYSE, SIPC.

**DJA132**

CORNELL021638_0003

# Fidelity Class K Fund List

| Fund Name | Morningstar Category | Non-K, Non-Advisor Class Gross Expense Ratio | Class K Gross Expense Ratio | As of Date (Date of Prospectus) |
|---|---|---|---|---|
| Fidelity Balanced Fund | Moderate Allocation | 0.68% | 0.50% | 10/30/2009 |
| Fidelity Blue Chip Growth Fund | Large Growth | 0.76% | 0.53% | 10/09/2009 |
| Fidelity Capital Appreciation Fund | Large Growth | 0.79% | 0.55% | 12/30/2009 |
| Fidelity Contrafund® | Large Growth | 1.02% | 0.66% | 03/01/2010 |
| Fidelity Disciplined Equity Fund | Large Blend | 0.84% | 0.61% | 12/30/2009 |
| Fidelity Diversified International Fund | Foreign Large Growth | 1.01% | 0.77% | 01/18/2010 |
| Fidelity Dividend Growth Fund | Large Blend | 0.62% | 0.40% | 10/09/2009 |
| Fidelity Emerging Markets Fund | Diversified Emerging Mkts | 1.16% | 0.91% | 12/30/2009 |
| Fidelity Equity Income Fund | Large Value | 0.74% | 0.54% | 04/01/2010 |
| Fidelity Equity Income II Fund | Large Value | 0.75% | 0.56% | 01/29/2010 |
| Fidelity Export & Multinational Fund | Large Growth | 0.91% | 0.67% | 10/30/2009 |
| Fidelity Fund | Large Blend | 0.64% | 0.45% | 08/29/2009 |
| Fidelity Growth & Income Portfolio | Large Blend | 0.78% | 0.56% | 10/09/2009 |
| Fidelity Growth Company Fund | Large Growth | 0.93% | 0.72% | 01/29/2010 |
| Fidelity Growth Discovery Fund | Large Growth | 0.90% | 0.67% | 08/29/2009 |
| Fidelity Growth Strategies Fund | Mid-Cap Growth | 0.88% | 0.60% | 01/29/2010 |
| Fidelity Independence Fund | Large Growth | 0.92% | 0.73% | 01/29/2010 |
| Fidelity International Discovery Fund | Foreign Large Blend | 1.12% | 0.88% | 12/30/2009 |
| Fidelity Leveraged Company Stock Fund | Mid-Cap Blend | 0.92% | 0.71% | 10/09/2009 |
| Fidelity Low-Priced Stock Fund | Mid-Cap Blend | 0.99% | 0.81% | 10/09/2009 |
| Fidelity Magellan® Fund | Large Growth | 0.75% | 0.59% | 05/29/2010 |
| Fidelity Mid-Cap Stock Fund | Mid-Cap Growth | 0.65% | 0.43% | 06/29/2010 |
| Fidelity OTC Portfolio | Large Growth | 1.13% | 0.92% | 10/09/2009 |
| Fidelity Overseas Fund | Foreign Large Blend | 1.02% | 0.78% | 12/30/2009 |
| Fidelity Puritan® Fund | Moderate Allocation | 0.67% | 0.50% | 10/30/2009 |
| Fidelity Stock Selector | Large Growth | 0.87% | 0.65% | 12/30/2009 |
| Fidelity Value Fund | Mid-Cap Value | 0.64% | 0.40% | 12/30/2009 |
| Fidelity Value Discovery Fund | Large Blend | 0.93% | 0.69% | 10/09/2009 |
| Fidelity Value Strategies Fund | Mid-Cap Blend | 0.78% | 0.51% | 01/29/2010 |

For a mutual fund, the expense ratio is the total annual fund or class operating expenses (before waivers or reimbursements) paid by the fund and stated as a percentage of the fund's total net assets. Expense ratios change periodically and are drawn from the fund's prospectus. For more detailed fee information, see the fund prospectus or annual or semiannual reports.

**Before investing in any mutual fund, please carefully consider the investment objectives, risks, charges, and expenses.  For this and other information, call or write Fidelity for a free prospectus or, if available, a summary prospectus.  Read it carefully before you invest.**

For institutional investor use only.  Not for distribution to plan participants.

Fidelity Brokerage Services LLC, Member NYSE, SIPC, 900 Salem Street, Smithfield, RI 02917



497240.7

DJA133

# Fidelity Freedom® Fund and Fidelity Freedom K<sup>SM</sup> Fund Expense Ratio Information

| Fund | Gross Expense Ratio * | Fund | Gross Expense Ratio* |
|------|------|------|------|
| Fidelity Freedom Income Fund® | 0.50% | Fidelity Freedom K<sup>SM</sup> Income Fund | 0.42% |
| Fidelity Freedom 2000 Fund® | 0.51% | Fidelity Freedom K<sup>SM</sup> 2000 Fund | 0.43% |
| Fidelity Freedom 2005 Fund® | 0.64% | Fidelity Freedom K<sup>SM</sup> 2005 Fund | 0.52% |
| Fidelity Freedom 2010 Fund® | 0.67% | Fidelity Freedom K<sup>SM</sup> 2010 Fund | 0.53% |
| Fidelity Freedom 2015 Fund® | 0.68% | Fidelity Freedom K<sup>SM</sup> 2015 Fund | 0.54% |
| Fidelity Freedom 2020 Fund® | 0.74% | Fidelity Freedom K<sup>SM</sup> 2020 Fund | 0.57% |
| Fidelity Freedom 2025 Fund® | 0.76% | Fidelity Freedom K<sup>SM</sup> 2025 Fund | 0.59% |
| Fidelity Freedom 2030 Fund® | 0.79% | Fidelity Freedom K<sup>SM</sup> 2030 Fund | 0.61% |
| Fidelity Freedom 2035 Fund® | 0.81% | Fidelity Freedom K<sup>SM</sup> 2035 Fund | 0.61% |
| Fidelity Freedom 2040 Fund® | 0.81% | Fidelity Freedom K<sup>SM</sup> 2040 Fund | 0.62% |
| Fidelity Freedom 2045 Fund® | 0.82% | Fidelity Freedom K<sup>SM</sup> 2045 Fund | 0.62% |
| Fidelity Freedom 2050 Fund® | 0.84% | Fidelity Freedom K<sup>SM</sup> 2050 Fund | 0.63% |

*As of 5/31/10
See Important Additional Information slide for definition of gross expense ratios.



# Cornell Motion for Summary Judgment Exhibit 60

**To:** Borio, Rich D[Rich.Borio@fmr.com]
**Cc:** Giesen, William[william.giesen@fmr.com]; Mutter, Lauren[Lauren.Mutter@fmr.com]; Warner, Patrick[Patrick.Warner@fmr.com]
**From:** Mary D'Ambrosio Zielinski
**Sent:** Thur 12/23/2010 4:52:28 PM
**Subject:** RE: Vanguard Signal Shares
Vanguard Signal Shares LOD 12-23-10.pdf

Rich:

Paul has signed the LOD for the Vanguard Signal Shares, and I have attached it to this message. I will mail you the original letters today.

Thanks.

Mary

Mary D'Ambrosio Zielinski, Assistant Director, Benefit Services
CORNELL UNIVERSITY, 130 Day Hall, Ithaca, NY 14853
Office: 607-255-9662, Fax:  607-255-6873, mfd7@cornell.edu

-----Original Message-----
From: Borio, Rich D [mailto:Rich.Borio@fmr.com]
Sent: Wednesday, December 22, 2010 10:32 AM
To: Mary D'Ambrosio Zielinski
Cc: Giesen, William; Mutter, Lauren; Warner, Patrick
Subject: RE: Vanguard Signal Shares

Hi Mary, please find the letter of direction attached.  Once complete, feel free to scan/email a soft copy and mail hard copy to:

Fidelity Investments Institutional Operations Company, Inc.
100 Magellan Way, KE22
Covington, KY 41015

I will be emailing you a link to a PSW report containing the participants/balances in these funds as well.

Thanks,

Rich

---

From:  Warner, Patrick
Sent:  Wednesday, December 22, 2010 9:41 AM
To:    Mary D'Ambrosio Zielinski
Cc:    Borio, Rich D; Giesen, William; Mutter, Lauren
Subject:    Vanguard Signal Shares
Importance:    High

Mary

Per our conversation, Vanguard has recently announced that it is removing the $1 million initial investment minimum for its Signal Share Class. Since Signal shares have a lower expense ratio than Investor shares currently offered for three Vanguard Funds in your line-up at Fidelity, you will want to consider converting from the Investor to the Signal Share Class.

The Funds are:

Vanguard Balanced Index - Fund Code OFD8 Vanguard Growth Index - Fund Code OFUE Vanguard 500 Index - Fund Code OFUG

I have included a copy of their Press Release for your review.
<< File: Vanguard Signal Ltr.pdf >>

As Fidelity has numerous clients looking to make this change, we will be offering two conversion dates, one on February 18, 2011 and one on May 20, 2011.  Per our discussion, you would like to move to the lower share class as soon as possible to allow employees access to these cost savings.

Therefore, Rich Borio, will provide you with a Letter of Direction later today to instruct Fidelity to convert from Investor shares to Signal shares effective February 18, 2011.  In order for this change to be effective on this date, we must have the Letter of Direction back to Fidelity by January 14, 2011.

Fidelity Investment Operations will be mailing a communication piece, notifying participants with a balance of the signal share conversion.  Lauren will provide you with a copy of this notice once available.

