# No. 21-88 (L)

### 21-96 (XAP), 21-114 (XAP)

## United States Court of Appeals
### *for the*
## Second Circuit

CASEY CUNNINGHAM, CHARLES E. LANCE, STANLEY T. MARCUS, LYDIA PETTIS, and JOY VERONNEAU, individually and as representatives of a class of participants and beneficiaries of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca & the Cornell University Tax Deferred Annuity Plan,

*Plaintiffs-Appellants-Cross-Appellees,*

– v. –

CORNELL UNIVERSITY, THE RETIREMENT PLAN OVERSIGHT COMMITTEE, MARY G. OPPERMAN, and CAPFINANCIAL PARTNERS, LLC D/B/A CAPTRUST FINANCIAL ADVISORS,

*Defendants-Appellees-Cross-Appellants.*

On Appeal from the United States District Court for the Southern District of New York, Hon. P. Kevin Castel, No. 16-cv-6525

## PRINCIPAL AND RESPONSE BRIEF OF
## THE CORNELL DEFENDANTS

Nancy G. Ross
Samuel P. Myler
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
nross@mayerbrown.com
smyler@mayerbrown.com

Michelle N. Webster
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
mwebster@mayerbrown.com

*Counsel for Defendants-Appellees-Cross-Appellants Cornell University, The Retirement Plan Oversight Committee, and Mary G. Opperman*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee-Cross-Appellant Cornell University states that it has no corporate parents, and there is no publicly held corporation that owns more than 10 percent of its stock.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUES...........................................................1

PRELIMINARY STATEMENT ........................................................2

STATEMENT OF THE CASE...............................................................4

    A.    The Cornell Plans ......................................................4

    B.    Overview of Plaintiffs' Claims ......................................7

    C.    The Decisions Below ....................................................8

SUMMARY OF ARGUMENT ...........................................................9

ARGUMENT ....................................................................................11

I.    The District Court Correctly Granted Summary Judgment On The Recordkeeping Claim. ......................................................12

    A.    Plaintiffs Failed To Introduce Evidence To Support A Rational Finding That Cornell Breached Its Duty To Plan Participants. .........13

        1.    Cornell Was Not Required To Consolidate With A Single Recordkeeping Provider....................................13

        2.    Plaintiffs' Other Efforts To Second-Guess Plan Management Are Equally Meritless. ...................16

    B.    In The Alternative, The District Court Correctly Held That Plaintiffs Failed To Offer Evidence Of Loss. ...................20

        1.    The Court Did Not Abuse Its Discretion In Excluding Plaintiffs' Experts On Loss....................................22

        2.    Plaintiffs' "Non-Expert" Evidence Is Unavailing. .................24

    C.    In The Further Alternative, Plaintiffs Failed To Show A Material Dispute Of Fact Over Causation.........................28

    D.    Plaintiffs Forfeited A Request For Non-Monetary Relief. ...............29

II.    The District Court Correctly Granted Summary Judgment On The Investments Claim. ......................................................31

    A.    Plaintiffs Failed To Create A Genuine Dispute Over Breach............32

        1.    Plaintiffs' Criticisms Of Cornell's Pre-2013 Process Are Meritless....................................................33

# TABLE OF CONTENTS
### (continued)

**Page**

2. Plaintiffs' Criticisms Of Cornell's Post-2013 Process Are Meritless. ................................................................... 37

B. In The Alternative, Plaintiffs Failed To Create A Genuine Dispute Over Causation. ............................................... 41

    1. Plaintiffs Bear The Burden To Show Causation ..................... 42

    2. Plaintiffs Failed To Meet Their Burden ................................. 44

        a. TIAA Annuities .................................................. 44

        b. Other Supposedly Underperforming Investments ....................................................... 49

    3. Alternatively, Summary Judgment Should Be Affirmed For Cornell Even If It Bears The Burden On Causation. ........ 51

C. The District Court's Share-Class Ruling Was Correct. .................... 52

    1. There Is No Evidence Of Imprudence And Therefore No Evidence Of Breach. .......................................................... 53

    2. There Is No Evidence Of Loss Or Causation. ......................... 54

III. Plaintiffs' Remaining Arguments On Appeal Likewise Fail. ...................... 56

A. The District Court Correctly Dismissed Plaintiffs' Legally Flawed Theories At The Pleading Stage. ............................................ 56

B. The District Court Correctly Dismissed The Prohibited Transaction Claim. ...................................................................... 59

C. Plaintiffs' Challenge To The Class Definition Is Improper And Unripe. ...................................................................................... 61

IV. Plaintiffs Are Not Entitled To A Jury Trial. ............................................... 62

CONCLUSION ...................................................................................................... 68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Lockheed Martin Corp.*,
  2007 WL 2316481 (S.D. Ill. Aug. 13, 2007)......................................................66

*Acosta v. Chimes D.C., Inc.*,
  2019 WL 931710 (D. Md. Feb. 26, 2019)..........................................................19

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)............................................................................................30

*In re Agent Orange Prod. Liab. Litig.*,
  818 F.2d 187 (2d Cir. 1987) ..............................................................................52

*Amicas, Inc. v. GMG Health Sys., Ltd.*,
  676 F.3d 227 (1st Cir. 2012)..............................................................................52

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ........................................................................22, 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).......................................................................................3, 28

*Bauer-Ramazani v. TIAA-CREF*,
  2013 WL 6189802 (D. Vt. Nov. 27, 2013)........................................................66

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
  860 F. Supp. 2d 251 (S.D.N.Y. 2012) ...............................................................42

*Birse v. CenturyLink, Inc.*,
  2020 WL 1062902 (D. Colo. Mar. 5, 2020) ......................................................35

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .............................................................................40

*Brown v. City of New York*,
  862 F.3d 182 (2d Cir. 2017) ..............................................................................30

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Cates v. Columbia Univ.*,
　　No. 16-cv-6524 (S.D.N.Y. Jan. 25, 2018) ...........................................................67

*Chao v. Merino*,
　　452 F.3d 174 (2d Cir. 2006) ..................................................................15, 35, 54

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
　　494 U.S. 558 (1990).........................................................................................63

*CIGNA Corp. v. Amara*,
　　563 U.S. 421 (2011)..............................................................................65, 66, 67

*Conkright v. Frommert*,
　　559 U.S. 506 (2010)...................................................................................11, 44

*Davis v. Washington Univ.*,
　　960 F.3d 478 (8th Cir. 2020) ...........................................................................45

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
　　874 F.2d 912 (2d Cir. 1989) .............................................................................15

*Divane v. Northwestern Univ.*,
　　953 F.3d 980 (7th Cir. 2020) .........................................................................2, 67

*Dorman v. Charles Schwab Corp.*,
　　2019 WL 580785 (N.D. Cal. Feb. 8, 2019) .......................................................49

*Fairley v. Andrews*,
　　578 F.3d 518 (7th Cir. 2009) ...........................................................................43

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
　　2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ...................................................35

*Fifth Third Bancorp v. Dudenhoeffer*,
　　573 U.S. 409 (2014)...................................................................................12, 19

*Fine v. Semet*,
　　699 F.2d 1091 (11th Cir. 1983) .......................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   594 F.2d 923 (2d Cir. 1982) ................................................................21

*George v. Kraft Foods Glob., Inc.*,
   641 F.3d 786 (7th Cir. 2011) ........................................................19, 39

*Great–West Life & Annuity Insurance v. Knudson*,
   534 U.S. 204 (2002)..........................................................................64

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .............................................................18

*Henry v. Champlain Enters., Inc.*,
   445 F.3d 610 (2d Cir. 2006) ..............................................................32

*Hightshue v. AIG Life Ins.*,
   135 F.3d 1144 (7th Cir. 1998) ...........................................................36

*Hughes v. Northwestern Univ.*,
   2021 WL 2416925 (U.S. June 10, 2021) .............................................58

*In re Interborough Consolidated Corp.*,
   288 F. 334 (2d Cir. 1923) ..................................................................64

*Jackson v. Federal Express*,
   766 F.3d 189 (2d Cir. 2014) ..............................................................30

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006) .............................................................49

*Katsaros v. Cody*,
   744 F.2d 270 (2d Cir. 1984) ..............................................................36

*Kirschbaum v. Reliant Energy, Inc.*,
   526 F.3d 243 (5th Cir. 2008) .............................................................12

*Kopp v. Klein*,
   894 F.3d 214 (5th Cir. 2018) .............................................................51

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................22

*Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*,
2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012)......................................27

*In re Lehman Brothers Sec. & ERISA Litig.*,
113 F. Supp. 3d 745 (S.D.N.Y. 2015) ...............................................51

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ........................................................40, 57

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) .............................................................47

*Marshall v. Northrop Grumman Corp.*,
No. 2:16-cv-6794 (C.D. Cal. Feb. 15, 2018)......................................66

*Marshall v. Snyder*,
572 F.2d 894 (2d Cir. 1978) .............................................................43

*Mauro v. S. New England Telecomm., Inc.*,
208 F.3d 384 (2d Cir. 2000) .............................................................13

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ...........................................................45

*N.Y. State Psychiatric Assoc. v. UnitedHealth Grp.*,
798 F.3d 125 (2d Cir. 2015) .............................................................67

*New York State Teamsters Council Health & Hospital Fund v.*
*Estate of DePerno*,
18 F.3d 179 (2d Cir. 1994) ..........................................................42, 43

*New York v. U.S. Dep't of Justice*,
951 F.3d 84 (2d Cir. 2020) ...............................................................60

*Nicholas v. Goord*,
430 F.3d 652 (2d Cir. 2005) .............................................................67

vii

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Omnicom Grp., Inc. Secs. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...............................................47

*Pereira v. Farace*,
   413 F.3d 330 (2d Cir. 2005) ......................................*passim*

*Perez v. Silva*,
   185 F. Supp. 3d 698 (D. Md. 2016)....................................66

*Pfeil v. State Street Bank & Tr. Co.*,
   806 F.3d 377 (6th Cir. 2015) ............................................48

*Ramos v. Banner Health*,
   1 F.4th 769 (10th Cir. 2011) ......................................23, 60

*Randelman v. Fidelity Nat'l Title Ins. Co.*,
   646 F.3d 347 (6th Cir. 2011) ............................................62

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1998) ........................................47, 50

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   2016 WL 7494320 (D. Conn. Dec. 30, 2016) ..................15

*Sacerdote v. N.Y. Univ.*,
   328 F. Supp. 3d 273 (S.D.N.Y. 2018) ........................*passim*

*Schaffer ex rel. Schaffer v. Weast*,
   546 U.S. 49 (2005)...........................................................43

*Silverman v. Mutual Beneficial Life Ins. Co.*,
   138 F.3d 98 (2d Cir. 1998) ..............................28, 41, 44

*Spring Street Partners-IV, L.P. v. Lam*,
   730 F.3d 427 (5th Cir. 2013) ............................................31

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan
   v. Morgan Stanley*,
   712 F.3d 705 (2d Cir. 2013) ...............................12, 20, 32

viii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Strom v. Goldman, Sachs & Co.*,
   202 F.3d 138 (2d Cir. 1999) ................................................................64

*Sweda v. University of Pennsylvania*,
   923 F.3d 320 (3d Cir. 2019) ..................................................58, 59, 60

*Taylor v. United Techs. Corp.*,
   2009 WL 535779 (D. Conn. Mar. 3, 2009) .......................................21

*Teets v. Great–West Life & Annuity Ins.*,
   921 F.3d 1200 (10th Cir. 2019) ........................................................60

*Thomas v. Speedway SuperAmerica, LLC*,
   506 F.3d 496 (6th Cir. 2007) .............................................................49

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015)............................................................................32

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013) ...............................................39, 40, 57

*Tompkins v. Metro-North Commuter Railroad Co.*,
   983 F.3d 74 (2d Cir. 2020) ................................................................55

*Tracey v. Mass. Inst. of Tech.*,
   395 F. Supp. 3d 150 (D. Mass. 2019)................................................67

*Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016) ..............................................................21

*Tussey v. ABB, Inc.*,
   2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) .................................24

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) .............................................................43

*U.S. Life Ins. v. Mechs. & Farmers Bank*,
   685 F.2d 887 (4th Cir. 1982) .............................................................44

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Botti*,
711 F.3d 299 (2d Cir. 2013) ..........................................................46, 49

*UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*,
870 F.3d 856 (8th Cir. 2017) ...............................................................31

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,
373 F.3d 241 (2d Cir. 2004) ................................................................30

*White v. Chevron Corp.*,
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .............................18, 60

*Wilcox v. Georgetown Univ.*,
2019 WL 132281 (D.D.C. Jan. 8, 2019).......................................14, 46

*Wildman v. Am. Century Servs., LLC*,
362 F. Supp. 3d 685 (W.D. Mo. 2019)................................................53

*In re YRC Worldwide, Inc. ERISA Litig.*,
2010 WL 4920919 (D. Kan. Nov. 29, 2010).......................................66

**Statutes, Rules and Regulations**

72 Fed. Reg. 41128 (2007) .........................................................................4

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

29 U.S.C. § 1002(14)(B).............................................................................59

29 U.S.C. § 1104(a)(1)(B) .......................................................................9, 11

29 U.S.C. § 1106(a)(1).........................................................................59, 60

29 U.S.C. § 1108(b)(2).............................................................................61

29 U.S.C. § 1109(a) ..........................................................................9, 28, 42

Fed. R. App. P. 4(a)(3)................................................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Fed. R. Civ. P. 23(c)(1)(C) ..........................................................................62

Fed. R. Civ. P. 39(a)(2)..............................................................................63

Pub. L. No. 93-406, 88 Stat. 829 (1974).....................................................5

# CITATION FORMAT

| Abbreviation | Description |
|:---:|:---|
| A_ | Plaintiffs-Appellants' Appendix |
| Br._ | Plaintiffs-Appellants' Opening Brief |
| DJA_ | Defendants-Appellees-Cross-Appellants' Joint Appendix |
| DJSA_ | Defendants-Appellees-Cross-Appellants' Joint Special Appendix |
| Dkt._ | Docket entries in No. 16-cv-6525 (S.D.N.Y.) |
| SA_ | Plaintiffs-Appellants' Special Appendix |

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1331. It entered a final judgment on December 22, 2020. DJSA8.

