# 21-88 (L)

21-96 (XAP), 21-114 (XAP)

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CASEY CUNNINGHAM, CHARLES E. LANCE, STANLEY T. MARCUS, LYDIA PETTIS, and JOY VERONNEAU, individually and as representatives of a class of participants and beneficiaries on behalf of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan,
*Plaintiffs-Appellants/Cross-Appellees*,

v.

CORNELL UNIVERSITY, THE RETIREMENT PLAN OVERSIGHT COMMITTEE, MARY G. OPPERMAN, AND CapFINANCIAL PARTNERS, LLC d/b/a CAPTRUST FINANCIAL ADVISORS,
*Defendants-Appellees/Cross-Appellants.*

Appeal from the United States District Court for the Southern District of New York, Hon. P. Kevin Castel, No. 16-cv-6525

**APPELLANTS' REPLY AND CROSS-APPELLEES' RESPONSE BRIEF**

Jerome J. Schlichter
Heather Lea
Sean E. Soyars
Joel D. Rohlf
SCHLICHTER BOGARD & DENTON LLP
100 S. Fourth Street, Suite 1200
St. Louis, Missouri 63102
(314) 621-6115
*Counsel for Plaintiffs-Appellants/Cross-Appellees*

# CONTENTS

Authorities.............................................................................................. iii

Appellants' Reply ................................................................................1

I.   The partial Rule 12(b)(6) dismissal was erroneous and prejudiced summary judgment .........................................................................1

   A.  Partial dismissal of Count V was error.....................................1

      1.  *Sacerdote* confirms the holistic standard of review .........1

      2.  Even if construed as separate claims, dismissal was improper........2

   B.  The erroneous dismissal prejudiced summary judgment .....................10

   C.  Plaintiffs stated a prohibited-transaction claim (Count IV) .................12

      1.  DOL's interpretation receives deference .........................12

      2.  If construed *de novo*, Cornell's interpretation is wrong, contrary to precedent, and disputed by TIAA itself.......................16

      3.  Cornell's §1108(b)(2) defense is premature and disputed.............19

II. Plaintiffs established genuine disputes on all properly raised issues..........20

   A.  The investment-review claim is materially disputed (Count V)..........22

      1.  Defendants were imprudent ..........................................22

      2.  Defendants have not disproven causation.......................28

   B.  The share-class claim is materially disputed (Count V) ......................32

      1.  Cornell forfeited the "no breach" argument and has no evidence.............................................................32

      2.  Cornell's loss arguments are waived or meritless...........................34

   C.  The recordkeeping claim is materially disputed (Count III)................36

      1.  Cornell's process was flawed.......................................36

      2.  Plaintiffs' evidence establishes loss...............................43

      3.  Plaintiffs' prayer for equitable relief compels reversal..................47

   D.  Plaintiffs waived no objection to *sua sponte* rulings (Counts III, V)...............................................................50

III.   Defendants fail to justify the class period ending date ........................51

i

Cross-Appeal Response ...........................................................................52

    I.   Summary of the Argument ..........................................................52

    II.  Standard of Review ...................................................................53

    III. Argument: Plaintiffs have a Seventh Amendment right to a jury trial because they seek money damages, the classic form of legal relief. ..........53

Conclusion ............................................................................................59

Certificate of Compliance ......................................................................60

Certificate of Service .............................................................................61

# AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)................................................................48

*Allen v. GreatBanc Tr. Co.*,
835 F.3d 670 (7th Cir. 2016) ...............................................19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................52

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985)................................................................21

*Atl. Mut. Ins. Co. v. Comm'r*,
523 U.S. 382 (1998)................................................................15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................12

*Box v. A & P Tea Co.*,
772 F.2d 1372 (7th Cir. 1985) ...............................................33

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ...................................................1

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018).................................... 28, 43, 46

*Brown v. City of N.Y.*,
862 F.3d 182 (2d Cir. 2017) .................................................47

*Brown v. Sandimo Materials*,
250 F.3d 120 (2d Cir. 2001) .................................................58

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
846 F.3d 492 (2d Cir. 2017) ........................................ 13, 15

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006) .................................................26

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)........................................................ 14, 15

*Cigna Corp. v. Amara*,
563 U.S. 421 (2011)........................................................ 54, 55, 56

*Cty. of Suffolk v. Stone & Webster Eng'g Corp.*,
106 F.3d 1112 (2d Cir. 1997) .............................................................52

*Curtis v. Loether,*
415 U.S. 189 (1974).............................................................................58

*Dardaganis v. Grace Capital Inc.*,
889 F.2d 1237 (2d Cir. 1989) .............................................................43

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) .................................................................9

*Dixon v. Nw. Nat. Bank of Minneapolis*,
297 F. Supp. 485 (D. Minn. 1969).......................................................58

*Donovan v. Bierwirth*,
754 F.2d 1049 (2d Cir. 1985) ....................................... 43, 44, 46, 47

*FDIC v. Laguarta*,
939 F.2d 1231 (5th Cir. 1991) ............................................................33

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)............................................................. 9, 22, 24

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011) ....................................................... passim

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)...............................................................................53

*Great–West Life & Annuity Insurance Company v. Knudson,*
534 U.S. 204 (2002)............................................................. 54, 56, 57

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
920 F.3d 1 (D.C. Cir.), *cert. denied*, 140 S.Ct. 789 (2020) ................13

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000)............................................................................17

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ................................................................7

*Henry v. Champlain Enterprises, Inc.*,
445 F.3d 610 (2d Cir. 2006) ...............................................................48

*Howell v. Motorola, Inc.*,
633 F.3d 552 (7th Cir. 2011) ................................................................9

*Hughes v. Northwestern Univ.*,
No. 19-1401 (U.S.)................................................................................2

iv

*In re Beck Indus., Inc.*,
  605 F.2d 624 (2d Cir. 1979) ...............................................................29

*In re Duffy's Will*,
  298 N.W. 849 (Iowa 1941) ...............................................................17

*In re Hill's Estate*,
  82 A. 338 (N.J. Prerog. Ct. 1912) ....................................................17

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) .................................................................9

*ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*,
  892 F.3d 511 (2d Cir. 2018) ........................................................ 35, 50

*Jackson v. Fed. Exp.*,
  766 F.3d 189 (2d Cir. 2014) ........................................................ 48, 49

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005) ..............................................................24

*Jenkins v. City of New York*,
  478 F.3d 76 (2d Cir. 2007) ................................................................52

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006) .............................................................31

*Jimenez v. City of New York*,
  166 F. Supp. 3d 426 (S.D.N.Y. 2016) ...............................................51

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)..............................................................................13

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................45

*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of
  Nassau Cty., Inc.*,
  710 F.3d 57 (2d Cir. 2013) .............................................................6, 24

*Langbecker v. Elec. Data Sys. Corp.*,
  476 F.3d 299 (5th Cir. 2007) ..............................................................9

*Leber v. Citigroup, Inc.*,
  2010 WL 935442 (S.D.N.Y. Mar. 16, 2010).....................................19

*Liss v. Smith*,
  991 F. Supp. 278 (S.D.N.Y. 1998) ....................................................49

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) ........................................................ 5, 6, 7

*Lopez v. City of New York*,
   901 F. Supp. 684 (S.D.N.Y. 1995) ....................................................51

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ............................................................30

*Marshall v. Snyder*,
   572 F.2d 894 (2d Cir. 1978) ........................................... 17, 20, 36, 39

*Medical Society of N.Y. v. UnitedHealth Group Inc.*,
   2021 WL 4263717 (S.D.N.Y. Sept. 20, 2021) ....................................52

*Mertens v. Hewitt Assocs.*
   508 U.S. 248 (1993)................................................................. 56, 57

*Moitoso v. FMR LLC*,
   451 F. Supp. 3d 189 (D. Mass. 2020)..............................................9, 37

*Moll v. Telesector Res. Grp., Inc.*,
   760 F.3d 198 (2d Cir. 2014) .............................................................39

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Ben. Plan*,
   577 U.S. 136 (2016)...................................................................... 56, 57

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ............................................................52

*N.Y. State Psychiatric Association (NYSPA) v. UnitedHealth Group*,
   798 F.3d 125 (2d Cir. 2015) ......................................................... 54, 56

*N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
   18 F.3d 179 (2d Cir. 1994) .......................................................... 16, 20, 28

*New York v. Julius Nasso Concrete Corp.*,
   202 F.3d 82 (2d Cir. 2000) ..............................................................47

*New York v. U.S. Dep't of Justice*,
   951 F.3d 84 (2d Cir. 2020) ..............................................................12

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement
   Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ........................................................ 5, 11, 29

*Pereira v. Farace*,
   413 F.3d 330 (2d Cir. 2005) ...................................................... 53, 54, 56, 57

vi

*Pfeil v. State St. Bank & Tr. Co.*,
  671 F.3d 585 (6th Cir. 2012) ................................................................9

*Ramos v. Banner Health*,
  1 F.4th 769 (10th Cir. 2021) ............................................................18

*Ramos v. Banner Health*,
  461 F. Supp. 3d 1067 (D. Colo. 2020)............................................ 36, 37, 38, 41

*Rankins v. United States*,
  366 F. Supp. 3d 634 (S.D.N.Y. 2019) .................................................50

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) ................................................................30

*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133 (2000)................................................................ 24, 30, 33, 36

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) .............................................................26

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) .............................................................12

*Roth v. Sawyer-Cleator Lumber Co.*,
  16 F.3d 915 (8th Cir. 1994) .............................................................30

*Sacerdote v. New York Univ.*,
  2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)........................................ 1, 6, 18

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018) .................................................21

*Sacerdote v. New York Univ.*,
  9 F.4th 95 (2d Cir. 2021) ........................................................... passim

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
  442 F. Supp. 3d 53 (D.D.C. 2020)....................................................14

*Schwan-Stabilo Cosms. GmbH & Co. v. Pacificlink Int'l Corp.*,
  401 F.3d 28 (2d Cir. 2005) ..............................................................50

*Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) ...........................................................13

*SoundExchange, Inc. v. Copyright Royalty Bd.*,
  904 F.3d 41 (D.C. Cir. 2018)...........................................................13

*Sweda v. Univ. of Pennsylvania*,
  923 F.3d 320 (3d Cir. 2019) ....................................................... passim

*Tatum v. RJR Pension Inv. Comm.*,
  761 F.3d 346 (4th Cir. 2014) ...............................................................29

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015)...........................................................................4, 8

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013) ................................................. 7, 27, 32

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) .........................................................4, 17

*Tibble v. Edison Int'l*,
  2017 WL 3523737 (C.D. Cal. Aug. 16, 2017) ............................. 34, 36

*Tolbert v. Queens Coll.*,
  242 F.3d 58 (2d Cir. 2001) ...................................... 10, 12, 33, 34

*Turner v. Schneider Elec. Holdings, Inc.*,
  --- F. Supp. 3d ---, 2021 WL 1178308 (D. Mass. Mar. 26, 2021)......................19

*Tussey v. ABB, Inc.*,
  2012 WL 1113291 (W.D. Mo. Mar. 31, 2012), *aff'd in relevant part,* 746
  F.3d 327 (8th Cir. 2014) .....................................................................39

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ......................................... 36, 37, 38, 40

*Tussey v. ABB, Inc.*,
  850 F.3d 951 (8th Cir. 2017) ..............................................................43

*United States v. ASCAP*,
  323 F. Supp. 2d 588 (S.D.N.Y. 2004) .................................................50

*United States v. Kelley*,
  551 F.3d 171 (2d Cir. 2009) ...............................................................48

*Van Buskirk v. United Grp. of Companies, Inc.*,
  935 F.3d 49 (2d Cir. 2019) .................................................................51

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996)......................................................................41, 55

*Wall v. Boston Safe Deposit & Tr. Co.*,
  150 N.E. 220 (Mass. 1926)................................................................17

*Weissman v. Fruchtman*,
  658 F. Supp. 547 (S.D.N.Y. 1987) .....................................................51

*Yates v. Hendon*,
    541 U.S. 1 (2004).................................................................22

*Zervos v. Verizon New York, Inc.*,
    252 F.3d 163 (2d Cir. 2001) ...........................................48