Please let me know if you have any questions regarding this conversion opportunity.

Regards,
Patrick

Patrick T. Warner
Vice President, Managing Director
Retirement Services
Tax-Exempt Market/Plan Sponsor Services

Fidelity Investments
245 Summer Street, V6B
Boston, MA 02210
Tel: 508-787-7642
Fax: 508-490-6966
Patrick.Warner@fmr.com

Notice:  All e-mail sent to or from Fidelity Investments is subject to retention, monitoring and/or review by Fidelity personnel.
Please note that Fidelity is unable to accept orders left over voicemail or email regarding any account.
The information in this e-mail and in any attachments is intended solely for the attention and use of the named addressee(s) and may contain information that is considered privileged, proprietary, confidential, and/or exempt from disclosure under applicable law.  If you are not the intended recipient of this email or if you have otherwise received this email in error, please immediately notify me by replying to this message or by telephone (you may call me collect).  Any use, dissemination, distribution or copying of this e-mail is strictly prohibited without authorization from Fidelity Investments.
Clearing, custody or other brokerage services may be provided by Fidelity Brokerage Services LLC or National Financial Services LLC, members NYSE, SIPC.

DJA137



**Cornell University**
Division of Human Resources

Paul Bursic, CEBS
Director
Benefit Services
130 Day Hall
Ithaca, NY 14853-2801
t. 607.255.7074
f. 607.255.6873
e. jpb22@cornell.edu
www.ohr.cornell.edu

To:      Rich Borio, Fidelity Investments

From:   Paul Bursic

Date:    December 23, 2010

Re:      **Share Class Conversion of <u>Vanguard Investor Class</u> to <u>Vanguard Signal Class</u>**
         Cornell University Retirement Plan, #73168
         Cornell University Tax Deferred Annuity Plan, #53074 (the "Plans")

This letter relates to the investment options available under the Trust Agreement,
Group Custodial Account Agreement, Service Agreement and/or Recordkeeping
Agreement, as applicable (individually or collectively, the "Agreement") between
Cornell University (the "Sponsor" or "Employer") and Fidelity Management Trust
Company ("FMTC") and/or Fidelity Investments Institutional Operations Company,
Inc. ("FIIOC") and/or Fidelity Employer Services Company LLC ("FESCO")
(collectively, "Fidelity"), as applicable, for the above-referenced Plan(s).

Fidelity is hereby directed to do the following with respect to the above referenced
fund action:

### Adding Funds
☐ Effective <u>February 17, 2011</u>, please <u>add</u> Vanguard Signal Class for the fund(s)
listed below to the plan line-up:

**SIGNAL CLASS**

| Vanguard 500 Index Fund | Signal | VIFSX |
|---|---|---|
| Vanguard Balanced Index Fund | Signal | VBASX |
| Vanguard Growth Index Fund | Signal | VIGSX |

### Fund Close, Investment Elections & Fund Balances
☐ Effective <u>February 17, 2011</u>, the fund(s) listed below will close to new investments.

☐ Effective as of the close of business (normally, 4 p.m., Eastern Time) on <u>February
17, 2011</u>, all contributions, loan repayments and all exchanges-in, otherwise
transferred  or directed to the Vanguard Investor Class of the fund(s) listed below
will be transferred or redirected to the Vanguard Signal Class for the fund(s) listed
below.

Cornell University is an equal opportunity affirmative action educator and employer.

☐ Effective as of the close of business on February 18, 2011, balances in the fund(s) listed below will be reallocated from the Vanguard Investor Class to the Vanguard Signal Class.

**INVESTOR CLASS**

| Vanguard 500 Index Fund | Investor | VFINX |
|---|---|---|
| Vanguard Balanced Index Fund | Investor | VBINX |
| Vanguard Growth Index Fund | Investor | VIGRX |

In order for this direction to be processed in a timely manner, this Letter of Direction needs to be received by Fidelity no later than January 14, 2011.

By their execution of this letter below, the parties intend and agree that this Letter of Direction and Amendment shall constitute an amendment to the Trust, GCA, Service and/or Recordkeeping Agreement(s) with respect to the Plan(s).

By: _____     Date: 12-23-2010

Paul Bursic
Authorized Signatory

Agreed to and accepted by Fidelity:

FIDELITY MANAGEMENT TRUST COMPANY
and/or FIDELTY INVESTMENTS INSTITUTIONAL
OPERATIONS COMPANY, INC. and/or FIDELITY
EMPLOYER SERVICES COMPANY LLC, as applicable

By:     _____

Authorized Signatory

**DJA139**

# Cornell Motion for Summary Judgment Exhibit 81



Prospectus

May 1, 2016

# College Retirement Equities Fund

Individual, group and tax-deferred variable annuities



BUILT TO PERFORM.
CREATED TO SERVE.

TIAA_CORNELL_00024810

## Equity Accounts

### Stock Account

**Investment Objective:** A favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks.

**Principal Investment Strategies:** Under normal circumstances, the Stock Account invests at least 80% of its assets in a broadly diversified portfolio of common stocks. The Account's investment adviser, TIAA-CREF Investment Management, LLC ("TCIM"), typically uses a combination of three different investment strategies to manage the Account—active management, enhanced indexing and pure indexing—and invests in both domestic and foreign securities. TCIM seeks to achieve the Account's overall investment objective by managing the Account in segments, each of which may use one of these different investment strategies.

A portion of the Account is managed using an active management strategy. With active management, TCIM concentrates on individual companies rather than sectors or industries. TCIM looks for stocks that it believes are attractively priced based on an analysis of the company's prospects for growth in earnings, cash flow, revenues or other relevant measures. TCIM also looks for companies whose assets appear undervalued in the market. In general, TCIM focuses on companies with shareholder-oriented management dedicated to creating shareholder value. The Account may invest in companies of any size, including small companies.

A portion of the Account is managed using an enhanced index strategy. With enhanced indexing, TCIM may use several different investment techniques to build a portfolio of stocks that is structured to resemble and share the risk characteristics of various segments of the benchmark index, while also seeking to outperform that benchmark index. Enhanced index strategies often employ proprietary, quantitative modeling techniques for stock selection, country allocation and portfolio construction. Quantitative analysis involves the use of mathematical models and computer programs that attempt to outperform the index by over- and underweighting certain stocks while keeping the Account's overall financial and risk characteristics similar to those of its benchmark index. Relative to TCIM's other approaches for managing other equity accounts, in general, the enhanced indexing methodology is designed so that the Account diverges from and may outperform its benchmark more than an indexing approach, but remains closer to the benchmark than other equity accounts using a traditional active management style. Enhanced index strategies will typically hold more stocks than traditional active strategies.

A portion of the Account is managed using a pure index strategy. This portion of the Account is designed to track various segments of the component indices of the Account's composite benchmark index. This portion of the Account buys most, but not necessarily all, of the stocks in the indices of its composite

Confidential

**DJA142**

TIAA_CORNELL_00024838

benchmark index, and will attempt to closely match the overall investment characteristics of its composite benchmark index.

The Account invests in foreign stocks and other equity securities. The Account also may invest in fixed-income securities and money market instruments traded on foreign exchanges or in other foreign securities markets, or that are privately placed. Foreign securities have different types and levels of risk than domestic securities. The Account will also invest a portion of its foreign investments in emerging market securities and, to a lesser extent, foreign developed market small-cap equities. Under normal circumstances the Account seeks to maintain the weightings of its holdings as approximately 70–75% domestic equities and 25–30% foreign equities. Under normal circumstances, the foreign equities portion of the Account will include investments in both developed and emerging markets securities and in securities of large-, mid- and small-capitalization issuers. As of December 31, 2015, the market value of the Account was divided as indicated below among U.S., foreign developed and foreign emerging markets securities:



- 69.5%  United States
- 23.9%  Foreign developed markets
- 6.6%  Foreign emerging markets

For a discussion of additional risks concerning investments in foreign securities, see "Additional information about investment strategies and risks" below.

Within the Account's globally diversified, multi-investment style strategy, the Account allocates assets to a variety of underlying investment strategies. The allocations to such strategies, including domestic or foreign investments in mega-cap, large-cap, mid-cap and small-cap and various industry sector specializations, may change over time. As of December 31, 2015, the equity investments of the Account were divided among issuers with varying market capitalizations as indicated below:



- 41.9%  Mega-cap: more than $50 billion
- 24.1%  Large-cap: more than $15 billion–$50 billion
- 26.5%  Mid-cap: more than $2 billion–$15 billion
- 7.5%  Small-cap: $2 billion or less

The benchmark for the Stock Account is a composite index composed of two unmanaged indices: the Russell 3000® Index and the MSCI All Country World ex-USA Investable Market Index ("MSCI ACWI ex-USA IMI"). The weights in the composite index change to reflect the relative sizes of the domestic and foreign segments of the Account and to maintain its consistency with the Account's

Confidential

**DJA143**

TIAA_CORNELL_00024839

investment strategies. See "More about benchmarks and other indices" below for additional information about composite and other benchmarks.

**Principal Investment Risks:** The Account is subject to the following principal investment risks:

- market risk;
- issuer risk (often called financial risk);
- index risk;
- enhanced index risk;
- quantitative analysis risk;
- foreign investment risk;
- emerging markets risk;
- small-cap risk;
- mid-cap risk;
- large-cap risk; and
- active management risk.