This Court has jurisdiction under 28 U.S.C. § 1291. Plaintiffs timely filed their notice of appeal on January 12, 2021. A2069. Defendants Cornell University, The Retirement Plan Oversight Committee, and Mary G. Opperman (collectively "Cornell") timely filed their notice of conditional cross-appeal on January 19, 2021. DJA344; *see* Fed. R. App. P. 4(a)(3).

# STATEMENT OF THE ISSUES

Plaintiffs' opening brief identifies the following issues:

1) Whether the district court correctly awarded Cornell summary judgment on Plaintiffs' recordkeeping claim.

2) Whether the district court correctly awarded Cornell summary judgment on Plaintiffs' investment claims.

3) Whether the district court correctly rejected certain allegations underlying Plaintiffs' investment claims as a matter of law.

4) Whether the district court correctly dismissed Plaintiffs' prohibited transaction claims.

5) Whether the class definition should be revisited.

Cornell's conditional cross-appeal presents the following issue:

6) Whether the district court erred in holding that the Seventh Amendment entitles Plaintiffs to a jury trial.

## PRELIMINARY STATEMENT

In 2016, Plaintiffs' counsel filed nearly identical lawsuits against more than a dozen universities, including Cornell, alleging that they did not engage in reasoned decision-making processes or consider relevant factors when making decisions about their retirement plans' recordkeeping and investment options.[1] The district court allowed Plaintiffs to proceed on certain of their claims against Cornell. After nearly two years of fact and expert discovery, full briefing, and oral argument, however, the district court held that Cornell was entitled to summary judgment.

That conclusion was entirely correct. The record shows that Cornell made careful decisions about recordkeeping and investment options. In addition, uncontested facts show that Cornell's retirement plans did not pay too much for recordkeeping services. Indeed, the Cornell plans' rates were entirely consistent with

---

[1] Cornell notes two of these parallel cases, both pending, for the Court's convenience.

First, in 2018, Judge Forrest ruled in favor of New York University ("NYU") on similar claims following a bench trial. *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018). Plaintiffs appealed, and the parties are awaiting a decision. *Sacerdote v. New York Univ.*, No. 18-2707 (2d Cir., argued Oct. 14, 2020). As noted in this brief, several of the issues raised here overlap with issues raised in the NYU case, though this appeal ultimately turns on Plaintiffs' inability to show a genuine issue of fact based on the evidence in this case.

Second, the Supreme Court recently granted certiorari in *Hughes v. Northwestern University*, No. 19-1401, to review the dismissal of similar recordkeeping and investment claims against Northwestern University at the pleading stage. *See Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020). Because this case proceeded to full discovery on both theories, Cornell anticipates that the decision in *Hughes* will not bear directly on the summary judgment determination that is the primary subject of this appeal.

hundreds of similarly situated TIAA clients. Plaintiffs also failed to muster any evidence that similarly situated fiduciaries viewed the investments Cornell offered to participants as imprudent. In lieu of such evidence, Plaintiffs relied on *ipse dixit* from their so-called "experts," and the district court exercised its considerable discretion over these matters to conclude, correctly, that this evidence did not raise a genuine issue of material fact.

Plaintiffs offered no meaningful response to the district court's rulings and have presented none on appeal. They insist that certain factual disputes remain, but "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The disputes Plaintiffs identify are neither. Plaintiffs merely try to gin up material conflicts by warping the governing law.

At the core of Plaintiffs' litigation theory is the notion that plan administrators are liable whenever counsel for a group of participants claims that, with the benefit of hindsight, they would have done something differently. But this theory ignores ERISA's controlling principles, which proscribe only demonstrably *imprudent* conduct. Plaintiffs failed to provide evidence that a prudent fiduciary never would have acted as Cornell did. The record showed just the opposite: Cornell acted sensibly and in a manner consistent with its peers. Nor is there evidence that the

3

plans would have performed any better under Plaintiffs' preferred approach, which provides independent grounds to affirm the judgment below.

## STATEMENT OF THE CASE

### A.    The Cornell Plans

Pursuant to Section 403(b) of the Internal Revenue Code, Cornell University sponsors two defined-contribution retirement plans for its employees: the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca, established in 1937 and funded by employer contributions (DJA230); and the Cornell University Tax Deferred Annuity Plan, established in 1976 and funded by employee contributions (DJA245) (collectively, the "Plans"). The University is the named administrator for the Plans. It delegated administrative responsibilities to Cornell's Vice President for Human Resources (Defendant Mary Opperman), who in turn delegated certain duties to Paul Bursic, Senior Director of Benefits Services and Administration until his retirement in 2016, and employees under his direction. DJA282 (Bursic Decl.) ¶¶ 1-2.

*IRS Regulations*. On January 1, 2009, shortly before the start of the class period, the Internal Revenue Service's "comprehensive update" to regulations governing 403(b) plans became effective. 72 Fed. Reg. 41128, 41129 (2007). Sponsors and administrators of 403(b) plans interpreted these regulations to require them to take a more active role in plan administration. DJA257; DJA260. To assess

4

the effect of the update and ensure the Plans' compliance with the new regulations, the Benefits Department at Cornell formed the Retirement Plan Oversight Committee ("RPOC"), chaired by Ms. Opperman, which met for the first time in November 2010. DJA288-89; DJA298 (11/2010 Minutes). In April 2011, RPOC put out a Request for Proposal for a third-party consultant "to assist it in building a fully compliant retirement plan operation." DJA146 (RFP). After evaluating bids, RPOC selected Capfinancial Partners LLP ("CAPTRUST") as the Plans' investment advisor and plan administration consultant. DJA109.

*Plan Investments*. For over 80 years, the Plans' lineup has included fixed and variable annuities from TIAA-CREF. Indeed, until 1974, 403(b) plans were allowed to offer *only* tax-deferred annuities. Pub. L. No. 93-406, § 1022(e), 88 Stat. 829, 1072 (1974). Annuity products were, and remain, very popular with participants, who have collectively invested hundreds of millions of dollars in these products. *See* DJA265 & DJA268 (2012 Form 5500s).

By the mid-1990s, mutual funds had become increasingly desirable investment vehicles, both for retail investors and retirement plan participants. Because TIAA did not offer any mutual fund options at the time, the University engaged Fidelity Investments to ensure that participants had access to mutual funds as investment options. DJA283 (Bursic Decl.) ¶ 3. Although TIAA eventually began to offer mutual funds as investment options, by that time thousands of plan

5

participants had invested substantial amounts in the mutual funds offered by Fidelity. Accordingly, the Plans continue to offer both Fidelity and TIAA investment options. DJA272-273 & DJA278-279 (Plan Summaries).

*Plan Recordkeeping*. Plans typically retain third-party administrators—called "recordkeepers"—to track contributions, implement investment decisions, manage account distributions, and perform many other services. For the past several decades, multiple recordkeepers have been the norm in higher education plans. DJA168 (Chittenden *Sacerdote* Decl.) ¶ 45. In part, that is because plans had to engage both annuity providers and mutual fund companies to ensure that participants had access to both types of investments, and ████████████████████████████ ████████████████████████████████████████ ████████████████████. DJA390 (Chittenden Decl.) ¶ 27.

In recent years, the recordkeeping market has changed, and some fiduciaries have made different decisions depending on their circumstances. For example, as Plaintiffs note, a few universities have "frozen" contributions to TIAA—meaning participants could no longer invest new sums in TIAA annuities—and moved active contributions to a non-TIAA recordkeeper while continuing to pay TIAA to recordkeep the frozen investments. A88-89; DJA386-388 (Chittenden Decl.) ¶¶ 12, 18; DJA375-376 (Otto Tr.) 149:6-150:10. Many plans continue to retain the services of multiple recordkeepers, however. From 2010 to 2016, when Plaintiffs filed suit,

well over half of TIAA's 200 largest 403(b) clients used more than one recordkeeper. DJA168 (Chittenden *Sacerdote* Decl.) ¶ 45; A2404-2405 (Poehler Rpt.) ¶ 40 & Ex. 1. This included Cornell, which had recordkeeping arrangements with both TIAA and Fidelity.

### B. Overview of Plaintiffs' Claims

Plaintiffs filed their Corrected Amended Complaint on February 24, 2017. A47. Plaintiffs alleged that Cornell violated its duties of prudence and loyalty by offering the TIAA Traditional Annuity, a fixed annuity investment, A167-170 (Count I); by failing to monitor and control recordkeeping fees, A172-174 (Count III); and by failing to monitor and offer appropriate investment options, A176-180 (Count V).[2] Plaintiffs also brought "prohibited transaction" claims based on each of these theories. A170-172 (Count II), A174-175 (Count IV), A180-181 (Count VI). Finally, in Count VIII—there is no "Count VII" in the complaint— Plaintiffs brought a derivative claim for breach of the duty to monitor. A182-184.[3]

---

[2] Although pled as a single count, Plaintiffs have treated Count V as encompassing at least two distinct claims: one for retaining certain investment options in the menu despite a history of supposed underperformance, and another for offering higher-cost share classes of certain investments despite allegedly available lower-cost institutional shares. *See generally* Part II *infra*.

[3] As the district court later explained, the monitoring claim is "only as broad" as the underlying prudence claims, SA46 n.17, and Plaintiffs have apparently abandoned the Count VIII claim by not mentioning it in their opening brief. Therefore, Cornell does not address that claim on appeal.

### C.   The Decisions Below

On September 29, 2017, the district court granted Cornell's motion to dismiss in part. The court dismissed Plaintiffs' duty of loyalty claims and the prudence claim based on the Traditional Annuity in Count I. SA54. Plaintiffs do not challenge either of these rulings.

The court declined to dismiss Plaintiffs' prudence claims based on recordkeeping or plan investments, although it held that several of the supposedly "imprudent" actions set out in Count V failed to suggest imprudence as a matter of law. Finally, the court dismissed Plaintiffs' prohibited transaction claims, because it would be nonsensical to construe ERISA to mean that the Cornell Defendants "caused the Plans to engage in prohibited transactions each time the Plans paid fees to TIAA-CREF and Fidelity." SA73-74.

Subsequently, on September 6, 2018, the district court relied on *Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005), to deny Cornell's motion to strike the jury demand in the complaint. DJSA9.

Following discovery, Cornell moved to exclude Plaintiffs' recordkeeping and investment experts and for summary judgment. On September 27, 2019, the district court granted summary judgment for Cornell on nearly all of Plaintiffs' claims. SA9.

After first excluding unreliable opinions from Plaintiffs' proposed recordkeeping-fee experts, the court found that Plaintiffs failed to marshal evidence

8

that purported recordkeeping breaches caused any loss to the plan. SA21, SA26-30. The court also found no evidence that the two funds at the heart of Plaintiffs' investment claim—the CREF Stock Account ("CREF Stock") and the TIAA Real Estate Account ("TIAA Real Estate")—were considered imprudent investments during the class period, or that Cornell failed to make reasoned decisions in retaining those options despite a period of supposed underperformance. SA33, SA39-40. While recognizing that briefing "at all stages" had focused on CREF Stock and TIAA Real Estate, on summary judgment the Court allowed Plaintiffs to introduce evidence involving more than 175 other allegedly imprudent funds. SA40. Yet the court also found that Plaintiffs failed to identify evidence of imprudence with respect to this expanded universe of claims. SA42-44. Finally, the court dismissed the share-class claim in large part. SA44-46.

On December 22, 2020, the district court approved the parties' settlement of the portion of the case remaining after summary judgment. DJSA8.

## SUMMARY OF ARGUMENT

To demonstrate a triable issue at summary judgment, Plaintiffs must come forward with evidence that Cornell departed from the standard of care exercised by prudent fiduciaries in like circumstances, and that the alleged breach caused a loss to the Plans. 29 U.S.C. §§ 1104(a)(1)(B), 1109(a). Plaintiffs failed to make these showings for any of the live claims remaining in the case. On appeal, Plaintiffs raise

a host of supposed errors by the district court, but these arguments—while numerous—are meritless, and Plaintiffs ultimately fail to carry their burden of identifying a genuine issue of material fact for trial.

As an initial matter, Plaintiffs have no evidence of a breach of fiduciary duty. The record shows that Cornell made reasoned and prudent decisions that were consistent with those made by its peers. Plaintiffs say they disagree with those decisions, but ERISA does not make Plaintiffs, their counsel, or their experts the yardstick of a prudent fiduciary. By law, prudence turns on the conduct of comparable fiduciaries in the market, and Plaintiffs offer no such evidence to support their claims.