**Statutes**

29 U.S.C. §1002(14) .............................................................18

29 U.S.C. §1002(14)(A) ........................................................18

29 U.S.C. §1002(14)(B) ........................................................14

29 U.S.C. §1104(a)(1)(B) ......................................................42

29 U.S.C. §1104(c)(1)(A) ........................................................7

29 U.S.C. §1106(a) ........................................ 14, 15, 16, 17, 18

29 U.S.C. §1106(a)(1) .................................................... 13, 18

29 U.S.C. §1106(a)(1)(A) ......................................................14

29 U.S.C. §1106(a)(1)(C) ............................................ 13, 14, 15

29 U.S.C. §1106(a)(1)(D) ......................................................18

29 U.S.C. §1106(b) ...............................................................18

29 U.S.C. §1108 ...................................................................17

29 U.S.C. §1108(b) ...............................................................16

29 U.S.C. §1108(b)(2) ...................................................... 15, 19

29 U.S.C. §1108(b)(2)(A) ................................................... 15, 19

29 U.S.C. §1109(a) ...................................................... 55, 56, 58

29 U.S.C. §1110(a) .................................................................9

29 U.S.C. §1132(a)(2) ..................................................... 55, 56

29 U.S.C. §1132(a)(3) ..................................................... 54, 55

29 U.S.C. §1135 ...................................................................15

**Rules**

Fed.R.Civ.P. 56(f)(2) ...........................................................50

FRAP 28(a)(8)(A) ................................................................31

**Regulations**

29 C.F.R. §2550.404a-1(b)(1)(i)................................................4

29 C.F.R. §2550.404a-1(b)(1)(ii)................................................4

29 C.F.R. §2550.404a-1(c) ......................................................22

29 C.F.R. §2550.404c-1(b)(3)(i)................................................7

29 C.F.R. §2550.408b-2(a)(1)–(3) ...........................................15

29 C.F.R. §2550.408b-2(c) .....................................................15

29 C.F.R. §2550.408b-2(c)(1)(i)–(iii)(B) .................................15

**Other**

Assurance of Discontinuance, *In re TIAA-CREF Individ. & Instl. Svcs., LLC*
    (July 9, 2021) ...................................................................25

Bogert, & G. Bogert, *Law of Trusts and Trustees* (3d ed. 2009) .............................4

DOL Advisory Op. 2013-03A,
    2013 WL 3546834 (July 3, 2013).......................................36

DOL Advisory Op. No. 88-16A,
    1988 WL 222716 (Dec. 19, 1988) .....................................22

Restatement (Second) of Trusts (1959) ...................................58

SEC Announces $97 Million Enforcement Action Against TIAA Subsidiary for
    Violations in Retirement Rollover Recommendations (July 13, 2021) .............25

x

**APPELLANTS' REPLY**

I. **The partial Rule 12(b)(6) dismissal was erroneous and prejudiced summary judgment**

   A. **Partial dismissal of Count V was error**

      1. ***Sacerdote* confirms the holistic standard of review**

The district court's Rule 12(b)(6) order relied upon a similar decision involving NYU. SA67, SA74 (citing *Sacerdote v. New York Univ.*, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) (*Sacerdote I*)). This Court partially reversed that decision, on slightly different grounds.[1] *Sacerdote v. New York Univ.*, 9 F.4th 95, 103–10 (2d Cir. 2021) (*Sacerdote III*).

The Court endorsed a "holistic" plausibility inquiry. *Id.* at 109 & n.49 (quoting *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 331–32 (3d Cir. 2019), *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)); *see* Appellants' Principal Brief ("P.Br.") 22 (citing same). It did not assess in isolation the allegation that NYU provided "higher-cost retail shares" instead of identical lower-cost shares, but considered surrounding facts, such as the proportion of retail funds relative to the total portfolio. *Id.* at 108–09.

Cornell (p.56) and CAPTRUST (p.19) concede that Rule 12(b)(6) requires

---

[1] *Sacerdote* contained no allegation that the plans were unmonitored. SA71 n.3. NYU's plans had 84 and 103 funds, compared to Cornell's 300. *Sacerdote III*, 9 F.4th at 102. The issues on appeal did not involve an allegation of overly duplicative funds. *Id.* at 105.

1

considering the facts together, but contend the district court did so. The record

speaks for itself. SA66–SA67, SA71 ("This Court agrees with Judge Forrest that

the fourth and fifth allegations fail to plausibly allege a breach").

Cornell warns of "gamesmanship," noting Plaintiffs' counsel referred to a part

of Count V as a "claim" in *Hughes v. Northwestern Univ.*, No. 19-1401 (U.S.).[2]

But Plaintiffs have never disputed that an allegation *can* be sufficient standing

alone to demonstrate imprudence and thus be construed as a separate claim or

theory—the *Sacerdote* share-class "claim" being a prime example. It does not

follow from that premise that allegations which may not rise to that level standing

alone should effectively be stricken from a complaint, as the district court did here.

### 2. Even if construed as separate claims, dismissal was improper

Defendants next contend the court properly determined the dismissed

allegations were "deficient" or "impermissible legal theories." Cornell Br. 56–58;

CAPTRUST Br. 19–22. Even if analyzed as distinct theories or claims, Defendants

identify no basis for dismissal.

---

[2] Although *Hughes* involves Rule 12(b)(6), it "bear[s] directly" on this case. *Cf.* Cornell Br. 2 n.1. Determining whether the *Hughes* complaint plausibly alleges breach of fiduciary duty will require first defining the contours of the duty, which will likely inform the propriety of summary judgment here. *Hughes* also involves allegations that fiduciaries imprudently provided hundreds of duplicative investments, which bears directly on Plaintiffs' Rule 12(b)(6) appeal.

### a.    "Too many funds"

Defendants mischaracterize the dismissed "fifth allegation" (SA66–SA67) as alleging only "too many funds." Cornell Br. 57; CAPTRUST Br. 21. But the complaint alleges much more. The Plans' 300-fund lineup had many drawbacks: excessive duplication, higher fees, participant confusion, and the fiduciaries' inability to monitor the investments. A124–A141 ¶¶153–74. This included significant duplication in each investment style—such as 55 large cap domestic equity and 44 international investments—such that participants did not have real choice commensurate with the number of options. A124–A125 ¶153, A129 ¶¶162–63. This increased investment fees (A126–A127 ¶156, A129–A133 ¶¶163–69), reduced value from active management (A128 ¶159), and caused undue complexity and participant confusion (A124–A125 ¶153, A128–A129 ¶¶159–60, 162). Cornell could not effectively monitor all 300 funds on an ongoing basis, so it didn't try. A126 ¶154, A133–A134 ¶¶170–172. That monitoring failure left participants' retirement savings exposed to overpriced and underperforming funds that a prudent monitoring process would have eliminated. A134–A141 ¶¶173–74, A141 ¶172, A177–A179 ¶¶237–242. In contrast to Cornell's inaction, similarly situated prudent fiduciaries at the time reviewed their plans and streamlined options to a "best in class" lineup averaging 15 options.[3]

---

[3] A88 ¶83 (Loyola Marymount implemented "best in class" lineup in 2009); A91

Viewing the facts holistically thus paints a much different picture than Defendants' portrayal of a bare allegation of "too many funds." Retaining duplicative funds which drove up plan expenses raises a plausible inference that Defendants breached their "duty to be cost-conscious," to "incur only costs that are reasonable in amount," and to avoid "[w]asting beneficiaries' money." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (en banc) (citing trust law authorities). Providing dozens of investments in the same style and several "virtually interchangeable" index funds (A131–A132 ¶¶165–68) raises a plausible inference that Defendants failed to give "appropriate consideration" to "the role the investment or investment course of action plays in … the plan's investment portfolio." 29 C.F.R. §2550.404a-1(b)(1)(i)–(ii). And Cornell's admitted failure to monitor investments raises a plausible inference that it failed to "'systematically consider *all the investments*'" periodically "to ensure that they are appropriate." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (quoting Bogert, & G. Bogert, *Law of Trusts and Trustees* §684 (3d ed. 2009)) (cleaned up, emphasis added).

Accordingly, even if the dismissed "fifth allegation" is construed as a distinct claim, a holistic assessment supports the inference that, had Defendants prudently reviewed the Plans as did other fiduciaries, Defendants would have concluded that

---

¶86 (Purdue eliminated redundancy by reducing from 381 options to 19 in 2010); A92 ¶87 (Caltech eliminated 100 Fidelity mutual funds in 2010); A126 ¶155 (average plan had 15 options in 2014).

the costs and monitoring difficulties outweighed any marginal benefit of having 300 choices. *See Sweda*, 923 F.3d at 331–32 (finding claim plausible which included allegations that funds "were duplicative thereby decreasing the value of actively managed funds, reducing the Plan's leverage, and confusing participants"). And because Defendants' practices were unlike the "practices of similarly situated fiduciaries," *id.* at 332, the Court can reasonably infer that "a prudent fiduciary in like circumstances would have acted differently," *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013) ("*PBGC*")).

Defendants fail to distinguish *Sweda*, which *Sacerdote* repeatedly cites with approval. *Sacerdote III*, 9 F.4th at 108–09 nn. 42, 44, 47, 49, 51. Cornell calls *Sweda* "inapposite"—a remarkable assertion, since its brief's first sentence says *Sweda* is "nearly identical." Br. 2, 58 n.19. While *Sweda* did not hold "that every allegation that predicated Count V supported an inference of imprudence" (*id.* 58 n.19), that is exactly the point—analyzing each allegation for plausibility is improper. More importantly, the court did not affirm the dismissal of *any* part of Count V. *Sweda*, 923 F.3d at 331–32.

Defendants justify dismissal on the ground that choice is a good thing. Cornell Br. 57; CAPTRUST Br. 20 (both citing, *inter alia*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011)). But a potential justification for challenged conduct

5

does not justify dismissing an otherwise plausible claim. *Sacerdote III*, 9 F.4th at

108; *see Sacerdote I*, 2017 WL 3701482, at *11 (also citing *Loomis* and dismissing

claim because retail funds "offer higher liquidity").[4] The notion that a fiduciary

*could* prudently decide to retain 300 funds despite the drawbacks "provides no

basis to dismiss pleadings that otherwise generate plausible inferences of the

claimed misconduct. Such an argument 'goes to the merits and is misplaced at this

early stage.'" *Sacerdote III*, 9 F.4th at 108 (quoting *Sweda*, 923 F.3d at 333).

Accordingly, Defendants' assertion that choice is an unabashed virtue cannot

be credited over Plaintiffs' contrary allegations. *Id. Sweda* squarely rejected the

notion that merely "stocking a plan with hundreds of options" would automatically

"insulate[] plan fiduciaries from liability." 923 F.3d at 330. A bright-line rule that

maximizing choice is *per se* prudent would be at odds with ERISA's prudence

standard, which requires a "considered decision" based on "weigh[ing] the costs

and benefits" of a course of action. *L.I. Head Start Child Dev. Servs., Inc. v. Econ.*

*Opportunity Comm'n of Nassau Cty., Inc.*, 710 F.3d 57, 70 (2d Cir. 2013). While

*Loomis* cited "the safe harbor in §1104(c)" as "encourag[ing] sponsors to allow

more choice to participants in defined-contribution plans," 658 F.3d at 673, a plan

satisfies its "broad range of investment alternatives" requirement by providing as

---

[4] The decision under review in *Hughes* also relied heavily upon *Loomis*. *Divane v. Northwestern Univ.*, 953 F.3d 980, 986, 989–92 (7th Cir. 2020), *cert. granted sub nom. Hughes v. Northwestern Univ.*, 2021 WL 2742780 (U.S. July 2, 2021).

few as *three* options. 29 C.F.R. §2550.404c-1(b)(3)(i); 29 U.S.C. §1104(c)(1)(A). Nothing in the safe harbor suggests a 300-fund lineup is prudent as a matter of law regardless of countervailing factors. The facts here raise a strong inference that Defendants failed to balance the costs and benefits of maintaining the 300-fund lineup, and thus tend "to rule out" Defendants' alternative explanation, even though that was not required. *Sacerdote III*, 9 F.4th at 108.