Investing in securities traded in foreign exchanges or foreign markets involves risks beyond those of domestic investing. These include political or social instability, changes in currency rates and the possible imposition of market controls or currency exchange controls. Also, seeking enhanced results relative to an index may cause that portion of the Account that is managed using an enhanced index strategy to underperform the index. Furthermore, because of the Account's size, it may be buying or selling blocks of stock that are large compared to the stock's trading volume, making it difficult to reach the positions called for by TCIM's investment decisions and/or affecting the stock's price. As a result, TCIM may not be able to adjust the portfolio as quickly as it would like.

As with any investment, you can lose money by investing in this Account.

**Who May Want to Invest:** The Stock Account may be best for individuals who have a longer time horizon, think stocks will perform well over time and want to invest in a broadly diversified stock portfolio.

See "Principal risks of investing in the Accounts" below and "Additional information about investment strategies and risks" below for more information.

## Global Equities Account

**Investment Objective:** A favorable long-term rate of return through capital appreciation and income from a broadly diversified portfolio that consists primarily of foreign and domestic common stocks.

**Principal Investment Strategies:** Under normal circumstances, the Global Equities Account invests at least 80% of its assets in equity securities of foreign and domestic companies. Typically, at least 40% of the Account is invested in foreign securities and at least 25% in domestic securities, as TCIM deems appropriate. The remaining 35% is distributed between foreign and domestic securities. However, when market conditions warrant, the Account may invest

Confidential

**DJA144**

TIAA_CORNELL_00024840

# Cornell Motion for Summary Judgment Exhibit 20

## CORNELL UNIVERSITY              Request for Proposal

April 1, 2011

The Retirement Plan Oversight Committee of Cornell University and the Weill Cornell Medical College invite you to respond to the following request for consulting services.

**Section 1.         Background**

Cornell University comprises two distinct campuses in Ithaca, NY and the Weill Cornell Medical College in Manhattan, NYC, when viewed as an employee retirement plan sponsor.   The Endowed Colleges of Cornell, Ithaca, provide a complete benefits package supplied by the University to all benefits eligible employees as a private employer subject to ERISA.   The New York State Contract Colleges at Cornell, also in Ithaca, NY, represent the land grant mission of the University.  Faculty and staff of the Contract Colleges are Cornell University employees, but they partake in New York State provided retirement plans as part of the state funding to support the land grant mission.  Thus, the retirement plans for Contract College employees are not ERISA plans.  The Weill Cornell Medical College in Manhattan has its own complete employee benefits package for their faculty and staff that are also subject to ERISA.

Cornell University sponsors several defined contribution retirement plans for faculty and staff that qualify under §403(b) of the Internal Revenue Code of the United States.   The plans currently use the investment funds provided by well-known investment fund families:  TIAA-CREF, Fidelity Investments and the Vanguard Group.  See **Section 3** for more plan specifics.

**Section 2.         Services Required**

Given the current regulatory environment for §403(b) plans, the University seeks a consulting partner to assist it in building a fully compliant retirement plan operation.    Cornell needs professional assistance to determine the proper investment vehicles for plan participants to select among when investing in self-directed accounts.

In addition, the University needs a consulting partner with proven expertise in advising plan sponsors on the administrative set up of custodial accounts, recordkeeping,  retail-level customer service for plan participants and reporting capabilities for compliance and proper management of the plans.

**Section 3.         Plan Specifics**

There are four distinct plans offered by the University to faculty and staff of the endowed and contract colleges in Ithaca, NY and the Weill Cornell Medical College in Manhattan, NYC.   The endowed colleges of Cornell University in Ithaca offer two retirement plans for faculty and staff, the CURP and the TDA. (See the accompanying table below for greater specification per plan.)  The contract colleges of Cornell University in Ithaca offer only the TDA for faculty and staff.  The State University of New York-Optional Retirement Plan is offered to exempt employees of Cornell's contract colleges in Ithaca through the State University of NY, thus it is not included in the purview of plan oversight by Cornell University.

**Exhibit 98**

**DJA146**

## CORNELL UNIVERSITY            Request for Proposal

The Weill Cornell Medical College located in Manhattan offers two retirement plans for faculty and staff, the FERP and their own TDA.

The University also offers the Non-exempt Employees' Retirement Plan, a §401(a) defined benefit pension plan, for hourly workers at the Weill Cornell Medical College, and a §457(b) Non-Qualified Deferred Compensation Plan for highly compensated employees of both campuses.  None of these latter plans are part of the scope of this consulting project.

**The Cornell University 403(b) Retirement Plans**

| Plan Name | Current Vendor Options | Fund Sources | As of December  2010 | |
|---|---|---|---|---|
| | | | *Participants* | *Plan Assets* |
| CURP- Cornell University Retirement Plan (endowed only) | TIAA-CREF (T-C) Fidelity Investments (F) | Employer only | (T-C) 17,354<br><br>(F)    9,510 | (T-C) $1,161,874,842<br><br>(F)    $297,450,958 |
| | | **Totals:** | **26,864** | **$1,459,325,800** |
| TDA- Tax Deferred Annuity (Ithaca, endowed and contract colleges) | (T-C)<br>(F)<br>Lincoln Life (L)*<br>Dreyfus (D) *<br>AXA Equitable (A) * | Employee only | (T-C)  8,310<br>(F)    4,446<br>(L)       62<br>(D)       13<br>(A)        1 | (T-C)  $595,891,999<br>(F)    $283,939,607<br>(L)       $3,175,948<br>(D)         $344,009<br>(A)          $17,192 |
| ∗    Not active vendors. | | **Totals:** | **12,832** | **$883,368,755** |
| FERP-    Faculty    &    Exempt  Retirement Plan (WCMC) | (T-C)<br>Vanguard (V) | Employer only | (T-C)  4,850<br>(V)    2,449 | (T-C)  $587,933,519<br>(V)    $144,623,516 |
| | | **Totals:** | **7,299** | **$732,557,035** |
| TDA-  Tax Deferred Annuity Plan (WCMC) | (T-C)<br>(V) | Employee only | (T-C)  2,850<br>(V)    1,896 | (T-C)  $201,903,569<br>(V)    $145,082,935 |
| | | **Totals:** | **4,746** | **$346,986,504** |
| | | **Grand Total:** | | **$3,422,238,094** |

∗   These vendors were placed on an inactive status in December 1998.  Cornell does not remit contributions to these vendors, but the investment houses hold grandfathered accounts for a limited number of participants.

**DJA147**

CORNELL UNIVERSITY                    Request for Proposal

**Section 4.**      <u>**Instructions**</u>

**RFP Timetable**

| Activity | Responsibility | Completion Date |
|---|---|---|
| Release of RFP | Cornell | April 1, 2011 |
| Confirmation of intent to respond | Respondents | April 8, 2011 |
| Questions or requests for clarification due to Cornell | Respondents | April 22, 2011 |
| Collective response to questions from bidders | Cornell | April 26, 2011 |
| RFP  final responses due to Cornell | Respondents | May 6, 2011 |
| Finalists announced | Cornell | June |
| Finalists interviews | At Cornell | June/July |
| Selection of Consulting Firm | Cornell | TBD |

**Questions or requests for clarification must be in writing and should be sent to Mary Zielinski (mfd7@cornell.edu) of the Cornell Benefits Services office.  We will submit answers to these inquiries to all respondents simultaneously.**

**Final responses must be submitted to Cornell in hard copy format (three hard copies) along with an electronic version.  These responses should be sent to Mary Zielinski (Assoc. Director, Benefit Services, 130 Day Hall, Ithaca, NY 14853) by April 29, 2011.  Responses received after the deadline may not be considered.**

**Cornell University will not be liable under any circumstances for any expenses incurred by any respondent in connection with their responses to this RFP.  Use of the Cornell name by the bidder is expressly prohibited.   The University reserves the right to select a consulting partner or make no selection, based on its own criteria that will not be shared with bidding vendors.**

**DJA148**

**CORNELL UNIVERSITY**                    Request for Proposal

**Section 5.**        **Enumeration of Services Required**

Investment Fund Selection and Monitoring Function:

1.  The consulting partner will meet with the Retirement Plan Oversight Committee (RPOC) as needed to provide expert and accountable guidance that enables the group to prudently exercise their fiduciary duty under the §403(b) regulations and other applicable laws and regulations which may apply during the establishment of the fundamental structure and offerings of the various plans.

2.  The consulting partner will assist RPOC in drafting the Cornell University Investment Policy Statement in compliance with relevant regulations.  The consulting partner will advise RPOC on establishing procedures that may be necessary to put the policy statement into operation per ERISA requirements and cost efficient business practice.

3.  The consulting partner will devise structural models for RPOC consideration that would represent best practice forms of administrative structures to fit the new regulatory and investing environment for participants.  Any revised administrative structure should include but may not be limited to:

    a.  Maintain the highest level of customer service for plan enrollment and account inquiries

    b.  Be able to handle all arrangements with investment houses to provide access to any fund approved by RPOC for inclusion in retirement plan fund options.

    c.  Provide a strong local presence with financial education and investment advice capabilities, delivered by registered representatives.

    d.  Be proficient in maintaining custodial account activities

    e.  Meet technological requirements for web-based customer access to  account information, investment fund information, investment transactions and confirmations

    f.  Produce consolidated investor statements of account

    g.  Provide Benefits staff with effective professional-level access to participant data from report library as well as ad hoc capability

    h.  Provide the highest level of customer service to participants for processing distributions and loans.

    i.  Provide financial and participant data for 403(b) plan audits and 5500 package preparation and filing.