Nor do Plaintiffs offer support for the remaining elements of their claims—loss and causation. Plaintiffs argue at length that, contrary to the traditional rule, Cornell bears the burden to *disprove* the element of causation. That is wrong and irrelevant. Before assessing causation, Plaintiffs must satisfy their burden to show loss, and the district court correctly held that Plaintiffs could not carry that burden on the recordkeeping claim. And even if Cornell bore the initial burden on causation, it would make no difference here, for there is no material dispute of fact on the absence of evidence of loss, wherever the burden at trial may lie.

Plaintiffs' remaining arguments are equally meritless. Plaintiffs forfeited their request for equitable relief, which fails in any event because they cannot show

10

imprudence. Their share-class claims fail on breach and causation grounds. There is no legal support for Plaintiffs' argument that the district court erred by "parsing" the investment count. And Plaintiffs' prohibited transaction claims fail as a matter of law, and their challenge to the class definition is improper.

Finally, as to Cornell's conditional cross-appeal, the district court erred in denying Cornell's motion to strike the jury demand. If the Court does not affirm the judgment below, it should reverse the district court's ruling and hold that any trial the Court finds may be required should be a bench trial.

## ARGUMENT

Congress designed ERISA to "ensure that employees … receive the benefits they had earned" without creating a system that is "so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (brackets and citations omitted). To achieve this balance, Section 404 of ERISA provides that plan fiduciaries shall discharge their duties:

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1)(B).

The Department of Labor has interpreted this Section to "provid[e] greater flexibility, in the making of investment decisions by plan fiduciaries, than might

11

have been provided under pre-ERISA common and statutory law in many jurisdictions." Op. No. 81-12A, 1981 WL 17733, at *1 (Jan. 15, 1981); *see also Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008) (describing ERISA's "flexible" standard); *Fine v. Semet*, 699 F.2d 1091, 1094 (11th Cir. 1983) ("a goal of Congress in holding ERISA fiduciaries to the 'prudent man' standard" was to allow for "the flexibility necessary for proper financial management of such plans").

Deciding whether a fiduciary has acted prudently "necessarily" is "context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). The fundamental question is whether the plaintiff has adduced facts sufficient to show "that a prudent fiduciary in like circumstances would have acted differently." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley*, 712 F.3d 705, 717 (2d Cir. 2013).

## I.   The District Court Correctly Granted Summary Judgment On The Recordkeeping Claim.

Plaintiffs' recordkeeping claim asserts that Cornell caused the Plans to pay more for recordkeeping than a prudent fiduciary would have allowed under similar circumstances. A prudence claim has three elements: (1) breach—that the fiduciary's conduct fell below a recognized standard of care, (2) loss—that when considered against other valid comparators, the plan lost money based on the fiduciary's decision, and (3) causation—that the plan would not have suffered the

loss if a hypothetically prudent fiduciary had been managing it. All agree that Plaintiffs bear the burden of proof on the first and second elements, but the parties disagree on where the burden lies for the third. Br.26.

### A. Plaintiffs Failed To Introduce Evidence To Support A Rational Finding That Cornell Breached Its Duty To Plan Participants.

Plaintiffs' recordkeeping claim fails at the outset because there is no evidence that Cornell fell short of the standard of care that similarly situated fiduciaries followed from 2010 to 2016. While the district court found that "[m]aterial issues of fact remain" regarding the prudence of Cornell's process for monitoring recordkeeping fees, SA19, as shown below none of the issues Plaintiffs identified are material. This Court may affirm the grant of summary judgment "on any basis for which there is a record sufficient to permit conclusions of law." *Mauro v. S. New England Telecomm., Inc.*, 208 F.3d 384, 387 n.2 (2d Cir. 2000).

### 1. Cornell Was Not Required To Consolidate With A Single Recordkeeping Provider.

Plaintiffs' core contention with respect to recordkeeping was that Cornell should have moved from its dual-recordkeeper arrangement (engaging TIAA and Fidelity) to a single recordkeeper, thereby (allegedly) reducing the overall fees paid by the Plans. But discovery showed the insurmountable obstacle to this theory: no single provider could provide recordkeeping services for the Plans' entire investment lineup. Transitioning to a sole recordkeeper would have required Cornell to jettison

TIAA investment options on which thousands of Plan participants relied, while still requiring the Plans to pay TIAA to recordkeep legacy TIAA investments based on the individual contracts between Plan participants and TIAA, which Cornell had no authority to terminate. Alternatively, Cornell could have taken matters out of Plan participants' hands entirely by selling off hundreds of millions of dollars of plan assets and unilaterally investing the proceeds in different funds.

At its January 2012 meeting, RPOC noted that TIAA and Fidelity were "unwilling/unable to provide administration and recordkeeping services for the others funds" and that there were challenges associated with "individual contracts at TIAA." DJA202-203 (1/2012 Minutes). Given this reality, and after considering CAPTRUST's advice, Cornell reasonably concluded that consolidation would be impractical and disruptive at best. DJA195-196 (Bursic Tr.) 147:16-151:2; DJA292 (Opperman Tr.) 86:18-89:7; DJA209 (Matheson Decl.) ¶ 3.

Even assuming that somehow it would have been prudent for Cornell to transform the Plans radically to save a small amount per participant on recordkeeping fees, nothing in ERISA *required* Cornell to take that enormous leap. As Judge Collyer explained about this identical theory in another case, although "the Plans could be transformed from what they are to something else," ERISA does not require that transformation. *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at \*12 (D.D.C. Jan. 8, 2019).

Put another way, "ERISA protects plan participants' reasonable expectations in the context of the market that exists." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017). From 2010 to 2016, the market did not permit Cornell or other fiduciaries to consolidate to a sole recordkeeper without substantially reshaping their plans. Cornell recognized this and decided against such a significant transformation. So long as a fiduciary satisfies the baseline "prudent person" standard, ERISA does not impose a "duty to take any particular course of action if another approach seems preferable." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 917 (2d Cir. 1989)).

Plaintiffs' primary response to the constraints Cornell faced in choosing recordkeepers is to theorize that—despite the lack of evidence that any similarly situated plan used a recordkeeper other than TIAA for TIAA annuity products— Cornell *might* have forced TIAA to make concessions or "mapped" billions of dollars in TIAA investments onto an alternative provider to enable a sole recordkeeping arrangement. But aside from the fact that Cornell did not want (and was not required) to eliminate TIAA annuities, Plaintiffs' speculation about the potential effects of that overhaul does nothing to show a violation of the duty of prudence. As Judge Forrest held in the NYU case, a fiduciary is not required to treat its participants as "guinea pigs" in the hopes of lowering recordkeeping fees.

15

*Sacerdote*, 328 F. Supp. 3d at 302-03. Further, TIAA's legacy annuities were structured as individual contracts between the participant and the annuity provider, meaning fiduciaries had limited ability to move participants into other investments. DJA164-168 (Chittenden *Sacerdote* Decl.) ¶¶ 23, 27, 31, 35, 46; DJA199 (1/2012 Materials) at 35. Plaintiffs offered no evidence that any similar fiduciary has ever mapped TIAA annuities onto another product, as Plaintiffs propose a prudent fiduciary necessarily would have done.

### 2. Plaintiffs' Other Efforts To Second-Guess Plan Management Are Equally Meritless.

With no evidence to support their core theory on fees, Plaintiffs challenge several aspects of Defendants' management process, but none merits reversal.

*First*, Plaintiffs claim, Cornell did not monitor recordkeeping fees. Br. 12. The record forecloses this theory.

Before the formation of RPOC, Cornell attempted to leverage the Plans' size to negotiate a fee reduction with TIAA on at least two occasions. Each time, TIAA told Cornell—as it told all of its clients at the time—that its fees were non-negotiable. DJA189 (Bursic Tr.) 36:6-37:14; DJA284 (Bursic Decl.) ¶ 6; DJA388 (Chittenden Decl.) ¶ 17; A2422-2423 (Poehler Rpt.) ¶¶ 79-80. Plaintiffs do not dispute that this was TIAA's decades-long policy. Without the ability to negotiate a reduction, Cornell ensured that its fees were reasonable by negotiating for additional services—including more counseling opportunities through the opening of a local

16

TIAA office, a customized call center, and more frequent on-campus educational sessions—for the same fee. DJA284 (Bursic Decl.) ¶ 6.

Fidelity similarly refused to provide retirement plans with administrative fee discounts or lower-cost share classes. In 2009, Fidelity began to offer some of its retirement plan clients "K Shares," which had a lower administrative fee component. Cornell was among the first higher education clients to request and receive K Shares, which Cornell first added to the Plans in 2010. DJA189-190 (Bursic Tr.) 36:11-38:14; DJA130 (9/2010 email).

In 2011, TIAA changed its pricing approach and began agreeing to lower administrative fees for certain clients. DJA186 (CREF Presentation). Cornell recognized the shift toward so-called "plan based economics" and engaged CAPTRUST to assist with negotiating lower administrative fees. *E.g.*, A345 (4/2012 Materials). These negotiations resulted in progressive decreases, from roughly $155 and $82 per participant in 2010 for TIAA and Fidelity, respectively, to $59 and $38 in 2018. A2424 (Poehler Rpt.) ¶ 82. CAPTRUST's benchmarking database demonstrates that these fees are not only reasonable, but below average for plans of similar size and with similar features. DJA210-211 (Matheson Decl.) ¶¶ 5-6.

**Second**, Plaintiffs assert that it is "standard fiduciary practice" to negotiate fixed-rate recordkeeping fees, while Cornell's contracts with TIAA and Vanguard assessed fees as a percentage of total Plan assets. Br.11-12. The record demonstrates

17

that negotiating fixed-rate fees was not "standard fiduciary practice" for 403(b) plans; on the contrary, during the relevant period, most recordkeeping fees were charged and collected through asset-based fees built into 403(b) plan investment options. A2413-2414 (Poehler Rpt.) ¶ 58; DJA365 (Warner Tr.) 102:6-104:14. Regardless, asset-based fees "violate[] no statute or regulation." *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009). What determines whether a recordkeeping fee is prudent is not how the fee is calculated, but what the fee *is*. As Judge Forrest recognized in the NYU case, "as assets under management increase, so may efficiencies, and a fiduciary can thus negotiate to reduce the [asset-based] charge." *Sacerdote*, 328 F. Supp. 3d at 306 n.75. That is precisely what the uncontested record shows Cornell did here.

**Third**, Plaintiffs assert (at 12-13) that Cornell did not follow "industry standard practices" by obtaining competitive bids for recordkeeping. But here again, Plaintiffs ignore the flexibility ERISA affords plan fiduciaries, confusing *a* way to manage a plan with the *only* way to do so.

While bidding "can be an example of an action taken to ensure fees are appropriate," it "is not *per se* required under ERISA." *Sacerdote*, 328 F. Supp. 3d at 286; *see also White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) ("nothing in ERISA compels periodic competitive bidding"). There are many alternatives for controlling costs, including engaging in regular negotiations,

18

retaining consultants familiar with reasonable fee levels, and periodically benchmarking fees against peer institutions. Cornell took all of these steps.

In fact, bidding is especially unlikely to be helpful where, as here, only one provider offers the necessary service. In such circumstances, an RFP would have wasted money without reducing costs. *See Acosta v. Chimes D.C., Inc.*, 2019 WL 931710, at \*7, \*19 (D. Md. Feb. 26, 2019) (defendants acted prudently in not issuing RFPs when "given the few choices available, … they believed that sending out a formal RFP did not make practical sense").[4]

***Fourth***, Plaintiffs' remaining "evidence" of imprudence merely mischaracterizes testimony from Paul Bursic. *See* Br.12. Contrary to Plaintiffs' contention, Bursic was always aware of both the total expense ratio and its administrative fee component. DJA283 (Bursic Decl.) ¶ 5. Indeed, Plaintiffs do not dispute that this information was disclosed to Cornell annually throughout the entire class period. DJA389-390 (Chittenden Decl.) ¶¶ 24-26; A542 (2009 disclosure).

What Bursic said he did not know were the line item costs for each of the

---

[4] The district court agreed that "competitive bidding is not required under ERISA" but hesitated to grant judgment for Cornell because "summary judgment has been denied where fiduciaries failed to solicit competitive bidding over a fifteen year period and there was evidence that such failure resulted in a monetary loss." SA20 (citing *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011)). *Kraft Foods*, however, involved a standard 401(k) plan, with none of the complications posed by a plan with a significant percentage of TIAA assets. Again, ERISA requires a "context-sensitive" inquiry, *Dudenhoeffer*, 134 S. Ct. at 2471, and *Kraft Foods* says nothing about whether Cornell acted prudently in *these* circumstances.

individual bundled services the administrative fee covered. For example, although Bursic was aware that the total administrative services package cost approximately $4,000,000 in 2009, he did not know what portion of that fee covered core recordkeeping services, participant communications, participant education, call center costs, and all of the other administrative services that were part of the bundled arrangement. DJA337 (Bursic Tr. 92:7-17). Plaintiffs presented no evidence that any plan fiduciaries had access to that level of detail related to how TIAA or Fidelity priced their services, much less that it was a standard fiduciary practice to possess such information.

In sum, Plaintiffs fail to show that Cornell did not use "appropriate methods" to monitor recordkeeping (*PBGC*, 712 F.3d at 712), and they offer no evidence that their preferred procedures are the only ones that prudent fiduciaries followed. Plaintiffs thus provide no basis to rule for them on the breach element of their claim.