Defendants' cases are inapposite. The plans had at most a few dozen funds.[5] The plaintiffs alleged it was "categorically imprudent" for large plans to offer *any* mutual funds instead of only non-mutual fund alternatives such as "commingled pools." *Tibble*, 729 F.3d at 1134; *Loomis*, 658 F.3d at 669, 671–72 (plan had eight non-mutual funds; plaintiffs alleged number of mutual funds "must be zero"). The courts rejected that theory because ERISA encourages a "*reasonable* range" of choices. *Tibble*, 729 F.3d at 1134–35 (emphasis added); *Loomis*, 658 F.3d at 673. They did not suggest a 300-fund lineup would be prudent as a matter of law.

### b.    Failure to monitor

Cornell cites no authority supporting the district court's rationale for dismissing allegations that Defendants failed to monitor at least 74% of the Plans' investments. *See* SA71 & n.3; A133–A134 (¶¶170–71). Cornell argues only that

---

[5] *Loomis*, 658 F.3d at 669 (32 funds); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1118, 1134 (9th Cir. 2013), *vacated,* 575 U.S. 523 (2015) (51 funds); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (20 funds plus brokerage window).

Plaintiffs' position that all funds must be monitored to some extent is "a separate point from the district court's reasoning" about "a tiered approach." Br. 57–58.

Regardless of whether the point is "separate," Cornell does not *dispute* the point: "a fiduciary still must monitor non-core investment options to some extent." Cornell Br. 57 (citing P.Br. 24–25). Cornell failed to do so. A133–A134 (¶¶170–71). Thus, Cornell plausibly violated its duty to "'systematically consider *all the investments*'" in the Plans "to ensure that they are appropriate." *Tibble*, 575 U.S. at 529 (emphasis added).

Cornell's contention that "a tiered approach to investment review does not demonstrate imprudence" misses that point. Br. 57–58. Defendants could not exempt themselves from their monitoring duty by labeling investments by "tiers." Because the monitoring duty includes "*remov[ing]* imprudent *ones*," a duty "*of some kind*" necessarily applies to *every* investment in a plan, as Cornell apparently concedes. *Tibble*, 575 U.S. at 530.

Cornell contends that *Tibble* left the scope of the duty unresolved. Br. 32. But the unresolved questions pertain to matters such as frequency and whether fees must be monitored along with performance—not whether a fiduciary may leave part of a plan unmonitored. *See Tibble*, 575 U.S. at 526, 530–31 (parties disputed necessity of a "full due-diligence review" of share classes). Every circuit to address the point agrees that providing "a single imprudent investment offered as part of an

otherwise prudent menu of investment choices amounts to a breach of fiduciary duty."[6] To ensure that imprudent options are eliminated, a fiduciary necessarily must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007); *see also Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 199–200, 205–06, 208–10, 221, 222 (D. Mass. 2020) (fiduciary that "disclaimed any obligation to monitor investments other than the two" core options breached duty by "failing to monitor" remaining funds).

While a common law trust settlor may "reduce or waive the prudent man standard of care by specific language in the trust instrument," "trust documents cannot excuse trustees from their duties under ERISA." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 422 (2014) (citations omitted). ERISA prohibits it: "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility ... for any ... duty under this part shall be void as against public policy." 29 U.S.C. §1110(a); *Dudenhoeffer*, 573 U.S. at 421 ("[T]he duty of prudence trumps the instructions of a plan document."). Accordingly, Cornell could not exempt itself from its monitoring duty by the simple expedient of a "non-

---

[6] *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012); *Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 422–23 & n.8 (4th Cir. 2007); *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 308 n.18 (5th Cir. 2007); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 438–40 (3d Cir. 1996).

core" designation. Regardless of labels, the failure to monitor any options for years, and over 200 thereafter, raises a plausible inference of imprudence. A133–A134 (¶¶170–71).

## B. The erroneous dismissal prejudiced summary judgment

Cornell does not respond to Plaintiffs' Argument I.B. P.Br. 25. Cornell thus concedes that the erroneous dismissal affected the Count V summary judgment decision and should be vacated. *Tolbert v. Queens Coll.*, 242 F.3d 58, 75–76 (2d Cir. 2001) (appellee conceded issue by failing to present adequate counter-argument); *see also Sacerdote III*, 9 F.4th at 105, 117 (vacating decision on later motion that was prejudiced by error on prior motion).

A footnote in Cornell's summary judgment argument contends that "Plaintiffs do not challenge" the district court's refusal to consider many funds. Br. 49 n.16 (citing SA41). In fact, Plaintiffs specifically cited SA41 as an error flowing directly from the erroneous dismissal. P.Br. 25.

CAPTRUST makes a similar waiver argument. Br. 28–29. The district court denied Defendants' Rule 37 motion on this point. SA40–SA41. CAPTRUST shows no abuse of discretion.

CAPTRUST contends that the existing record shows that any error was harmless as to CAPTRUST. Br. 19–23. But the dismissal necessarily affected discovery, expert opinions, and briefing on summary judgment. Because the

10

overall lineup and monitoring allegations were dismissed, Defendants' summary judgment briefing focused on specific funds,[7] and the district court required Plaintiffs to make a fund-by-fund showing while refusing to consider funds that would have been encompassed by the dismissed allegations. SA41.

Moreover, even if *CAPTRUST* prudently recommended a "[s]treamlined fund line up," Cornell's years-long delay in even making a decision and beginning to implement it cannot be deemed prudent as a matter of law. P.Br. 33–37; *cf.* CAPTRUST Br. 21–22. Deliberation alone does not establish prudence. *Sacerdote III*, 9 F.4th at 111 ("[W]e ask 'whether a fiduciary employed the *appropriate* methods … ,' not merely whether there were any methods whatsoever.") (quoting *PBGC*, 712 F.3d at 716).

CAPTRUST also ignores that the district court explicitly relied on the dismissal order to sustain Cornell's extensive objections to Plaintiffs' evidence that Cornell did not "monitor" the Plans' investments. P.Br. 25; SA31 n.11; *see also* Cornell SJ Mem. 23–25 (Doc. 233) (citing dismissal order to argue that beyond CREF Stock and TIAA Real Estate, "[n]o other investment options are properly part of Plaintiffs' case"). Although the court did not specify which evidence it excluded, the court recited Defendants' evidence at length while stating that

---

[7] SA31 (Cornell argued for summary judgment on the ground that "plaintiffs have not demonstrated that any of the challenged funds underperformed").

Plaintiffs had "no evidence" on various points, demonstrating that the dismissal affected Plaintiffs' case. SA36–SA40, SA42–SA44.

Because Count V was "stated adequately," Plaintiffs were entitled to support it "'by showing any set of facts consistent with the allegations in the complaint.'" *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)). The partial dismissal of Count V should be reversed and summary judgment vacated as to Count V.

## C. Plaintiffs stated a prohibited-transaction claim (Count IV)

Cornell's arguments are contrary to the Department of Labor's view and this Court's precedents. *Even the Plans' recordkeeper* concedes that §1106(a) applies to its services in another pending appeal, *Haley v. TIAA*, No. 21-805 (2d Cir.). And Cornell's §1108(b) defense can only be resolved by the jury.

### 1. DOL's interpretation receives deference

If *Chevron* is subject to forfeiture, Cornell forfeited its single-sentence-footnote forfeiture argument. Br. 60 n.21; *Tolbert*, 242 F.3d at 75–76. But the better view, which this Court appears not to have resolved,[8] is that "*Chevron* is not a 'right' or 'privilege' belonging to a litigant." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 22 (D.C. Cir.), *cert. denied*, 140 S.Ct. 789

---

[8] *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 101 n.17 (2d Cir. 2020) (noting circuit split).

(2020). *Chevron* is a standard of review or tool of statutory construction, *id*., which the parties "cannot waive … by failing to argue," *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018). In determining a statute's meaning, "the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Guedes*, 920 F.3d at 22 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). If the rule were otherwise, the meaning of the same statute could fluctuate from case to case based on whether parties cited *Chevron*.

Even if waivable, the only forfeiture was by Cornell. Forfeiture occurs when "a *party challenging* an agency's interpretation of a statute" fails to raise "an *objection* to *Chevron* deference." *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018) (emphasis in original). Cornell disputes DOL's interpretation of §1106(a)(1) yet chose not to analyze *Chevron*.

Plaintiffs had no reason to argue deference in the opening brief: Plaintiffs contend that §1106(a)(1)(C) *unambiguously* applies to the "furnishing of" recordkeeping "services," and the district court's "self-dealing" requirement appears nowhere in that unambiguous text. P.Br. 61. "[I]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017)

13

(quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

Moreover, Cornell *conceded* below that §1106(a)(1)(C) applied to the Plans' recordkeeping services. *See* Doc. 66 at 28–30.[9] It disputed that recordkeeping fees are "property" or "assets" under §1106(a)(1)(A) and (D),[10] questions involving no contrary DOL interpretation. *Id*. at 29. But Cornell's only §1106(a)(1)(C) argument was an affirmative defense. *Id.* at 29–30.

Because Cornell's position below comports with DOL's view and the district court did not rely on any ambiguity, Plaintiffs had "no need" to address *Chevron* in the opening brief and did not forfeit a deference argument. *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 73 n.12 (D.D.C. 2020).

Cornell now contends §1106(a) does not apply to the Plans' recordkeeping services. Cornell Br. 59–60. Though the basis for Cornell's position is somewhat unclear, Cornell does not defend the district court's "self-dealing" requirement. Cornell appears to assert that TIAA and Fidelity are not "parties-in-interest" by virtue of providing recordkeeping services.[11] *Id.* 59. That new position contradicts

---

[9] "Doc. __ at __" citations are to the page numbers on the ECF header.

[10] Cornell abandons this position by not responding to Plaintiffs' "plan assets" argument. P.Br. 61–62.

[11] The term "party in interest" includes, *inter alia*, "a person providing services to such plan." 29 U.S.C. §1002(14)(B). "Person" includes corporate entities. 29 U.S.C. §1002(9).

DOL's interpretation and raises an ambiguity, triggering *Chevron* step two. *Catskill*, 846 F.3d at 519–20.

Plaintiffs cited not just a "prefatory section" as Cornell asserts (n.21), but also the regulation setting forth criteria for an exemption under §1108(b)(2). P.Br. 61 (citing 29 C.F.R. §2550.408b-2(c)). The regulation was promulgated pursuant to the Secretary of Labor's authority to "prescribe such regulations as he finds necessary or appropriate," 29 U.S.C. §1135, *i.e.*, "an express delegation" of legislative authority, *Chevron*, 467 U.S. at 843–44.

The regulation construes §1106(a) [ERISA "section 406(a)"] as applying to a plan's "contract or arrangement" with a provider of "[r]ecordkeeping services"— which is "a party in interest"—but a fiduciary can avoid liability if the plan pays "[n]o more than reasonable compensation" for services "necessary for the … operation of the plan." 29 C.F.R. §2550.408b-2(a)(1)–(3), (c)(1)(i)–(iii)(B).

DOL's construction is permissible and not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44. It is consistent with the statute. 29 U.S.C. §1106(a)(1)(C), §1108(b)(2)(A) (SA114, SA117). Regardless of whether it is "the best interpretation of the statute," it is "a reasonable one," and entitled to deference. *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 389 (1998).

**2.      If construed *de novo*, Cornell's interpretation is wrong, contrary to precedent, and disputed by TIAA itself**

Cornell caricaturizes Plaintiffs' position as asserting that §1106(a) "proscribes retirement pension plans' most basic operations." Br. 59–60. But that "absurd" reading depends on ignoring the statute's first clause: "*Except as provided in Section 1108*." 29 U.S.C. §1106(a); *see also id*., §1108(b) (prohibitions of §1106 "*shall not apply*" if exemption met) (emphases added).

TIAA itself—represented by lawyers for Cornell's *amici*—disputes Cornell's view. TIAA repeatedly emphasizes that "ERISA's prohibited-transaction provisions were drafted to make *all* transactions involving service providers prohibited unless an exemption applies." Pet. 18, *Haley v. TIAA*, No. 20-4117 (2d Cir. Dec. 9, 2020); Appellants' Br. 13, No. 21-805 (July 20, 2021) (provisions "cover[] *all* plan transactions with service providers"); *id*. 30 (similar).