4.  The consulting partner will periodically perform the necessary research and analysis to produce a report with recommendations for investment fund alternatives to be considered for inclusion in the retirement plans, based on professional analysis of the appropriate investment vehicles, using the approved Investment Policy Statement as a guide.   Fund selections must also conform to the investment array structure decided by RPOC and must be capable of integrating fully into the administrative recordkeeping and custodial arrangements established for the retirement programs.

5.  The consulting partner will advise and assist RPOC in appointing various service providers, such as investment managers and third party providers to operate various parts of the plan.

**DJA149**

### CORNELL UNIVERSITY                     Request for Proposal

6.  The consulting partner must show excellent resources and skills in preparing an effective communication campaign to inform and educate a wide range of participants to the changes in their plans.  The communications campaign must be multi-modal and contain short-intermediate and very long range planning milestones and metrics. This campaign must meet the new regulations for fee disclosure to participants.   The communication campaign must also include analysis of its effectiveness on investor behavior.

7.  The consulting partner must present a reporting capability that will measure utilization of the plan pre and post-implementation to permit RPOC to reasonably assess the success of the new plan.

8.  The consulting partner must collaboratively work with Cornell University and WCMC Benefits Services staff to focus on participant education programming opportunities.

9.  The consulting partner must inform RPOC of legal and regulatory changes in the future that affect the operation of the plan, including investment choices and representations to plan participants.  In addition, the consulting partner must provide guidance and support for actions as recommended and approved by RPOC.

10. The consulting partner must present an annual report to RPOC that provides the following:

    a.  The performance of the selected investment funds compared to their commonly agreed upon market benchmarks

    b.  The performance of the selected investment funds in light of the relevant standards from the Investment Policy Statement

    c.  Recommendations for replacement of funds for the coming measurement period and an analysis of the new funds for selection by RPOC.

    d.  Faculty and staff utilization on both campuses and demographic profiles of utilizers and non-utilizers for communication and education programming needs.

    e.  Aggregate financial analysis of the plans' performance with comparison to industry benchmarks, including plan expenses and investment fund fees.


**Section 6.**      **Additional Services as Needed**

If any additional services are needed, the selected consulting partner will be asked to submit a separate scope of work and fee proposal at the appropriate time.

**Section 7.**      **Affirmative Action**

Cornell University is committed to affirmative action and equal opportunity in all areas of operation.  We encourage consulting partners to consider local, small businesses and/or those owned by underrepresented minorities for potential subcontracting in this project for the selection process for funds or administrative services.

DJA150

CORNELL UNIVERSITY                    Request for Proposal

**Section 8.**     __Insurance__

Consulting partners must provide evidence of sufficient comprehensive general liability coverage, workers' compensation and professional liability coverage that will be in effect during the engagement. The documentation on insurance will include, without limitation, the scope of coverage against possible claims for property damage, personal or bodily injury, or death which may arise by reason of consultant's employees being located on University premises.

**Section 9.**     __Qualifications__

As part of your proposal, please respond in writing to each of the following questions.

1. Please describe your firm's relevant experience in advising §403(b) fiduciaries on plan administration.

2. Please describe your firm's relevant experience in designing and implementing compliant retirement plan fund offerings.

3. Describe the size of your firm; the size of the section or division of your firm that handles investment advisory services for clients; the size of the section or division of your firm that specializes in consulting for retirement plan administration services; and the location of the professional staff that will support Cornell's needs through the initial stages of this project as well as long term.

4. Please describe your firm's approach to §403(b) fiduciary compliance for plan sponsors and how you might distinguish your firm from your competitors.

5. Provide a list of §403(b) clients willing to serve as references for Cornell's project.  Please describe the nature of the engagement you had with each and how the scope of those engagements may compare with your anticipated project scope with Cornell.

6. Do you have a consulting relationship  or ownership interests with any investment firm that may offer funds eligible for inclusion in a defined contribution plan under §403(b) or may offer fund products to an annuity bundling company for packaging in a §403(b) annuity product?

7. Do you have a consulting relationship or ownership interests with any retirement plan recordkeeping firms, insurance brokerage operations or management firms in the business of providing retirement plan administrative services?

8. Describe any existing or potential relationships between your firm and Cornell University or the Weill Cornell Medical College, any of its employees, members of the Board of Trustees or the Board of Overseers that could lessen your independence and objectivity because of a perceived or actual conflict of interest.

**DJA151**

## CORNELL UNIVERSITY                Request for Proposal

9. Does your firm belong to the National Association of Independent Retirement Plan Advisors and subscribe to the precepts of this organization?

10. How would you characterize the nature of the reliance Cornell University may place upon your firm's work product and recommendations as a basis of action?

    a. Will your firm characterize your recommendations to RPOC as advice provided as a co-fiduciary under ERISA?   If not, why not?

    b. Will you confirm in writing your firm's acknowledgement that the work product and recommendations to RPOC will form the primary basis for fund selection in the participant-directed defined contribution plans offered to employees?

11. What is your required timeframe to complete the proper establishment of the investment and administrative disciplines to a point where only annual meetings would be required to assess conditions and make recommendations for the coming year?

12. Please provide the current copy of the enhanced SAS 70 report produced by an outside auditing firm on your service delivery.

13. If any of your services are sub-contracted, please provide the names and addresses of these corporate partners along with contact information for possible reference checking.  Please describe the nature of the services you receive from the sub-contractors and their relationship to your company.


**Section 10.**      **Financial Quote**

1. Please provide a financial quote for the services to be provided.  The quote must itemize various services your firm is prepared to provide and what services your firm is not prepared to provide from the foregoing description of services.

2. The financial quote should clearly represent estimates for the costs of any third party service providers whose services are integral to the overall delivery of consulting services your firm will provide.   Cornell understands that subsequent RFPs may be needed for plan management and other ancillary services to complete the retirement plan offering.

3. The financial quote should contain an itemization and maximum cap for any contingency fees charged for necessary travel, lodging, etc. as well as any extra charges for production of paper reports, etc.

4. Is your firm willing to provide a rate guarantee over multiple years?  If so, please specify.

**DJA152**

CORNELL UNIVERSITY                    Request for Proposal

5.  Cornell reserves the right to ask for revised financial quotes if misunderstandings about scope and content are discovered in the process of review.

6.  All quotes will be held in confidence by Cornell and no work product of the RPOC will be distributed to other bidding firms that contain quote comparisons.

7.  Cornell reserves the right to reject any quote without explanation or to choose no successful bidder in the RFP process in its sole discretion.

**Questions or requests for clarification must be in writing and should be sent to Mary Zielinski, ([mfd7@cornell.edu](mailto:mfd7@cornell.edu)) of the Cornell Benefits Services office in Ithaca, NY.  We will submit answers to these inquiries to all respondents simultaneously.**

**Final responses must be submitted to Cornell in hard copy format (three hard copies) along with an electronic version.  These responses should be sent to Mary Zielinski (Assoc. Director, Benefit Services, 130 Day Hall, Ithaca, NY 14853) by April 29, 2011.  Responses received after the deadline may not be considered.**

**Cornell University will not be liable under any circumstances for any expenses incurred by any respondent in connection with their responses to this RFP.  Use of the Cornell name by the bidder is expressly prohibited.   The University reserves the right to select a consulting partner in its sole discretion or make no selection, based on its own criteria that will not be shared with bidding vendors.**

Project Director and additional contact:

Paul Bursic, Senior Director, Benefit Services

Cornell University

130 Day Hall, Ithaca, NY 14853-2801

607-255-3936, jpb22@cornell.edu

**DJA153**

**Cornell Motion for Summary Judgment Exhibit 24**



Financial Services

### Amendment No. 5 to the
### Record Keeping Services Agreement
### Between Teachers Insurance and Annuity Association of America (TIAA)
### And Cornell University
### Dated November 11, 2006

Effective as of **the date signed by both parties,** or such later date as the parties shall agree by Notice, the Record Keeping Services Agreement (Agreement), dated **November 11, 2006,** between Teachers Insurance and Annuity Association of America ("TIAA") and **Cornell University** ("Employer") as Sponsor of the **Cornell University Retirement Plan,** the **Cornell University Tax-Deferred Annuity Plan** and the **Cornell University 457(b) Executive Deferred Compensation Plan** (the "Plans"), is hereby amended as follows:

1. **Effective as of November 11, 2006, the first WHEREAS clause in section** WITNESSETH **is hereby amended to read as follows:**

   WHEREAS, Employer sponsors and maintains **Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca, Cornell University Tax-Deferred Annuity Plan** and the **Cornell University 457(b) Executive Deferred Compensation Plan** (the "Plans"), for the benefit of eligible employees and their beneficiaries ("Participants");

2. **New item numbers 15 and 16 are hereby added to Schedule A (List of Services) and reads as follows:**

   15. TIAA shall provide the information that the Employer will need with respect to the funds and annuity accounts listed in Schedule B of this Agreement so that the Employer can meet its obligations to make the disclosures to plan participants and beneficiaries required by Department of Labor ("DOL") regulation § 2550.404a-5. In addition, TIAA will make the disclosures to the Employer required by DOL regulation § 2550.408b-2.