## B.    In The Alternative, The District Court Correctly Held That Plaintiffs Failed To Offer Evidence Of Loss.

Even if Plaintiffs had marshaled evidence sufficient to persuade a rational factfinder that Cornell breached a duty to Plan participants (they did not), Plaintiffs' recordkeeping claim fails on the alternative ground that Plaintiffs offered no credible evidence of loss, a separate element upon which Plaintiffs also bear the burden of proof.

The loss element requires Plaintiffs to show that "but for the breach, the [plan]

would have earned even more than it actually earned." *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016). To prove loss in this context, Plaintiffs must identify evidence sufficient to show that the Plans paid more for recordkeeping services during the class period than similar plans. In other words, Plaintiffs must point to factually similar comparators. *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 594 F.2d 923, 930 n.3 (2d Cir. 1982) (rejecting proposed comparisons where "[t]he nature and extent of the services required by each type of fund differ sharply"); *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009) (similar).

Plaintiffs attempted to demonstrate recordkeeping loss using testimony from two putative experts, Al Otto and Ty Minnich. Both declared that, in their "experience," a reasonable recordkeeping rate for the Plans would have been $35 to $40 per participant. SA28-29.

After an exhaustive analysis of these opinions, however, the district court concluded that neither Otto nor Minnich offered any "recognizable, describable methodology" to support their estimates or even their choice of comparator plans. SA29. The court therefore excluded their opinions on loss. Plaintiffs offer no meaningful challenge to this ruling on appeal, and as the district court held, Plaintiffs' failure to furnish any evidence of loss constitutes an independent basis for summary judgment on their recordkeeping claim.

### 1. The Court Did Not Abuse Its Discretion In Excluding Plaintiffs' Experts On Loss.

This Court reviews "a district court's determination to admit or exclude expert testimony under *Daubert* for abuse of discretion," which requires Plaintiffs to demonstrate that the decision is "manifestly erroneous." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264-65 (2d Cir. 2002). The abuse of discretion standard "applies as much to the trial court's decisions about *how to determine reliability* as to its ultimate conclusion." *Id.* at 265 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Plaintiffs do not even acknowledge the standard of review, much less meet it.

Instead, Plaintiffs contend that Otto and Minnich's methodology is admissible because it was the "same" method they purportedly applied in their professional capacities. Br.52-53. But that contention fails for two reasons. First, Otto's and Minnich's experience was inapposite, because neither had ever priced recordkeeping fees for plans with active TIAA annuities—the fundamental factor distinguishing plans like Cornell's from a generic 401(k) or 403(b) plan. Indeed, Minnich's experience with university clients undermined his opinions; ██████████████████ ████████████████████████████████████████████████████████.

DJA351-352 (Minnich Tr.) 98:18-99:13.

Second, as the district court found, the "methodology" Plaintiffs' experts purportedly applied was no methodology at all. Otto did "not detail how his

22

knowledge and experience led him to calculate the fees for the time periods listed, or why those numbers are reasonable in light of any features of the Plans," and he "concede[d] that he picked [comparable] plans" only to "support his numbers." SA27-28. Similarly, Minnich offered "no explanation as to how [his comparator] schools were chosen, no example for reasonable rates in the 2010-2012 time period, and only one rate per [comparator] school to cover the entire time period at issue." SA29-30. As Judge Forrest observed in the NYU case, regarding a materially identical opinion by another expert proffered by Plaintiffs' counsel, "[P]laintiffs fail to demonstrate … that their proposed fee ranges were the only plausible or prudent ones—or, indeed, that any comparable Plan has ever [been] charged within that range." *Sacerdote*, 328 F. Supp. 3d at 307.

*Daubert* does not authorize experts to pick numbers out of the air—much less in a way that admittedly favors one party's interests—and chalk that process up to "experience." Especially in light of the district court's "broad discretion" to determine "what method is appropriate for evaluating reliability under the circumstances of each case," *Amorgianos*, 303 F.3d at 256, the district court did not err in concluding that Otto and Minnich's *ipse dixit* failed the Rule 702 admissibility test. On the contrary, admitting these experts' testimony on this record could even be considered an abuse of discretion. *Cf. Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2011) (in another of Plaintiffs' counsel's cases, affirming exclusion of

recordkeeping expert's "experiential" opinions due to lack of "any replicable method underlying [the expert's] estimates").[5]

### 2. Plaintiffs' "Non-Expert" Evidence Is Unavailing.

Although they recognized the need for expert testimony to establish loss below, Plaintiffs now aim to overcome the adverse *Daubert* rulings by citing a smattering of "non-expert evidence." But none of this evidence fills the gap left by the exclusion of Minnich and Otto—for no reasonable factfinder could conclude that the evidence includes any relevant comparators, as required to show that the Plans overpaid.

*a. TIAA Data*. Plaintiffs contend that data used by Cornell's expert Glenn Poehler shows that "the Plans overpaid by up to $30 per participant per year from 2012-2017." Br.54. As an initial matter this data shows fees roughly *four times higher* than the supposedly "reasonable" fee that Otto and Minnich hypothesized.

But Plaintiffs misread the TIAA data in any event. Plaintiffs contend that because the Plans are in the 15th to 20th percentile by participant count, the Plans ought to have paid less for recordkeeping than the "25th percentile" of the plans in the TIAA data. Plaintiffs therefore compute an "excess," which they claim

---

[5] That one judge found Otto's opinions about recordkeeping fees admissible in a different case is immaterial. *See* Br.52-53 (citing *Tussey v. ABB, Inc.*, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012)). *Tussey* involved a 401(k) plan, not a 403(b) plan, that did not offer TIAA annuities. Furthermore, the judge ultimately relied on market evidence that (unlike in this case) validated Otto's figures. 2012 WL 1113291, at *11-13.

represents "loss" to the Plans. Br.54. This approach proceeds from a false premise, however, for the row Plaintiffs label "25th Percentile" does not represent the top quartile of clients by number of participants. 

DJA381 (Podzinski Decl.) ¶ 4.

*Id.* Thus, this data is yet another indication of Cornell's prudence in negotiating competitive fees.

***b. CAPTRUST And Other Data.*** The district court correctly rejected Plaintiffs' reliance on CAPTRUST data showing that a handful of clients paid $74 for recordkeeping in 2017. *See* Br.54-55. Plaintiffs never explain why the fees paid by these few schools in 2017 were relevant comparators for Cornell throughout the earlier class period, much less why Plaintiffs' interpretation of this data "would lead a reasonable juror to conclude that Cornell could have achieved lower fees based solely on these numbers." SA22.

Plaintiffs also suggest that "other plans" cited in their experts' reports establish loss, although Plaintiffs do not actually cite the data on which they rely. Br.55-56 (discussing Harvard and Caltech). The district court correctly rejected Plaintiffs' experts' reliance on this data twice, first in ruling on summary judgment

25

and later in denying Plaintiffs' motion for partial reconsideration. As the court observed, "neither Otto nor Minnich explained why or how they selected the universities to which they compared Cornell." SA52. It follows that Plaintiffs' attempt to rely on this evidence as *non*-expert proof necessarily fails.

In fact, these two "comparators" in Otto's and Minnich's reports are not comparable at all. Otto and Minnich's discussion of Harvard's supposed fees relied on a disclosure announcing that, effective in 2018, Harvard would be paying an asset-based fee to TIAA of 3.8 basis points (hundredths of a percentage point), which Minnich asserted would "equate to approximately \$18/participant." A847 (Minnich Rpt.) ¶ 147. But that disclosure applied to many different retirement plans sponsored by Harvard, while Otto and Minnich only looked at one of these plans in their analyses—in Otto's case, he admitted, "because it supported my fee assumption." DJA121 (Minnich Tr.) 158:8-20; DJA127-128 (Otto Tr.) 124:19-125:19. Applying that same fee to Harvard's retirement income plan for teaching faculty showed fees nearly three times greater than Otto and Minnich opined Cornell's Plans should have paid. DJA122-124 (Minnich Tr.) 160:20-162:13.

The Caltech evidence was even less probative, because it did not even involve a recordkeeping fee. Plaintiffs erroneously interpreted a rebate used to pay for other administrative services (like the plan's auditor) as the amount paid to TIAA for recordkeeping. Minnich testified that he had "no reason to believe" his interpretation

of the data was accurate. DJA119-120 (Minnich Tr.) 137:8-138:10. And Cornell's expert—who advised Caltech—unambiguously stated that it was not. A2387, A2440-2441 (Poehler Rpt.) ¶¶ 3, 107-108.

**c. Other Miscellaneous Evidence.** Nor can Plaintiffs salvage their case with the "admissible portions of Otto's and Minnich's testimony," namely their explanation of plans' "general characteristics." Br.55 (citing SA30 n.10). Again, the district court held that Plaintiffs' experts did not employ a reliable methodology by considering these "general characteristics" and proclaiming a reasonable recordkeeping fee. Plaintiffs cannot credibly contend that it is reliable for a non-expert factfinder to perform the same prognostication.

Finally, Plaintiffs' string cite of "additional evidence" of loss (Br.56-57) offers nothing more than non-material evidence. An RFP response, for example, indicates that using a single recordkeeper "generally optimize[s]" total fees. A2513. That is what the document says, but its advice is irrelevant to plans, like Cornell's, that reasonably determined not to use a single recordkeeper. *See supra* pp. 13-15. Other evidence shows that Cornell's recordkeeping costs declined during the class period. But that is not evidence that a prudent fiduciary would have been able to lower costs *earlier* in the period. On the contrary, it reflects Cornell's prudent and successful efforts to negotiate lower fees when it became possible to do so. *See supra* pp. 16-17; *cf. Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 2012 WL

27

3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence."), *aff'd*, 513 F. App'x 78 (2d Cir. 2013).

In short, none of this evidence is "significantly probative" of lower rates Cornell could have paid, *Anderson*, 477 U.S. at 249, and it therefore does not support a genuine dispute to defeat summary judgment.

## C. In The Further Alternative, Plaintiffs Failed To Show A Material Dispute Of Fact Over Causation.

ERISA Section 409(a) provides that a fiduciary is liable only for "losses to the plan *resulting from* each … breach." 29 U.S.C. § 1109(a) (emphasis added). In *Silverman v. Mutual Beneficial Life Insurance Co.*, this Court held that under this section, an ERISA plaintiff "must show some causal link between the alleged breach of Principal's duties and the loss plaintiff seeks to recover." 138 F.3d 98, 104 (2d Cir. 1998). In other words, "[c]ausation of damages is … an element of the claim" and "the plaintiff bears the burden of proving it." 138 F.3d at 105 (Jacobs & Meskill, JJ., concurring).

In addition to Plaintiffs' failures to establish evidence of breach and loss, Count V also fails on causation grounds. Even if a lower recordkeeping fee were theoretically attainable, Plaintiffs have no evidence that a hypothetical prudent fiduciary would have obtained those lower rates. As shown above, Cornell already paid among the lowest rates for TIAA recordkeeping services. And, in the NYU

28

case, similar decisions about recordkeeping were found to be prudent at trial, undermining any purported causal link to the (non-existent) loss. *See Sacerdote*, 328 F. Supp. 3d at 298.

Plaintiffs offer no meaningful argument on appeal. Rather, they contest the premise that *Silverman* controls and contend that Cornell bears the burden to *dis*prove causation. Because Plaintiffs save their full *Silverman* argument for their investments claim, this brief will discuss the burden of proof on causation in the course of addressing that claim. *See* Part II.B *infra*. As that later discussion shows, Plaintiffs' burden argument fails, and their recordkeeping claim therefore fails on this alternative ground as well.

### D.      Plaintiffs Forfeited A Request For Non-Monetary Relief.

Plaintiffs contend that they should be allowed to seek non-monetary relief—e.g., an injunction requiring Cornell to obtain bids for recordkeeping—"even if no losses have been established." Br.58.[6] That claim is moot, however, because Plaintiffs failed to establish a genuine dispute as to whether Cornell breached its fiduciary duty of prudence. *See supra* Part I.A.

In addition, as the district court held, Plaintiffs abandoned any equitable claim at summary judgment. SA22-23. This Court reviews that ruling for abuse of

---

[6] Although Plaintiffs call their non-monetary relief "equitable," their claim for monetary relief also seeks " equitable" relief for purposes of the jury demand. *See* Part IV *infra*.

29

discretion. *Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017).

Plaintiffs' abandonment is obvious from the absence of any argument in the court below. Cornell sought summary judgment in its favor on "all claims." Dkt.233 (Cornell Mem. ISO SJ) at 14. Plaintiffs did not respond that they were entitled to seek non-monetary relief notwithstanding Cornell's arguments on loss. The district court thus applied well-established precedent that, "[w]here abandonment by a counseled party … may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." *Jackson v. Federal Express*, 766 F.3d 189, 196 (2d Cir. 2014).

Nor is there merit to Plaintiffs' argument that they did not need to respond to a motion for summary judgment at all, and therefore could not have forfeited a claim in doing so. *See* Br.58 (citing *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004)). In *Jackson*, this Court cautioned against such an "overreading" of *Vermont Teddy Bear*, particularly where—as here—the plaintiff is represented by experienced counsel. *Jackson*, 766 F.3d at 195 & n.3. And Plaintiffs' remaining authority (at Br.58) is simply inapposite. They cite decisions involving the non-movant's obligation to come forward with "countering evidentiary materials," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970), not the stricter obligation to preserve a legal claim in response to a motion directly at odds with it.