TIAA is correct. There is nothing absurd about a general prohibition accompanied by broad exemptions which require the fiduciary to ensure that plan expenditures—which reduce participants' retirement benefits—are no more than reasonable. This Court's precedents reflect this interpretation. *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir. 1994) (requiring trustees to show that payment of "$45,484.15 over five winters on two maintenance employees who were 'parties in interest'" was "fair and reasonable under all of the circumstances."); *Marshall v. Snyder*, 572 F.2d 894,

16

900 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the defendants."). This view comports with the trust law duties to "incur only costs that are reasonable in amount" and to avoid "[w]asting beneficiaries' money." *Tibble*, 843 F.3d at 1197–98. Common-law courts have long required trustees to justify such expenditures. *E.g.*, *Wall v. Boston Safe Deposit & Tr. Co.*, 150 N.E. 220, 222 (Mass. 1926) (disallowing charge of real estate broker fee that was "more than the usual commission"); *In re Hill's Estate*, 82 A. 338, 339 (N.J. Prerog. Ct. 1912) (applying duty to administer estate "without unnecessary expense"); *In re Duffy's Will*, 298 N.W. 849, 851 (Iowa 1941) (per curiam) (disallowing expense not "necessary . . . for the proper management of the trust").

True, §1106(a) is aimed at transactions "likely to injure" a plan. Cornell Br. 59–60 (quoting SA74); *Sweda*, 923 F.3d at 336. But Congress did not leave the task of assessing "propensity to injure" to the *courts* on a case-by-case basis. Congress determined which transactions may be injurious through the specific language it used in §1106, while simultaneously allowing fiduciaries to show the absence of injury through §1108. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000). Congress likewise identified the "entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries" through the categories it included in "party in interest." *Id.* at 242

17

(citing 29 U.S.C. §1002(14)). It was not the district court's role to second-guess those legislative judgments based on its own view of injury potential.

The district court also relied on *Sacerdote I*. Cornell Br. 60 n.20. To be sure, §1106(a) transactions *can* "involve self-dealing." *Sacerdote I*, 2017 WL 3701482, at \*14. But it does not follow that proof of self-dealing is *required*. For instance, because a "fiduciary" is a "party in interest," 29 U.S.C. §1002(14)(A), a fiduciary who self-deals with plan assets violates §1106(a)(1)(D). But that does not mean that *all* party-in-interest transactions are outside of §1106(a)(1) *unless* they involve self-dealing. Indeed, because §1106(b) *explicitly* prohibits transactions that favor the fiduciary or a third-party over the plan, 29 U.S.C. §1106(b) (SA114–SA115), interpreting §1106(a) as *also* being limited to such transactions would render §1106(a) redundant.

Cornell cites a recent holding that a prospective service provider is not yet a "party in interest" at the time of its "initial agreement" with a plan. *Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021). Instead, "some prior relationship must exist between the fiduciary and the service provider to make the provider a party in interest under §1106." *Id.*

Here, the Cornell Plans had longstanding prior relationships with TIAA and Fidelity by the start of the class period in August 2010. "Cornell's relationship with TIAA spans over 80 years: TIAA was first retained to provide annuities to

18

Cornell's employees in 1937." A2089 ¶20. Thus, TIAA has been a "party in interest" to the Plans since ERISA's 1974 inception. And "Cornell retained Fidelity as a second recordkeeper in the mid-1990s," making Fidelity a party-in-interest long before the class period. A2090 ¶21; *see also* Doc. 66 at 31–32 & n.42 (conceding longstanding service relationships at pleading stage).

Cornell warns of exposing fiduciaries to litigation "merely because they engaged in an arm's length deal with a service provider." Br. 60. The Seventh Circuit rejected the same argument, giving no weight to speculative fears that plaintiffs would "waste … time and resources" pursuing futile prohibited-transaction claims. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 677 (7th Cir. 2016) ("[W]hy would a beneficiary sue the trustee over a chair?"). Rule 11 is another deterrent. *Id.* And §1106(a) claims that fail to rebut obvious exemptions are frequently dismissed. *E.g.*, *Turner v. Schneider Elec. Holdings, Inc.*, --- F. Supp. 3d ---, 2021 WL 1178308, at *8 (D. Mass. Mar. 26, 2021); *Leber v. Citigroup, Inc.*, 2010 WL 935442, at *9–10 (S.D.N.Y. Mar. 16, 2010).

### 3. Cornell's §1108(b)(2) defense is premature and disputed

Though the district court did not reach Cornell's §1108(b)(2) defense at the pleading stage, Plaintiffs necessarily defeated it by showing that the unnecessary dual-recordkeeper arrangement caused unreasonable compensation. *See* SA65–SA66; *cf.* 29 U.S.C. §1108(b)(2)(A). Because the legal requirements to establish

the defense were never briefed below on an evidentiary record, it should be addressed by the district court in the first instance.

Even if the Court were to reach the issue, it is materially disputed. Although recordkeeping is a necessary service, it was *unnecessary* for Cornell to retain two recordkeepers, an inefficient structure which increased fees. P.Br. 13, 57; *see DePerno*, 18 F.3d at 181–83 (requiring trustee to justify hiring four maintenance worker parties-in-interest instead of two). Cornell claims that the fees were reasonable, but *how much* the Plans actually paid TIAA and Fidelity is genuinely disputed. SA14; A2142–A2146 ¶¶50–51, A2167–A2174 ¶¶62–63. Plaintiffs' evidence shows that the fees were unreasonable. P.Br. 13, 53–57; *see infra*, pp. 45–46. That TIAA and Fidelity immediately "leaped" to lower their fees when Cornell finally asked in 2012 is evidence that the prior compensation was unreasonable. A343–A345; A1067–A1068 (100:17–101:9). Even if the *total* expenditures were reasonable (which Plaintiffs dispute), Cornell would still have to prove that the amounts paid to *each* recordkeeper were reasonable, which it has not done. *See Snyder*, 572 F.2d at 900–01 (reasonableness of payment for "each service" is assessed "separately"). Resolving those disputes are jury tasks.

## II. Plaintiffs established genuine disputes on all properly raised issues

As discussed below, *Sacerdote III* further supports Plaintiffs' arguments for reversal. The decision also illustrates the extremely deferential review of a trial

20

judgment, which stands in stark contrast to the *de novo* summary judgment standard requiring the record to be viewed most favorably to Plaintiffs.

Although Defendants rely heavily on the *Sacerdote* trial decision, they ignore that Judge Forrest *denied* summary judgment, finding it "*clear that the remaining issues in this case implicate questions of fact.*" Doc. 174 in S.D.N.Y. No. 16-6284 (Feb. 22, 2018) (emphasis added). The trial decision then turned largely on witness credibility—"credible" or "credibly" appears 14 times[12]—findings virtually immune from appellate review. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). The Court thus affirmed that NYU performed its fiduciary duties "adequately" because "a lengthy and resource-intensive change" of campus computer systems made it prudent not to immediately consolidate recordkeepers and NYU "paid special attention" to CREF Stock and TIAA Real Estate. *Sacerdote III*, 9 F.4th at 117, 119–21.

*Sacerdote* thus confirms that disputed issues in this breach of fiduciary duty case are inherently fact-intensive and can only be resolved by a jury[13] after observing witnesses and weighing the evidence. P.Br. 33–37, 42, 51. Plaintiffs' evidence here is significantly different from *Sacerdote*, as set forth in the opening

---

[12] *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 282–83 nn.11–12, 16, 21–22, 24, 296, 304–06 & nn.67, 76, 309–10 & nn.106, 108 (S.D.N.Y. 2018) (*Sacerdote II*).

[13] *Sacerdote* plaintiffs waived a jury. *Id*. at 117.

brief and below. Among other things, no "lengthy and resource-intensive" technology issues prevented Cornell from consolidating recordkeepers, nor did Defendants pay "special attention" to disputed investments (which go beyond the two in *Sacerdote*).

## A. The investment-review claim is materially disputed (Count V)

### 1. Defendants were imprudent

ERISA fiduciaries are held to the standard of an "expert in the field," meaning one who lacks expertise must seek outside assistance and good faith is no defense. P.Br. 34; *Katsaros*, 744 F.2d at 279; *Sweda*, 923 F.3d at 329.

The term "benefits" in §1104(a) means "*financial* benefits (such as retirement income)"—it does not include "nonpecuniary benefits." *Dudenhoeffer*, 573 U.S. at 421. Allowing "nonpecuniary goals" like disruption and liability avoidance to impair the goal of "*maximiz[ing] retirement savings*" violates ERISA's duty of prudence. *See id.* at 420 (emphasis added); DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (investment decision "may not be influenced by non-economic factors" unless all else equal); 29 C.F.R. §2550.404a-1(c) (same); *see Yates v. Hendon*, 541 U.S. 1, 17–18 (2004) (relying on DOL advisory opinion).

Against this backdrop, Plaintiffs' opening brief (15–17, 33–37, 47–48), established the following flaws in Defendants' fiduciary processes:

- Until 2012, Cornell did not designate anyone with "expertise or experience" to review investments. A1054–A1056 (78:9–80:11).

22

- Instead, Cornell "very heavily" relied on conflicted non-fiduciaries (TIAA and Fidelity) to monitor their own proprietary investments. A1054–A1055 (78:20–79:2); A1122–A1123.

- In January 2012, CAPTRUST advised Cornell that it should "streamline[]" the Plans' "redundant" 300-fund lineup and "eliminate on a go forward basis" "many" underperforming investments. A323; A1324–A1325, A1327, A1331–A1335.

- Instead of following this advice, two-and-a-half years later Cornell relabeled the investments by tiers and left over 200 "tier III" funds unmonitored, despite being advised that doing so was not "fully" compliant with fiduciary obligations. A380, A414.

- To "monitor" Tier III investments, Cornell trusted that TIAA and Fidelity would "self-monitor[]" and act in the "best interest of the employees." A1102–A1104 (176:8–177:3, 178:9–25).

- At year-end 2014—nearly three years after CAPTRUST advised eliminating many options, Cornell was again advised that to comply with its fiduciary duties, it should eliminate the "unmonitored tier III Menu" as soon as practicable. A380. Cornell finally pledged to "work on *defining a process* to make decisions." A381 (emphasis added).

- Cornell did not reach a decision to remove a single fund until 2016— *four years* after CAPTRUST's recommendation—and did not actually remove any funds until *spring 2017*—over five years after the recommendation. P.Br. 16–17, 47–48; A373–A374.

- Cornell's explanation for the delay was avoiding "disruption"—a nonpecuniary goal. DJA333. It retained CREF Stock based on nonpecuniary "legacy" considerations. A1108–A1109 (220:10–221:19).

- For its part, CAPTRUST delayed 19 months from its December 2011 hiring before realizing it had "*yet to do a review*." A1413. It then hastily reviewed the "massive" fund lineup within the next few weeks to provide "*fiduciary cover*" and "mitigate" potential liability until Cornell consolidated funds. A1411, A1414–A1415. The review omitted

23

numerous Plan funds and data needed to interpret the report, which CAPTRUST customarily provided other clients. A712–A714 ¶¶68–69.

Plaintiffs' expert explains how Defendants' conduct fell short of the methods used by prudent fiduciaries at the time. A698–A723 ¶¶24–88. On this record, a reasonable jury could find that Defendants failed to use the "*appropriate methods*," *Sacerdote III*, 9 F.4th at 111, failed to make a "considered decision," *L.I. Head Start*, 710 F.3d at 70, and violated ERISA's "exclusive purpose" of pursuing financial benefits for participants by focusing on nonpecuniary goals of avoiding disruption (Cornell) and liability (CAPTRUST), *Dudenhoeffer*, 573 U.S. at 420–21.

In response, Defendants dispute Plaintiffs' interpretation of the record and contend other evidence favors their position. Cornell Br. 32–41; CAPTRUST Br. 30–33. But at this stage, it is not enough to show even that the evidence "unmistakably" favors Defendants. *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The question is "whether a fair-minded jury" viewing the record most favorably to Plaintiffs could find liability. *Id.* The Court considers the entire record but "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000). The Court credits evidence favoring the movant only to the extent that it is "*uncontradicted* and unimpeached" and "*comes from disinterested witnesses*." *Id.* (emphasis added).

24

As shown by the facts cited above and the Rule 56.1 statement, virtually all of Defendants' evidence is contradicted. A698–A723 ¶¶24–88; A2071–A2260. And all of Defendants' witnesses are biased to some extent. Cornell has had close relationships with TIAA and Fidelity for decades. A2089–A2090 ¶¶20–21.