   16. Revenue Credit Account: For the duration of the five (5) year contract period beginning January 1, 2011, where the **Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca** and the **Cornell University Tax-Deferred Annuity Plan** (the "Plans") maintain a balance in and make active contributions to any of the mutual funds, other investment vehicles, and/or the TIAA-CREF annuity contracts record kept on TIAA's platform and listed in Schedule B, TIAA will fund a Revenue Credit Account in each Plan based upon revenues generated by that Plan. A Revenue Credit Account is a suspense account held under the terms of each plan which is funded with excess revenue generated from that Plan. Based on assets under management and our financial projections, TIAA expects to generate on average 16.4 basis points of revenue annually over the duration of the

SJ EXHIBIT PAGE 37

Confidential                          **DJA155**                    TIAA_CORNELL_00043632



TIAA CREF

Financial Services

contract period. TIAA will reconcile the actual revenue earned for the 2011 calendar year against the revenue requirement of 15 basis points. The amount so determined to be the 2011 revenue credit will be pro-rated among the Plans on the basis of their relative assets record kept by TIAA and will be deposited into the Revenue Credit Accounts of the Plans as soon as administratively feasible but no later than sixty (60) days after this Agreement has been signed by both parties. The subsequent Revenue Credit Account funding amounts will be based on the reconciliation of the actual revenue for all Plans versus the revenue requirement listed above on a semi-annual basis, for the six-month periods ending each June 30th and December 31st. The amount so determined to be in excess of TIAA's revenue requirement will be pro-rated among the Plans on the basis of their relative assets record kept by TIAA and deposited into the Revenue Credit Accounts of the Plans approximately sixty (60) days after the end of each semi-annual period.

The Revenue Credit Accounts may only be used either to pay direct, reasonable and necessary expenses of the Plans which the Plans are authorized to pay or to provide benefits for Plan participants and beneficiaries in the form of revenue credits. Such revenue credits can be paid to Plan participants' accounts, with at least thirty (30) days' Notice from the Employer to TIAA prior to the plan year end, on a per capita or pro rata basis at the election of the Employer. Revenue Credit Account money should be paid out in the form of revenue credits or for plan expenses before the end of the plan year of each of the Plans.

The revenue generated to pay Plan expenses will not be a direct offset from plan participant accounts (i.e., an annual participant fee) or a reduction in returns from those participant accounts. No payments shall be made directly to the Employer or the Named Fiduciary of the Plans. Instead, with respect to reasonable and necessary Plan expenses, the Named Fiduciary of the Plan, TIAA and the Plan service provider shall enter into an agreement ("Plan Expense Reimbursement Agreement") pursuant to which TIAA shall be billed for amounts to cover reasonable and necessary plan expenses that each Plan itself could pay. Payments shall be made within an administratively feasible period of time and no later than thirty (30) days after the date such an invoice is received. The invoice must be submitted along with an ERISA Account Disbursement for Vendor Expense Form via mail or PDF to the plan's Customer Service Consultant. A duplicate of the ERISA Account Disbursement for Vendor Expense Form and the invoice should also be sent via PDF to RMURRAY@tiaa-cref.org.

If, in TIAA's sole determination, the assumptions and terms listed above change substantially, the parties agree to revise this agreement and TIAA will also not make the payments described herein. The Employer and TIAA will amend this item number 16 and

PLNSETRKA
Client ID: 011113
Plans(s): 101161, 101160, 151199

SJ EXHIBIT PAGE 38

Confidential                                    **DJA156**                        TIAA_CORNELL_00043633



**Financial Services**

any additional agreements pertaining to these payments, in order to reflect the new revenue requirements that will be used for the calculation of any payments for expenses made on behalf of the Plans.

Teachers Insurance and Annuity Association of America

By: Sandy Breyman

Print Name: Sandy Breyman

Title: Director, product Delivery

Date: 6/26/2012

Cornell University

By: Mary Opperman

Print Name: Mary Opperman

Title: Vice President, Human Resources

Date: 6/21/2012

SJ EXHIBIT PAGE 39

TIAA_CORNELL_00043634

Confidential

**DJA157**

# Cornell Motion for Summary Judgment Exhibit 30

*Sacerdote, et al. v. New York University*, 1:16-cv-06284 (KBF) (S.D.N.Y.)

# Joint Pretrial Order

# April 5, 2018

# Defendant's Exhibit 892

# Declaration of Douglas Chittenden


EXHIBIT 242
WIT:
DATE: 10-10-18
RANDY DUNN, CRR, RPR, CCR

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DR. ALAN SACERDOTE, et al., | : | Case No.: 1:16-cv-06284 (KBF) |
| | : | |
| Plaintiffs, | : | |
| | : | ECF Case |
| v. | : | |
| | : | |
| NEW YORK UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

### DECLARATION OF DOUGLAS CHITTENDEN

I, Douglas Chittenden, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am the Executive Vice President and head of the Institutional Retirement business of Institutional Financial Services ("IFS") at Teachers Insurance and Annuity Association of America ("TIAA").  As the head of the Institutional Retirement business, my responsibilities include oversight of institutional retirement sales, strategy, product development and management; relationship and services management; and participant consulting and guidance for more than 15,000 retirement plan sponsors in the academic, research, medical and cultural fields.

2.      I joined TIAA in 1985.  I have held several positions at TIAA.  My most recent positions were the following:  From 2003-2006, I served as the Vice President of the Individual Products and Services business division.  My responsibilities in this role included the management of TIAA's individual products and services, such as individual retirement accounts ("IRAs"), life insurance, brokerage services, and trust services.  I became Executive Vice President and the head of the Individual Products and Services business division in 2011, and my

**DJA160**

responsibilities expanded to include Internal Revenue Code § 529 qualified tuition plans ("529 plans") and banking.

3.      From 2006-2011, I served as the head of TIAA's 529 plan business, which included responsibility for the management, distribution and delivery of the state 529 plans TIAA manages.

4.      I have personal knowledge of the facts set forth herein and hereby testify to their truth.

## I.    HISTORY OF TIAA

5.      TIAA was established in 1918 by Andrew Carnegie and the Carnegie Foundation for the Advancement of Teaching as a New York insurance company to provide retirement solutions and life insurance to educators.

6.      TIAA's charter provides that "[t]he purpose of the corporation is to aid and strengthen nonprofit colleges, universities, [and similar government and research institutions] by providing annuities, life insurance, and accident and health insurance . . . all without profit to the corporation or its stockholders."

7.      TIAA has operated without profit over the past 100 years.

8.      Although TIAA's tax-exempt status was eliminated in 1998, its purpose and priorities remain the same, and it continues to operate without profit.  Its mission remains unchanged.

9.      TIAA historically has limited its institutional clients to tax-exempt, non-profit, and governmental clients.

10.     TIAA is not publicly traded and therefore not subject to short-term shareholder interests.  TIAA has subsidiaries, affiliates and businesses it owns that operate for profit.  The revenues earned by those entities are held internally, reinvested in the business, or used to make

2

**DJA161**

supplemental payments (in addition to contractually required ones) to plan participants who have

TIAA Traditional fixed annuity accounts.

11.     TIAA holds the highest rating currently awarded from all four leading

independent insurance industry ratings agencies, and has been awarded numerous best-in-class

awards for retirement plan participant and plan sponsor services.

## II.     TIAA TRADITIONAL

12.     TIAA Traditional is a fixed annuity that provides contract holders with

guaranteed principal and a minimum guaranteed crediting rate, as well as the option for

additional amounts and guaranteed lifetime income (among other payout options available to

retiring participants).

13.     Over the last 100 years, TIAA Traditional has never missed a payout – even

during periods of war, recession, and financial turmoil.

14.     Like any annuity, TIAA Traditional has two distinct phases:  accumulation and

payout.  A participant puts money into Traditional during the accumulation phase, and then may

receive a lifetime income stream (or other income options) during the payout phase.

15.     Contributions to TIAA Traditional during the accumulation phase are guaranteed

to earn a minimum crediting rate (*i.e.*, a guaranteed minimum rate of return), which varies

depending upon the annuity contract purchased by contract holders (*see* Section III).

16.     TIAA also may declare additional amounts to be credited to annuitants in excess

of the guaranteed minimum crediting rate.  TIAA has declared additional amounts in every year

since 1948.

17.     Total crediting rates (guaranteed minimum plus additional amounts credited) vary

depending upon the annuity contract type and the date of contribution.  TIAA Traditional credits

interest based on the period during which the participant makes each contribution.

3

18.     In addition to the guaranteed minimum crediting rates and additional crediting amounts that TIAA may declare, TIAA also periodically returns unused contingency reserves to participants who accumulated over time in TIAA Traditional and then annuitized.  As an insurance company, TIAA is required to maintain contingency reserves to ensure that it will be able to fulfill its contractual obligations to policyholders, even in the face of unexpected adverse circumstances.  To the extent that built-up reserves on older contributions are not needed over time, TIAA makes distributions to accumulating participants in the form of additional annuity income during the payout phase.  A typical stock insurance company can distribute unneeded reserves to its stockholders, but TIAA distributes unneeded reserves to its participants.  This is a unique and significant benefit for participants in TIAA Traditional that accumulate over longer periods of time (as opposed to transferring in shortly before selecting lifetime income).

19.     At the payout phase, a participant has the flexibility to take accumulated money out of TIAA Traditional in many ways.  These include several lifetime income options (guaranteed lifetime payments) and several non-lifetime income options.