That Plaintiffs abandoned the claim they now press is particularly clear given

what transpired *after* the court entered partial summary judgment on it. Although Plaintiffs now contend that they had no notice of the basis for the district court's decision before the court ruled (Br. 59-60), nine months elapsed between the district court's summary judgment order and the entry of final judgment. During that time, Plaintiffs did not ask the district court to reconsider its ruling on abandonment, despite moving for reconsideration of the summary judgment order on *other* grounds. SA49. It is well-settled that "a party waive[s] any objection to a district court's *sua sponte* order granting summary judgment by failing to raise the matter in the district court after the order was entered." *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 866 (8th Cir. 2017). Here, Plaintiffs complain that the order was effectively *sua sponte* as to their non-monetary claims, but "even if the district court erred by granting summary judgment against [the defendants] without prior notice or an opportunity to respond, they have waived this argument by failing to pursue it before the district court." *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 436 (5th Cir. 2013). For each of these reasons, the Court should deny Plaintiffs' appeal for failure to preserve their claim to equitable relief.

## II. The District Court Correctly Granted Summary Judgment On The Investments Claim.

For their investments claim, Plaintiffs assert that Cornell did not adequately monitor the Plan investments. The contours of that claim have morphed throughout the litigation. Though pled as one count (Count V), Plaintiffs have advanced two

distinct theories—that Cornell left underperforming options in the Plans, and that Cornell failed to offer supposedly available, less expensive institutional-share versions of certain options. At the same time, the scope of Plaintiffs' underperformance theory has been a moving target, with Plaintiffs offering a shifting range of funds whose performance supposedly offers *per se* evidence of imprudence. No matter the form, however, Plaintiffs' investment claim fails on multiple independent grounds, and summary judgment on that claim should be affirmed.

### A. Plaintiffs Failed To Create A Genuine Dispute Over Breach.

As with Plaintiffs' recordkeeping claim, Plaintiffs' investments claim fails for lack of evidence that Cornell acted imprudently. ERISA "focuses on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate the merits of the investment." *PBGC*, 712 F.3d at 717; *see also Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006). The fiduciary's decisions are "not assessed in isolation," but in the context of "the portfolio as a whole." *PBGC*, 712 F.3d at 716.

To be sure, a fiduciary "normally has a continuing duty *of some kind* to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015). But the Supreme Court "express[ed] no view on the scope" of this duty, *id.*, and Plaintiffs have failed to provide any evidence that Cornell's monitoring process fell short of the standard a prudent person would have followed at the time.

### 1. Plaintiffs' Criticisms Of Cornell's Pre-2013 Process Are Meritless.

Plaintiffs assert that a "reasonable factfinder could readily conclude" that Cornell breached its duty by supposedly (i) failing to review investments for the first three years of the class period; (ii) failing "to seek outside assistance"; and (iii) relying on "an interested party's representations." Br.34. None of these points has support in the record.

*First*, there is no evidence that Cornell failed to review investments. As Cornell's witnesses testified, although the degree of oversight increased over the time period at issue, the Plans' investments were always subject to monitoring. Prior to the RPOC's formation, Cornell's Benefits Department regularly reviewed the Plans' investment options, often with the assistance of the Plans' vendors. DJA191-193 (Bursic Tr.) 69:25-77:15. This included broad reviews of investment options, as well as reviews of the funds' fees and performance compared to their benchmarks as part of general due diligence. A1001-1005 (Opperman Tr.) 32:14-33:25 & 53:16-54:24; DJA283 (Bursic Decl.) ¶ 4.

After the Internal Revenue Service's update to the regulations governing 403(b) plans, Cornell created the RPOC, demonstrating continued dedication to prudent monitoring. Cornell then engaged CAPTRUST and intensified its investment review, launching a process to evaluate the investment funds in depth "from the moment CAPTRUST walked through the door" in 2011. DJA194 (Bursic

33

Tr.) 82:5-83:21; DJA299-300 (11/2010 Minutes). After RPOC finalized and adopted the IPS, RPOC—with the help of CAPTRUST and a faculty committee—turned its focus to redesigning and streamlining the investment menu. Cornell decided that its objectives included maintaining symmetry across recordkeepers, offering appropriate choices, retaining widely held current investment options that meet performance standards, and avoiding unnecessary participant disruption. DJA329 (6/2012 email regarding faculty committee); DJA326-327 (11/2012 Minutes); DJA285 (Bursic Decl.) ¶ 9. As discussed below, Cornell then began a phased removal of Plan investments, continuing to this day.

In light of the above, Plaintiffs' argument that Cornell did "nothing" to monitor the Plans' investments prior to 2013 is irreconcilable with the record. Of course, Plaintiffs assert that Cornell ought to have reviewed the Plans' investments *differently* at the start of the class period. But as the district court recognized, such assertions are insufficient to carry Plaintiffs' burden as a matter of law.

Plaintiffs' fundamental criticism is that Cornell was not individually reviewing every fund in the Plans' lineup at the start of the class period. But Plaintiffs offer no evidence that *any* prudent fiduciary in Cornell's position engaged in a fund-by-fund benchmarking review immediately following the IRS's update to the regulations governing 403(b) plans, much less that prudence required such a review in every instance. Their assertion is particularly deficient where, as here,

34

Cornell chose to focus first on hiring an investment advisor and developing an Investment Policy Statement to guide the Plans' overall strategic direction.

Moreover, Plaintiffs' disagreement with that sequence is not evidence of imprudence. Plaintiffs have not shown that their preferred means of obtaining a prudent investment lineup was preferable to Cornell's approach, but even if they had, it would not matter. "[E]ven if an expert proposes a better alternative to a fiduciary's conduct, the fiduciary will not be in breach of its duties if its course of conduct was prudent." *Birse v. CenturyLink, Inc.*, 2020 WL 1062902, at *8 (D. Colo. Mar. 5, 2020) (citing *Chao*, 452 F.3d at 182). The steps Cornell took were prudent.

*Second*, Cornell did not "admittedly" lack experience needed to monitor its plan before July 2013. The testimony Plaintiffs cite merely states that Cornell did not have experience performing the type of quantitative and qualitative analysis performed by CAPTRUST. Benefits administration departments are not typically staffed by certified financial analysts, economists, or investment managers. Plaintiffs have provided no evidence that ERISA requires plan administrators to personally possess in-depth investment expertise or that Cornell's investment expertise fell below that of similarly-situated fiduciaries. *Cf. Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *11 (S.D.N.Y. Sept. 18, 2019) ("Nothing in ERISA requires a 401(k) retirement plan investment committee to engage an investment adviser."). Regardless, Cornell took prudent steps to hire an investment

advisor shortly after the class period began. "Seeking independent expert advice is evidence of a thorough investigation." *Hightshue v. AIG Life Ins.*, 135 F.3d 1144, 1148 (7th Cir. 1998).

***Third***, Plaintiffs' assertion (at 34) that it was imprudent to rely on information provided by TIAA and Fidelity also fails to create a genuine factual dispute. In the decision Plaintiffs cite, the fiduciaries made a $2 million loan to Des Plaines Bancorporation, Inc., which defaulted soon thereafter. The fiduciaries admitted that they were "wholly unequipped personally to analyze the figures presented to them" by the borrower, and after making the loan "received only sporadic, incomplete financial information," which they "never analyzed." *Katsaros v. Cody*, 744 F.2d 270, 275-77 (2d Cir. 1984). The record here is different in all material respects. Cornell did not invest the Plans' assets directly in a single risky venture or rely solely on TIAA and Fidelity's representations in deciding which investment options to offer to participants. DJA191-193 (Bursic Tr.) 69:25-77:15; DJA283 (Bursic Decl.) ¶ 4. And once again, Plaintiffs have no evidence that other prudent fiduciaries in Cornell's situation found information from TIAA or Fidelity insufficient at the time.[7]

---

[7] Plaintiffs also appear to argue in their appellate brief that it was imprudent to rely on TIAA or Fidelity for assistance with investment reviews because they were "interested part[ies]." Br.34. Plaintiffs did not present any evidence (or argument) at summary judgment that TIAA or Fidelity had an interest in which investments were offered to participants, that any such interest influenced the investments the Plans offered, or that TIAA or Fidelity stood to benefit in any way from the particular investments the Plans offered. Plaintiffs' attempt to raise this issue on appeal is improper procedurally and

## 2. Plaintiffs' Criticisms Of Cornell's Post-2013 Process Are Meritless.

Plaintiffs begrudgingly admit that CAPTRUST's hiring is "evidence of prudence" but charge that Cornell's process "remained deficient" during this time because CAPTRUST's work for the committee was of "generally lower quality." Br.35. Plaintiffs cite no record evidence to support this contention, only a broad range of paragraphs from their Rule 56.1 filing. Many of these statements have nothing to do with CAPTRUST, and regardless, they raise no genuine or material disputes of fact for the reasons stated in Cornell's response to those paragraphs. A2322-A2335 (¶¶ 228-250). Plaintiffs' conclusory attacks on CAPTRUST's process also fail to demonstrate a genuine issue for the additional reasons stated in CAPTRUST's brief on appeal.[8]

Similarly, the claim that Cornell failed to exercise its own "independent judgment" (Br.36) ignores voluminous evidence directly to the contrary. As the district court found, the undisputed evidence shows that Cornell worked closely with CAPTRUST, reviewing CAPTRUST's results and exercising independent judgment to make decisions in the best interests of participants. SA37-38.

---

unsubstantiated from an evidentiary perspective, and it therefore fails to provide a basis for reversal.

[8] In any event, Plaintiffs do not suggest, let alone cite evidence to show, that Cornell was or ought to have been aware of purported deficiencies in CAPTRUST's process. Speculation is insufficient to reverse a properly granted summary judgment order.

For example, in April 2012, CAPTRUST suggested that Cornell create a "tiered" investment menu consistent with the approach taken by many other higher education plans. A337-338 (4/2012 Materials at 7-8). RPOC decided to create a four-tiered structure: target date funds (Tier I); "core" active and passive funds (Tier II); "non-core" funds that were not widely selected by participants, which Cornell decided to phase-out over time (Tier III); and a brokerage window, allowing participants to invest in additional funds and other investments (Tier IV). RPOC members raised concerns about unnecessary disruption, however, and created a subcommittee to address the issue. DJA333 (9/2013 Minutes); A380 (12/2014 Minutes). RPOC then began a gradual phase-out of Tier III investments. *E.g.*, A374-375 (3/2016 Minutes); A488-489 (12/2016 Minutes).

As another example, the record rebuts Plaintiffs' unsupported assertion that Cornell "passively accepted" CAPTRUST's "assurance" that CREF Stock and TIAA Real Estate were prudent choices. Br.37. Cornell considered both of these investments, the validity of proposed benchmarks, and their history in the Plans in deciding to retain them. DJA338-343 (Bursic Tr.) 217:15-219:21, 223:6-224:5; DJA285-286 (Bursic Decl.) ¶¶ 9-11. As the district court found, this and other "undisputed evidence" shows that Cornell did not "passively accept" CAPTRUST's proposals. SA37-38.

Without grounds to challenge the substance of Cornell's overall approach,

38

Plaintiffs contend that Cornell took *too long* to make decisions. Br.37. But the district court specifically addressed, and correctly rejected, this contention, finding that Cornell had good reason to proceed as it did:

> After being presented with [CAPTRUST'S] high-level overview in [July 2013], defendants continued to monitor and review the performance of these funds as part of a larger strategy to streamline the Plans' lineups. They reviewed proposals for a tiered structure, found investment alternatives for underperforming funds, and assessed participant disruption with eliminating funds in the Plans. These issues were important because the fiduciaries were not discussing removal of one or even a few funds. The proposed removal involved hundreds of funds that would significantly change the lineup of the Plan offerings.

SA43. Further, the district court stated that "Plaintiffs offer no evidence that the time defendants took to remove the Tier III funds from the Plans was imprudent." SA43-44. On appeal, Plaintiffs still fail to identify any such evidence. Instead, they simply assert that a reasonable factfinder "could conclude" that Cornell should have acted more "promptly." Br.37. That speculative assertion lacks any factual support; it provides no basis to reverse the district court's findings evidencing prudent conduct.[9]

---

[9] The facts demonstrating Cornell's reasoned decision to proceed carefully in overhauling the Plans distinguishes this case from Plaintiffs' key authority, *George v. Kraft Foods* (cited at Br.40-41). There, the court concluded that it was insufficient at summary judgment to state that "the Plan fiduciaries had made a reasoned decision to maintain the status quo" without "cit[ing] a document or affidavit, or any deposition testimony, explaining what that decision was." *George*, 641 F.3d at 795. Here, by contrast, the record amply shows that Cornell made a reasoned decision to phase out Tier III investments and proceeded to execute on that decision. *See supra* pp. 37-38; *Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013) (distinguishing *Kraft*, where record showed that fiduciary made "reasonable" and "informed" decisions).

Plaintiffs contend that a factfinder could conclude that Cornell's stated desire to move slowly was a "euphemism." Br.38-39. But there is no evidence supporting that assertion. Cornell consistently identified concern for participant disruption and a desire to offer participant choice as guiding principles for any restructuring. *E.g.*, DJA333 (9/2013 Minutes at 2); A380 (12/2014 Minutes). Plaintiffs' own authority not only recognizes that fiduciaries are permitted to make such decisions, but forecloses the assertion that a fiduciary must consider only historical performance or expenses in deciding whether a fund is a prudent investment option. *See Tibble*, 729 F.3d at 1136 ("There are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable."); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) (fiduciary "could have chosen funds with higher fees for various reasons").