Cornell asserts there is no evidence that TIAA or Fidelity "stood to benefit in any way from the particular investments the Plans offered." Br. 36 n.7. To the contrary, the record shows that they collected fees on billions of dollars of the Plans' assets. A2134 n.341. A jury need not speculate to draw the common-sense inference that financial services companies have an incentive to maximize assets under management. Were there doubt, judicially noticeable public records show that TIAA in July 2021 settled charges that it abused its position as a retirement-plan recordkeeper to defraud employees into "rolling" assets from plans to TIAA's more-lucrative non-plan products—a practice discussed by Plaintiffs' experts.[14] A786–A787 ¶¶76–77; A843 ¶¶135–36. TIAA devised the scheme because it needed a new revenue source due to "erod[ing] ... assets under management" in its retirement-plan business.[15] The jury can infer that TIAA and Fidelity would have

---

[14] *See* SEC Announces $97 Million Enforcement Action Against TIAA Subsidiary for Violations in Retirement Rollover Recommendations (July 13, 2021), https://www.sec.gov/news/press-release/2021-123.

[15] *See* Assurance of Discontinuance 2 ¶4, *In re TIAA-CREF Individ. & Instl. Svcs., LLC* (July 9, 2021),
 https://ag.ny.gov/sites/default/files/tiaa_aod_-_2021.07.13_-_fully_executed.pdf.

been loath to inform Cornell that their investments were no longer in the "best interest of the employees." A1102–A1104 (176:8–177:3). Accordingly, the jury can reject Cornell's position (Br. 33, 36) that a prudent fiduciary would outsource monitoring of over 200 options to conflicted "vendors" with no fiduciary obligation to participants. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011) ("Fidelity owes no fiduciary duty" as recordkeeper).

Cornell relies on circular reasoning in arguing that ERISA does not mandate a "particular course of action." Br. 15, 35. That principle simply recognizes that *if* the fiduciary used appropriate methods, courts will not second-guess a choice between reasonable alternatives. *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006); *cf. Sweda*, 923 F.3d at 333 ("Fiduciary discretion must be exercised within the statutory parameters of prudence and loyalty."). Cornell cannot transform that principle into a finding that it acted prudently in the first place, the question here.

Defendants' arguments boil down to a contention that because they had a process of some sort, they satisfied their duty of prudence as a matter of law. But a deliberative process alone does not establish prudence if the methods are not the "*appropriate* methods." *Sacerdote III*, 9 F.4th at 111. A jury could determine that focusing on nonpecuniary factors like "disruption" (Cornell Br. 38–40), does not reflect the process of a prudent financial expert focused on furthering participants' economic interests. P.Br. 38–41, 45. In short, a reasonable jury could find that

26

Defendants' methods were not the *appropriate* methods.

Cornell's cases (Br. 40) are not on point. Cornell's quote from *Braden* is paraphrasing a district court order that the Eighth Circuit *reversed* and criticized as "speculation." *Braden*, 588 F.3d at 596–97. As noted *supra*, p.7, *Tibble* involved a "broadside" attack against mutual funds. 729 F.3d at 1135. The court did not suggest that "relevant considerations for a fiduciary" include whether to prioritize nonpecuniary matters over participants' financial interests.

Although participants were not "forced" to invest in any particular option (Cornell Br. 40), moving promptly to a streamlined lineup would have created financial benefits for all participants—the very reason CAPTRUST recommended it as its first order of business. A722 ¶85; A323; A1321–A1335. Allowing disruption concerns to interfere with the exclusive purpose of enhancing retirement savings was not prudent, *see supra*, pp. 22–24, particularly since Cornell knew that its disruption fears would likely generate little "push back" and amount to a "non-event." A1663; A2578.

Merely hiring a consultant also does not establish prudence as a matter of law. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799–800 (7th Cir. 2011). And Cornell did not probe the bases for CAPTRUST's advice despite knowledge that it was "fundamentally unreliable" in some respects and omitted information. P. Br. 16–17, 35–37.

IRS regulations are a red herring. Cornell Br. 33–34. They affected plans that previously qualified for an exemption from ERISA. Cornell's Plans have always been subject to ERISA's fiduciary duties. A2075 ¶6 & n.14; Doc. 290-1 at 14.

### 2. Defendants have not disproven causation

While it is the plaintiff's burden to show a loss, "the burden under ERISA shifts to the defendants to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty." *Sacerdote III*, 9 F.4th at 113 & n. 68 (citing *DePerno*, 18 F.3d at 183). In light of background trust-law principles, "it makes little sense to have the plaintiff hazard a guess as to what the fiduciary would have done had it not breached its duty in selecting investment vehicles, only to be told [to] guess again." *Id.* at 113 & n.71 (quoting *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 38 (1st Cir. 2018)).

*Sacerdote III* directly supports Plaintiffs' position and shows that the district court misallocated the burden to Plaintiffs. P.Br. 26–33 & n.7. It defeats the contrary position of Defendants and their *amici*.[16] Cornell Br. 42–50.

To meet their burden of "showing that the loss was not caused by the breach of

---

[16] *Amici* contend that Plaintiffs' harmonization of *DePerno* and *Silverman* requires "an impossible line-drawing exercise." Br. 17. But it could not be simpler: burden-shifting applies to §1104(a) claims involving "the defendant's own breach," but not §1105(a) claims regarding a co-fiduciary's breach. P.Br. 31. In any event, the *Sacerdote*/*DePerno* burden-shifting rule plainly applies here; the Court need not resolve where the line might be drawn in some other case involving a more attenuated link between breach and loss.

fiduciary duty," defendants must show that no reasonable jury could fail to conclude that Defendants' "resulting investment decision was objectively prudent." *Sacerdote III*, 9 F.4th at 113 & n.71. Defendants therefore must conclusively demonstrate that a hypothetical prudent fiduciary "*would* have" retained the challenged investments—a difficult burden because "[c]ourts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363–65 (4th Cir. 2014) (quoting *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979)).

Cornell also must demonstrate that a prudent fiduciary who was advised in 2012 to promptly streamline and eliminate many redundant and underperforming investments would have waited until 2017 to begin the removal process. *See supra*, p.23. Plaintiffs' evidence shows that similarly situated CAPTRUST clients did so swiftly. P.Br. 47. Cornell cites no evidence favoring its approach, compelling reversal. The "how fast" question is not irrelevant, as Cornell asserts. Br.50. After making a considered decision that a streamlined lineup would financially benefit participants, delaying implementation undermines participants' interests and prolongs the harms of the prior inefficient structure. *See PBGC*, 712 F.3d at 717 ("A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.").

29

Defendants raise a host of factual disputes regarding fund characteristics, appropriate benchmarks, adjusted performance, and the magnitude and duration of underperformance. Cornell Br. 44–50. These "fact-intensive" questions are for the jury. *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994).

Plaintiffs' expert disputes Defendants' position on each of these points. A722–A733 ¶¶86–121; A1711–A1726 ¶¶26–61. Cornell claims the district court had discretion to give the opinions no weight, but cites no relevant authority. Br.47 n.14, 50. The district court "DENIED" Defendants' *Daubert* motion (SA47), rendering inapposite *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 310–11 (2d Cir. 2008). P.Br. 43. *Raskin* upheld exclusion of an expert on relevance grounds—"the report was probative of no material fact." *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997). The district court did not find Dominguez's testimony *irrelevant*. The ruling therefore was not "evidentiary in character." *Id.* Indeed, "ruling that [Dominguez's] opinions were irrelevant would have been an abuse of discretion, since [her] opinions" on fund removal "went to the heart of plaintiffs' claim." *George*, 641 F.3d at 799 n.10. Determining credibility and "weighing of the evidence" are "jury functions, not those of a judge." *Reeves*, 530 U.S. at 150.

Cornell contends "three to five years" of underperformance is irrelevant as a matter of law (Br.49), but the original source—involving events from two decades

30

ago—was discussing unrefuted evidence of one trustee's investment strategy, not a rule of law. *Jenkins v. Yager*, 444 F.3d 916, 921, 925–26 (7th Cir. 2006). Whether a prudent fiduciary would deem such sustained underperformance significant in today's market is a fact question. *Sweda*, 923 F.3d at 330 ("Practices change over time" and "ERISA fiduciaries have a duty to act prudently according to current practices"); *see also Sacerdote III*, 9 F.4th at 108–09 (cautioning against "overreliance" on practices deemed not imprudent in another case).

There is no merit to Cornell's assertion that Plaintiffs' arguments regarding a benchmark and 38 additional funds are "undeveloped." Br. 46 n.12, 49. Plaintiffs cited those two "reasons" as support for their "contention[]"—a fully developed seven-page argument—that causation is genuinely disputed. FRAP 28(a)(8)(A); P.Br. 42–48. The district court did not address the 38 funds individually (SA41–SA43), and Cornell suggests no reason greater detail is needed.

The prevalence of these funds among TIAA's other university clients does not satisfy Defendants' burden. Cornell Br. 47–48. Cornell contends it is "nonsensical" for Plaintiffs to point to evidence that over 600,000 defined contribution plans do not invest in CREF Stock or TIAA Real Estate. *Id.*; P.Br. 45. But the same could be said of Defendants' position. Of course TIAA's largest clients invest in TIAA's annuity products—that is exactly what makes them TIAA's largest clients—thus making it "nonsensical" and circular to rely on a list of TIAA's largest clients to

establish prudence. Courts wouldn't deem a pizza chain's retirement plan prudent as a matter of law simply because the fiduciaries retained the same number and type of investments as other pizza chains, if sophisticated financial experts in the broader economy had overwhelmingly rejected them, as they have here. P.Br. 45.

## B. The share-class claim is materially disputed (Count V)

Cornell concedes two key points: (1) it does not defend requiring a full-blown damages calculations to establish "some loss" for each fund (SA45–SA46), and (2) does not dispute that Plaintiffs presented evidence that institutional shares of the Plans' mutual funds charged lower fees than the Plans' retail shares (P.Br. 49), contrary to the district court's belief that "Plaintiffs present no evidence as to which additional funds had lower-cost options available" (SA46). Cornell identifies no basis for affirmance.

### 1. Cornell forfeited the "no breach" argument and has no evidence

Plaintiffs showed that TIAA offered institutional shares as of February 2009. SA44; A2377 ¶345. Cornell responded with zero evidence "that anyone at Cornell attempted to transition to the institutional share class funds before February 22, 2012." SA44. A prudent fiduciary would have had "no reason not to switch." *Id.* Fiduciaries have been found liable at trial based on similar proof. *Tibble*, 729 F.3d at 1138–39 (court had "little difficulty" finding a breach due to the "utter absence of evidence that Edison considered the possibility of institutional classes").

32

Cornell challenges these findings (Br.53), but it is too late. Although courts "may affirm a summary judgment on any ground" in the record, "the ground must have been adequately presented in the trial court so that the non-moving party had an opportunity to submit affidavits or other evidence and contest the issue." *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985); *FDIC v. Laguarta*, 939 F.2d 1231, 1240 (5th Cir. 1991) (same); *see also Tolbert*, 242 F.3d at 76–77 (same for Rule 50 motion); *Reeves*, 530 U.S. at 150 (Rule 50 standard same as Rule 56).

Below, Cornell argued only that a switch would not have produced a net fee reduction and TIAA would not allow it. A191. Cornell thus conceded it had no evidence that is "attempted to transition" sooner (SA44), but claimed this lack of diligence did not cause a loss. A191. The new argument was not preserved.

Cornell also mischaracterizes Mr. Bursic's testimony (Br.53), which did not involve attempting to "transition to" institutional shares which *actually existed* from 2009–2012. SA44. Bursic spoke with TIAA's President "back way before RPOC was founded," *i.e.*, "way before" 2011. DJA189 (36:6–22); DJA288. Fidelity had "introduced" share classes by then; TIAA had not. DJA190 (38:3–14). That is not evidence that TIAA refused a request to "transition to" the share classes that were later offered as of February 2009, the claim here. SA44. And Bursic's biased declaration is material that a court "must disregard" at summary judgment. *Reeves*, 530 U.S. at 151. It is also too vague to prove anything about the February

33

2009–February 2012 period. DJA284 ¶¶6–7.