20.     The TIAA General Account backs the guarantees and benefits of TIAA Traditional.

21.     As of the end of 2016, TIAA has paid over $394 billion in benefits to retired participants.

## III.     THE TIAA TRADITIONAL ANNUITY CONTRACTS

22.     TIAA has offered several different TIAA Traditional contracts to plan participants and sponsors over time.  These contracts include Retirement Annuity ("RA"), Group Retirement Annuity ("GRA"), Supplemental Retirement Annuity ("SRA"), and Group Supplemental Retirement Annuity ("GSRA") – colloquially known collectively as "legacy" contracts – as well as the more-recent Retirement Choice ("RC") and Retirement Choice Plus ("RCP").  Each

4

contract has different features and guarantees, which I describe below.

### Retirement Annuity Contract ("RA")

23.     The first TIAA Traditional contract was an individually-owned contract between the participant and TIAA, now known as the Retirement Annuity contract. Employers make contributions to RA contracts but the contracting parties are the participant and TIAA. The plan sponsor cannot direct the transfer of assets to another investment offered in its retirement plan (*i.e.*, it cannot "map" an individual participant's existing RA assets).

24.     Lump-sum withdrawals or transfers are not available from TIAA Traditional contributions made to, and earnings in, the RA contract. Withdrawals and transfers must be paid in 10 annual installments. These provisions are designed to allow the TIAA General Account, which backs the guarantees and benefits under TIAA Traditional, to invest in longer-dated assets that typically offer higher yields than shorter-term assets. Other annuity contracts described below may offer participants more liquidity (*i.e.*, more immediate withdrawal and transfer options), but these contracts typically have lower total crediting rates.

25.     The minimum guaranteed crediting rate for contributions made in the RA contract is 3.0%.

### Supplemental Retirement Annuity ("SRA")

26.     In 1973, TIAA introduced the Supplemental Retirement Annuity contract. The SRA contract permits additional tax-deferred annuity contributions, deducted from the participant's paycheck. It is a supplement to the standard employer-funded retirement plan.

27.     The SRA contract is an individually-owned contract between the participant and TIAA, and the plan sponsor cannot map a participant's existing SRA assets to another investment in the retirement plan.

**DJA164**

28.     The SRA contract is generally funded with employee elective deferrals.  For this contract, TIAA permits lump-sum withdrawals and transfers from TIAA Traditional without any restrictions or charges.

29.     The minimum guaranteed crediting rate for contributions made in the SRA contract is 3.0%.  To compensate for the greater liquidity of the SRA contract, total crediting rates are typically lower than for contributions made in the RA contract.

**Group Retirement Annuity ("GRA")**

30.     In 1984, TIAA introduced the Group Retirement Annuity.  The GRA contract offers plan participants an additional liquidity option as compared to the RA contract, the other employer-funded contract.

31.     The GRA contract is a group contract between TIAA and the plan sponsor.  The sponsor makes contributions to GRA contracts.  Participants receive certificates, and their rights are enforceable directly against TIAA.  Because the certificates under the GRA contract are individually-controlled, the plan sponsor cannot map a participant's existing GRA assets to another investment in the retirement plan.

32.     The GRA contract permits lump-sum withdrawals and transfers from TIAA Traditional, subject to certain limitations.  Within 120 days of termination of employment, the participant may take a lump-sum withdrawal, subject to a 2.5% surrender charge.  All other withdrawals and transfers from the account must be paid out in 10 annual installments.

33.     The minimum guaranteed crediting rate for contributions in the GRA contract is 3.0%.

**DJA165**

**Group Supplemental Retirement Annuity ("GSRA")**

34.     In 1991, TIAA introduced the Group Supplemental Retirement Annuity contract ("GSRA" contract), a group version of the SRA contract. Contributions to the GSRA contract are employee elective deferrals deducted from the participant's paycheck. Like the SRA, the GSRA contract supplements the standard employer-funded retirement plan.

35.     The GSRA contract is a group contract between TIAA and the plan sponsor. Participants receive certificates, and their rights are enforceable directly against TIAA. Because the certificates under the GSRA contract are individually-controlled, the plan sponsor cannot map a participant's existing GSRA assets to another investment in the retirement plan.

36.     The GSRA contract permits lump-sum withdrawals and transfers from TIAA Traditional without any restrictions or charges. Total crediting rates are typically lower than for contributions made in the RA and GRA contracts. The minimum guaranteed crediting rate for contributions made in the GSRA contract is 3.0%.

**Legacy Contracts**

37.     Many of TIAA's largest institutional clients continue to use some combination of the RA, SRA, GRA and GSRA contracts. The higher minimum crediting rate guaranteed by these contracts makes them attractive to plan sponsors, which frequently value higher guaranteed returns for their participants over the ability to map assets.

38.     The RA, SRA, GRA and GSRA contracts include provisions that require the sponsor to offer CREF Stock Account and the CREF Money Market Account as companion investment options on the sponsor's retirement plan menu. As a result, participants are assured access to diversified retirement offerings through CREF Stock and the CREF Money Market

7

**DJA166**

Account.  TIAA does not require that participants in TIAA Traditional invest in the CREF Stock Account or the CREF Money Market Account.  The individually-controlled contracts cannot be amended by plan sponsors to remove the requirement that CREF Stock Account and the CREF Money Market Account are a bundled offering with TIAA Traditional.

### Retirement Choice ("RC") and Retirement Choice Plus ("RCP")

39.     TIAA's most recent contracts are the Retirement Choice ("RC") and Retirement Choice Plus ("RCP") contracts.

40.     TIAA introduced Retirement Choice and Retirement Choice Plus contracts in 2005 and 2006, respectively.  The RC contract is generally offered to employer retirement plans. The RCP contract is generally offered to supplemental retirement plans.

41.     RC and RCP contracts are institutionally-controlled group contracts between TIAA and the plan sponsor.  Participants receive a certificate.  Upon 90 days-notice, the plan sponsor can map assets in these contracts over the course of 60 months without any surrender charge.  Plan sponsors have the discretion to include or exclude any of the offered TIAA and CREF annuities on the plan investment menu.

42.     Participants may take lump-sum withdrawals from the RC contract within 120 days after termination of employment, subject to a 2.5% surrender charge.  All other withdrawals and transfers by participants must be paid in 84 monthly installments.  Participants may take lump-sum withdrawals from the RCP contract without any restrictions or charges.

43.     The RC and RCP contracts have a minimum guaranteed crediting rate between 1.0% and 3.0%, determined annually.  The minimum guaranteed crediting rate applies to contributions deposited during the applicable period.  The lower minimum guaranteed crediting rate for the RC and RCP contracts reflects, in part, the mapping options available to plan sponsors under these contracts.  Moreover, because there is higher risk to TIAA from a contract

**DJA167**

that provides a static 3% minimum crediting rate (legacy contracts), as compared to an "indexed" or floating minimum crediting rate (RC/RCP), RC and RCP participants are generally credited slightly higher total interest crediting rates on accumulations in RC and RCP contracts.

### TIAA As Sole Recordkeeper for TIAA Traditional

44.     TIAA Traditional is a complex product to recordkeep and TIAA is the sole recordkeeper for TIAA Traditional.

45.     The majority of TIAA's largest 200 clients with at least one 403(b) plan[1] use multiple recordkeepers.  For the period of 2010 through 2016, between 110 and 147 of TIAA's largest 200 clients with at least one 403(b) plan employed a multi-vendor approach to recordkeeping.  And, of those clients that have consolidated to a sole recordkeeper, the majority have chosen to consolidate with TIAA as their sole recordkeeper.

46.     When a plan sponsor opts to eliminate TIAA as a recordkeeper, TIAA Traditional may cease to be available for new contributions.  TIAA continues to recordkeep plan assets and charge recordkeeping fees for the individually-held contracts for employees who elect to maintain their investments in TIAA Traditional.

## IV.     THE CREF STOCK ACCOUNT

47.     The College Retirement Equities Fund ("CREF") was the first variable annuity. The CREF Stock Account ("CREF Stock") was CREF's first offering.

48.     CREF Stock is a broadly diversified investment vehicle.  It invests across all major equity market segments, including large-, mid-, and small-cap stocks, both domestically and within foreign developed and emerging markets.  Under normal circumstances, CREF Stock

---

[1]     TIAA's 200 largest clients were selected based on the amount of those clients' assets administered by TIAA in their respective defined contribution 403(b) plans as of December 31, 2010.  Assets or contributions into 403(b) employee supplemental plans, which include only employee deferrals, were not considered.

9

**DJA168**

seeks to maintain approximately 65-75% domestic equities and 25-35% foreign equities. The CREF Stock strategy seeks a favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks. Three different investment strategies are used—active management, quantitative, and indexing— to manage the account.

49.     CREF operates on an "at-cost" basis. CREF deducts expenses from the net assets of each class of each account (including CREF Stock) each business day for, among other services and expenses, investment management, administration, and distribution services. TIAA and its subsidiaries provide or arrange for the provision of these services to CREF, charging CREF the cost borne by TIAA and its affiliates.

50.     CREF Stock historically has been offered primarily to tax-exempt, non-profit, and governmental clients.

51.     CREF Stock's benchmark is detailed in the prospectus and is a composite index comprised of two indices: the Russell 3000 index (domestic equities) and the MSCI ACWI ex USA IMI index (foreign equities). The CREF Stock Account Composite Index is created by calculating a weighted average of the performance of the two indices using the target weights on the domestic and foreign segments of CREF Stock. The Composite Index is currently weighted 70% Russell 3000 index and 30% MSCI ACWI ex USA IMI index. Prior to mid-2011, the benchmark for the account was a similar composite index composed of four unmanaged indices: the Russell 3000 Index, the MSCI EAFE + Canada Index, MSCI Emerging Markets Index, and the MSCI EAFE + Canada Small Cap Index, whose weights were changed to reflect the relative sizes of the domestic and foreign segments of the account and to maintain its consistency with the account's investment strategies.