Plaintiffs' contention is also extraordinarily paternalistic. No participant was forced to select any option in the Plans if they thought another would result in "more money in their account." Br.39. But some participants chose to invest in the challenged funds, and Cornell was permitted to take those choices into account as it decided how best to proceed with streamlining the Plans. *Cf. Loomis v. Exelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011) (ERISA encourages fiduciaries of defined-contribution plans to "le[ave] choice to the people who have the most interest in the outcome").

40

Finally, Plaintiffs argue that Cornell failed to follow its IPS by not immediately removing underperforming funds—supposedly evidence of breach *and* causation. Br.47. But as the district court repeatedly found (and Plaintiffs do not dispute), "the IPS does not mandate exclusion or removal of funds that do not meet the quantitative criteria of benchmarking relative to peer groups." SA47; *see also* SA39, SA42. Rather, the IPS sets forth principles for making investment decisions, and performance is but one of many such principles. Under Cornell's IPS, a fund with recent underperformance was subject to heightened scrutiny from the RPOC to decide whether it remained a prudent and worthwhile option to make available to participants. A394-395. Even Plaintiffs' investment expert conceded that "prudent fiduciaries evaluate funds for inclusion in plans based on additional characteristics" other "'than recent performance.'" SA33. Thus, as the district court repeatedly held, Cornell's determinations were consistent with its IPS.

## B. In The Alternative, Plaintiffs Failed To Create A Genuine Dispute Over Causation.

Plaintiffs' investments claim also fails because they have no evidence of causation. This Court has squarely held that an ERISA plaintiff "must show some causal link between the alleged breach … and the loss plaintiff seeks to recover." *Silverman*, 138 F.3d at 104. But even if Plaintiffs were correct that Defendants bear the burden of proof on this element, Cornell still is entitled to summary judgment on

41

this claim.[10]

### 1. Plaintiffs Bear The Burden To Show Causation.

Plaintiffs contend (Br. 28-29) that *Silverman* conflicts with *New York State Teamsters Council Health & Hospital Fund v. Estate of DePerno*, 18 F.3d 179 (2d Cir. 1994). But *DePerno* addresses a different question. There, this Court "framed the issue as one of damages" and "establishe[d] that where there is uncertainty in damages, there is a presumption that the fund plans would have been invested in the most profitable of equally plausible investment strategies," while in *Silverman*, this Court "directly addressed the issue of causation" and "interpreted the language" in 29 U.S.C. § 1109(a) to make causation "an element of the claim, for which plaintiffs have the burden of proof." *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 260-61 (S.D.N.Y. 2012).

Plaintiffs' alternative reading of *DePerno* and *Silverman* ignores the plain language of both decisions. According to Plaintiffs, those cases implicitly hold that a *principal* wrongdoer bears the burden of disproving causation, while a *vicarious* wrongdoer (perhaps) does not. Br.29-31. Yet there is no hint of such a distinction on the face of the statute or in these opinions. Rather, the outcome in *DePerno* follows from the fact that it was a self-dealing case, and "the burden of proof is always on

---

[10] Plaintiffs' counsel here also argued in the NYU appeal that ERISA requires the defendant to disprove causation. That appeal remains pending.

the party to the self-dealing transaction to justify its fairness." *DePerno*, 18 F.3d at 183 (quoting *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978)). Here, the duty of loyalty claim was dismissed at the start of the case. SA62-63.

The principle that the party with a "virtual monopoly of information" should bear the burden of proof (Br.29) does not help Plaintiffs either. Causation asks whether a "hypothetical prudent fiduciary … would have made the same decision" as the defendant. *Tussey v. ABB, Inc*., 746 F.3d 327, 335 (8th Cir. 2014). Cornell has no "monopoly" on the information underpinning this objective inquiry. In fact, because Plaintiffs contend that a prudent fiduciary *would* have done something differently, it only makes sense for Plaintiffs to come forward with that evidence rather than require Cornell to prove a negative.

Plaintiffs' reliance on "trust law sources" (Br.27-28) is likewise misplaced. ERISA, like other federal statutes, is subject to the "ordinary default rule" that plaintiffs in federal civil cases bear the burden of proof on all elements of their claims. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *see also Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) ("unless a statute … provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law"). Reliance on trust law to fill gaps is unnecessary here because Congress has explicitly "placed the burden of proving causation on the *plaintiff* by requiring him to prove that the losses 'result[ed] from' the defendant's inaction."

43

*Silverman*, 138 F.3d at 106.[11]

### 2. Plaintiffs Failed To Meet Their Burden.

Plaintiffs' investment challenge in this case, both in the complaint and during discovery, focused on two TIAA variable annuities, CREF Stock and TIAA Real Estate. At summary judgment, however, Plaintiffs sought to add over 100 other supposedly imprudent fund options, including 38 funds that Plaintiffs claimed should have been removed because they underperformed over three- and five-year periods beginning in 2010.

The district court correctly held that Plaintiffs lacked any evidence that the degree of underperformance Plaintiffs' expert measured would have led an objectively prudent fiduciary to remove any of the supposedly underperforming options from the Plans' investment menu. Plaintiffs' arguments on appeal only confirm this failing.

### a. TIAA Annuities

The CREF Stock Account and TIAA Real Estate are unique, tax-deferred variable annuities. Plaintiffs contend that the CREF Stock and TIAA Real Estate

---

[11] It is also uncertain to what extent trust law actually embraced a burden-shifting principle when ERISA was enacted in 1974. *See U.S. Life Ins. v. Mechs. & Farmers Bank*, 685 F.2d 887, 896 (4th Cir. 1982) (doubting "the novel proposition that, whenever a breach of the obligation by a trustee has been proved, the burden shifts to the trustee to establish that any loss suffered by the beneficiaries of the trust was not proximately due to the default of the trustee"). The Court should not import trust law into ERISA when the relevant trust-law rule is "unclear." *Conkright*, 559 U.S. at 515.

funds should have been removed from the plan in 2010 because those funds supposedly underperformed one of several mutual fund benchmarks. As the Eighth Circuit explained in rejecting an identical theory, however, focusing solely on investment performance is the wrong way to assess these types of investment. Unlike a mutual fund, variable annuities "can provide a steady stream of income at retirement." *Davis v. Washington Univ.*, 960 F.3d 478, 485 (8th Cir. 2020). Thus, "[e]ven if stock index funds will typically outperform a variable annuity like [the] CREF Stock Account, it is not imprudent to provide options with differing features from which to choose, regardless of whether some perform better than others." *Id.*

Plaintiffs' performance-based challenge to these options also failed because Plaintiffs did not demonstrate underperformance. Plaintiffs originally alleged that CREF Stock "dramatically underperformed" the Russell 3000 Index, an index composed of domestic securities. A148. CREF Stock, however, is a blend of domestic and foreign securities, DJA143, so this supposed discrepancy merely reflected the different performance of domestic and international stock markets. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice"). Plaintiffs try to justify their use of the Russell 3000 Index because that index was listed in the CREF Stock prospectus and disclosures. Br.46. But as the court

explained in the Georgetown case, that is because federal regulations do not permit the use of a composite benchmark. *Wilcox*, 2019 WL 132281, at *10-11.[12]

Similarly, Plaintiffs alleged that TIAA Real Estate was an imprudent option because it underperformed an index of real estate investment trusts (REITs). A155-158. As explained in the NYU case, however, "a REIT is not a proper comparison for the TIAA Real Estate Account, which invested directly in commercial properties, had a low correlation to stocks and, therefore, operated differently from a REIT index." *Sacerdote*, 328 F. Supp. 3d at 312. TIAA Real Estate actually outperformed its benchmark over multiple periods as of year-end 2009. *See* TIAA Real Estate Quarterly Analysis at 3 (Dec. 31, 2009), https://bit.ly/3kUwAo9.[13]

In any event, Plaintiffs offered no evidence that any of "the benchmarks they

---

[12] The fleeting suggestion that the benchmark CAPTRUST used for CREF Stock in 2014 somehow validates Plaintiffs' *post hoc* custom benchmark (Br.46) fails for several reasons. First, it is entirely undeveloped. *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Second, as the district court found, CAPTRUST consistently recommended including CREF Stock in the Tier II lineup, and Cornell specifically concluded that such a benchmark was not a reliable basis on which to remove the fund from the Plans. SA36-38; DJA394-396 (Bursic Tr.) 217:15-219:8.

[13] Plaintiffs purport to dispute the "propriety" of these figures because they are based on adjusted performance. Br.47. Yet that is because the fund's management "believes that a comparison of only the Account's Total Return performance to that of a broad-based index or benchmark does not allow for the Account to be fairly evaluated and compared to other real estate funds, given its unique liquidity guarantee feature." DJA215; *see also Sacerdote*, 328 F. Supp. 3d at 312 (rejecting plaintiffs' expert's opinion because he "did not adjust the returns to account for cash as TIAA did").

46

cite to demonstrate underperformance in the August 2010 to July 2013 period would have been used by prudent fiduciaries at the time" (SA34) and cited only their investment expert's "conclusory assertion" that she believed a prudent fiduciary would have removed CREF Stock or TIAA Real Estate based on the measured underperformance. SA33. As this Court has explained, expert opinions that are "conjectural" and "not supported by evidence" are "insufficient to create a genuine factual dispute." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 319 (2d Cir. 2008).[14]

Plaintiffs' failure to meet their burden on causation is confirmed by record evidence that the vast majority of TIAA's 200 largest clients *did not* remove the CREF Stock and TIAA Real Estate options from their plans at any point during the class period. SA33-34; DJA170-172 (Chittenden *Sacerdote* Decl.) ¶¶ 53-54, 63-64. Plaintiffs' response—that "[t]he jury could easily find more compelling the fact that virtually 100% of non-TIAA clients have not invested in CREF Stock or TIAA Real

---

[14] Plaintiffs respond that the district court's conclusion regarding Dominguez's testimony was improper because the Court did not formally exclude her opinions under *Daubert* and instead "weighed" her opinions against Defendants' evidence on summary judgment. Br.43. But this Court has squarely rejected the argument that it is improper for a judge to reject an expert report "because he thought it lacked weight, and thereby usurped the role of the jury." *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1998). If the court's conclusion can be viewed "as evidentiary in character"—easily the case here—then the conclusion need only "satisf[y] the deferential standard of review for evidentiary rulings." *Id.*; *see also In re Omnicom Grp., Inc. Secs. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (granting summary judgment where expert's opinion would not permit juror to find for plaintiff).

Estate" (Br.45)—is nonsensical. Of course clients who do not invest with TIAA (for any reason) do not invest in TIAA's annuity products.

Plaintiffs also speculate that, "[i]f other institutions also failed to monitor performance for years and made decisions based on popularity concerns instead of economic factors, then Cornell's list shows what imprudent fiduciaries did, not what a prudent fiduciary would have done." Br.45. But there is no evidence that any, let alone all, of the other institutions that continue to offer CREF Stock and TIAA Real Estate in their plans "failed to monitor performance" or "made decisions based on popularity." To the contrary, Judge Forrest found that TIAA Real Estate and CREF Stock were both prudent investments for NYU given the funds' performance, objectives, and other features. *Sacerdote*, 328 F. Supp. 3d at 311-16.

Nor can Plaintiffs assume away their burden to demonstrate that prudent fiduciaries would have removed funds that the overwhelming majority of actual fiduciaries retained. As a matter of law—and common sense—decisions by other real-world fiduciaries to offer a particular investment "demonstrate[] the reasonable nature" of a defendant's similar decision. *Pfeil v. State Street Bank & Tr. Co.*, 806 F.3d 377, 388 (6th Cir. 2015). The district court's decision rejecting Plaintiffs' various arguments on this point should be affirmed.[15]

---

[15] Plaintiffs assert that "[i]mplicit in the district court's reliance on this evidence is a legal conclusion that because Cornell is a university, the prudence of its actions should be judged by what other universities did." Br.44. But the district court did not adopt such a rule. The

### b.    Other Supposedly Underperforming Investments

Despite shoehorning more than three dozen additional purportedly "imprudent" investments into their claim at summary judgment, on appeal, Plaintiffs effectively ignore their burden to show causation as to these funds. *See* Br.47-48. The argument that prudent fiduciaries would have removed the 38 funds takes up just one paragraph, addresses none of the funds individually, and is so cursory that the argument is not even properly before the Court. *See Botti*, 711 F.3d at 313; *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500 n.1 (6th Cir. 2007) (refusing to consider a "one-paragraph argument").[16]

Plaintiffs do not establish that a prudent fiduciary would have removed any of the funds Plaintiffs challenge in any event. Plaintiffs' argument was based on their contention that these 38 funds had underperformed their benchmarks over three-to-five-year periods as of 2010. SA41. But "three to five years … [is] considered [a] relatively short period[ ] of underperformance" and does not imply imprudence as a matter of law. *Dorman v. Charles Schwab Corp*., 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019); *see also Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (affirming

---

other comparators are important not because they are universities, but because they demonstrate what other fiduciaries in like circumstances considered prudent. SA33.