Cornell contends that a new contract with TIAA in 2012 "achieved the same outcome" as changing to lower-cost share classes. Br.54. It did not. The alternative route still caused the Plans to incur unnecessary fees and lost investment opportunity for part of the class period, losses not fully reimbursed with the 2012 arrangement. SA45. A prudent fiduciary would have monitored the availability of institutional shares and switched immediately once they became available. A703 (¶46); SA44; *Tibble v. Edison Int'l*, 2017 WL 3523737, at *12–13 (C.D. Cal. Aug. 16, 2017) ("[A] prudent fiduciary would know immediately that a switch is necessary."). Disputes of fact remain regarding Cornell's prudence before the 2012 contract. SA45.

### 2. Cornell's loss arguments are waived or meritless

Cornell's argument (Br.54–55) that Plaintiffs did not provide evidence that the Plans met the $2 million eligibility threshold is also unpreserved. *Tolbert*, 242 F.3d at 76–77. Cornell's "eligibility" argument below was that "TIAA did not permit" institutional shares in *any* plan in 2010. Mem. 22 (Doc. 233); Reply 10 (Doc. 312). If that were accurate, a $2 million threshold would be irrelevant—even $2 *trillion* would not be enough. But Cornell had "no evidence that the Plans could not have transitioned" in 2010. SA45.

Accordingly, the $2 million requirement cited by the district court is a different

issue. SA46. Cornell never asserted that the Plans did not meet the threshold, nor could it. Cornell still does not actually *dispute* that the Plans met the requirement—it argues only that Plaintiffs should have cited more evidence in response to Cornell's non-existent argument. Br.55.

In any event, Plaintiffs *did* submit evidence that 11 other TIAA funds met the threshold. P.Br. 49. Plaintiffs did not omit the evidence from the Rule 56.1 statement as Cornell asserts. Br.55. The evidence was cited in paragraphs 345–349 of the Rule 56.1 statement, which the district court *cited* in the order. SA44–SA45. This includes paragraph 346 (SA45), which clearly shows that "[t]he Plans had over $2 million" invested in 11 TIAA mutual funds by year-end 2009. A2378 ¶346 & n.1473 (citing A254–A260, cited at P.Br. 59). *Why* the district court found this insufficient to show that "Cornell had over $2 million invested in these funds" is a mystery (SA46), and highlights the problem with a "notice-free, *sua sponte* entry of summary judgment." *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 524 (2d Cir. 2018). That was "reversible error," *id.*, and Plaintiffs waived no objection, *see infra*, Part II.D.

Cornell's citation of how many TIAA clients used institutional shares in *2009* (Br.55–56) is "no evidence that the Plans could not have transitioned to institutional shares in 2010." SA45. The declaration is more notable for what it does *not* say: either that Cornell asked in 2009 or that TIAA said "no." As one of

TIAA's largest clients, TIAA surely would have agreed if Cornell tried to make the switch, as a prudent fiduciary would have done. A703 (¶46); *Tibble*, 2017 WL 3523737, at *12. And the declaration's omission of data from later years is glaring; a jury could disregard as not credible this incomplete and selective presentation. *Reeves*, 530 U.S. at 151.

## C.     The recordkeeping claim is materially disputed (Count III)

### 1.     Cornell's process was flawed

Cornell's challenge to the district court's finding of material disputes regarding Cornell's prudence should be quickly dispatched. SA20.

#### a.     ERISA requires reasonableness

ERISA requires "administrative costs" to be "'reasonable.'" *George*, 641 F.3d at 789 (quoting 29 U.S.C. §1104(a)(1)); *Snyder*, 572 F.2d at 900. To determine reasonableness, fiduciaries must "understand and monitor plan expenses," and "should be vigilant in 'negotiation of the specific formula and methodology'" used to pay recordkeepers. *Sweda*, 923 F.3d at 328 (quoting DOL Advisory Op. 2013-03A, 2013 WL 3546834, at *4 (July 3, 2013)).

Courts have entered judgment against fiduciaries based on failures to "monitor and control" asset-based "recordkeeping fees." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1106, 1132–34 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021); *Moitoso*, 451 F. Supp. 3d at

213–14, 218 ("[Given] the importance of the duty to monitor, it was imprudent for the Plan Fiduciaries to fail to monitor recordkeeping expenses.").

In *Tussey*, plan fiduciaries were held liable for failing to "calculate the amount the Plan was paying Fidelity through revenue sharing," to "determine whether Fidelity's pricing was competitive," and to "leverage the Plan's size to reduce fees." 746 F.3d at 336. *Ramos* reached the same conclusion based on a lack of competitive bids and the absence of a "thorough process for evaluating" whether "the amounts paid to Fidelity" were reasonable compared "to the actual costs of administering the Plan." 461 F. Supp. 3d at 1106, 1133–34. In *George*, evidence of a "failure to solicit bids" when a prudent fiduciary would have done so precluded summary judgment. *George*, 641 F.3d at 798–799. The defendant's reliance on a consultant's advice did not establish prudence as a matter of law. *Id*. at 799–800.

### b. Cornell breached its duty

To fulfill the fiduciary duty regarding plan expenses:

> [T]he responsible plan fiduciaries must assure that the compensation the plan pays directly or indirectly to Principal for services is reasonable, taking into account the services provided to the plan as well as all fees or compensation received by Principal in connection with the investment of plan assets, *including any revenue sharing*.

DOL Advisory Op. 2013-03A, 2013 WL 3546834, at *3 (emphasis added).

Mr. Bursic, Cornell's Senior Director of Benefits until 2016 (A1045–A1047 (24:10–26:15)), admits Cornell had no idea how much the Plans' recordkeepers

were paid until 2012. A780 ¶61; A1062–A1069 (92:7–95:14, 99:2–102:1). The recordkeepers received asset-based revenue sharing payments from the expense ratios of the Plans' investments, which paid for both investment management and recordkeeping. SA13; A781 ¶63. Until CAPTRUST "pull[ed] the veil off," Cornell knew only the "total" expense ratios. A1063–A1064, A1067 (93:21–94:9, 100:5–9). Cornell did not "split[] out" the "components" to determine what portion of the total was attributable to recordkeeping. A1065, A1067 (95:5–17, 100:13–22) ("The fee is the fee. We didn't know what it was before."). Cornell did not know what "revenue sharing" meant until CAPTRUST introduced the term. A1065 (95:21–25). Cornell also did not know the recordkeepers' actual costs of administration. A1062 (92:7–17).

Without knowing *how much* the Plans were paying TIAA or Fidelity—or even what revenue sharing meant—Cornell could not fulfill its duty to "assure that the compensation" paid to TIAA and Fidelity, "including any revenue sharing," "[was] reasonable" for the services provided. DOL Advisory Op. 2013-03A, 2013 WL 3546834, at *3. The jury could easily find that Cornell acted imprudently by failing to have any process to even calculate the Plans' fees, let alone to determine whether they were reasonably related to the services provided and costs of administration. *Tussey*, 746 F.3d at 336; *Ramos*, 461 F. Supp. 3d at 1106, 1133–34.

As a matter of law, it was imprudent to look only at total expense ratios

38

without assessing the underlying components. *Snyder*, 572 F.2d at 900–01

("[T]here is no reasonable basis on which it could be found that a payment that

fully compensates for two separate services can be supposed to be no more than a

reasonable compensation for each service taken separately."); *Tussey v. ABB, Inc.*,

2012 WL 1113291, at *16 (W.D. Mo. Mar. 31, 2012), *aff'd in relevant part,* 746

F.3d 327 (8th Cir. 2014) (reviewing total expense ratios only was imprudent). Even

Cornell's expert acknowledges the "importan[ce]" of "separat[ing] the

recordkeeping costs from the total investment fee costs" to assess the

recordkeeping component. A891 (92:4–11). Looking at fees "only on an all-in

basis" is imprudent because a fiduciary needs "to be able to understand the fees

both from a recordkeeping and an investment perspective." A914 (174:11–23).

Plaintiffs' experts agree. A771 ¶¶36–37; A841 ¶126.

Cornell (Br.19) cites a sham affidavit to contradict Bursic's repeated and

unequivocal insistence that he "didn't know" the fee components, but this it cannot

do. *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014). The cited

materials say nothing about the "administrative fee component" in any event.

After CAPTRUST was hired, CAPTRUST did not actively negotiate for lower

fees from TIAA or Fidelity, contrary to prudent fiduciary practice. A780–A781

¶¶61–62. Cornell blindly relied on CAPTRUST's "assurances that this is a good

deal"; no Committee member took steps to verify if the deal was good nor to

determine how CAPTRUST was "conducting those negotiations." A1051–A1053 (52:16–54:13), A1086 (119:1–13).

Because a plan's participant count is the primary driver of recordkeeping costs, a standard fiduciary practice is to review how much the plan is paying on a per-participant basis rather than as a percentage of assets. A766–A767 ¶¶20–21, A781–A782 ¶63. This shows whether the fee is reasonable relative to the costs of administration. A781–A782 ¶63. Defendants never evaluated reasonableness on a per-participant basis. *Id*. On the sole occasion Cornell received per-participant pricing information, it never questioned why TIAA, at $214/participant, was receiving double Fidelity's $112/participant rate for the same services. A782 ¶64.

Cornell mischaracterizes this as an allegation that it was *per se* imprudent to use asset-based fees instead of *negotiating* "fixed-rate recordkeeping fees," but that is a distinct issue. Br.17–18. A prudent fiduciary would at least investigate the issue, but Bursic had "*no idea*" if fixed fees were even available "*and no desire to find out.*" A1084–A1085 (117:15–118:6).

If a fiduciary *does* negotiate a fixed rate, determining a per-participant figure for *monitoring* purposes becomes moot, which is why Cornell's expert endorses per-participant pricing. P.Br. 11–12; A911–A916 (170:9–171:22, 173:4–174:10, 181:4–182:1). But when a fiduciary negotiates a percentage fee while never converting it to a per-participant figure for monitoring purposes—as here, *Tussey*,

and *Ramos*—it cannot assess reasonableness relative to costs and per-participant market rates. A781–A782 ¶63; *see* A72 ¶57.

Prudent fiduciaries also use a market-based process such as competitive bidding at regular intervals to determine if fees remain reasonable. A769, A771–A772 ¶¶28–29, 38–40. Cornell never obtained bids or used other methods to assess market pricing. A784–A785 ¶¶71–73; A1048–A1050 (44:7–23, 50:23–51:2). Bursic thought obtaining bids "would be a crazy idea." A1048 (44:18–20).

Cornell's contention (Br.18–19) that ERISA does not contain a *per se* competitive bidding requirement misunderstands the duty of prudence. "If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose." *Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996). Whether a prudent fiduciary would have obtained bids under the circumstances is a question of fact, not law, and Plaintiffs' evidence shows that a prudent fiduciary would have sought bids at some point during the class period, precluding summary judgment. *George*, 641 F.3d at 798–99; A769, A771–A772 ¶¶28–29, 38–40. While Cornell claims to have used other benchmarking methods (Br.18–19), Bursic testified otherwise. A1050 (51:3–14) ("I can't imagine what you're talking about.").

Cornell claims that following these practices would have done no good because TIAA and Fidelity had an iron-clad policy of refusing to negotiate. Br. 16–17. That

41

assertion is implausible on its face and a jury would be free to disregard it. If Cornell put the Plans' services out to competitive bidding, TIAA and Fidelity would have negotiated to avoid losing a premier client and one of the largest plans in the country. Cornell again relies on Bursic's conversation with TIAA's President "way before" 2011, *i.e.*, likely before the class period. DJA189 (36:6–22). Bursic's testimony that TIAA and Fidelity immediately "leaped" to lower their fees once CAPTRUST broached the subject further undermines Cornell's position and shows the Plans' loss from Cornell's failure to act sooner. A1067–A1068 (100:17–101:9).

Another industry standard practice is moving to a single recordkeeper. A777–A778 ¶¶52–56. Despite repeatedly being informed by CAPTRUST and others of the benefits of using a single recordkeeper, Cornell never even asked TIAA for a quote. P.Br. 56–57; A786 ¶¶74–75; A272, A1332, A2513; A1214–A1215 (200:15–201:22). Cornell disputes feasibility (Br.13–16), but that goes to causation, and is contradicted by the evidence just cited. Unlike Cornell, a prudent fiduciary at least would have investigated the matter.