**DJA169**

52.     As of December 31, 2017, CREF Stock had approximately $127 billion in assets under management.

53.     Of TIAA's 200 largest institutional clients with at least one 403(b) plan, all 200 clients held assets in CREF Stock for the period 2010 through 2014.  In 2015 and 2016, all but one of TIAA's largest clients held assets in CREF Stock.

54.     Of those 200 clients, over 93% had plans that received contributions into CREF Stock for the period 2010 through 2016.

55.     Participants who invest in CREF Stock have the option to transfer their investment to TIAA Traditional in the future, at a guaranteed crediting rate and subject to a mortality table specified in the CREF certificate.  Without this guarantee, participants investing in CREF Stock would risk several contingencies, including that TIAA Traditional may not accept new participant contributions, or that the mortality table and guaranteed minimum crediting rates become less favorable to the participant.  CREF Stock charges participants half a basis point for these guarantees.  Participants are also provided with prospectuses, which are made available to participants who invest in CREF Stock.  DX752 through DX759 are true and complete copies of the CREF prospectuses, including CREF Stock.

56.     CREF Stock's fees are among the lowest in the industry.

57.     As of December 31, 2017, Morningstar rated CREF Stock as a 5-star fund—the highest possible rating.  Morningstar currently rates CREF Stock as a 4-star fund overall, a 5-star fund for 3-years, a 4-star fund for 5-years, and a 4-star fund for 10-years.  Morningstar rates funds based on an enhanced Morningstar Risk-Adjusted Return measure, which also accounts for the effects of all sales charges, loads, or redemption fees.  Funds are ranked by their Morningstar Risk-Adjusted Return scores, and only the top 10% receive five stars, with the next 22.5% of

DJA170

funds receiving four stars.

## V.    THE TIAA REAL ESTATE ACCOUNT

58.    The TIAA Real Estate Account is a tax-deferred variable annuity contract.

59.    The TIAA Real Estate Account historically has been offered primarily to tax-exempt, non-profit, and governmental clients.

60.    The Real Estate Account allocates its investments primarily to directly-owned real estate and other real estate-related assets, such as real estate investment trust ("REIT") common stocks, and secondarily to non-real estate related short-term investments. The Real Estate Account intends to have 75-85% of its net assets invested directly in real estate or real estate-related investments and is authorized to hold up to 25% of its net assets in liquid real estate-related securities, such as publicly traded REITs and commercial mortgage-backed securities ("CMBS"). Traditionally, less than 10% of the Real Estate Account's net assets have been comprised of interests in such securities, and management intends that the Real Estate Account will not hold more than 10% of its net assets in such securities on a long-term basis.

61.    The Real Estate Account provides participants with direct investment exposure in real estate and derives its returns primarily from rents and the appreciation of property values. It is not comparable to a REIT fund, which is an investment in a fund that invests primarily in securities of publicly-traded companies, which in turn own and manage real estate investments. The Real Estate Account provides important diversification to retirement portfolios because its performance may vary substantially from REITs. The Real Estate Account's volatility has been lower than that of most REITs over time because REITs are highly correlated to stocks, bonds, and cash, whereas the Real Estate Account is not.

62.    As of December 31, 2017, the TIAA Real Estate Account had approximately $25 billion in assets under management.

12

**DJA171**

63.     Of TIAA's 200 largest institutional clients with at least one 403(b) plan, all but one client held assets in the TIAA Real Estate Account for the period 2010 through 2014.  In 2015 and 2016, all but two of TIAA's largest institutional clients held assets in the TIAA Real Estate Account.

64.     Of those 200 clients, over 84% had plans that received contributions into the TIAA Real Estate Account for the period 2010 through 2016.

## VI.    TIAA'S RECORDKEEPING SERVICES

65.     TIAA negotiates a price with each of its institutional clients (or their consultants) to provide recordkeeping services to the client's retirement plan or plans.

66.     The recordkeeping price (also called the "revenue requirement") that TIAA negotiates with plan sponsors represents the total compensation TIAA will earn for providing its bundled recordkeeping services.  To determine the revenue requirement, TIAA considers, among other factors, its costs in servicing the plan, the services the plan sponsor requires, the number of plan participants, the average participant account balance, total plan assets under administration, and the allocation of plan assets across investment options.  TIAA may adjust the revenue requirement based upon market competition and the size of the client relationship, among other subjective considerations.  TIAA also considers costs in light of the fact that annuities require additional services that are not required for mutual funds and therefore, in comparison, increase administrative costs.

67.     TIAA generally receives its negotiated compensation through a "recordkeeping offset"—*i.e.*, a portion of the expense ratio on the proprietary and non-proprietary investment options offered on the plan investment menu that is allocated to recordkeeping costs.  When a participant invests in a TIAA or third-party investment option that has a recordkeeping offset, a portion of the expense ratio is paid to TIAA for providing recordkeeping services.  Revenues

13

**DJA172**

generated from recordkeeping offsets on the various investment products on the plan investment menu accrue in aggregate toward the revenue requirement TIAA has negotiated with the plan sponsor.

68.     The average expense for recordkeeping services is 40% of the total "Plan Service Expense" paid to TIAA for the full range of services that TIAA provides the plans.  The Plan Service Expense is reported annually to the plan sponsor as part of the reporting TIAA provides to the sponsor in connection with the sponsor's preparation of the plans' Form 5500 Department of Labor filings.

69.     TIAA administers "Revenue Credit Accounts" for many of its institutional clients, which are the vehicle through which plan sponsors recoup certain recordkeeping offset revenues generated by the plans in excess of the negotiated revenue requirement (*i.e.*, accumulated revenues above the recordkeeping price).  TIAA generally reconciles the revenue generated by recordkeeping offsets across the investment options on the plan menu against the negotiated revenue requirement, and deposits excess amounts into the plan's Revenue Credit Account.  The plan sponsor uses funds in the Revenue Credit Account to pay qualified plan expenses, such as fees for a consultant, or allocates the funds back to participants.

## VII.   NYU'S REVENUE REQUIREMENT

70.     New York University ("NYU") has worked with TIAA since 1919.

71.     In March 2009, TIAA responded to a Request for Information ("RFI") from NYU.  TIAA committed to working within NYU's governance process to develop a highly competitive pricing strategy.

72.     In September 2009, TIAA responded to a Request for Proposal ("RFP") from NYU.  TIAA's RFP response offered a recordkeeping price of 15 basis points on future flows to NYU's new proposed investment menu.

73.     Following its finalist presentation to NYU and NYU's investment committee, TIAA responded to additional informational requests in January 2010.

74.     In March 2011, NYU selected TIAA to be its sole recordkeeper for the NYU School of Medicine Faculty Plan (the "School of Medicine Faculty Plan"). TIAA and NYU entered into a recordkeeping agreement in 2012 under which TIAA's revenue requirement would be 16 basis points while the School of Medicine Faculty Plan retained more than one recordkeeper, and 10 basis points once it transitioned to a sole recordkeeping model with TIAA. Prior to that time, from 2008 through 2011, TIAA collected approximately 19.9 basis points in revenue from the School of Medicine Faculty Plan.

75.     The 2012 recordkeeping agreement for the School of Medicine Faculty Plan also established a Revenue Credit Account. TIAA agreed to reconcile the actual recordkeeping offset revenue generated by the Plan's investment menu against the 16-basis point and 10-basis point revenue requirements. Excess revenue above those respective thresholds is returned to the Plan's Revenue Credit Account, and the Plan can use the funds in the Account to pay Plan expenses or allocate money to participants. Reconciliation of the actual recordkeeping offset revenue generated by the Plan's investment menu against the revenue requirements, and any revenue credits derived from that reconciliation, was retroactive to 2011.

76.     NYU did not, at that time, accept TIAA's proposal to serve as its sole recordkeeper for the New York University Retirement Plan for Members of the Faculty, Professional Staff and Administration Plan (the "NYU Faculty Plan"), but TIAA and NYU agreed to a recordkeeping price of 13.8 basis points for the NYU Faculty Plan retroactive to 2011. Thus, although from 2008 through 2010 TIAA collected approximately 19.9 basis points in revenue from the NYU Faculty Plan, retroactive to January of 2011, that rate was reduced to

15

13.8 basis points.  The 2012 amendment to the NYU Faculty Plan's recordkeeping agreement also established a Revenue Credit Account.

77.    In 2014, TIAA and NYU renegotiated the revenue requirement to recordkeep the School of Medicine Faculty Plan down to 9 basis points.

78.    In 2015, TIAA and NYU renegotiated the revenue requirement to recordkeep the NYU Faculty Plan down to 10 basis points.

79.    In November 2016, TIAA responded to a second RFP from NYU with respect to the NYU Faculty Plan.  TIAA's response detailed its proposal for bundled recordkeeping, administration, investment, and participant education and independent advice services for the NYU Faculty Plan.  The proposal focused on TIAA's sole recordkeeping service model, its plan sponsor services, participant counseling and education services, open architecture investment platform, proprietary and non-proprietary investment options, and transition implementation services.