[16] Plaintiffs refer to "100 unmonitored funds" (Br.48) even though they only challenged 87 before the district court, and even though the district court refused to consider all but 38 of these funds because Plaintiffs attempted to raise new theories of imprudence as to the remaining funds at summary judgment. SA41. Plaintiffs do not challenge this ruling.

grant of summary judgment where fiduciary concluded it was reasonable to select funds "with long-term growth potential and to stay with those mutual funds even during years of lower performance").

As the district court found, besides their expert's "conclusory statement" that prudent fiduciaries would have removed the funds by the end of 2009, Plaintiffs "offered no evidence that [supposed underperformance] alone would lead a prudent fiduciary to remove these funds" and "no evidence that other fiduciaries were removing these funds in 2010" or that the underperformance "was considered at the time indicative of imprudence." SA41-42. Again, that evidentiary determination is reviewed only for "manifest error." *Raskin*, 125 F.3d at 66.

In response, Plaintiffs contend that two schools completed a lineup review process with CAPTRUST faster than Cornell did. Br.47. But the causation question is whether an objectively prudent fiduciary would have *removed* the funds based on Plaintiffs' performance metrics, not how fast a fiduciary that decided to remove the funds would have done so. And in any case, that two schools (out of thousands) proceeded faster than Cornell—and at different speeds from one another—is not evidence of imprudence. It simply illustrates that fiduciaries can take different approaches to exercise prudent decision-making depending on their specific facts and circumstances.

### 3. Alternatively, Summary Judgment Should Be Affirmed For Cornell Even If It Bears The Burden On Causation.

Ultimately, Plaintiffs' argument about the burden of proof at trial is academic to this appeal. The causation element in Plaintiffs' claim requires a finding "that the Defendants would have acted differently had they engaged in proper monitoring." *Kopp v. Klein*, 894 F.3d 214, 221 (5th Cir. 2018); *accord In re Lehman Brothers Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 756–58 (S.D.N.Y. 2015) ("plaintiffs allege no facts to suggest that the review they claim should have been done would have averted the injury that ultimately occurred"), *aff'd*, 817 F.3d 56, 66 (2d Cir. 2016). But when Cornell and CAPTRUST performed an individual benchmarking review in 2013, Cornell reaffirmed its decision to keep the CREF Stock and TIAA Real Estate options and did not immediately remove the other challenged funds, opting instead to complete a careful, phased overhaul. That is prima facie evidence that the benchmarking process Plaintiffs (erroneously) claim Cornell was required to follow in 2010 was not a litmus test, requiring fiduciaries to immediately jettison underperforming investments, but one piece of a comprehensive monitoring process.

On summary judgment, the question is whether there are genuine issues of material fact requiring trial. And to create a genuine issue of fact on causation, Plaintiffs need *some* evidence that an objectively prudent fiduciary would have removed the challenged funds from the menu based on the funds' performance history in 2010. As explained above (at 44-50), there is no evidence that other

51

fiduciaries removed the challenged investments at the time, and all Plaintiffs offer on causation is the *ipse dixit* of their expert that the district court correctly rejected. Either way, there is no genuine dispute of material fact.

Accordingly, because Plaintiffs offer no material evidence on causation, Cornell is entitled to summary judgment "regardless of which party bears the burden of proof." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 187, 192 (2d Cir. 1987); *accord Amicas, Inc. v. GMG Health Sys., Ltd.*, 676 F.3d 227, 231 (1st Cir. 2012) ("[t]he burden of proof issue does not matter here because at the summary judgment stage Amicas did tender adequate proof that it had performed and GMG … failed to offer any competing competent evidence"). Plaintiffs' investments claim therefore fails on this ground as well.

The same is true of Cornell's recordkeeping claims. The undisputed evidence shows that Cornell paid one of the lowest rates among TIAA's customers for recordkeeping, and that a majority of similarly situated fiduciaries declined to consolidate recordkeepers during the relevant period. *See supra* pp. 6-7, 13-15. Regardless of the trial burden, that is sufficient to require Plaintiffs to come forward with contrary evidence to demonstrate a genuine issue of fact on causation. For the reasons explained in Part I.C, they have not (and cannot) do so.

### C. The District Court's Share-Class Ruling Was Correct.

Plaintiffs advance a second theory under Count V, based on investment share

classes. Many investments in retirement plans are offered to investors in various share classes. Each provides exposure to the same underlying investments, but the associated expenses are different. Plaintiffs contend that Cornell did not offer lower-cost share classes for certain TIAA funds in the Plans, and that as a result, the cost to invest in those funds was higher than was prudent.

### 1.    There Is No Evidence Of Imprudence And Therefore No Evidence Of Breach.

The district court concluded that there were fact questions involving whether Cornell made prudent decisions about share classes based on evidence that TIAA began offering lower-priced institutional share classes of certain mutual funds to some institutional clients with more than $2 million invested beginning in mid-2009. That evidence was insufficient to create a genuine issue, however, because Plaintiffs had to show more than the mere existence of "institutional" share classes generally. Plaintiffs had to show that TIAA would have offered those share classes *to the Plans* specifically. *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 709 & n.14 (W.D. Mo. 2019) (rejecting claim where plaintiff "only prove[d] that the institutional share class was generally available at American Century, not to the Plan"). Prior to 2011, Paul Bursic asked TIAA on multiple occasions for discounts, or a "break in share values," and was told "very clearly and very firmly that TIAA offers the same price to everybody." DJA189 (Bursic Tr.) 36:6-37:14; DJA284 (Bursic Decl.) ¶ 6. As further evidence of Cornell's prudence, it is undisputed that

Cornell transitioned dozens of Fidelity funds to lower-cost share classes beginning in 2010. DJA130 (9/2010 email); DJA136 (12/2010 email).

Given this evidence, Plaintiffs offer no basis to conclude that Cornell could have forced, or should have tried to force, TIAA to offer discounts that TIAA refused to provide. But Cornell did not stop there in any event. After hiring CAPTRUST, Cornell successfully negotiated a new contract with TIAA in 2012 that capped the total revenue TIAA could collect from the Plans' investment, and TIAA rebated certain payments back to the Plan, retroactive to January 1, 2011. DJA284 (Bursic Decl.) ¶ 7; A2420 (Poehler Rpt.) ¶ 75; DJA155-157 (Recordkeeping Agmt. Amend. 5). Those rebates achieved the same outcome as the change in share classes that Plaintiffs espouse—even if TIAA had offered institutional pricing to Cornell in 2010. Because ERISA imposes no duty to take "a particular course of action if another approach seems preferable," *Chao*, 452 F.3d at 182, Cornell did not breach its duty by choosing to reduce fees in one manner rather than another.

## 2. There Is No Evidence Of Loss Or Causation.

Even if a rational factfinder could find that the supposed failure to change share classes in 2010 was imprudent (and it could not), Plaintiffs' share-class claims fail in the alternative on both loss and causation grounds.

Turning first to loss, the district court correctly found that Plaintiffs failed to come forward with evidence sufficient to support a triable issue for nearly all of their

share-class claims, because they offered no evidence that any of the funds in question actually met the eligibility threshold for the lower-cost share classes. SA45-46.[17] Plaintiffs complain that Cornell did not dispute eligibility in its summary judgment briefing, but that is incorrect, for whether Plaintiffs had demonstrated eligibility was central to Cornell's motion. Dkt.233 at 22; Dkt.312 at 10.

Regardless, Plaintiffs themselves chose to introduce evidence on the size of only some of the Plans' investments in the funds. *See* SA45. Although Plaintiffs now claim they could have cited other evidence in the record as well, the district court was entitled to rely on the evidence Plaintiffs chose to include in their statement of facts in support of this proposition. *See Tompkins v. Metro-North Commuter Railroad Co.*, 983 F.3d 74, 81 n.26 (2d Cir. 2020) (court was entitled to "rely on the parties' Rule 56.1 statements … to the exclusion of other factors in the record that were favorable" to the parties).[18]

As for causation, Plaintiffs have no evidence that other fiduciaries in Cornell's position obtained lower fees from TIAA during this time period. ████████████ ████████████████████████████████████████████████████████

---

[17] The Court found a triable issue on loss only for a single family of TIAA target date funds. SA46. The parties have settled the claim involving those funds. DJSA1. They are not a subject of the pending appeal. Br.4.

[18] The argument that Plaintiffs could have "filled any evidentiary gaps" (Br.48) with proper notice is also forfeited because Plaintiffs received notice in the summary judgment order but did not attempt to raise this issue on their motion for partial reconsideration before entry of final judgment. SA49; *supra* pp. 30-31.

██████████████████████████ DJA389 (Chittenden Decl.) ¶ 23.

Since the rebates Cornell negotiated obviated any share-class concerns as of January 1, 2011, this evidence is fatal to Plaintiffs' claims on appeal, regardless of who bears the burden of proof on causation.

## III. Plaintiffs' Remaining Arguments On Appeal Likewise Fail.

Plaintiffs' remaining arguments fail to identify any error warranting reversal.

### A. The District Court Correctly Dismissed Plaintiffs' Legally Flawed Theories At The Pleading Stage.

Plaintiffs accuse the district court of improperly "parsing" their investments claim at the motion-to-dismiss stage. Br.22-26. Plaintiffs quote the proposition that courts should evaluate the allegations in a complaint "as a whole" when deciding whether the plaintiff has plausibly alleged a breach of fiduciary duty. Br.22. But that is precisely what the district court did. SA66-71.

It is true that in the course of denying the motion to dismiss as to the investment claim, the district court discussed and rejected several subsidiary allegations Plaintiffs offered to support an inference of an imprudent process. But that is because those allegations were deficient as a matter of law and therefore added nothing to the analysis—not because the court "parsed" Count V into multiple standalone "claims."

For example, in support of Count V, Plaintiffs alleged that Cornell selected and retained investment options with "unnecessary layers of fees." A177 (¶ 238).

The Court explained that this theory failed to support Plaintiffs' claim as a matter of law, for "alleging that the Plans included investment options with unnecessary 'layers' of fees" proves nothing if the overall investment fee is reasonable. SA67. Plaintiffs do not challenge this commonsense determination.

Plaintiffs also alleged that Cornell's lineup of investment opportunities was too large, accusing Cornell of failing to "consolidat[e] the Plans' roughly 300 investment options into a core lineup." A177 (¶ 239). The district court held that this, too, failed as a matter of law. SA67. Plaintiffs respond that the "point" of the "too many funds" allegation was that offering a large menu instead of a "streamlined" one somehow "tends to show the lack of a thorough and reasoned process." Br.24. That is a non sequitur, and contrary to ERISA's basic purposes. Participant choice "is the centerpiece of what ERISA envisions for defined-contribution plans." *Tibble*, 729 F.3d at 1135. ERISA has no rule "that forbids plan sponsors to allow participants to make their own choices"; rather, it affirmatively "encourages sponsors to allow more choice to participants in defined-contribution plans." *Loomis*, 658 F.3d at 673.

Finally, the district court observed that Plaintiffs offered no "principled reason" why focusing on "core" investment options was imprudent. SA71. Plaintiffs respond that a fiduciary still must monitor non-core investment options to some extent. Br.24-25. But that is a separate point from the district court's reasoning that

57

a tiered approach to investment review does not demonstrate imprudence.

Plaintiffs' "parsing" argument also creates unacceptable opportunities for gamesmanship—opportunities that are not hypothetical. Plaintiffs themselves contend that Count V states *two* claims: one based on underperforming investments, another based on share-class expenses. And just last month, Plaintiffs' counsel stated to the Supreme Court in another university case that Count V *ought* to be parsed when doing so would serve their purposes.

Specifically, seeking to rebut the argument that the then-pending petition for certiorari in the *Northwestern* case suffered from vehicle problems, the same counsel who signed the brief for this appeal told the Supreme Court that Count V really was multiple "claims" in one. Their brief stated that "[a]ll parties and the courts below understood that Count V *included a claim* for imprudently offering retail share classes," even though Count V "encompassed additional conduct that also allegedly violated respondents' fiduciary duties." Pet. Supp. Br., *Hughes v. Northwestern Univ.*, 2021 WL 2416925, at *3-5 (U.S. June 10, 2021) (emphasis added). That is contrary to Plaintiffs' current position that the separate theories within Count V "are not standalone claims" but merely "pieces of circumstantial evidence supporting the overall claim in Count V that Defendants had a flawed investment-review process." Br.23.[19]

---

[19] *Sweda v. University of Pennsylvania*, 923 F.3d 320 (3d Cir. 2019), cited at Br.22-23, is

In short, Plaintiffs offer no reason to revisit the district court's decision dismissing their legally defective theories at the pleading stage.

## B. The District Court Correctly Dismissed The Prohibited Transaction Claim.

Plaintiffs challenge the district court's dismissal of their prohibited transaction claim in Count IV. ERISA provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect" transaction with a "party in interest." 29 U.S.C. § 1106(a)(1). According to Plaintiffs, ERISA defines a "party in interest" to include a plan's service provider, 29 U.S.C. §1002(14)(B), and TIAA and Fidelity provided recordkeeping services to the plan. Therefore, Plaintiffs contend, Cornell violated ERISA Section 406(a)(1) "each time the Plans paid fees to TIAA-CREF and Fidelity" for recordkeeping. A175 ¶ 230.