In short, a jury would have little difficulty finding that Cornell failed to act with the "care, skill, prudence, and diligence" that it owed participants. 29 U.S.C. §1104(a)(1)(B).

## 2.    Plaintiffs' evidence establishes loss

Cornell relies on a non-ERISA case to propose a "factually similar comparators" standard. Br. 21. The Court need not look to other areas of law; the seminal ERISA case on the measure of loss is *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985). Determining loss requires comparing "what the Plan actually earned" and what it "would have earned" but for the breach. *Id.* at 1056; *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989). If a loss occurred, the Court proceeds to damages: if "several alternative" measures are "equally plausible, the court should presume that the funds would have been used in the most profitable of these." *Bierwirth*, 754 F.2d at 1056 (emphasis added). "The burden of proving that the funds would have earned less than that amount is on the fiduciaries." *Id.*

"[I]t is a mistake to argue," as Cornell does, that an "apples-to-oranges comparison" cannot show loss. *Tussey v. ABB, Inc.*, 850 F.3d 951, 960 (8th Cir. 2017). If a fiduciary imprudently makes a risky investment when the prudent decision would have been a conservative one, it would make little sense to measure loss by a similarly risky fund—the very basis of the breach. The dissimilar conservative fund shows what the plan would have earned *but for* the breach.

*Brotherston*, cited with approval in *Sacerdote III*, held that it was "reasonable to compare" a plan's active funds to passive "index" funds "to determine whether

43

there was a loss." 907 F.3d at 34. Even though the funds are dissimilar in that active funds try to "pick winners and losers" while index funds do not, the loss measure was consistent with the plaintiffs' theory that a prudent fiduciary would have used index funds. *Id*. at 31–34. The index funds thus provided a reasonable estimate of what the plan would have earned if it "had been properly administered." *Id.* at 32 (quoting Restatement (Third) of Trusts, §100). Putnam's arguments that the particular benchmarks were not "suitable" or "plausible" were questions of fact—not grounds for finding no loss "as a matter of law." *Id*. at 34.

According, Cornell's argument about factual dissimilarities goes to its burden of showing that a higher-earning measure is less "plausible" than another measure, *Bierwirth*, 754 F.2d at 1056, a question of fact, not the threshold loss showing.

*Sacerdote* provides additional guidance, having rejected the district court's "no-loss" findings regarding recordkeeping fees. *Sacerdote III*, 9 F.4th at 111–14. The district court "made no explicit findings about why plaintiffs had failed to prove loss." *Id*. at 111. Instead of analyzing what the plan "would have earned" with a prudent alternative, the court found the plaintiffs' failure to establish that fees cited by their expert "were the only plausible or prudent ones" amounted to a failure to prove "damages," which conflated distinct concepts and misallocated the burden of proof. *Id.* at 112.

The court here made similar errors. It made no explicit findings as to whether

Plaintiffs' evidence showed that the Plans "would have earned" more by investing in institutional shares, instead requiring *damages* calculations for each retail-class fund. P.Br. 48–50; SA45–SA46. That misapprehension of what Plaintiffs had to prove also caused the court to wrongly reject Plaintiffs' experts and to conclude that other loss evidence was not even "relevant." P.Br. 50–57; SA22, SA27–30.

In light of *Sacerdote* clarifying the law in this area, the Court should vacate the order excluding Plaintiffs' experts and remand for further consideration under the correct standard. The Rule 702 "test of reliability is 'flexible'" and necessarily depends on the purpose and subject of the testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150–51 (1999). Assuming *arguendo* the opinions lacked sufficient reliability as a basis for calculating *damages*, it does not follow that the opinions necessarily lack reliability for purposes of the more basic question of providing some evidence that the Plans "would have earned" more but for Cornell's imprudence.

Regardless, the record satisfies Plaintiffs' burden on the loss element. Plaintiffs can make a *prima facie* showing that the Plans would have earned more by identifying a "prudent alternative"—a lower level of fees "that it would have been prudent to pay." *Sacerdote III*, 9 F.4th at 113. It would have been prudent to pay the $30–$45 rates cited by Plaintiffs' experts. P.Br. 13; A789 ¶81; A852 ¶158. It also would have been prudent to pay the rates of prudently managed plans cited by

45

Plaintiffs' experts, such as Harvard ($34/participant) and Caltech ($37/participant). A790–A791 ¶¶85–89; A845–A851 ¶¶143–156. Rates paid by other TIAA and CAPTRUST clients and other data in the record also demonstrate potentially prudent fees. P.Br. 54–57; A964–A987 (279:14–302:20), A989–A992 (305:1–308:5); A2301–A2303 ¶¶189–191; A2496.

Cornell raises various objections and disputes Plaintiffs' interpretations of what the data show (Br. 24–27), but those are factual disputes that go to Cornell's burden of proving "that there is some price higher than [$X] that it would have been prudent to pay." *Sacerdote III*, 9 F.4th at 114; *Bierwirth*, 754 F.2d at 1056; *Brotherston*, 907 F.3d at 34. Those objections are inadequate to disprove loss as a matter of law.

Even if Cornell's objections to certain data were valid, it has no valid objection to evidence of the steep decline in the Plans' fees once CAPTRUST approached TIAA and Fidelity. A343–A345 (TIAA fee reduction from $214/participant to $112 and Fidelity from $145/participant to $58). In Bursic's words, TIAA and Fidelity "leaped" to immediately lower their fees. A1067–A1068 (100:17–101:9). This supports a reasonable inference that the Plans would have earned more had Cornell fulfilled its duty to seek outside assistance by the outset of the class period. Cornell cannot dispute that the Plans are "factually similar comparators." Br.21. Although Cornell claims that TIAA and Fidelity refused to negotiate sooner, its

only evidence is from an interested witness from a time "way before" 2011. *See supra*, p. 42.

Plaintiffs are not using fee reductions to prove Cornell's "imprudence." Cornell Br. 27–28. Cornell's imprudence is shown by the evidence in the previous section. If Plaintiffs fail to prove a breach, loss is moot. *See Sacerdote III*, 9 F.4th at 119 n.101. But if Plaintiffs prove Cornell's imprudence, Cornell would have no grounds to complain about Plaintiffs using the evidence available to them for loss purposes. To hold otherwise would inequitably "deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000). That is particularly so because the difficulty in proving a reasonable fee for the Plans arises from the very fact that Cornell never obtained competitive bids. Thus, allowing Plaintiffs to use the fee-reduction evidence serves Congress' goal of providing meaningful remedies for breaches of fiduciary duty. *See Bierwirth*, 754 F.2d at 1055.

### 3. Plaintiffs' prayer for equitable relief compels reversal

Cornell concedes that its motion omitted non-monetary relief. Br.29–31.

Cornell's argument for abuse-of-discretion review relies on an inapposite case involving a finding of *non-waiver*. *Brown v. City of N.Y.*, 862 F.3d 182, 187–89 (2d Cir. 2017). Here, "whether the plaintiffs' actions constituted an abandonment

47

of their disgorgement claim against the sellers is a question of law, which is subject to *de novo* review." *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 623 (2d Cir. 2006); *Jackson v. Fed. Exp.*, 766 F.3d 189, 193–94, 196 (2d Cir. 2014) (reviewing summary judgment *de novo* including inference of abandonment).

Even if abuse-of-discretion applied, it occurred here. *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (abuses include legal errors). As a matter of law, Plaintiffs had no obligation to address an issue on which Cornell had not met its initial burden under Rule 56. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Cornell suggests an illusory distinction; contrary to Cornell's belief, *Adickes* involved a summary judgment motion—a motion "directly at odds with" the plaintiff's claim. Br. 30. Nevertheless, the failure to respond with proof on a critical issue was not a failure to preserve the claim, because the movant had not met its burden. *Adickes*, 398 U.S. at 161. And unlike *Vermont Teddy Bear*, the plaintiff had "counsel." *Id*. The abandonment ruling violates *Adickes*.

Because Cornell had the initial burden, the case for finding forfeiture by *Cornell* was much stronger than as against Plaintiffs. Arbitrarily finding abandonment by Plaintiffs only was a second abuse. *See United States v. Kelley*, 551 F.3d 171, 175 (2d Cir. 2009).

Cornell contends abandonment can be inferred because "Plaintiffs did not respond that they were entitled to seek non-monetary relief notwithstanding

48

Cornell's arguments on loss." Br. 30. That is a non-sequitur. Non-monetary relief remains available "*even if no losses have been established*." *Liss v. Smith*, 991 F. Supp. 278, 312 (S.D.N.Y. 1998) (emphasis added). Responding with arguments about non-monetary relief therefore would have been an irrelevant waste of pages needed to address the issues actually raised. *If* Cornell had argued Plaintiffs could obtain *no remedy*, an abandonment finding might have been justified. But Cornell chose to exclusively argue damages. SJ Mem. 11–14 (Doc. 233).

Although "Cornell sought summary judgment in its favor on 'all claims'" (Br.30), Plaintiffs *opposed* the motion on all claims, stating without qualification: "the Court *must deny Cornell's motion for summary judgment*" in its entirety. Opp. 25 (Doc. 286) (emphasis added). Plaintiffs also disputed virtually all of Cornell's 118 "fact" statements. A2071–A2260. There is no basis to infer that Plaintiffs intended not to pursue all remedies on Count III. If summary judgment had been denied, no one would have thought Plaintiffs were barred from requesting non-monetary relief at trial based on their summary judgment briefing.

Cornell cites *Jackson*, but ignores its facts. Br.30. In contrast to Plaintiffs' full-throated opposition, Ms. Jackson asserted that summary judgment should be denied as to "*one* of [appellant's] claims: Title VII retaliation." 766 F.3d at 193 (emphasis added). She disputed only 13 and "explicitly admitted 111" of 124 undisputed facts, admitting "numerous matters undermining" her four non-

49

retaliation claims. *Id.* at 192–93. And "[e]ven a cursory examination of the record" showed FedEx's entitlement to summary judgment on the non-retaliation claims. *Id.* at 197. Thus, the "abandonment" was based upon failing to dispute issues on which FedEx *had met its burden*—not issues omitted from the motion.

If courts could find abandonment as to "grounds not raised by a party," Rule 56(f)'s "notice" requirement would be meaningless. Fed.R.Civ.P. 56(f)(2) (SA142); P.Br. 59. "A notice-free, *sua sponte* entry of summary judgment is 'firmly discouraged'" and "almost always reversible error." *ING*, 892 F.3d at 524. It was reversible error here, and an independent basis for reversal. P.Br. 59.

### D.    Plaintiffs waived no objection to *sua sponte* rulings (Counts III, V)

Cornell's argument that Plaintiffs had to move for reconsideration of the *sua sponte* rulings cites only out-of-circuit authority. Br.31, 55 n.18. In this circuit and under S.D.N.Y. Local Rule 6.3, motions to reconsider are *not* to be used as "a substitute for an appeal." *Schwan-Stabilo Cosms. GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 35 (2d Cir. 2005). This appears in many S.D.N.Y. decisions spanning decades.[17] Its judges "have repeatedly been forced to warn counsel" *not* to seek reconsideration merely because "a party does not like the way the original motion was resolved," *Jimenez v. City of New York*, 166 F. Supp. 3d 426, 429

---

[17] *E.g.*, *Rankins v. United States*, 366 F. Supp. 3d 634, 636–37 (S.D.N.Y. 2019); *United States v. ASCAP*, 323 F. Supp. 2d 588, 590 n.1 (S.D.N.Y. 2004).

(S.D.N.Y. 2016), or "to reargue points on which the Court and the movant disagree," *Lopez v. City of New York*, 901 F. Supp. 684, 694 (S.D.N.Y. 1995).