80.    TIAA offered NYU a revenue requirement for bundled recordkeeping services of 3.4 basis points if NYU selected TIAA to be its sole recordkeeper for the NYU Faculty Plan.

81.    In addition to the efficiencies gained by transitioning to a sole recordkeeping model, the reduction in NYU's recordkeeping price reflected reductions in TIAA's cost to recordkeep these and other retirement plans due to improved technology and increased automation and other efficiencies, as well as changes in the market for recordkeeping services. TIAA is continually upgrading and improving processes, systems, and technology to deliver the tools and services plan sponsors and participants want.  For example, each year approximately 25% of TIAA's service technology budget is set aside for recordkeeping maintenance and enhancements.  TIAA's core recordkeeping system is upgraded twice a year, while upgrades for

16

**DJA175**

peripheral software are implemented throughout the year to address changing legal and regulatory requirements, install IT improvements, and meet client demand for new product capabilities.

82.     NYU selected TIAA as its sole recordkeeper for the NYU Faculty Plan in March 2017 and agreed to a revenue requirement of 3.2 basis points for bundled recordkeeping services, effective March 1, 2017, to be reduced to 3.0 basis points effective April 1, 2018.

83.     When the recordkeeping agreement for the School of Medicine Faculty Plan expired in 2017, TIAA and NYU renegotiated the revenue requirement to 4.0 basis points, retroactive to January 1, 2017.

84.     The NYU Faculty Plan and the School of Medicine Faculty Plan are funded with legacy contracts except for the RCP contracts that are used for forfeitures and deposit of revenue credits.

## VIII.   PARTICIPANT SERVICES INCLUDED AS PART OF TIAA'S BUNDLED RECORDKEEPING PRICE

85.     TIAA provides NYU participants with a wide range of services included as part of TIAA's bundled recordkeeping price.  TIAA refers to its offerings to clients like NYU as a "high-touch" service model, reflecting the significant services and resources requested by the plan sponsor.  Additionally, servicing NYU plans has required unique customizations over the years.

86.     TIAA provides NYU with a minimum of 150 days per year of on-site education (*e.g.*, one-on-one counseling and/or group meetings on campus).  Additional support is available if needed.  Although TIAA manages the schedule of on-site education days, participants may schedule additional appointments online with financial consultants or wealth management advisors in three local TIAA offices.

17

**DJA176**

87.     During the first month of the NYU Faculty Plan's transition to TIAA as the Plan's sole recordkeeper, TIAA financial consultants were on-site three days per week based on demand for group meetings, including group seminars and departmental meetings.  For the next two months, TIAA provided one-on-one counseling, information tables, and help desks three to four days per week, depending upon demand.

88.     TIAA provides on-site education seminars and counseling schedules outside typical business hours for employees who do not work nine-to-five shifts.  There is no additional charge for this service.

89.     TIAA's dedicated communications consultant for NYU works with NYU and TIAA financial consultants to build comprehensive communications campaigns drawing on all resources, including print and e-mail communications as well as on-site and online education and individual counseling support to engage employees.

90.     TIAA also provides plan-specific outcome analyses, customized, plan-branded communications for plan changes or enhancements, a plan-specific website, and e-mail and direct mail foundational retirement plan campaigns for no additional charge.  TIAA can customize its educational messages for specific employee segments based on factors such as job classification, life stage, gender, and generation.

91.     TIAA provides quarterly retirement portfolio statements to participants that contain a retirement income projection that determines if the individual is saving enough for retirement.  Statements also include a calculation of the participant's personalized rate of return for the current quarter and year-to-date.

92.     TIAA provides NYU participants with a third-party investment advice program,

through Morningstar,[2] which provides objective advice on all accounts and funds on TIAA's recordkeeping platform, including proprietary and non-proprietary investments. TIAA has provided this advice tool to NYU participants since 2008.

93.   Morningstar's independent advice considers the level of risk necessary to achieve specific investment goals. It considers many possible outcomes to help employees gauge the probability of achieving their goals under different scenarios, and then presents a proposed investment strategy that compares the current portfolio mix to an alternative one that may improve the chances for success.

94.   This independent advice service is part of TIAA's basic offering and is delivered to participants who choose to utilize it through TIAA's on-campus participant counseling program, at meetings in TIAA's local offices, and through pre-scheduled phone appointments.

95.   Retirement Advisor, TIAA's online advice service, provides the same advice TIAA delivers in person and by phone in the form of personalized reports generated by the Morningstar advice engine. Retirement Advisor is an interactive tool that evaluates the participant's risk preference, retirement goals, and career stage, and delivers a simple action plan best suited to those needs. The plan will include specific fund and allocation recommendations that can be implemented by the participant with a few clicks.

96.   There is no additional cost to NYU or the participants in the NYU Plans for utilizing TIAA's advice service.

---

[2]   Morningstar Inc. acquired Ibbotson Associates, Inc., a privately held firm that specialized in asset allocation, in 2006. The NYU Faculty Plan's 2012 recordkeeping amendment and the School of Medicine Faculty Plan's 2012 recordkeeping agreement provide that Ibbotson Associates, Inc. is the independent financial expert under the participant advice program. The School of Medicine Faculty Plan's 2017 recordkeeping agreement and the NYU Faculty Plan's 2018 recordkeeping agreement provide that Morningstar Investment Management, LLC is the independent financial expert under the participant advice program.

DJA178

97.     Participants can also call TIAA's National Contact Center ("NCC") with questions about the plans or to execute transactions in their accounts.  A priority service team of telephone representatives in the NCC provides ongoing, dedicated support for the NYU Plans. These representatives are the primary point of contact for calls from NYU participants and are trained on the Plans' rules, investment menus, distributions, and any special operational processes.

98.     During the NYU Faculty Plan's transition to sole recordkeeping with TIAA, TIAA trained a core group of approximately 120 telephone representatives to serve as the NYU enrollment and transition team.

99.     NCC representatives are specially trained with detailed knowledge of the Plan and can educate and counsel participants on the Plan's structure, eligibility, features, investment options, and rules; complete the enrollment process; provide beneficiary updates and web support; and schedule appointments with financial consultants.

100.    Full transaction support is provided for account balances, fund transfers, investment election changes, fund performance, loan modeling, loan initiation, request forms, hardship withdrawals, lump sum withdrawals, prospectus and statement requests, deferral changes, plan enrollment, PIN changes, asset allocation and investment advice, automatic rebalancing, retirement calculators, and plan provisions.

101.    TIAA maintains an NYU-branded microsite on TIAA's website at www.tiaa.org/nyu.  The microsite is customized with NYU colors and images, as well as NYU materials.  Participants can view NYU-specific plan details and utilize comprehensive investment education to help with enrollment decisions.

102.    TIAA's participant website provides a wealth of content, videos, and tools on

**DJA179**

topics such as saving for retirement, building a legacy, and living well in retirement. TIAA also provides financial education webinars on several topics, such as the basics of investing, asset allocation, staying on track in a volatile market, and receiving retirement income.

103.    NYU participants who enroll with TIAA can find information about their retirement accounts by logging into their account on TIAA's website. On their account pages, participants can view current TIAA account balances by asset class and fund or by plan, retirement account performance, and transaction history for current and previous quarters; view or change investment allocation; request annual portfolio rebalancing; transfer funds between investment options; view or cancel scheduled transfer requests; check last contribution and status of recent service requests; view their quarterly account statements; view or update their personal information; request loans; and initiate withdrawals. With TIAA's 360 Financial View, participants can include asset balances outside of TIAA.

104.    NYU participants who enroll with TIAA also have access to a suite of personalized planning tools, including graphic displays of accumulations; asset allocation guidance; a Retirement Goal Evaluator that estimates how much a participant's salary can be replaced at retirement and how much more will need to be saved to make up for a shortfall; and several other online tools and calculators that help participants plan for retirement, such as an asset allocation evaluator, TDA contribution limits calculator, TDA advantage calculator, minimum distribution calculator, life insurance needs analysis, IRA eligibility and contribution limits, target value calculator, compound interest calculator, and financial organizer.

105.    Participants can also generate personalized retirement illustrations. Based on a menu of available assumptions, illustrations hypothesize future values and income under different payout options.

DJA180

106.    NYU participants can find additional information on TIAA's website about the performance of TIAA's accounts and mutual funds; prospectuses and product disclosure materials; market research news and insights; tools to research and compare stocks, funds, and plan investments; information and registration for group and on-on-one meetings; and answers to frequently asked questions.  They can e-mail questions directly to TIAA.

107.    The TIAA mobile application enables participants to view current TIAA account information and personal rate of return, see pending and recent transaction details, contact an advisor or TIAA consultant, find TIAA office locations, and track fund performance.

108.    TIAA provides plan sponsors like NYU with annual financial reports that give the plan sponsor the information it needs to file the plan's annual Form 5500 Reports with the Department of Labor.  TIAA also provides NYU with a Form 5500 preparation service through Deloitte, for which TIAA did not charge a fee.

109.    TIAA provides plan sponsors like NYU with the information the sponsor needs to make required disclosures to plan participants and beneficiaries.  These disclosures provide summaries of plan services and costs, and include information on investment performance and fees. For NYU, TIAA also assisted with the delivery of these disclosures to participants.

110.    TIAA offers a comprehensive set of services and tools to aid plan sponsors in ensuring compliance with the plans' provisions and governing documents.  TIAA works with plan sponsors to determine which of these services and tools are necessary and appropriate for the plan's specific compliance needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of April 2018

Douglas Chittenden

22

**DJA181**