As the district court recognized, however, Plaintiffs' syllogism fails at the threshold. Interpreting Section 406(a) to prohibit payment for the recordkeeping transactions that *make* a service provider a party-in-interest "would transform § 406—a statutory provision meant to 'categorically bar' certain transactions

---

inapposite. There, the district court dismissed the investment-monitoring claim in its entirety, concluding that none of the allegations supported a plausible claim. The Third Circuit reversed that decision and remanded for further proceedings. 923 F.3d at 334. But it did not hold, or even suggest, that every allegation that predicated Count V supported an inference of imprudence.

deemed 'likely to injure the pension plan'—into a statutory provision that proscribes retirement pension plans' most basic operations." SA74 (cleaned up).[20]

Rather than engage with the substance of the district court's ruling, Plaintiffs recycle the arguments their counsel made in *Sweda*. Br.60-62. But Plaintiffs omit the fact that the Third Circuit rejected those arguments, because "[i]nterpreting § 1106(a)(1) to prohibit necessary services would be absurd." *Sweda*, 923 F.3d at 335-38. Plaintiffs also invoke the Tenth Circuit's recent observation that ERISA Section 406 covers "wide swaths of plan activity." *See* Br.61 (quoting *Teets v. Great–West Life & Annuity Ins.*, 921 F.3d 1200, 1222 (10th Cir. 2019)). But just last month, the Tenth Circuit explained that "[o]ur statement that § 1106 'covers wide swaths of plan activity' … does not mean it covers *all* plan activity." *Ramos*, 1 F.4th at 787. As the Tenth Circuit held, "ERISA cannot be used to put an end to run-of-the-mill service agreements, opening plan fiduciaries up to litigation merely because they engaged in an arm's length deal with a service provider." *Id.*[21]

Even if ERISA's prohibited transaction rules did apply to arms-length

---

[20] The district court relied on Judge Forrest's dismissal of an identical prohibited transaction claim against NYU, which Plaintiffs' counsel did not appeal to this Court.

[21] Plaintiffs also rely on a brief statement, from the prefatory section of a Department of Labor rulemaking, that agreements with service providers may constitute prohibited transactions. *See* Br.61. The *Ramos* plaintiffs relied unsuccessfully on the same "passing statement." 1 F.4th at 786 n.11. As in *Ramos*, moreover, Plaintiffs have not argued that the Department's statement is entitled to *Chevron* deference and have forfeited the point. *See New York v. U.S. Dep't of Justice*, 951 F.3d 84, 101 n.17 (2d Cir. 2020).

arrangements between a plan and its recordkeeper, those rules include a statutory exemption for transactions or arrangements with a party-in-interest that are reasonable, necessary for the operation of the plan, and for which the plan pays no more than reasonable compensation. 29 U.S.C. § 1108(b)(2). Plaintiffs themselves acknowledge that "[r]ecordkeeping is a service necessary for every defined contribution plan." A64 ¶38. And the fees that the Plans paid for recordkeeping were reasonable. Indeed, they were among the lowest fees paid by comparable plans. *See generally supra* Part I; A2424-2437 (Poehler Rpt.) ¶¶ 81-99; DJA210-212 (Matheson Decl.) ¶¶ 5-8. Accordingly, to the extent Section 406 applies here, the prohibited transaction exemption at Section 408(b)(2) applies as well and warrants affirmance of the summary judgment decision on Count IV.

### C. Plaintiffs' Challenge To The Class Definition Is Improper And Unripe.

Plaintiffs contend that the district court erred by certifying a class of participants and beneficiaries "from August 17, 2010, through August 17, 2016" instead of through judgment. Br.62. Because the Court should affirm the judgment in all respects, this issue is moot. But the argument also fails on the merits.

First, Plaintiffs ask the Court to "vacate[]" the certification order "for further consideration" only if it remands the case. Br.62. In other words, Plaintiffs seek to expand the class definition if they succeed, while depriving Cornell of an equally expansive victory if Plaintiffs lose. Plaintiffs may not wait to see how this Court

rules before deciding how broad they want the class to be. *Cf. Randelman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (describing improper fail-safe class, where "[e]ither the class members win or, by virtue of losing, … are not in the class and, therefore, not bound by the judgment").

Second, Plaintiffs' request for conditional vacatur of the class certification order is unnecessary. A district court may "alter[] or amend[]" such an order any time before final judgment. Fed. R. Civ. P. 23(c)(1)(C). If this Court does remand, Plaintiffs may simply ask the district court to give the class definition the "further consideration" they say is required. Br.62.

Finally, Plaintiffs do not explain how the class definition the district court certified "could preclude complete relief," or why that definition "caused the court to disregard evidence" at summary judgment. Br.62. In the footnote Plaintiffs cite, the district court simply observed that evidence it had *already* considered and deemed unreliable was *also* outside the class period. SA30 n.9. In short, there is no basis to alter the district court's certification ruling in this appeal.

## IV. Plaintiffs Are Not Entitled To A Jury Trial.

Following the motion to dismiss, Cornell moved to strike Plaintiffs' jury demand. The district court denied the motion. DJSA9. Because this issue is moot if there will be no trial, the Court need not address this ruling if it affirms the judgment below. If the Court does remand any portion of this case for trial, however, it should

reverse the district court's order on the motion to strike the jury demand.[22]

A district court must strike a jury demand if, as to the applicable claims, "there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2). Because ERISA does not create a right to a jury trial, the only potential source of a jury trial right lies in the Seventh Amendment, which preserves the right to trial by jury "where legal rights"—as opposed to equitable rights—"are at stake." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 565 (1990).

To decide whether a jury trial right exists under the Seventh Amendment, a court first must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id.* Here, that inquiry is straightforward. As Plaintiffs stress in their opening brief, ERISA's fiduciary duties are "derived from the common law of trusts." Br.4. And at common law, "an action by a trust beneficiary against a trustee for breach of fiduciary duty" was historically "within the exclusive jurisdiction of courts of equity." *Terry*, 494 U.S. at 567.

Next, courts must "examine the remedy sought and determine whether it is legal or equitable in nature." *Terry*, 494 U.S. at 565. Here, the district court thought

---

[22] This Court previously denied Cornell's petition for a writ of mandamus on the jury ruling, but its reasoning was based on the prematurity of the issue rather than any finding that the district court's application of *Pereira* was correct. *See In re Cornell Univ.*, No. 18-3203 (2d Cir. 2019), Doc. 33. Plaintiffs' counsel has also raised the issue in the NYU appeal.

that *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005), compelled the conclusion that Plaintiffs' claims for "make-whole" relief were *not* equitable in nature, despite acknowledging that subsequent Supreme Court decisions have "cast doubts" on that conclusion. DJSA13. But *Pereira* was wrongly decided and should not be followed.

In *Pereira*, which arose under Delaware law, this Court concluded that the Seventh Amendment entitled plaintiffs to a jury trial on their breach of fiduciary duty claim because the relief sought was in the nature of "compensatory damages." 413 F.3d at 337. *Pereira* acknowledged that prior circuit authority, *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138 (2d Cir. 1999), appeared to foreclose that characterization. Indeed, this Court held nearly a century ago that victims of a breach of fiduciary duty could obtain money damages in equity from the breaching defendant. *In re Interborough Consolidated Corp.*, 288 F. 334 (2d Cir. 1923).

*Pereira* departed from this history not because the panel concluded these decisions were wrong, but because the panel read Supreme Court dictum in one 2002 case to point in the other direction. In *Great–West Life & Annuity Insurance v. Knudson*, the Supreme Court observed that "generally" a request for equitable relief seeks to restore to the plaintiff "particular funds or property in the defendant's possession" rather than "to impose personal liability on the defendant." 534 U.S. 204, 210 (2002). *Pereira* believed *Great–West*'s dictum had "reconfigur[ed] the legal landscape of restitution" by announcing a virtually categorical "rule that a

64

defendant must possess the funds at issue" for monetary relief against him to be equitable. 413 F.3d at 340.

But that prediction proved incorrect several years later. In *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), the Supreme Court explained that the mere fact that relief "takes the form of a money payment does not remove it from the category of traditionally equitable relief," because "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty." *Id*. at 441. The Court then specified that an order to make good losses resulting from breach of fiduciary duty—precisely the "make whole" damages relief Plaintiffs seek here (A185)—is equitable, not legal, relief.

"[P]rior to the merger of law and equity," *Amara* explained, "this kind of monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable.'" 563 U.S. at 442. "The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing *any* violation of a duty imposed upon that fiduciary." *Id*. (emphasis added).

*Amara* thus eliminated the cornerstone of *Pereira*'s interpretation of the legal/equitable divide. *Pereira* reasoned that "the Court appears to be little concerned with the nature of the defendant and critically concerned with whether the defendant is being compelled to disgorge specific, traceable funds in his possession." 413 F.3d at 346 (Newman, J., concurring). In *Amara*, however, the Court clarified

that "insofar as an award of make-whole relief is concerned" the fact that "the defendant … is analogous to a trustee makes a critical difference." 563 U.S. at 441.

Even before *Amara*, *Great–West*'s applicability in this context was questionable. *Great–West* addressed only ERISA Section 502(a)(3), not the scope or meaning of the Seventh Amendment. Further, it was a claim *by*, rather than against, a fiduciary. The fiduciary in *Great–West* sued on behalf of an insurance plan to recover reimbursement for money the plan had advanced to a beneficiary after an accident. In contrast to this case, the underlying dispute was in essence a contract claim—a prototypically *legal* dispute. *See Pereira*, 413 F.3d at 346 (Newman, J., concurring) (observing that *Great–West*'s emphasis on defendant's "personal liability" was "dictum" in "an action against a fiduciary" because "the defendant in *Great–West* was not a fiduciary").

Courts have overwhelmingly concluded that *Great–West*'s dictum does not compel a jury trial in fiduciary breach cases seeking monetary relief for alleged imprudence in monitoring plan service providers or investments—a trend that has accelerated since *Amara*.[23] Courts have also routinely struck the jury demand in

---

[23] *See, e.g.*, *Marshall v. Northrop Grumman Corp.*, No. 2:16-cv-6794 (C.D. Cal. Feb. 15, 2018), Dkt.146; *Perez v. Silva*, 185 F. Supp. 3d 698, 703 (D. Md. 2016); *Bauer-Ramazani v. TIAA-CREF*, 2013 WL 6189802, at *11 (D. Vt. Nov. 27, 2013); *In re YRC Worldwide, Inc. ERISA Litig.*, 2010 WL 4920919, at *4 (D. Kan. Nov. 29, 2010); *Abbott v. Lockheed Martin Corp.*, 2007 WL 2316481, at *2 (S.D. Ill. Aug. 13, 2007).

403(b) cases against universities, including cases in this Circuit.[24]

This Court is not bound by prior precedent when "its rationale is overruled, implicitly or expressly, by the Supreme Court." *Nicholas v. Goord*, 430 F.3d 652, 659 (2d Cir. 2005). And *Amara* shows that, contrary to *Pereira*'s rationale, there is no basis for interpreting *Great–West* as holding that claims that seek "make-whole" relief from fiduciaries are "legal" for Seventh Amendment purposes. To the contrary, as this Court later recognized, "losses flowing from [a trustee's] breach of fiduciary duty … resemble the remedy of surcharge" and are "true equitable relief." *N.Y. State Psychiatric Assoc. v. UnitedHealth Grp.*, 798 F.3d 125, 134-35 (2d Cir. 2015) (citing *Amara*).

Thus, if the Court determines that further proceedings are necessary, it should make clear that Plaintiffs are not entitled to a jury trial on any of their claims that may be resurrected for trial.

---

[24] *Tracey v. Mass. Inst. of Tech.*, 395 F. Supp. 3d 150, 154 (D. Mass. 2019) (collecting cases); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (S.D.N.Y. Dec. 19, 2017) (Dkt.122); *Cates v. Columbia Univ.*, No. 16-cv-6524 (S.D.N.Y. Jan. 25, 2018) (Dkt.140). In *Divane*, the Seventh Circuit held that the plaintiffs had no right to a jury trial. 953 F.3d at 994. Plaintiffs' counsel did not challenge that holding in their petition for certiorari.

## CONCLUSION

The Court should affirm the final judgment of the district court dismissing Plaintiffs' complaint. If necessary, the Court should order that Plaintiffs are not entitled to a jury trial on any of their claims.

Dated: July 27, 2021                          Respectfully submitted

                                             /s/ *Nancy G. Ross*

Michelle N. Webster                          Nancy G. Ross
MAYER BROWN LLP                              Samuel P. Myler
1999 K Street, NW                            MAYER BROWN LLP
Washington, DC 20006                         71 South Wacker Drive
(202) 263-3000                               Chicago, IL 60606
mwebster@mayerbrown.com                      (312) 782-0600
                                             nross@mayerbrown.com
                                             smyler@mayerbrown.com

*Counsel for Defendants-Appellees-Cross-Appellants*
*Cornell University, The Retirement Plan Oversight Committee,*
*and Mary G. Opperman*

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I hereby certify that this brief complies with the typeface requirements of Fed.

R. App. P. 32(a)(5); the type style requirements of Fed. R. App. P. 32(a)(6); and the

type volume limitations of Fed. R. Ap. P. 29(a)(5) and 32(a)(7)(B) and

L.R. 28.1.1(b) because it is proportionally faced, has a typeface of 14 point Times

New Roman, and contains 16,478 words, excluding the parts of the brief exempted

by Fed. R. App. P. 32(f).

*/s/ Nancy G. Ross*
Nancy G. Ross

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July, 2021, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, who will be served by the appellate CM/ECF system.

*/s/ Nancy G. Ross*
Nancy G. Ross