Plaintiffs sought reconsideration on a *different* issue based on new evidence—a rare circumstance in which reconsideration is appropriate. Doc. 387 at 5 & n.1; *Weissman v. Fruchtman*, 658 F. Supp. 547, 548 (S.D.N.Y. 1987) (reconsideration proper "when new facts come to light" or "controlling precedents were overlooked"). Plaintiffs were not obligated to include additional issues not meeting those criteria. The court's *sua sponte* rulings *misapplied* but did not overlook precedent. P.Br. 49–50, 59; SA22–SA23, SA45–SA46. The court overlooked share-class evidence (P.Br. 48-49), but that alone would not have "alter[ed] the conclusion" in light of the court's separate error in requiring damages calculations. *Van Buskirk v. United Grp. of Companies, Inc.*, 935 F.3d 49, 54 (2d Cir. 2019).

Cornell's proposal would unfairly disadvantage appellants. Whereas summary judgment is reviewed *de novo*, "[d]enials of motions for reconsideration are reviewed only for abuse of discretion" and "rare[ly]" granted. *Id.* at 53–54. A reconsideration prerequisite would anomalously create more deferential review when a court *violates* Rule 56(f) than when it follows the required procedures.

## III. Defendants fail to justify the class period ending date

Defendants do not dispute that the unexplained 2016 ending date was an abuse of discretion. P.Br. 62. The class as currently defined may prevent complete relief

because the challenged conduct continued beyond August 2016, and employees who later joined the Plans would be excluded from any recovery.

A failsafe definition incorporates elements of liability, meaning "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment," *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015). For example: "all participants harmed by Defendants' breaches." If a jury finds no breach or no harm, the class would have no members. In contrast, all members of any revised class for the remanded claims would be bound by the judgment on those claims, win or lose. Defendants waived any argument for an expanded class for any affirmed claims by not raising the point in their cross-appeal. *Jenkins v. City of New York*, 478 F.3d 76, 86 n.6 (2d Cir. 2007).

The issue is ripe. Law-of-the-case doctrine precludes raising it on remand. *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997). Rule 23(c) is not a vehicle for relitigating errors. *Medical Society of N.Y. v. UnitedHealth Group Inc.*, 2021 WL 4263717, at *1 (S.D.N.Y. Sept. 20, 2021)*; see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 n.9 (2013).

## CROSS-APPEAL RESPONSE

## I.    Summary of the Argument

An action for damages against a fiduciary is a legal remedy in the form of legal restitution, as distinguished from equitable restitution, which concerns specific

52

funds in a defendant's possession. ERISA provides for recovery of plan "losses" and is not limited to equitable remedies. Plaintiffs seek to recover the Plans' losses in a money judgment, not to recover funds in Defendants' possession. Thus, Plaintiffs are seeking a legal remedy and are entitled to a jury trial.

## II.    Standard of Review

Review is *de novo*. *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005). The Seventh Amendment preserves the right to a jury trial in "suits at common law." U.S. Const., amend. VII. The Court uses a two step-test that considers (1) "whether the action would have been deemed legal or equitable in 18th century England," and (2) whether "the remedy sought" is "legal or equitable in nature." *Pereira*, 413 F.3d at 337 (citing *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42 (1989)). The second factor receives "greater weight" and is "more important." *Id*.

## III.    Argument: Plaintiffs have a Seventh Amendment right to a jury trial because they seek money damages, the classic form of legal relief.

*Pereira* controls here. A bankruptcy trustee brought breach of fiduciary duty claims against a corporate debtor's officers and directors. The district court denied defendants' request for a jury trial and found after a bench trial that defendants breached their fiduciary duties. 413 F.3d at 333.

This Court reversed. Although *Granfinanciera*'s first step weighed against a jury trial, *id*. at 337–39, the "more important" second step entitled defendants to a jury trial on claims for money damages, *id*. at 339–41. The district court

mistakenly characterized damages as "equitable restitution." *Id.* at 339. Because the defendants did not possess the funds at issue, the trustee sought nothing more than "'compensatory damages' … the classic form of *legal* relief." *Id.*

Although earlier cases had "characterized as equitable the monetary relief sought by plaintiff for defendant's alleged breach of fiduciary duty even though the defendant did not actually *possess* the funds in question," the decision in *Great–West Life & Annuity Insurance Company v. Knudson,* 534 U.S. 204 (2002) "reconfigured the legal landscape of restitution." *Pereira*, 413 F.3d at 339–40. *Great-West* held that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property *in the defendant's possession.*" *Id.* at 340 (quoting *Great-West*, 534 U.S. at 214) (emphasis by *Pereira*). The fact that the trustee did not seek to recover an "unjust gain," but instead to recover the corporation's loss, confirmed that the trustee sought "compensatory damages—a legal claim" entitling defendants to a jury trial. *Id*. at 340–41.

Defendants contend *Cigna Corp. v. Amara*, 563 U.S. 421 (2011) and *N.Y. State Psychiatric Association (NYSPA) v. UnitedHealth Group*, 798 F.3d 125 (2d Cir. 2015), abrogated *Pereira* by characterizing monetary relief against a fiduciary as an equitable "surcharge." *Amara* and *NYSPA* are inapposite because they involved claims under 29 U.S.C. §1132(a)(3), which authorizes only an injunction or "other

appropriate equitable relief." *Amara*, 563 U.S. at 438. Plaintiffs bring suit under §1132(a)(2), which incorporates the broader remedies in §1109(a). Section 1109(a) is not limited to equitable relief, does not mention "surcharge," and includes the traditional legal remedy of "losses to the plan." 29 U.S.C. §1109(a) (SA140).

Interpreting §1109(a) as authorizing equitable remedies only would do violence to its text. While courts look to trust law to interpret ERISA, "trust law does not tell the entire story." *Varity*, 516 U.S. at 497. ERISA "partly reflect[s] a congressional determination that the common law of trusts did not offer completely satisfactory protection." *Id.* Trust law does not determine the outcome when "the language of the statute, its structure, or its purposes require departing from common-law trust requirements." *Id.*

The language of §1109(a) requires such a departure. After setting out two specific remedies—"losses to the plan" and a fiduciary's "profits"—it authorizes "such other equitable *or remedial relief* as the court may deem appropriate, including removal of such fiduciary." *Id.* (emphasis added). If §1109(a) were limited solely to equitable relief, the statute's reference to "remedial relief" would be meaningless. Remedial relief must be non-equitable or it would be surplusage. "Equitable" relief on its own (as in §1132(a)(3)) cannot mean "all relief available for breach of trust at common law" because that would "deprive of all meaning the distinction Congress drew between 'equitable' and 'remedial' relief in §409(a)

55

[§1109(a)]." *Mertens v. Hewitt Assocs.* 508 U.S. 248, 258 (1993). Likewise, an action under §1132(a)(2) cannot be limited to only equitable remedies without obliterating its distinction from §1132(a)(3).

After *Amara* and *NYSPA*, the Supreme Court reiterated that equitable relief concerns "specifically identifiable funds" in a defendant's possession. *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Ben. Plan*, 577 U.S. 136, 144 (2016). That definition "remains unchanged" after *Amara*. *Id.* at 148 n.3. *Montanile* squarely rejected the argument that *Amara* had "all but overruled" *Great-West*, confirming that *Amara*'s discussion of equitable relief was "not essential to resolving that case." *Id*. *Montanile* thus confirmed Justice Scalia's observation in *Amara* that the Court's discussion of equitable relief was "*purely dicta*" and not binding. *Amara*, 563 U.S. at 449 (Scalia, J., concurring, emphasis added). Accordingly, *Great-West* and *Pereira* remain good law and control here.

*Montanile* reaffirmed that monetary relief is equitable only when the plaintiff can clearly identify particular funds in the defendant's possession that in good conscience belong to the plaintiff. *Id.* at 143 (citing *Great-West*, 534 U.S. at 213). When a court—even in equity—awards money from a defendant's general assets, "the rights of the parties are *strictly legal* and the final remedy granted is of the kind which might be conferred by a *court of law*." *Id*. at 148–49 (emphasis added). Thus, *Montanile* reaffirms that claims for "monetary relief for all losses [a] plan

sustained as a result of [an] alleged breach of fiduciary duty" seek "nothing other than compensatory *damages*"—a "classic form of *legal* relief." *Mertens*, 508 U.S. at 255 (emphasis in original).

Here, Plaintiffs seek damages in an amount that would "make good to the Plans all losses … resulting from each breach of fiduciary duty." A185. Plaintiffs seek this recovery under §1109(a), which holds errant fiduciaries "personally liable" for "compensatory damages," *i.e.*, "legal relief." *Mertens*, 508 U.S. at 252, 255. Plaintiffs are not seeking to recover "specifically identifiable funds" in the possession or control of Cornell or CAPTRUST. *Cf. Montanile*, 577 U.S. at 144. The administrative and investment-related fees at issue in Counts III–V were paid to third parties, TIAA and Fidelity. A110–A113 ¶¶129, 133–39, 141; A115–A124 ¶¶148, A129–A131 ¶¶163–64, A146 ¶184, A154 ¶198; A185.

Because the fee payments are not in Defendants' possession, Plaintiffs can only recover from Defendants' general assets. Such a recovery is "a *legal* remedy, not an equitable one." *Montanile*, 577 U.S. at 145–46 (emphasis in original). Plaintiffs "seek no more than compensation for loss resulting from the defendant's breach of legal duty[.]" *Great-West*, 534 U.S. at 210 (citation omitted). They seek "to obtain a judgment imposing merely a personal liability upon the defendant to pay a sum of money[.]" *Id.* at 213 (citation omitted). They thus seek legal, not equitable, remedies. *Pereira*, 413 F.3d at 341. Because the nature of the remedy sought is the

57

"more important" step and entitled to "greater weight," Plaintiffs are entitled to a jury trial on their claims for monetary relief. *Id*. at 339–41. Plaintiffs' request for certain equitable remedies does not negate their right to a jury trial on legal claims. *Brown v. Sandimo Materials*, 250 F.3d 120, 127 (2d Cir. 2001) (citing *Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974)).

Even if §1109(a) claims for plan losses were generally equitable claims (which they are not), when the trustee has an immediate and unconditional duty to make payment, the beneficiary has an "action at law." Restatement (Second) of Trusts §198(1) (1959). Class members who are now retired may have closed Plan accounts that suffered losses during the class period. *See, e.g.*, A56 ¶21. Those members would be entitled to a share of any monetary recovery. Whereas money paid to the Plans pursuant to §1109(a) would simply be allocated to active accounts, former-participant class members who no longer have accounts would have an immediate and unconditional right of payment from Defendants, a legal remedy. *Dixon v. Nw. Nat'l Bank of Minneapolis*, 297 F. Supp. 485, 488–89 (D. Minn. 1969) (pre-ERISA case holding that beneficiaries who had "terminated their employment" and "ceased their participation in the trust" had right to a jury trial because any "monetary judgment" in their favor would trigger the trustee's "duty to pay the beneficiaries immediately and unconditionally"). Accordingly, even if current participants did not otherwise have the right to a jury, the former

58

participants do, which must extend to the entire class to prevent potentially inconsistent adjudications.

## CONCLUSION

The Court should affirm Plaintiffs' right to a jury trial for claims seeking recovery of "losses to the Plans." DJSA10, DJSA16. The Court should otherwise vacate the judgment and remand for further proceedings.

September 27, 2021          Respectfully submitted,

        /s/ Sean E. Soyars
        Jerome J. Schlichter
        Sean E. Soyars
        Heather Lea
        Joel D. Rohlf
        SCHLICHTER BOGARD & DENTON LLP
        100 S. Fourth Street, Suite 1200
        St. Louis, Missouri 63102
        (314) 621-6115

        *Counsel for Plaintiffs-Appellants / Cross-Appellees*

# CERTIFICATE OF COMPLIANCE

1. I certify that this brief contains 13,999 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f) and thus complies with the type-volume limitation of Fed.R.App.P. 28.1(e)(2)(A) and Local Rule 28.1.1(a).

2. I certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Times New Roman 14 point font.

s/ Sean E. Soyars
Sean E. Soyars
Counsel for Plaintiffs-Appellants / Cross-Appellees
September 27, 2021

## CERTIFICATE OF SERVICE

On September 27, 2021, I electronically filed this Brief with the Clerk of the

Court for the United States Court of Appeals for the Second Circuit by using the

appellate CM/ECF system. I further certify that all counsel of record are Filing

Users and are served electronically by the Notice of Docket Activity.

s/ Sean E. Soyars
Sean E. Soyars
Counsel for Plaintiffs-Appellants / Cross-
Appellees
September 27, 2021